## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO, ) ) ) ) ) ) ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 3:02CV-1916 JBA |
| ) | |
| MAYTAG CORPORATION, ) | January 30, 2004 |
| ) | |
| Defendant. ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MAYTAG CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Maytag Corporation ("Maytag") submits the following memorandum of law in support of its Motion for Summary Judgment. The plaintiff has no evidence that the refrigerator in this case was defectively designed or manufactured or that it contained a defect at the time it left Maytag's possession some five years before the November 13, 2000 fire that forms the basis for this products liability case.

Even if the plaintiff's purported experts Peter S. Vallas and Frank Watkinson, Ph.D. are permitted to testify[1], neither will testify that the refrigerator was defectively designed, and no one will testify that it lacked adequate warnings which rendered it unreasonably dangerous. Instead, the plaintiff will rely on testimony that an unidentified defect in the refrigerator caused the fire in this case. With no evidence that this unidentified defect existed at the time the refrigerator was sold by Maytag, the plaintiff's claims cannot survive summary judgment.

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

---

[1] See accompanying motions to bar their testimony.

## I.    BACKGROUND

1.    This is a subrogation action arising out of a fire which occurred at the home of Norberto and Maria Claro, 35 Edgewood Avenue, Waterbury, CT on November 13, 2000.   (See, Complaint at ¶7, attached as Exhibit A).   At the time of the fire, Mrs. Claro was cooking dinner on the stove.   She claims that when she opened the refrigerator to get some milk, she saw black smoke inside. She called her husband into the kitchen and when he opened the freezer side of the refrigerator, there were flames.   Thereafter, Mrs. Claro called 9-1-1 to report the fire.   While she was doing that, Mr. Claro tried to push the refrigerator out the back door but it got stuck in the doorway leading from the kitchen to the rear hallway.   Thereafter, the Claro family evacuated the house and the Waterbury Fire Department arrived and extinguished the fire.   The refrigerator was purchased four or five years prior to the date of the fire.   (See, Plaintiff's Answer to Interrogatories, No. 20, attached hereto as Exhibit B).

In support of its claims in this case, the plaintiff disclosed three expert witnesses in this case, Patrick Ariola, the Deputy Fire Marshal who investigated the fire, Peter S. Vallas, a cause and origin investigator and Frank Watkinson, Ph.D., a metallurgist, who are prepared to testify that the fire originated in the Claro's refrigerator. (See, Plaintiff's Fed. R. Civ. P. 26(a)(2)(B) Expert Disclosures, attached as Exhibit C).

## II.    THE POST FIRE INVESTIGATION

### a)    Patrick Ariola's Investigation and Conclusions

After the fire was extinguished, Deputy Fire Marshal Patrick Ariola of the Waterbury Fire Department began his investigation. During the course of his work as a fire investigator for

2

the City of Waterbury[2], Mr. Ariola investigated approximately 100 fires, none of which were allegedly caused by a refrigerator. (*See*, Deposition of Patrick Ariola, p. 31, 11-17, p. 32, 12-15, attached as Exhibit D). After he arrived at the scene, he spoke to Mr. and Mrs. Claro, who told him they were in their living room when they smelled smoke. When they checked the kitchen they found that the smoke was coming from the refrigerator. (Id., p.45, 19-24). Mr. Ariola also examined the kitchen in the Claro home and noted that the interior of the refrigerator and its contents had been severely burned in the fire. He examined the electrical panel and noted that the circuit breaker for the range and kitchen outlets was tripped, though he does not know what caused that to occur. (Id., p.66, 3-9).

Based on his investigation, Mr. Ariola concluded that the area of the fire's origin was the refrigerator (*See*, Waterbury Fire Marshal's report, attached as Exhibit E), but he could not determine what actually caused the fire and could not say whether the fire originated inside the refrigerator or not. (Ariola Deposition, p.89, 4-18). Although he testified that "something didn't operate right" (Id., p.88, 21-22) he could not determine "what actually electrical-wise caused that problem" (Id., p.69, 9-15), admitted that he did not know how the refrigerator's motor worked, (Id., p.88, 21-22) and could not determine the ignition source for the fire. (Id., p.85, 9-12).

### b)    Peter Vallas' Investigation

On November 15, 2000, two days after the fire, SafeCo Insurance Company contacted Peter Vallas and Associates ("PVA") and requested they examine a refrigerator that had caused a fire. (*See*, Deposition of Peter Vallas, p. 23, 20-25, attached as Exhibit G). On November 16, 2000, Sergei Fell, an evidence handler (not a fire investigator) employed by PVA went to the Claro residence to pick up the refrigerator and bring it back to PVA's laboratory in Hackensack,

---

[2] The Waterbury Fire Marshal's office has three distinct divisions: code compliance, fire investigation and hazardous materials. For approximately one year, including the date of the fire in this case, Mr. Ariola was assigned

N.J. (Id., p.26, 4-7, p.29, 10-14) Mr. Vallas never went to the Claro residence to view the fire scene. (Id., pp.25-26, 24-25, 1-3) Mr. Fell had a brief conversation with Mr. Claro while he was at the fire scene and took some pictures of the fire scene.[3]  Mr. Fell then removed the refrigerator, several electrical receptacles, a cell phone charger and a power strip and took them back to PVA's laboratory in Hackensack, N.J.

At some point thereafter, Mr. Vallas visually inspected the refrigerator, although he cannot say when this occurred (Id., p.49, 18-19) and there are no written notes which document his examination. (Id., p.50, 2-9) Mr. Vallas claims this visual inspection lasted approximately one hour. (Id., p.56, 21-22) His inspection revealed no evidence of an electrical failure within the refrigerator compartment and there were no beaded wires he could identify that led him to conclude that the fire started in the wiring. (Id., p.67, 4-13) Likewise, he found no evidence of an electrical malfunction in the refrigerator's power cord. (Id., p.79, 2-3)

During the course of his "investigation", Mr. Vallas had one brief telephone call with Mr. Claro on January 5, 2001 – that was his only contact with the Claros. (Id., p. 36, 15-22) He never spoke to the firefighters who responded to the fire or to Mr. Ariola (Id., p.46, 20-22), he never reviewed the fire marshal or the fire department's report of the fire (Id., p.45, 14-18) and he never saw any of the photographs of the fire scene taken by the fire marshal. (Id., p.64, 17-20) On January 10, 2001, Mr. Vallas prepared a written report of his investigation, in which he concluded that "[a]n electrical malfunction and/or product defect existed within the equipment located at the rear base of the refrigerator." (See, Peter Vallas' January 10, 2001 report at p. 3, attached as Exhibit F).  While his report indicates that a "defrost timer or related wiring is the potential ignition source", Mr. Vallas' admitted during his deposition that like Mr. Ariola, he

---

to the fire investigation division. Since that time, he has been working in the hazardous materials division.

4

cannot say "what component, what wire or what mechanism" of the refrigerator malfunctioned and caused the fire. (Vallas Deposition, at p.101, 2-9, attached as Exhibit G) He admits that the statement in his report that the defrost timer or related wiring caused the fire was "speculating until further analysis". (Id., p.84, 11-15) Finally, while his report indicates that "[u]ntil the material is removed and x-raying of the melted plastic is performed, no further conclusive opinion on the exact item can be made", (See, Exhibit F at p.2) no x-rays of that material were ever performed. (Vallas Deposition, at p.101, 2-9, attached as Exhibit G).

c.    **Frank Watkinson, Ph.D.'s Investigation**

Dr. Watkinson did not get involved in this case until long after litigation had commenced. After he was retained by the plaintiff, he reviewed the deposition testimony of Mr. and Mrs. Claro, reviewed the report written by Mr. Vallas and the photos taken by Mr. Fell, and reviewed the fire marshal's report and photos. On June 2, 2003, more than two and a half years after the fire, he visually examined the refrigerator at PVA's laboratory in Hackensack, N.J. (See, Deposition of Frank Watkinson, Ph.D., p.38, 10-14, attached as Exhibit H).

On June 11, 2003, Dr. Watkinson prepared a report in which he opined that a malfunction or manufacturing defect in one of the components in the freezer or refrigerator compartment caused the fire. He arrived at this conclusion even though his examination of the refrigerator did not reveal evidence of an electrical malfunction in any of its components. (Id., p.33-34, 13-25, 1-4) The opinions expressed in his report were based almost entirely on the statements given by the Claros and Peter Vallas' report.

At his deposition, Dr. Watkinson admitted he could not identify the ignition source for the fire, (Id., p.82, 9-11) could not say whether there was some malfunction of some component

---

[3] Of the 20 photographs of the fire scene attached to Mr. Vallas' report in this case, only four show portions of the kitchen area and none depict the area where the refrigerator was located before it was moved by Mr. Claro.

5

and could not say whether there were any defects in the refrigerator when it left Maytag. (Id., p.82, 12-21). In fact, Dr. Watkinson admitted that from looking at the burn patterns on the refrigerator itself, "it certainly could be concluded that the fire didn't start within it." (Id., p.18, 11-14). Finally, Dr. Watkinson acknowledged that the interior of a refrigerator is not a common place for a fire to originate, due to the types of wiring and components that are contained inside a refrigerator, the limited supply of oxygen available to fuel such a fire, and the fact that refrigerators typically contain large volumes of cold products, which are not conducive to fire ignition. (Id., pp.31-32).

## III.   THE LAW

### a.    The Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, in pertinent part:

(b)    A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for summary judgment in the party's favor as to all or any part thereof.

(c) ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that here is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(b) and (c).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will carry the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*******

6

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of fact. Coletex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). Once that responsibility has been satisfied, the burden shifts to the nonmoving party to come forward with admissible evidence establishing specific, concrete facts demonstrating that there is a genuine issue for trial. Id., 324; Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988). The nonmoving party may not rely on averments in their pleadings and they may not rely on evidence that is merely colorable, conclusory, conjectural or not substantially probative. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988).

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." See Haesche v. Kissner, 229 Conn. 213, 217, 640 A.2d 89 (1994). Such an issue is not created by a mere allegation in the pleadings. Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970). Courts have stated:

> "[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party."

Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). *See,* Gatling v. Atlantic Richfield Co., 577 F.2d 185, 187-188 (2d Cir. 1978), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1979); Walter & Way Properties v. Colt's Mfg. Co., 230 Conn. 660, 665, 646 A.2d 143 (1994). The litigant opposing summary judgment, therefore, "may not rest upon mere conclusory allegations or denials" as a vehicle for obtaining a trial. SEC v.

7

Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978); Zuchowicz v. U.S., 870 F.Supp. 15, 20 (D. Conn. 1994). Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful. U.S. v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir. 1982). For the reasons set forth below, the plaintiff has not, and cannot, come forward with such evidence, and therefore, summary judgment is appropriate.

### b.     Connecticut Products Liability Law

Manufacturers in Connecticut are strictly liable for defective products under § 402A of the Restatement (Second) of Torts. *See* Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 233, 429 A.2d 486 (1980); Garthwait v. Burgio, 153 Conn. 284, 216 A.2d 189 (1965). Under § 402A, liability is imposed on:

" (1)     One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

        (a)     the seller is engaged in the business of selling such a product, and

        (b)     it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)     The rule stated in Subsection (1) applies although

        (a)     the seller has exercised all possible care in the preparation and sale of his product, and

        (b)     the user or consumer has not bought the product from or entered into any contractual relation with the seller."

2 Restatement (Second), Torts § 402A (1965). In Connecticut, in order to recovery under the doctrine of strict liability in tort the plaintiff must prove that: 1) the defendant was engaged in the business of selling the product; 2) the product was in a defective condition unreasonably dangerous to the consumer or user; 3) the defect caused the injury for which compensation was sought; 4) the defect existed at the time of sale; and 5) the product was expected to and did reach

the consumer without substantial change in condition. <u>Living & Learning Centre, Inc. v. Griese Custom Signs, Inc.</u>, 3 Conn. App. 661, 664 (1985).

The plaintiff must prove all five elements to prevail. <u>Living & Learning Centre, Inc. v. Griese Custom Signs, Inc.</u>, 3 Conn. App. 661, 664 (1985). (*quoting* <u>Coe-Park Donuts, Inc. v. Robertshaw Controls Co.</u>, 1 Conn. App. 84, 86-87 (1983). Under either a theory of strict tort liability or implied warranty, it is necessary for the plaintiff to establish that the product was defective at the time of sale. <u>Liberty Mutual Ins. Co. v. Sears, Roebuck & Co.</u>, 35 Conn. Sup. 687, 690 (1979).

The doctrine of strict liability in tort in Connecticut recognizes three types of product defects: (1) improper design; (2) manufacturing defects; and (3) failure to warn that a product is unreasonably dangerous. <u>Giglio v. Conn. Light & Power</u>, 180 Conn. 230, 235-36 (1980). The second type of defect occurs during the manufacture of the product or component, and results in the product not meeting the manufacturer's own design specifications. "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." <u>Miller v. United Technologies Corp.</u>, 233 Conn. 732, 779 (1995) (*quoting* <u>Harduvel v. General Dynamics Corp.</u>, 878 F.2d 1311, 1321 (11th Cir. 1989) cert. denied, 494 U.S. 1030, 110 S. Ct. 1479 (1990)).

Although Connecticut courts have concluded that "[i]n the absence of other identifiable causes, evidence of malfunction is sufficient evidence of a defect under § 402A of the Second Restatement of Torts", <u>Living & Learning Centre, Inc. v. Griese Custom Signs, Inc.</u>, 3 Conn. App. 661 (1985) (collapse of sign) (*quoting* <u>Liberty Mutual Ins. Co. v. Sears, Roebuck & Co.</u>, 35 Conn. Sup. 687, 690-91 (1979) (television as cause of fire), evidence of a malfunction itself is

9

not enough to sustain a claim under the products liability act without showing that the defect existed at the time of sale. Hunter v. Mazda of Milford, 1999 Conn. Super. LEXIS 695 (1999).

Circumstantial evidence of a defect is enough to take a case to a jury only if the plaintiff has introduced evidence as to two other matters: (1) . . . "plaintiff must present evidence which would tend to negate causes for an accident other than a defect in the product; and (2) . . . plaintiff must present proof which would suggest that whatever defect might have existed was one introduced into the product by the defendant." O'Connor v General Motors Corp., 1997 Conn. Super. 3343, *12 (1997) (quoting Jenkins v. Whittaker Corp., 785 F.2d 720, 732 (1986) (emphasis added).

While products liability law in Connecticut has evolved to hold manufacturers strictly liable for unreasonably dangerous products that cause injury to ultimate users, it has not transformed them into insurers of their products, nor does it impose absolute liability. See, Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 210 (1997). In order to prevail, the plaintiff must still show the existence of a defective condition due to either a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions. See, Vitanza v. Upjohn Co., 257 Conn. 365, 373-379 (2001). In this case, the plaintiff has no competent evidence to support its claim that the unidentified defect which its experts claim caused the fire at the Claro residence existed at the time the refrigerator left Maytag's possession. Therefore, the Court should grant summary judgment to Maytag on all of the plaintiffs' claims.

## IV.    ARGUMENT

In order for the plaintiff to prevail in this case, the plaintiff will have to prove 1) that Maytag was engaged in the business of selling refrigerators; 2) the refrigerator in this case was in a defective condition unreasonably dangerous to the consumer or user; 3) the defect caused the

fire at the Claro residence; 4) the defect existed at the time of the refrigerator's sale; and 5) the refrigerator was expected to and did reach the Claros without substantial change in its condition.

While SafeCo will be able to meet its burden of proof with respect to the first element, it has only no evidence that the Claro's refrigerator was defective or that it contained a defect at the time it left Maytag's possession.

**a.    The Plaintiff Has No Evidence That the Refrigerator was Defective**

The plaintiff has no evidence that the refrigerator in this case was defectively designed. Neither the Claros nor any of the plaintiff's purported experts will testify that the refrigerator contained a design defect. None of the plaintiff's experts has any opinion with regard to the refrigerator's design. Without expert testimony, the plaintiff cannot prevail on a design defect claim. The Connecticut Supreme Court has recognized that "there may be instances involving complex product designs in which an ordinary consumer may not be able to form expectations of safety." Potter v. Chicago Pneumatic Tool, Co., 241 Conn. 199, 210 (1997). As a rule, expert testimony is required "when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." Latham & Assoc., Inc. v. William Raveis Real Estate, Inc., 218 Conn. 297 (1991) (*quoting* Bader v. United Orthodox Synagogue, 148 Conn. 449, 454, 173 A.2d 192 (1961); Aspiazu v. Orgera, 205 Conn. 623, 630-31 (1987); Toomey v. Danaher, 161 Conn. 204, 210 (1971); Jaffe v. Department of Health, 135 Conn. 339, 350 (1949). C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.16.5. While a refrigerator is a common household appliance, it is a complicated machine consisting of hundreds of component parts, the design of which is well beyond the knowledge and experience of a jury. Without expert testimony that the refrigerator was defectively designed, the plaintiff cannot present a design defect claim to the jury in this case.

11

Likewise, the plaintiff has no evidence that the refrigerator contained a manufacturing defect. To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." Miller v. United Technologies Corp., 233 Conn. 732, 779 (1995) (quoting Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1321 (11th Cir. 1989) cert. denied, 494 U.S. 1030, 110 S. Ct. 1479 (1990)). This type of defect occurs during the manufacture of the product or component, and results in the product not meeting the manufacturer's own design specifications. Based on the Connecticut Supreme Court's definition of a manufacturing defect, in order to be permitted to testify that a manufacturing defect existed in the Claro's refrigerator, the plaintiff's experts would have to examine the refrigerator design specifications and be able to point to a specific component of the refrigerator that differed from its intended design. Since none of the plaintiff's experts have reviewed any specifications for the refrigerator, they cannot credibly testify that it contained a manufacturing defect. Finally, the plaintiff is not claiming that Maytag failed to provide adequate warnings with the refrigerator. (See, Plaintiff's Answers to Interrogatories, ¶12, attached as Exhibit B).

**b.    Malfunction Theory of Defect**

In addition to the three recognized types of product defects outline above, Connecticut courts have concluded that "[i]n the absence of other identifiable causes, evidence of malfunction is sufficient evidence of a defect under § 402A of the Second Restatement of Torts." Living & Learning Centre, Inc. v. Griese Custom Signs, Inc., 3 Conn. App. 661 (1985) (collapse of sign) (quoting Liberty Mutual Ins. Co. v. Sears, Roebuck & Co., 35 Conn. Sup. 687, 690-91 (1979) (television as cause of fire). Under this theory of defect, the "mere evidence of a malfunction" may be enough to allow the trier of fact to draw an inference, by a preponderance of the evidence, that the product was unreasonably dangerous and defective". Standard Structural Steel

12

<u>Co. v. Bethlehem Steel Corporation</u>, 597 F.Supp. 164, 183 (1984) (*quoting* <u>Liberty Mutual Ins. V. Sears Roebuck & Co.</u>, 35 Conn. Supp. 687, 690-691 (1979).

In a more recent opinion, a Connecticut Superior Court judge opined that purely circumstantial evidence of a defect is enough to take a case to a jury *provided* the plaintiff has introduced evidence as to two other matters: (1) . . . "plaintiff must present evidence which would tend to negate causes for an accident other than a defect in the product; and (2) . . . plaintiff must present proof which would suggest that whatever defect might have existed was one introduced into the product by the defendant." <u>O'Connor v General Motors Corp.</u>, 1997 Conn. Super. 3343, \*12 (1997) (*quoting* <u>Jenkins v. Whittaker Corp.</u>, 785 F.2d 720, 732 (1986) (emphasis added). Thus, in order to prevail under the "malfunction" defect theory, the plaintiff still must rule out alternative causes for the product's malfunction. More importantly, evidence of a malfunction itself is not enough to sustain a claim under the products liability act without showing that the defect existed at the time of sale. <u>Hunter v. Mazda of Milford</u>, 1999 Conn. Super. LEXIS 695 (1999).

The mere fact that there is sufficient evidence to infer a defect does not necessarily mean that there is sufficient evidence to infer that the defect existed at the time of sale. Although the question as to when the defect arose will normally be left to the jury, "[w]here the answers to these question would be based only on speculation or conjecture, however, the answers cannot stand." <u>Liberty Mutual Ins. V. Sears Roebuck & Co.</u>, 35 Conn. Supp. 687, 692 (1979) (*quoting* <u>Smith v. Bell Telephone Co. of Pennsylvania</u>, 397 Pa. 134, 138). Connecticut courts have also recognized that "[w]here the evidence of defect is wholly circumstantial and consists of the malfunction itself ... the likelihood that the defect existed at the time of sale is more speculative." <u>Id.</u>, at p.693.

13

In this case, the refrigerator was purchased by the Claros some four or five years before the fire. Unlike the television set in <u>Liberty Mutual Ins. V. Sears Roebuck & Co.</u>, 35 Conn. Supp. 687 (1979), which was approximately six months old and received only sporadic use, the Claro's refrigerator was operating for twenty four hours a day every day during those four or five years.[4] The Claros themselves testified that during the four or five years they had owned the refrigerator, they had never experienced any problems with it.

If the Claro's refrigerator contained a manufacturing defect at the time it was sold by Maytag, surely that defect would have manifested itself prior to the passage of between 35,000 and 44,000 hours of constant use!! The passage of that much time without any problem is strong evidence the refrigerator was not defective when sold and further illustrates the fact that a jury would have to resort to speculation and conjecture to determine that the refrigerator contained a defect, which no one has been able to identify, at the time it was sold by Maytag.

While the Connecticut Supreme Court has stated that products liability law in Connecticut has not transformed product manufacturers into insurers of their products and does not impose absolute liability, if the plaintiff's claims in this case are allowed to reach the jury that will be precisely what has happened. How can Maytag refute a defect claim which the plaintiff cannot even articulate? How can Maytag refute a claim that a five year old refrigerator which functioned normally for more than 35,000 hours suddenly malfunctioned due to an unspecified defect that allegedly existed when it left Maytag's possession? If the plaintiff's claims in this case are permitted to reach the jury, the burden of proof will have shifted to Maytag to prove that the Claro's refrigerator was not defective at the time it was sold by Maytag. Such a burden shifting cannot be permitted.

---

[4] If the refrigerator was four years old, that would equal 35,040 hours of continuous operation – if it was five years old, then that figure would increase to 43,800 hours of continuous operation without any problem.

14

In this case, the plaintiff has no evidence that the Claro's refrigerator was defective at the time it left Maytag and a jury would be required to engage in nothing more than speculation and conjecture to determine that essential element of the plaintiff's claims, something which the Connecticut case law acknowledges is improper.

## IV.    CONCLUSION

For the foregoing reasons, Maytag respectfully requests this Honorable Court grant Summary Judgment to it on all counts of the plaintiffs' Complaint.

MAYTAG CORPORATION
By Its Attorneys

CAMPBELL CAMPBELL
EDWARDS & CONROY
PROFESSIONAL CORPORATION

Holly M. Polglase (ct 09276)
Timothy M. Roche (ct 24373)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was mailed, postage prepaid, via first class mail, on January 30, 2004 to:

Erik Loftus, Esquire
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, Connecticut 06096

Timothy M. Roche

15