61

```
1    room, right?
2         A    It's helpful.
3         Q    Now, we talked about your report just sort
4    of generally.  Mr. Fell went to the scene on the 16th,
5    you examined the refrigerator at some point after that,
6    and you had one telephone call with Mr. Claro; is that
7    right?
8         A    Correct.
9         Q    Did you do anything else in between the date
10   that your company was assigned this case and the date
11   you prepared this report to investigate the fire?
12        A    I had that verbal -- I spoke with the
13   client, Mr. Fradette, F-r-a-d-e-t-t-e, and that was
14   probably right at the time I either prepared the report
15   or just after or just before.  That's generally how I
16   -- I generally make the phone call before I prepared
17   the report.  I'm sure that's what transpired at that
18   point.  Then the report was prepared.  I did a final
19   read on it.  And then it would have been mailed to the
20   client.  And we set up a storage folder, that we had
21   stuff in the laboratory, and put it in a location so
22   that we had proper securing of it.  And nothing else
23   was performed other than displaying it for that joint
24   inspection.
25        Q    That occurred after the date you prepared
```

62

```
1    your report?
2         A    That's correct.
3         Q    And you had already reached the conclusions
4    that you have in this case at the time you prepared
5    this report, right?
6         A    Yes.
7              ATTORNEY ROCHE:  Let's go off the
8         record.
9              (Whereupon, a recess was taken at 11:18,
10             and the deposition resumed at 11:22.)
11        Q    And this report that we marked as Exhibit
12   No. 5 contains all of the opinions you intend to
13   express to the jury at the time of trial; is that
14   correct, sir?
15        A    At this time, unless I'm asked to do
16   something else or perform additional evaluation.
17        Q    Sure.  But you understand that there's
18   deadlines in litigation and we're past the deadlines
19   for certain activities to take place.  And as we sit
20   here today, those are your opinions in the case --
21        A    Yes.
22        Q    -- in Exhibit 5, right?
23        A    That's correct.
24        Q    Okay.  If we could just go through the
25   report.  So the "purpose of the assignment," the last
```

63

```
1    sentence says here says, "After careful on-site
2    examinations, follow-up investigation, and laboratory
3    analysis," and you list the results, correct?
4         A    Yes.
5         Q    And the on-site examination is the time that
6    Mr. Fell spent at the scene that day, correct?
7         A    Yes.
8         Q    No other time?
9         A    Correct.
10        Q    And the follow-up investigation, what did
11   that consist of?
12        A    The follow-up was probably just the phone
13   call and, you know, preparing any -- the verbal to the
14   client and preparing any reports and looking at the
15   photographs, etc., just following up on what was done
16   at the site.
17        Q    Would that also include your examination of
18   the refrigerator in the laboratory?
19        A    Yeah.  Then it goes on to say laboratory
20   analysis.
21        Q    And that's your laboratory analysis --
22        A    Yeah.
23        Q    -- is that visual inspection of the
24   refrigerator that you performed in the lab?
25        A    Yes.
```

64

```
1         Q    Is that the sum total of the testing that
2    was done -- strike that.  Is that the sum total of the
3    activity that you engaged or that Peter Vallas
4    Associates engaged in that form the basis for your
5    opinions in this case?
6         A    That's right.
7         Q    "Fire origin and cause analysis," the third
8    section of your report.  So when you wrote the report,
9    you were actually writing it as a cause and origin
10   analysis, though, at that time; is that true?
11        A    Well, we had access to the scene, there were
12   photographs, there were observations made; so we put it
13   as a fire origin and cause analysis, because we had
14   some of that documentation, for me to expand a little
15   bit on just having picked up a refrigerator and looking
16   at only a refrigerator under those conditions.
17        Q    You never saw any of the photographs of the
18   scene taken by the fire marshal's office; is that
19   correct?
20        A    That's correct.
21        Q    And you never saw -- at the time that this
22   report was prepared, there had been no follow-up
23   inspections, so you hadn't had a chance to review any
24   other photographs that had been taken after that
25   obviously?
```

65

1    A    No..

2    Q    "An examination was made of all electrical
3  wiring in the wall, including the wall receptacle."
4  And that examination was made by?

5    A    Mr. Pell.  And then ultimately myself
6  through a photograph.

7    Q    Through a photograph that he took that day?

8    A    Yes.

9    Q    He removed those items as well; is that
10  correct?

11    A    Correct.

12    Q    What is Mr. Pell's background?  You told me
13  he's not a fire investigator.  What does he do?

14    A    He's an investigator on staff, and he deals
15  with the handling of evidence and assisting the fire
16  investigators on the site:  Digging, reconstruction.
17  So he's more of an assistant to the fire investigators.
18  And he has some formal seminars and some training.  I
19  don't know all of it off the top of my head.

20    Q    You are basing some of your opinions in this
21  case at least though on what he told you and what he
22  relayed to you; is that fair to say?

23    A    Yeah.  I would have to say that.  He has
24  documentation and photographs and conversation that
25  helped assist in evaluating, you know, to get to this

66

1  preliminary product analysis.  I would relay upon that,
2  yes.

3    Q    So this is a preliminary product analysis,
4  this report?

5    A    Well, more or less.  We recommended that
6  with all the circumstances that existed with some of
7  the cleanup at the scene and the type of damage that
8  existed to the refrigerator and the melted materials,
9  you know, verbally I had indicated that there should be
10  additional investigation; and secondly, you know, that
11  a legal expert of some type should evaluate all of this
12  in order to determine if there should be a joint
13  inspection or where to proceed from this particular
14  point based on the circumstances.

15    Q    So you talk -- sorry.

16    A    From a fire origin and cause or a product
17  analysis investigation, these opinions -- everything
18  appeared to have originated within the refrigerator,
19  but no other specific information could be provided at
20  that particular time.  That's basically how the report
21  reads.

22    Q    Okay.  Next sentence under fire origin and
23  cause says, "An examination was made of all electrical"
24  -- I'm sorry.  "It was noted that no evidence of an
25  electrical failure was found, therefore eliminating

67

1  wiring in the building as a cause of the fire
2  occurrence," correct?

3    A    Yes.

4    Q    Was there any evidence of electrical failure
5  found in the refrigerator compartment?

6    A    No.

7    Q    None?  You didn't find beaded wires to lead
8  you to believe that the fire began at some certain
9  location in the wiring; is that true?

10    A    That is true.

11    Q    Did you find any electrical faults in the
12  refrigerator?

13    A    No.

14    Q    Did you make a determination, though, that
15  this was an electrical fire?

16    A    It appeared that some sort of an electrical
17  malfunction may have been an ignition source.

18    Q    May have been an ignition source?

19    A    Correct.

20    Q    Were there other potential ignition sources
21  in the room?

22    A    No.  Specifically I thought in the
23  refrigerator you were referring to.

24    Q    I'm just talking generally.  I'm just trying
25  to understand, how did you determine that this was an

68

1  electrical fire?

2    A    Well, it appeared that, you know, the fire
3  originated in the refrigerator.  There was an
4  eyewitness account of it in the refrigerator, and the
5  only potential source in a refrigerator at that
6  particular place would be some type of an electrical
7  malfunction.  But specifically I don't know based on
8  the damage and the melted materials.

9    Q    Did you examine any of the individual
10  components of this refrigerator, other than looking at
11  them?  Was there any kind of testing done on any of the
12  compressor or condenser units, any of that stuff?

13    A    No.  Absolutely not.

14    Q    You would have wanted to involve the other
15  parties to litigation if there was?

16    A    That's why we referenced a legal opinion as
17  to the procedure and not to do anything further, and
18  other parties should be placed on notice based on the
19  circumstances that existed in the case.

20    Q    Towards the bottom of this page, the second
21  to last paragraph, it says "Overall examinations made
22  of the refrigerator revealed evidence of severe fire
23  damage, particularly to the interior compartment."
24  That's what it says, right?

25    A    Yes.

69

1  Q    Did you find that to be important in your
2  analysis in this case?
3  A    Sure.
4  Q    We talked earlier about the possibility of
5  the seal on the refrigerator door failing and the door
6  falling away from the unit, correct?
7  A    Right.
8  Q    Would that account for severe damage to the
9  contents of the refrigerator?
10  A    I don't believe in this particular case.
11  Q    Why not?
12  A    Well, there's -- the patterns are of such
13  that it appeared that the fire was in the refrigerator
14  compartment.  The eyewitness account did not provide
15  any information of fire anywhere else in the room.  So
16  one would think that you could eliminate that the fire
17  attacked the refrigerator based on what was provided to
18  us and that physical evidence somewhat supporting that.
19  Q    When you say "that physical evidence
20  somewhat supporting that," what physical evidence are
21  you talking about?  You talked about pattern evidence.
22  A    Yeah.  The meltdown and the destruction
23  inside the refrigerator.  The overall views of the room
24  don't show any other potential area other than the back
25  hallway where we could have had some other type of fire

70

1  development.  And taking into account the statement as
2  evidence that it was discovered burning inside of the
3  refrigerator would allow me to use that information to
4  develop that opinion, that it appeared to be in that
5  refrigerator.
6  Q    If you could look at your report there's a
7  couple of photographs that were taken in your
8  laboratory.  I think they're marked as Number 25 and
9  22.  22 says, a view documenting fire and heat
10  patterns, right?
11  A    Yeah.
12  Q    Is there something on this photograph that
13  you can point to to tell me that this is a burn pattern
14  that you feel shows that the fire originated from
15  within the refrigerator compartment?  I don't
16  understand burn pattern evidence, that's why I'm trying
17  to ask you to explain it to me.
18  A    The discoloration in 22 on the actual
19  cabinet or the frame of the refrigerator is indicative
20  of utilizing the patterns and the heat effect on the
21  inside to show that they were not as great on the
22  outside as they are on the inside of the refrigerator.
23  And you have to look at other photos and look at the
24  equipment to utilize that.  It would also indicate
25  that, you know, there was no fire in the back of the

71

1  refrigerator where a power cord or compressor or the
2  condensing evaporator coil may have been.
3  Q    Looking at this photograph then, do you
4  agree that the fire does not appear to have originated
5  in the rear part of this refrigerator?
6  A    That's correct.
7  Q    It didn't originate back in that machinery
8  compartment at the bottom rear of the refrigerator,
9  right?
10  A    I don't believe so, no.
11  Q    Okay.  Is that because of the way the burn
12  pattern is?  It appears that it's more towards the
13  front of the refrigerator?
14  A    Well, that and there's no fire damage.
15  Q    Sure.  In No. 22 if you look at the pattern
16  that runs up the side of the refrigerator, is that
17  indicative of a fire that originated in a front part of
18  the refrigerator?
19  A    Not necessarily.  When all that material
20  starts to burn and melt down and drop down and there's
21  involvement of the room in other areas, those patterns
22  --
23  Q    When you say "drop down," are you talking
24  about from the ceiling?
25  A    Within the refrigerator itself.

72

1  Q    Well, let's talk about the stuff that
2  dropped down in the refrigerator.  What is the interior
3  of this refrigerator made of, do you know?
4  A    I don't know the exact component.  It's a
5  plastic type of component that's now extremely hard and
6  melted together.
7  Q    But we talked about that earlier, and I
8  think you said that the melting point of plastic is
9  180, maybe a little bit more for different types
10  plastics.  But it's within that range --
11  A    Yes.
12  Q    -- a couple hundred degrees and it melts?
13  A    Yep.
14  Q    And obviously it melts inside the
15  refrigerator and it's going to drop down and go to the
16  bottom by force of gravity, right?
17  A    Yes, of course.
18  Q    And if the temperature within the room got
19  above the melting point, you would expect to see the
20  stuff inside the refrigerator melt and fall to the
21  base?
22  A    There's a lot happening there.  You have
23  potentially a fire in that refrigerator, and as the
24  room gets involved and the fire spreads, there's even
25  further damages that can exist or even further patterns

73

1  that may or may not exist.

2      Q    Do you have a potential for the fire

3  originating outside of the refrigerator causing this

4  type of a burn pattern?

5      A    Based on what was available, based on what

6  was left at the scene and the documentation that was

7  made, it did not appear that the fire originated

8  outside of the refrigerator.

9      Q    There are no photographs that depict the

10  area in front of where this refrigerator was at the

11  time of the fire that we're aware of, right?  Do you

12  have any of those?

13      A    There are not.  I don't have the exact

14  photograph or a photograph of where this was positioned

15  originally; however, there are photographs of overalls

16  of the room that show the lack of a lot of fire

17  developing from maybe counters or other locations.  And

18  we have, you know, an eyewitness account.

19      Q    How much weight do you give the eyewitness

20  account?  Pretty substantial weight, huh?

21      A    I would think so, yeah.

22      Q    Have you ever investigated a fire where

23  somebody gave you an incorrect accounting of what

24  happened based on perhaps maybe guilt that they caused

25  the fire or panic that set in once they realized there

74

1  was a fire?  Has that ever happened?

2      A    Sure.

3      Q    And that can affect your evaluation of the

4  evidence of the scene, can it?

5      A    It can.  Although what exists may or may not

6  be consistent with what someone's saying, but, you

7  know, looking at the room or the area where the fire

8  pattern is, one is able to still make a judgment on

9  where something may have developed or where the fire

10  may have developed regardless of what a statement may

11  have provided.

12      Q    Sure.  That's if you have an intact fire

13  scene that's adequately documented, right?

14      A    More or less, yes.

15      Q    Sure.  So this fire scene, the building had

16  been sealed, there had been some cleanup done, the

17  refrigerator had been moved, correct?

18      A    Yes.

19      Q    Obviously it wasn't optimal conditions for

20  you to make an investigatory analysis of what caused

21  this fire?

22      A    As I said earlier, that cleanup was why it

23  was called in as a pick up, to try to look at the

24  refrigerator.  I mean, they knew there was some

25  movement and debris had been discarded.  And it was

75

1  said that it even had been cleaned.  That's why it was

2  considered pick up the refrigerator and see if there's

3  anything absolutely conclusive based on a product

4  analysis that we can tell may have been the cause of

5  the fire.

6      Q    And you didn't have anything that was

7  absolutely conclusive based on your analysis, right?

8      A    Yeah.

9      Q    There's a statement on page 1 of the report

10  in the second to the last paragraph, second to the last

11  sentence:  "The fire patterns throughout the structure

12  indicated that some patterns did not exist where the

13  fire was originally located."  I'm trying to understand

14  what you mean by that statement.

15      A    That's referring to the little hallway

16  towards the rear of the kitchen or the rear of the

17  house.  There appeared to be some evidence of almost

18  like a separate fire or an unrelated fire to where the

19  refrigerator may have been located.  And then

20  ultimately, you know, through conversations we were

21  told that that represented the individual in the home

22  trying to put the refrigerator in that location as it

23  was burning.

24      Q    Were you able to make any determination as

25  to what level in the door jamb the fire began?

76

1      A    No.

2      Q    In other words, did it start three feet

3  above the floor?  Six feet above the floor?

4      A    I was not able to do that, no.

5      Q    Why is that?  Is that because the scene

6  wasn't photographed enough?

7      A    It had been cleaned up.  That area that

8  we're referring to had been cleared or cleaned up.

9      Q    Sure.  But if the door jamb was still there

10  and portions of it were not burned in the fire, you'd

11  be able to estimate where along the back, I guess, of

12  the refrigerator the fire was burning at the time it

13  was in contact with the door jamb, right?

14      A    I would think so, yes.

15      Q    Fire burns up, right?

16      A    It'd be right there, yeah.

17      Q    Mr. Fell secured a cell phone charger and a

18  power strip; is that right?

19      A    Yes.

20      Q    Do you know where they were located in

21  conjunction to where the refrigerator was located in

22  this room?

23      A    I don't.  He found them on a counter.  I

24  think it was a red counter.  It was in the kitchen and

25  he noticed the damage, noticed they were affected by

77

1  heat or fire, indicating that they may or may not have
2  been close to the refrigerator and decided to secure
3  them.
4      Q    Did he think that they were potential
5  ignition sources?
6      A    He didn't know.  That's why he secured them.
7      Q    Was there any laboratory analysis done on
8  the cell phone charger or the power strip?
9      A    Again, just a visual was performed in the
10 laboratory.
11     Q    Were you able to determine the make of the
12 power strip?
13     A    I don't know.  I don't believe I wrote it
14 down.  It may be on the back.  I think there may be a
15 photograph that documents the power strip in one of my
16 segments of photographs.
17          ATTORNEY ROCHE:  I'm just looking at a
18          couple of these photographs.  This whole
19          group we call before as Exhibit 4.  Can
20          we just call this one 4-A to keep it
21          separate?
22          (Defendant's Exhibit No. 4-A,
23          photograph, was marked for
24          identification.)
25     Q    The photograph marked as 4-A shows some,

78

1  looks like, fire damage debris outside of the
2  residence; is that correct?
3      A    Yes.
4      Q    Do you know where any of that debris came
5  from within the house?
6      A    I believe it came from the kitchen.  There
7  may be other things from other areas of the house, but
8  a lot of the burn material appeared to have come from
9  the kitchen.
10     Q    The kitchen or the rear hall of the house;
11 is that right?
12     A    Yes.
13          ATTORNEY ROCHE:  Can you make this 4-B?
14          (Defendant's Exhibit No. 4-B,
15          photograph, was marked for
16          identification.)
17     Q    I'm showing you what we marked as Exhibit
18 4-B.  It appears to be a receptacle with something
19 plugged into it.  Do you see what I'm referring to?
20     A    Yes.
21     Q    Is that the refrigerator power cord?
22     A    It is.
23     Q    Now, when you examined that, did you find
24 any evidence of beading or anything in the wires of the
25 power cord?

79

1      A    No.
2      Q    There was no evidence of an electrical
3  failure in the power cord; is that correct?
4      A    I did not observe any, no.
5      Q    If the fire was an electrical fire that
6  originated within the refrigerator, wouldn't you expect
7  to see some beading or some deformity of the wiring
8  other than sort of being attacked externally by the
9  heat of the fire?
10     A    We're still referring to the power cord?
11     Q    Yes.
12     A    Not necessarily.  The power cord is outside
13 and behind the unit, and you may or may not get
14 shorting or beading.  I did not see any on that
15 particular cord.  It does not necessarily indicate that
16 you would have that if it started in the refrigerator.
17     Q    But isn't that also consistent with the
18 power or the electricity to the refrigerator sort of
19 shutting down prior to the damage being inflicted on
20 the power cord?  In other words, the electrical system
21 shuts down, but then other areas of the room including
22 perhaps the power cord are attacked externally by
23 flames and heat, correct?
24     A    That's correct.
25     Q    And the damage that you observed on the

80

1  power cord, is it consistent with that type of
2  scenario?  Just considering the power cord now, not all
3  the other --
4      A    Considering the power cord, if it had been
5  energized and insulation had melted and the conductors
6  came in contact with each other, there may be evidence
7  of electrical activity.
8      Q    Page 2 of your report says that refrigerator
9  was purchased four or five years prior at a place
10 called Brooklyn Appliance; is that right?
11     A    That's what it says, yes.
12     Q    That's what Mr. Claro told you?
13     A    Told Sergei, yes.
14     Q    He didn't tell you, he told Sergei that?
15     A    Yes.
16     Q    Now, according to your report, Mrs. Claro
17 opened the refrigerator and saw smoke and flames at the
18 bottom of the refrigerator against the back wall on the
19 interior of the unit; is that right?
20     A    Yes.
21     Q    Is that consistent with the fire pattern
22 evidence contained in your photographs?
23     A    Yeah.  I mean, the meltdown and the amount
24 of damage in the refrigerator is consistent with there
25 having been fire inside of that compartment.

81

```
 1      Q    In the rear of the refrigerator as relayed
 2 to you by the homeowner?
 3      A    The damage and the meltdown obviously has
 4 covered this particular area, so viewing it at this
 5 time was very difficult.
 6      Q    Again, this says -- the report says down
 7 below "The fire patterns on the side and rear of the
 8 unit were consistent with evidence of fire development
 9 from within the unit."  We touched on that a little bit
10 earlier.  But I think as I understand your testimony
11 it's your opinion that the damage to the interior
12 compartment of the refrigerator was more extensive than
13 the damage to the exterior portion of the refrigerator?
14      A    That's correct.
15      Q    And could that have been caused by the fuel
16 load of food within the refrigerator burning after the
17 seal of the door on the refrigerator may have failed
18 during this fire?
19      A    I'm sure at one point that fire in the room
20 itself played a factor in the continuing damage to the
21 refrigerator.
22      Q    But it would have been right in contact with
23 the fuel, right?  The interior of the refrigerator
24 would have been in contact with the food contents at
25 the time that they were ignited in this fire, right?
```

82

```
 1      A    Sure.
 2      Q    So the fire would be actually right up
 3 against the interior surfaces of the refrigerator, if
 4 you will?
 5      A    Sure, yes.
 6      Q    Whereas the fire on the outside of the
 7 refrigerator wouldn't be directly in contact with the
 8 interior surface of the refrigerator.  Do you
 9 understand what I'm saying?
10      A    No, I don't.
11      Q    There's food inside the refrigerator that's
12 on fire, right?
13      A    Right.
14      Q    As it's on fire, it's in direct contact with
15 the sides of the refrigerator, is that true, unless
16 it's in the middle of the compartment?
17      A    For the most part.
18      Q    You're going to assume at least that some of
19 it's in contact with the interior portions of the
20 walls, right?
21      A    Correct.
22      Q    How about on the outside?  In other words,
23 if this refrigerator stands alone in the middle of the
24 room, there's not going to be any fuel load directly in
25 contact with the exterior walls of the refrigerator,
```

83

```
 1 isn't that true?
 2      A    Yes.
 3      Q    Unless you have some drop down that falls
 4 down and leans up against it, right?
 5      A    Correct.
 6      Q    Do you know whether or not this refrigerator
 7 was up against anything else in the room at the time
 8 this fire was alleged to have begun?
 9      A    I don't know.
10      Q    Down below it says that you examined the
11 power cord and found no evidence of short-circuiting,
12 beading or failure, right?
13      A    Correct.
14      Q    "The rear of the unit where the compressor,
15 fan motor, and condensing coil were located, along with
16 other wires revealed no evidence of any failure or fire
17 development from this compartment," correct?
18      A    That's correct.
19      Q    Then your next sentence says "It is obvious
20 that the fire originated within the base of the unit,
21 and in all probability, a defrost timer or related
22 wiring is the potential ignition source"; is that
23 correct?
24      A    Correct.
25      Q    Do you know where the defrost timer would
```

84

```
 1 have been located in this particular refrigerator?
 2      A    I'm not sure of the specific location.
 3      Q    Would you expect to find the defrost timer
 4 in the base of the refrigerator, or would you expect to
 5 find it up closer to the freezer compartment of the
 6 refrigerator?
 7      A    In some cases I've seen it mounted up high.
 8 After the course of the fire and the promulgation of
 9 the fire, that equipment or other wiring, whatever it
10 may be, would then be at the base of the unit.
11      Q    Okay.  Looks like from the report you
12 thought that a defrost timer or some related wiring was
13 the most likely cause of this fire?
14      A    Well, it's speculating until further
15 analysis.
16      Q    Okay.  So that's speculation at this point
17 until you do further analysis; is that true?
18      A    It's suggesting that wiring or the defrost
19 timer or some other component -- and that's how the
20 report is written -- is in all probability the ignition
21 source or the cause of the fire.
22      Q    Okay.  I guess that's what I'm trying to get
23 at.  When you say "or some other component," you never
24 actually made a determination of what component in this
25 refrigerator failed?
```

85

1    A    No.

2    Q    Did you ever examine the defrost timer for
3    this refrigerator, or is that contained in whatever was
4    in the base of the unit?

5    A    If it's intact it should be in the base of
6    the unit.  But with the amount of fire damage, I don't
7    know if it will ever be recovered or not.

8    Q    The next sentence says "Until all the material
9    is removed and x-raying of the melted plastic is
10   performed, no further conclusive opinion on the exact
11   item can be made," correct?

12   A    That's correct.

13   Q    There was no further x-raying done, right?
14   I think you said you had perhaps recommended it to
15   Safeco, but they never got back to you on that issue;
16   is that true?

17   A    I recommended that an engineer and/or
18   further x-raying may allow for more detailed
19   examination of wiring which may or may not show
20   something more conclusive to support an opinion that
21   the fire developed in the refrigerator.

22   Q    I mean, we're not able at this time to point
23   to any exact electrical cause for this fire, right?

24   A    That's correct.

25   Q    There's no piece of wire that you can show

86

1    me that's beaded or that you can say that is what
2    failed and that is what caused the fire to begin; is
3    that correct?

4    A    That's correct.

5    Q    Because obviously you've got to do more
6    testing based on the damage of the refrigerator?

7    A    Either more testing or further evaluation
8    and conversations with, you know, some type of a legal
9    analyst as to pursuing these options.

10   Q    What was the ignition source for this fire?

11   A    It would appear there may be some type of an
12   electrical failure or deficiency or defect or something
13   in the refrigerator and may have resulted in there
14   being ignition and ultimately the fire.

15   Q    You say "may have."  But we don't know
16   conclusively one way or the other; it could have been
17   something else that caused the fire?

18   A    The refrigerator itself, you know, I would
19   think if -- it would be an ignition source of an
20   electrical type bearing the fact that there was no
21   damage to the motor assembly or the mechanical aspect.
22   But I can't identify what that may be based on the
23   damage and based on the melted material and the lack of
24   having pursued any further analysis.

25   Q    When you talked to Safeco after you gave

87

1    them this report, did you have further conversations
2    with Safeco?

3    A    No.  The only correspondence -- it wasn't a
4    conversation.  It was correspondence from Safeco
5    advising me that someone else was handling the fire --
6    handling the file, excuse me.

7    Q    Okay.

8    A    And at that time, no, there was nothing else
9    ever -- the answer is no, sorry.

10   Q    Okay.  You haven't examined any design
11   specifications to this refrigerator, correct?

12   A    None.

13   Q    You are unable to say whether or not this
14   refrigerator differed in any way at the time it left
15   Maytag's possession or Magic Chef's possession as it
16   was intended to be designed, correct?

17   A    That's correct.

18   Q    I think we talked earlier that you're not an
19   appliance design expert, right?

20   A    No.

21   Q    You don't have an opinion in this case that
22   the design of this refrigerator was inadequate in any
23   way, do you?

24   A    No.

25   Q    Let me take a look at some of these items.

88

1    A    Take your time.

2        ATTORNEY ROCHE:  Can you mark this as
3        the next exhibit?

4        (Defendant's Exhibit No. 8, packet of
5        documents, was marked for
6        identification.)

7    Q    I have some documents that look to be a
8    correspondence portion of your file.  Do you have that
9    in front of you?

10   A    I have several correspondence.

11   Q    This one looks like letters to the insurance
12   company and perhaps from the lawyers from Safeco.  So
13   if you flip down a few pages into that exhibit, there's
14   a letter dated March 25th to you from the law offices
15   of Stuart Blackburn.  Do you see that letter?

16   A    Yes.

17   Q    Did you assist Safeco in preparing its
18   answers to the interrogatories in this case?

19   A    I don't believe so.  I mean, if I did, it
20   wasn't directly.  If they asked me a question and they
21   utilized it in those answers, perhaps, but...

22   Q    But you weren't sent a copy of the
23   interrogatory questions to review?

24   A    No.

25   Q    Towards the bottom of that letter, three

## 89

1  sentences up, it says "lastly we'll need an appliance
2  expert to inspect the refrigerator." Do you see that
3  portion of the letter?
4      A   Yes.
5      Q   And I think you said earlier you made some
6  references to them, to Safeco as to who they could
7  potentially employ as an appliance expert in this case;
8  is that right?
9      A   No. Originally at the time the report was
10 prepared I told them of the circumstances and the
11 issues and that further analysis would need to be done
12 and perhaps another expert would need to come on staff
13 and look at it, because I didn't have one at the time.
14     Q   Sure. Because this letter is dated March of
15 2003, and they're asking you if you have any appliance
16 experts in your employ. That's what I don't
17 understand.
18     A   When I produced the report and gave the
19 verbal, this file was unactive until these letters --
20     Q   So then two years later you get a letter
21 saying "do you have any appliance experts in your
22 employ"?
23     A   Yes.
24     Q   Did you make any recommendations?
25     A   I did. I recommended two firms -- or two

## 90

1  individuals of a firm. I think I have them.
2           (Defendant's Exhibit No. 9, photocopied
3           business card on a piece of paper that
4           also contains handwritten notes, was
5           marked for identification.)
6      Q   Let me show you what we've marked as Exhibit
7  No. 9.
8      A   Yeah.
9      Q   That Exhibit No. 9, that one-page document
10 has a photocopy of a business card on it; is that
11 correct?
12     A   Yes.
13     Q   Is that one of the people that you referred
14 Safeco to as an appliance expert?
15     A   I referred two for them to make that
16 decision, yeah. One is Affiliated Engineering
17 Laboratory Firm.
18     Q   Do you know who the other one is?
19     A   Jim Prior.
20     Q   That's the other name that appears on that
21 sheet?
22     A   That's correct. And the name of his firm.
23 I had it in a Rolodex, and I wrote it for the file.
24     Q   Okay. And that is -- what does that say?
25     A   It says "Sergei Pell pickup slash

## 91

1  interview."
2      Q   What was the purpose of that, do you know?
3      A   Chances are this was a piece of paper that
4  was in the file from day one, and when we were having a
5  conversation about pickup and that is just a
6  refrigerator type of thing, that was probably
7  handwritten there, and I just wrote on something that
8  was in the file, meaning a document that was in the
9  file at the time of my conversation with Margaret
10 Ralphs.
11     Q   Okay. Then there's a letter dated April
12 11th asking you to provide a CV of "your" appliance
13 expert. Do you see that?
14     A   Yeah.
15     Q   Did you provide any CVs to Safeco Insurance
16 at that request?
17     A   I don't believe so, no.
18     Q   You have a letter dated June 10th to Miss
19 Ralphs at the law office. Do you have that one?
20     Q   What was the date?
21     Q   June 10th.
22     A   Yeah.
23     Q   Okay. This is a letter that basically says
24 we had the product inspection, correct?
25     A   Yes.

## 92

1      Q   And your letter confirms that there was no
2  real attempt to examine the contents that were melted
3  in the base of the unit; is that true?
4      A   Not in those words, but it was minimal
5  invasive is what took place at the time.
6      Q   Did you ever review any of the photographs
7  taken during that inspection?
8      A   No.
9      Q   You have some in your file. Did you look at
10 those?
11     A   Oh, I thought you meant other photographs
12 other than my own firm's. I did. Photographs taken, I
13 believe, by Joe Liebersfeld, L-i-e-b-e-r-s-f-e-l-d, and
14 I briefly looked at them.
15     Q   Do you have any information as to what UL
16 standards are applicable to a household refrigerator?
17     A   Without researching it or looking it up, I
18 do not.
19     Q   You don't intend to provide evidence that
20 this refrigerator violated any standards, do you?
21     A   Not at this time, no.
22     Q   Did you ever examine any of the videotape
23 that was taken during the inspection at your
24 laboratory?
25     A   No.

93

1  Q    Were you aware that there was videotape?

2  A    No.

3  Q    Have you ever discussed this case with Frank

4  Watkinson, the electrical engineer hired by Safeco

5  Insurance in the case as an expert?

6  A    No.

7  Q    Never had any conversations with him?

8  A    No.

9  Q    I need just a couple minutes to review some

10 notes.  We're getting towards the end.  No one from

11 your office looked at the electrical panel in the Claro

12 house; is that true?

13 A    I don't believe so.

14 Q    Any particular reason why that didn't take

15 place?  Again, are we back to it was a product analysis

16 versus a cause and origin investigation?

17 A    More or less, yes.

18 Q    I guess I'm having a little trouble with

19 that.  If you had characterized this loss type as a

20 cause and fire investigation, would you have gone to

21 the fire scene or one of your fire investigators would

22 have gone to the fire scene?

23 A    Yes.  I mean, it was called in that there

24 was a cleanup, that it was a burned refrigerator, can

25 you get the refrigerator and look at the refrigerator.

94

1  And that's not uncommon.

2  Q    So that was the purpose of your assignment,

3  was just to look at the refrigerator?

4  A    The way it was called in and our

5  understanding was apparently there was a fire in the

6  refrigerator; the adjuster wants to know if there's

7  potential subro, meaning could there have been anything

8  wrong with the refrigerator; the site had been cleaned

9  up; and to pick up the refrigerator.  That's what we

10 did, except we went a little bit beyond, seeing that we

11 had access, we documented the scene and took it that

12 extra step on our decision.

13 Q    Sure.  But, again, if it had been called in

14 differently or you had characterized it differently,

15 you would have had a fire inspector out there

16 photographing the scene, looking at the electrical

17 panel; is that true?

18 A    Perhaps, yeah.

19 Q    Would you agree that a stove in a kitchen is

20 a potential ignition source?

21 A    Anything is a potential ignition source,

22 yes.

23 Q    But a stove is a fairly common ignition

24 source for a kitchen fire, isn't it?

25 A    Yes.

95

1  Q    Do you know whether or not the stove in this

2  case was a gas or an electric stove?

3  A    I don't know.

4  Q    You have an understanding at least that it

5  was in use at the time this fire began; is that

6  correct?

7  A    That's what we were told, yes.

8  Q    Because there's no reference in your report

9  to the stove at all.  Is that just because, again, it

10 was pick up the refrigerator, bring it back to the lab

11 type of assignment?

12 A    I would think so, yes.

13 Q    And, again, because if you were going in

14 there as a cause and origin investigator, you would

15 want to look at other potential ignition sources within

16 the room, particularly a stove in a kitchen, right?

17 A    Normally as part of the process of

18 elimination that would take place.

19 Q    Sure.  Even if you didn't think it started

20 there, you would want to document it photographically

21 so that you could later testify that you had an opinion

22 that it wasn't the stove, correct?

23 A    Yes.

24 Q    And you would do that with any other

25 appliance in the room that was at least in proximity to

96

1  where the suspected point of origin of the fire was,

2  correct?

3  A    Yes.

4  Q    And the only reason that that didn't happen

5  in this case is because of the way that it was called

6  into your office?

7  A    Yes.

8  Q    Is that the best way that you can explain

9  it?

10 A    Yeah.  I mean, our understanding was the

11 scene had been cleaned up and the refrigerator was

12 there, to pick it up and bring it back.

13 Q    So that when Mr. Pell shows up and there's a

14 fire scene there, he decides to take a few photographs?

15 A    He documented the kitchen and documented the

16 electrical and did the best that he could after the

17 cleanup of the scene under those conditions and secured

18 what he thought was the proper thing to do, like wall

19 outlets and other items that may have been melted.

20 Q    He didn't call anyone from your office to

21 say, Hey, we've got a fire scene out here; maybe we

22 should have someone come down and look at it?

23 A    No.  He did come back and after looking at

24 the refrigerator, in my verbal conversations with the

25 representative of Safeco, I stressed some of the points

97

1  that existed, like the scene had been cleaned up, the
2  refrigerator is extremely damaged, there's a melted
3  piece of material in the bottom that I don't know if
4  you'll ever get in there to make a determination in the
5  first place. So there's a lot of these issues, and how
6  should we proceed?
7      Q    Sure. So then you wait for their further
8  instruction on what they want you to do?
9      A    I wrote the report. They asked for a report
10  to date. I made the recommendations. I also made a
11  recommendation that legal counsel review it because
12  they know sometimes better in assisting this type of a
13  situation. And we secured the refrigerator, and
14  nothing else was performed until I was asked to provide
15  information surrounding an engineer.
16      Q    In the conclusions section, page 3 of your
17  report, second paragraph, third sentence it says "An
18  electrical malfunction and/or product defect existed
19  within the equipment located at the rear of the rear
20  base of the refrigerator." Now, I thought we looked at
21  some photographs that showed the rear base of the
22  refrigerator to be in undamaged condition; is that
23  true?
24      A    Yeah. I'm basically referring to the rear
25  base on the internal area.

98

1      Q    Is that an area somewhere above the
2  machinery compartment in the back of the unit?
3      A    Again, I don't know. I'm simply saying we
4  had an eyewitness account of a fire in that area. That
5  doesn't mean it couldn't have started high and dropped
6  down. I mean, there could be circumstances there that
7  we're unaware of. But we make reference to that not
8  being on the outside in the machine compartment, but
9  being on the internal area.
10      Q    So inside the sealed part of the
11  refrigerator when you shut the door, inside that area
12  is where the fire began; that's your opinion?
13      A    To date, based on everything that I looked
14  at that we were able to do, that's my opinion.
15      Q    I understand that's what you've done. Is it
16  your opinion that there's sufficient oxygen inside the
17  refrigerator compartment to get this conflagration that
18  came about on the date of the fire?
19      A    Perhaps.
20      Q    Perhaps not?
21      A    I would think it is possible.
22      Q    More probable than not?
23      A    Sure. I mean, I've seen examples of it
24  happening before.
25      Q    Where the fire originated within the sealed

99

1  compartment of the refrigerator?
2      A    Either within the sealed component of the
3  refrigerator or the freezer.
4      Q    How many times in the course of your career?
5  You told me about refrigerator fire cases.
6      A    Then I referenced --
7      Q    Are you talking a handful? Two or three at
8  the most?
9      A    Yeah. And if I didn't handle it personally,
10  someone else may have. But somewhere around ten that I
11  know of that I can think of.
12      Q    I thought we talked earlier of it being
13  around ten refrigerator fires that were caused -- fires
14  that were caused by refrigerators; is that true?
15      A    Correct.
16      Q    But of those ten fires, how many of those
17  ten fires did the fire actually originate within the
18  closed cabinet of the refrigerator as opposed to any
19  external machinery cabinet or the power cord?
20      A    Several that I can think of right now.
21      Q    Any specific ones that you can think of?
22      A    The ice maker equipment, I know, were a
23  problem. And I believe there was one that had to do
24  with the defrost mechanism to prevent freezing. Again,
25  I'm thinking --

100

1      Q    Sure.
2      A    -- these were either things at our lab or
3  were at our lab and someone was either inspecting,
4  working or investigating, so that's what I recall.
5      Q    There were no sketches done of the fire
6  scene, correct?
7      A    No.
8      Q    At least not by your office?
9      A    No.
10      Q    Again, does NFPA 921 recommend that a sketch
11  be prepared of every fire scene?
12      A    It does of various types. It does make
13  reference to that.
14      Q    Do you agree with that requirement?
15      A    I think in many cases it's possible to do,
16  yes.
17      Q    Was it not possible to do that in this case?
18  Again, I guess I'm struggling because you've told me
19  that it's the nature of your assignment that sort of
20  drove what happened at the scene.
21      A    Correct.
22      Q    Because you're calling it a product
23  analysis. But your product analysis hasn't determined
24  what, if any, electrical failure existed within the
25  refrigerator, correct?

101

```
1    A    That's correct.
2    Q    But you're going to give an opinion on cause
3  and origin of the fire in this case, correct?
4    A    I would provide an opinion based on what
5  this report states and what information was available
6  to me without having pursued this investigation:  That
7  the fire appears to originate within the refrigerator.
8  Specifically what component, what wire or what
9  mechanism, I don't know.
10   Q    Did you ever do any research to determine
11 whether or not Magic Chef refrigerators had been
12 involved in other fires?
13   A    No.
14   Q    Or that any other Magic Chef refrigerator
15 had ever been the subject of a recall within the
16 relevant time period?
17   A    No.
18   Q    That's the kind of thing that would be
19 helpful in a product analysis, isn't it?
20   A    If it was pursued.  There are things
21 normally conducted in the course of evaluating a
22 product.
23   Q    I think your web site talks a little bit
24 about that, doesn't it?
25   A    I'm sure it does.
```

102

```
1    Q    It says a library -- this is from your web
2  site now under the section called product analysis,
3  product liability, "A library of documented losses
4  involving products and years of experience in testing
5  provide a keen awareness of pre-existing problems."
6  Did you consult that library in this case?
7    A    No.  Again, the recommendation for follow-up
8  analysis was made, and we didn't do that, no.
9    Q    Sure.  That's just because you were not
10 instructed to do anything further in the case by the
11 insurance company in the case?
12   A    That's correct.
13   Q    Next sentence on your web site says "often a
14 duplicate unit will be purchased and used during
15 laboratory analysis for better understanding of the
16 product."  And obviously you didn't do that in this
17 case, correct?
18   A    Did not.
19   Q    You were unable to identify exactly what
20 model this thing was anyway, so it would have been
21 difficult for you to get an exemplar, right?
22   A    Correct.
23   Q    How many people work in the corporate office
24 of your company?
25   A    Maybe 25.
```

103

```
1    Q    I see that you have an office in Danbury,
2  Connecticut?
3    A    That's correct.
4    Q    Is that a staffed office or is it sort of a
5  satellite?
6    A    It's a satellite that we'll utilize when we
7  need to:  A deposition, a meeting, a property
8  inspection.
9    Q    You say there are 25 people in the
10 Hackensack office?
11   A    Yes.
12   Q    Where are the other six people located?
13   A    They're all up in -- actually it'd be seven,
14 I think, are based out of the Endicott operation.
15   Q    Okay.  So the only offices that are really
16 staffed full time by Peter Vallas Associates are the
17 corporate office and the northern regional office?
18   A    And the -- I don't know if it was in
19 existence at the time.  At this time, that's correct.
20   Q    I'm talking as we sit here today.  Are there
21 other offices that you have staffed on a regular basis?
22   A    We have, again, we have an engineer that's
23 staffed out of an office in Tamiment, Pennsylvania.
24   Q    That doesn't show up on your web site,
25 though, does it?  It's just talking about your
```

104

```
1  particular offices; is that right?
2    A    Yeah.  It needs a little updating as far as
3  addresses and locations.
4    Q    I see you have a Connecticut office, but
5  that's just a satellite office in Danbury?
6    A    It's in an office building.  There's a
7  physical office there that we use when we need it.
8    Q    Sure.  But you don't have anybody there
9  who's full time as a Connecticut fire investigator per
10 se?
11   A    No.
12   Q    Why don't we see if we have your testimony
13 list yet?
14             (Whereupon, a recess was taken at 12:20,
15             and the deposition resumed at 12:24.)
16             (Defendant's Exhibit No. 10, list of
17             testimony, was marked for
18             identification.)
19   Q    You had a chance to review what's been
20 marked Defendant's Exhibit 10, correct?
21   A    Yes.
22   Q    Is that -- is this a complete list of your
23 trial and deposition testimony in the last four years
24 or longer?
25   A    I believe we started documenting it in 1993,
```

105

1   and it's up until December 4, '02. And I have not
2   updated last year's history.
3       Q       Okay. Did you give trial testimony during
4   the course of 2003?
5       A       I think there was one trial.
6       Q       Do you remember where that trial was?
7       A       I don't at this time.
8       Q       Do you remember what the claim in that case
9   was?
10      A       I don't recall.
11      Q       Was it more than one trial that you gave
12  testimony at in 2003 or just one trial?
13      A       I think just one.
14      Q       Do you remember who the lawyer was that you
15  were working with in that case?
16      A       I don't really, but surely I can get you
17  that information.
18      Q       You understand that the federal rules of
19  civil procedure require that expert witnesses provide
20  testimony listings; do you understand that?
21      A       Yes.
22      Q       Is that why you keep this listing?
23      A       I think the first request was in 1993.
24  Whether the federal law was in existence then or not
25  I'm not sure, but that's when we started to keep a list

106

1   of the deposition and the trial history.
2       Q       Okay. Let me go through some of these. I
3   see you participated in some sort of arbitration with
4   the American Arbitration Association of New York. And
5   there's the name of an attorney, Joseph Rizzo. Could
6   that be the attorney who retained you in that case?
7   I'm talking about the arbitration now.
8       A       Well, ultimately, no. But that was the firm
9   that ended up representing the insurance company in
10  that particular case. And that firm was Cozen and
11  O'Connor. And Joe Rizzo, there's Joe Rizzos. One's an
12  attorney, the other's an investigator, and I don't know
13  which one is which. But that is the firm. The other
14  firm was representing the manufacturer of the product
15  in that case.
16      Q       Do you remember what the product was in that
17  arbitration?
18      A       That was an exhaust fan, bathroom exhaust
19  fan.
20      Q       Was that a Braun exhaust fan?
21      A       I think it was a Braun.
22      Q       And you were representing the insured in
23  that case?
24      A       That's correct.
25      Q       And I think you testified earlier that you

107

1   previously represented Braun; is that right?
2       A       Yes.
3       Q       So obviously you don't represent Braun
4   anymore; is that right?
5       A       I haven't done one recently, but I know that
6   on several occasions that we've done work for them.
7       Q       What was your opinion in that case? That
8   the exhaust fan was the cause of the fire?
9       A       Yes.
10      Q       It looks like you gave trial testimony in
11  Monmouth County Superior Court in '95. It says
12  Ortho-Kinetics. Does that refresh your recollection as
13  to what that case was about?
14      A       That was a manufacturer of a medical
15  reclining chair.
16      Q       Was it a fire investigation or some other
17  type of investigation?
18      A       I believe it was simply a product -- I think
19  the scene had been cleaned up. I did some review for
20  the manufacturer, and I examined the product.
21      Q       So you were for the manufacturer in that
22  case?
23      A       Yes.
24      Q       Does it matter what side of the equation you
25  testify about? I mean, it sounds like you've

108

1   represented cases involving Braun where you've defended
2   Braun products and also where you've essentially
3   attacked Braun products; is that true?
4       A       I wouldn't call it attack. I would call it
5   an investigation, and I render an opinion.
6       Q       Sure.
7       A       I don't have a specific contract with
8   someone. I get a call. I investigate it ethically,
9   fairly and honestly and render an opinion based on the
10  facts and the evidence that exist.
11      Q       Next one I want to ask you about quickly is
12  in '95. It says "trial testimony." It says "Town
13  Wigs." Any recollection of that case?
14      A       May I just see it, because it may be an
15  attorney that would trigger my memory? I don't recall.
16  I would need the file. I don't know.
17      Q       Sure. It's awhile back.
18      A       Yeah.
19      Q       '95, Herr-Piloso, looks like the name of
20  someone. Vincent McGuinness, Cozen and O'Connor?
21      A       I'd like to see it again. I recall it.
22      Q       What was that case about?
23      A       I represented an insurance company that
24  insured a large building in Mt. Vernon, New York. The
25  investigation that I performed was quite -- a whole

109

1    building burned down, so it was quite a long, extensive
2    investigation.  I determined that it was a pot on a
3    stove.
4        Q    A pot on a stove?
5        A    Pot on a stove, an unattended pot on a stove
6    by the cook of, I believe it was, a bakery shop.
7        Q    '96, Middlesex County Court, Benenati,
8    Attorney Ball?
9        A    I'm thinking to myself out loud.  I
10   apologize.  It was -- I think it was a fire
11   investigation.  There was a product involved.  I
12   believe Allstate Insurance Company was involved.  I may
13   have been retained by them, but I do not remember the
14   product.
15       Q    So you don't remember much about that case.
16   '97 trial, Rockland County Superior Court, Magurno,
17   David Smith's the lawyer?
18       A    Yep.  That was a fire case.  Is there
19   another reference to it?
20       Q    I think I gave it to you, other than there's
21   the docket number.
22       A    I believe it was a jewelry store.  I forget
23   the details.
24       Q    Okay.  Gregory Park Apartments case, looks
25   like trial testimony in '97 in Hudson County, Jersey

110

1    City?
2        A    Yes.  That was a case where I performed
3    noise level monitoring in a boiler room.
4        Q    Not a fire investigation?
5        A    No.
6        Q    Caroline Cleaners case?
7        A    This was a fire investigation involving a
8    pinched power cord in a cleaners.
9        Q    Who did you represent in that case?  An
10   insurance company?
11       A    I think I represented an insurance company
12   for the cleaners.
13       Q    And it was a pinched power cord, I'm sorry,
14   on what type of appliance?
15       A    It was a fan.
16       Q    Greer case in '98, what was that case about?
17       A    Is that Long Island?
18       Q    Garden City, New York.
19       A    This was the electrocution and fire case
20   that I referenced earlier.  I represented the
21   homeowner's insurance company.
22       Q    What was the product?
23       A    It wasn't a product.
24       Q    Faulty wiring or something?
25       A    I actually got called to testify -- there

111

1    was a wire that failed as a result of a power surge or
2    a power problem with the utility company.  And I
3    actually got called, although the insurance company had
4    some type of interest in the case, the plaintiff's
5    attorney for the homeowner, who was injured, had
6    actually called me to testify.
7        Q    Is that Mr. Amrod?
8        A    Yes.
9        Q    '98 case is Harris.  It says District Court
10   of Maryland.  Do you remember that case?
11       A    Yeah.  That was an automobile fire.  I
12   testified -- I forget what it was now.  The fire was in
13   the vehicle.
14       Q    Sure.  And it says District Court of
15   Maryland.  Is that state court?  State district court
16   in Maryland?
17       A    All I know is it took forever to get there.
18   It was all the way down at the bottom, the last county
19   in Maryland.  I don't know.
20       Q    So you're not sure if that was a state or
21   federal case then?
22       A    I'm not sure.
23       Q    I see one that says Spadaro, Nassau County
24   Federal Court.  That's obviously in the federal court?
25       A    Yes.

112

1        Q    What was the Spadaro case about, if you can
2    recall?
3        A    There's no other reference to anything
4    there?
5        Q    Cozen and O'Connor, Brian -- I won't say his
6    last name because I won't get it right.
7        A    That was a case where I investigated a fire
8    scene in a large home and rendered an opinion as to the
9    area, the point and the cause of the fire, but didn't
10   do any further analysis.  Another expert got involved
11   in the product case, and I believe it was a Black &
12   Decker toaster oven.
13       Q    That's the toaster oven case you were
14   talking about?
15       A    I think so.
16       Q    Well, Cozen and O'Connor is a large
17   subrogation firm, aren't they?
18       A    Yes.
19       Q    They wouldn't be representing the product
20   manufacturer in a case like that, would they?
21       A    In that particular case they represented the
22   carrier who insured the home.
23       Q    Okay.  But when we talked about the Black &
24   Decker case earlier I asked if you had testified on
25   behalf of the manufacturer, and you identified Black &

113

Decker as one of those companies, correct?

A    I don't know if I said I testified on behalf of Black & Decker.  And if I did, I don't believe that's the case, and I apologize.  I simply may have represented Black & Decker, but I've never testified for them.  In other words, they've retained us, I believe, on a case, but I don't think it ever got to a point of testifying.

Q    Sure.  This was a trial, the Spadaro case?

A    That's right.

Q    And you gave testimony that, what, Black & Decker --

A    The toaster oven --

Q    -- started the fire?

A    I pinpointed where the fire started, and the only thing in that area was a Black & Decker.  And they hired another engineer to deal with the --

Q    So what you did was sort of pinpoint the area of origin?

A    Yes.

Q    Sort of the general area of origin?

A    Yes.

Q    '98, Eldorado Motel case, Attorney Pasquarelli.  It says that you qualified as a specialist in lightning effects on electrical

114

equipment.  Does that help you remember what that case was about?

A    Can I see it again?  If my memory is correct, it was some type of a phone system or a computer system that had been damaged by lightning or not damaged by lightning, I can't recall.  Oh, I do recall.  It was a telephone system that had damage.  It had fire damage to it and had been burned.  And the testimony was whether it was external heat or flame placed on the equipment or was it damaged from lightning.

Q    Okay.  '98 case, Mafara, Attorney Sweet?

A    Location?

Q    Sure.  It's Freehold, New Jersey.

A    I'm not sure, but I think it involved a zero clearance fireplace unit that was located in a building, in a home or condominium, that was involved in the cause of the fire.

Q    2000, Ditullio v. Kenvil Laundromat.  It sounds like a laundromat fire to me.

A    I just need to look at it.  Doesn't ring a bell.

Q    You can't remember?

A    I do not remember.

Q    You testified in court.  You just don't

115

remember?

A    I do not remember.

Q    Trial in 2000, Zindt vs. Luzzi, Attorney Kleiner?

A    This -- what was this?  I represented a defense attorney who was defending, I believe, a tenant in a condominium.  And I don't recall what the issue was.

Q    And that says 2000?

A    Yeah.

Q    Did you give any trial testimony in 2001 or 2002?

A    I don't know.

Q    If it's not here --

A    -- then I probably did not.

Q    Okay.  Do you keep copies of any of your trial testimony anywhere?

A    I never see the trial testimony.

Q    You never see any of the transcripts?

A    No.

Q    As far as you're concerned, you've completed all your work on this case, right?  Safeco hasn't asked you to do anything other than make this refrigerator available for my office and some other folks to inspect, correct?

116

A    Yes.

Q    I think that is it.  I have no further questions for you this morning.

            ATTORNEY LOFTUS:  I don't have any.

            (Whereupon the deposition concluded
             at 12:48 p.m.)

1

## C E R T I F I C A T E

2

3      I hereby certify that I am a Notary Public, in and

4   for the State of Connecticut, duly commissioned and

5   qualified to administer oaths.

6      I further certify that the deponent named in the

7   foregoing deposition was by me duly sworn, and

8   thereupon testified as appears in the foregoing

9   deposition; that said deposition was taken by me

10  stenographically in the presence of counsel and reduced

11  to typewriting under my direction, and the foregoing is

12  a true and accurate transcript of the testimony.

13     I further certify that I am neither counsel nor

14  attorney to either of the parties to said suit nor

15  related to or employed by either counsel in said suit

16  nor am I interested in the outcome of said cause.

17     Witness my hand and seal as Notary Public

18  this __12__ day of _January_ 20 _04_.

19

20

21

22     _____
       Notary Public

23

24     Connecticut License No. 00181
       My commission expires:
       November 30, 2004

25

**SAFECO -V- MAYTAG - FRANK S. WATKINSON, PH.D. - 12/18/03**

**Page 1 to Page 84**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT     06108-1533*
*Phone:    860-291-9191*
*FAX:    860-528-1972*

## Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2  SAFECO INSURANCE COMPANY OF  :   CIVIL ACTION NO.
    AMERICA as subrogee of NOBERTO :  3:02CV-1916 (JBA)
 3  and MARIA CLARO,
                 Plaintiff      :
 4
 5
 6  vs.                         :
 7  MAYTAG CORPORATION,         :
 8          Defendant           :    DECEMBER 18, 2003
 9  DEPOSITION OF:  FRANK S. WATKINSON, Ph.D.
10  APPEARANCES:
11      LAW OFFICES OF STUART G. BLACKBURN
12          Attorneys for the Plaintiff
13          Two Concorde Way - P.O. Box 608
14          Windsor Locks, CT 06096
15          (860) 292-1116
16      BY:  ERIK LOFTUS, ESQ.
17      CAMPBELL, CAMPBELL, EDWARDS & CONROY
18          Attorneys for the Defendant
19          One Constitution Plaza
20          Boston, MA 02129
21          (617) 241-5115
22      BY:  HOLLY M. POLGLASE, ESQ.
23                 Christine E. Borrelli
24                 Connecticut License No. 117
25                 Registered Professional Reporter
```

## Page 3

```
 1  INDEX
 2
 3
    WITNESS DIRECT CROSS REDIRECT RECROSS
 4
 5  Frank S. Watkinson, Ph.D. 4
 6
 7
 8
 9
    EXHIBIT PAGE:
10
11  Defendant's Exhibits A1-24, Photographs ............ 4
12  Defendant's Exhibits B1-17, Photographs ........... 4
13  Defendant's Exhibits C1-13, Photographs ........... 4
14  Defendant's Exhibits D1-24, Photographs ........... 4
15  Defendant's Exhibit E, Curriculum Vitae ........... 4
16  Defendant's Exhibit F, File with Contents ......... 36
17  Defendant's Exhibit F1, Handwritten Notes ......... 42
18  Defendant's Exhibit F2, Three-Page Document ....... 48
19  Defendant's Exhibit F3, Testimony List ............ 49
20  Defendant's Exhibit F4, Report .................... 50
21  Defendant's Exhibit F5, Photograph ................ 54
22
23  * * * * * * * * * * * * *
24
25
```

## Page 2

```
 1  ...... Deposition of FRANK S. WATKINSON, Ph.D., a
 2  witness, taken on behalf of the Defendant, in the herein
 3  before entitled action, pursuant to the Connecticut Practice
 4  Book, before Christine E. Borrelli, duly qualified Notary
 5  Public in and for the State of Connecticut, held at the Law
 6  Offices of Campbell, Campbell, Edwards & Conroy, 100 Pearl
 7  Street, Hartford, Connecticut, commencing at 11:00 a.m. on
 8  Thursday, December 18, 2003.
 9
10  S T I P U L A T I O N S
11
12  It is hereby stipulated and agreed by and among counsel
13  for the respective parties that all formalities in
14  connection with the taking of this deposition, including
15  time, place, sufficiency of notice, and the authority of
16  the officer before whom it is being taken may be and are
17  hereby waived.
18  It is further stipulated and agreed that objections
19  other than as to form are reserved to the time of trial.
20  It is further stipulated and agreed that the reading and
21  signing of the deposition transcript by the deponent is
22  hereby not waived.
23  It is further stipulated and agreed that the proof of
24  the qualifications of the Notary Public before whom the
25  deposition is being taken is hereby waived.
```

## Page 4

```
 1      MS. POLGLASE:    Would you mark these?
 2
 3      (Defendant's Exhibits A-E, Documents, marked for
 4      identification)
 5
 6      FRANK S. WATKINSON, Ph.D., called as a witness by
 7  the Defendant, having been first duly sworn by the Notary, was
 8  examined and testified on his oath as follows:
 9
10  DIRECT EXAMINATION BY MS. POLGLASE:
11
12  Q.   Would you state your full name?
13  A.   My name is Dr. Frank S. Watkinson.
14  Q.   Is Frank a nickname for Francis or is it Frank?
15  A.   It's Frank.
16  Q.   Dr. Watkinson, I am going to show you what has been
17  marked as Exhibit E and just ask you if you can identify that
18  as a copy of your CV?
19  A.   Yes, it is.
20  Q.   Is that up to date?
21  A.   Yeah, I believe so.
22  Q.   Thanks. You are, as I understand it, a principal of
23  Spectrum Engineering Group?
24  A.   Yes.
25  Q.   Describe for me what Spectrum Engineering Group is?
```

## Page 9

1 Industry or whether to go into – go back to the university
2 and do the Ph.D.. One of the employers that had offered me a
3 job was Shell. So when I decided not to go into industry but
4 to go back to do research, they approached me and said they
5 would be willing to give me a sponsorship.
6     Q.    Do you have any post-Leeds University education?
7 And by that I mean formal education.
8     A.    I went to the Harvard Business School for – it's
9 about a five-month, six-month course in management
10 development.
11     Q.    Why did you take that course?
12     A.    Because my work history at that time had involved a
13 lot of technical management, but I also wanted to gain some
14 capabilities in other management fields ready to do general
15 management.
16     Q.    And that was while you were working for the
17 Kennecott Rubber Corporation?
18     A.    Kennecott Copper Corporation.
19     Q.    I'm sorry. Copper. I read that before and I read
20 it as rubber and then I see it was copper. Did you have any
21 jobs while you were going to school?
22     A.    Only during the summer months.
23     Q.    What kinds of jobs did you have?
24     A.    I worked for a large chemical company in my hometown
25 for a couple of years, and I worked in Sweden for a large

## Page 10

1 steel company one year.
2     Q.    What did you do for the chemical company?
3     A.    I ran experiments and the research lab.
4     Q.    Generally, what kind of experiments?
5     A.    They were on – they were looking for some
6 development of battery technology.
7     Q.    What did you do for the steel company in Sweden?
8     A.    I worked in the steel works on the shop floor for
9 most of the time, and then I worked in the engineering
10 department doing drafting work.
11     Q.    When you say "drafting work," can you tell me what
12 you mean?
13     A.    Producing engineering drawings.
14     Q.    For what types of products?
15     A.    They wanted a complete layout of their casting shop
16 to be documented, and I had this drawing that went about
17 thirty feet long.
18     Q.    All right. So, aside from the Harvard Business
19 School program, no formal education after Leeds University?
20     A.    Oh, I did – I have done courses and seminars in a
21 whole raft of things, but nothing that was more than a week or
22 two weeks in duration.
23     Q.    So, after you got out of Leeds University, you went
24 to work for the Kennecott Copper Corporation?
25     A.    One of their subsidiaries, yes.

## Page 11

1     Q.    What was the subsidiary?
2     A.    Chase Brass & Copper Company.
3     Q.    And did you work for the Chase Brass & Copper
4 Company from 1970 to 1978?
5     A.    Yes.
6     Q.    What did you do for that company?
7     A.    I started out in research in process development and
8 material development. I did some studies for them on welding
9 technology. I worked in one of their manufacturing facilities
10 trying to improve techniques for drawing copper tubing. Then
11 I moved to one of their other facilities and was in charge of
12 quality improvement and then was in charge of their entire
13 technical department.
14     Q.    I'm sorry. Were you finished?
15     A.    I worked for them as a project manager developing a
16 new casting technology.
17     Q.    The work that you did for this copper and brass
18 company, I take it was working with copper and brass
19 materials?
20     A.    Copper and brass alloys. Not just brasses, but
21 bronzes, other alloys of copper.
22     Q.    Utilizing your background in metallurgy?
23     A.    Yes.
24     Q.    Did you come to the United States to work for this
25 company –

## Page 12

1     A.    Yes.
2     Q.    – Chase Brass & Copper?
3     A.    Yes.
4     Q.    And in 1978, you moved on to the Century Brass
5 Products Company?
6     A.    Yes.
7     Q.    Why did you make that move?
8     A.    The company I was working for was closing down their
9 facilities and relocating them in South Carolina. I didn't
10 want to make that move. My wife was happy in Connecticut.
11     Q.    Where was the Chase Brass & Copper Company?
12     A.    Initially in Cleveland, and then I worked in one of
13 their plants in Connecticut.
14     Q.    Whereabouts in Connecticut?
15     A.    In Waterbury.
16     Q.    And where was Century Brass?
17     A.    That was in Waterbury.
18     Q.    What did you do for Century Brass?
19     A.    I was initially put in charge of the installation of
20 a large casting machine which we purchased in Germany. I was
21 responsible for the purchase and the implementation of the
22 technology in the facility. After that, I was in charge of
23 all technical and quality control issues and some of the
24 engineering issues.
25     Q.    And that was dealing with brass products?

Page 17

1  significant ones on that. I haven't updated it for a while.
2      Q.    All right. Have you obtained or received any kind
3  of certification as a fire investigator?
4      A.    No. At many of the conferences, such as the IAI
5  conferences, you receive partial certifications that
6  cumulatively you can use to get qualification of that nature.
7  I've received those partials, but I have never put in for the
8  qualification.
9      Q.    Do you consider yourself a cause and origin expert?
10      A.    I consider myself familiar with cause and origin. I
11  think I would qualify as an expert based on my experience, but
12  it's not the expertise that I sell as an engineer.
13      Q.    So, you don't put yourself out there as a cause and
14  origin expert?
15      A.    Correct.
16      Q.    You put yourself out there as an expert in –
17      A.    Fire investigations, particularly involving
18  appliances and electrical systems and in other types of
19  failure analyses.
20      Q.    And how did you obtain – coming from having a
21  metallurgical background, how did you obtain this expertise in
22  fire investigations involving appliances?
23      A.    Well, the engineering part of it I had done as part
24  of my schooling, the electrical engineering and mechanical
25  engineering. When I was in industry, we supplied product to

Page 18

1  many of the large electrical companies, both the manufacturers
2  of appliances and also the manufacturers of electrical
3  products. So, I interfaced with them frequently on the types
4  of materials that they wanted to use, why they wanted to use
5  them, and how they wanted to use them. In the early part of
6  my consulting period from 1984 onwards, I was asked to
7  evaluate products which had become damaged in fires, and so I
8  followed that up with the usual learning process of how
9  appliances are built. I disassembled them. I examined them.
10  I went to seminars. I read as much as I could on the subject.
11      Q.    Have you ever worked for an appliance manufacturer?
12      A.    Not directly, no.
13      Q.    Have you ever designed an appliance?
14      A.    No.
15      Q.    In your consulting business, has any appliance
16  manufacturer asked you to consult on fire-related matters?
17      A.    Yes.
18      Q.    Under what circumstances?
19      A.    Under the circumstances where a product that they
20  have either been using or promoting has been involved in fires
21  and they want an analysis and some recommendations with
22  respect to changes in the product.
23      Q.    How many times has that happened?
24      A.    Probably two or three.
25      Q.    How many appliance fires have you investigated?

Page 19

1      A.    Hundreds.
2      Q.    And those have been for persons or insurance
3  companies or entities who want to bring a – potentially want
4  to bring a lawsuit against the manufacturer?
5      A.    They have been for insurance companies primarily.
6      Q.    And those would be insurance companies looking to
7  recover – recoup their losses from a manufacturer?
8      A.    In most instances, I would say so.
9      Q.    Who is the insurance company you're working for in
10  this matter, is it Safeco?
11      A.    I believe it's Safeco.
12      Q.    You have had other cases for Safeco?
13      A.    Yes.
14      Q.    How many other cases have you had for Safeco?
15      A.    I have absolutely no idea.
16      Q.    It would be well in excess of ten or twenty, would
17  it not?
18      A.    Probably.
19      Q.    Would it be in the hundreds?
20      A.    I don't know.
21      Q.    What other insurance companies do you have cases
22  for?
23      A.    I've worked for – you name the company, I have?
24  worked for them.
25      Q.    How do you do your billing with these insurance

Page 20

1  companies? Are you on a flat rate, for instance, say, with
2  Safeco?
3      A.    No. I bill the same way for all of the fires that I
4  work on, whether it's for a plaintiff or whether it's for an
5  insurance company.
6      Q.    Let me stop you there. When you say a plaintiff,
7  you mean an individual?
8      A.    An individual, yes.
9      Q.    I'll come back to that, too.
10      A.    Okay. If I'm asked to do a basic understanding of
11  how an accident happened, which the insurance companies
12  often
do just to see what the cause of the fire was, I bill it at a
13  particular rate. If the fire is involved in litigation, then
14  I bill it at a different rate.
15      Q.    Okay. What are the two rates?
16      A.    Currently it's $155 for doing basic investigation
17  and $200 an hour for litigation.
18      Q.    Okay.
19      A.    And $240 for depositions and testimony.
20      Q.    So, for this matter, you have been at the litigation
21  rate?
22      A.    Yes.
23      Q.    You mentioned plaintiffs, you also do investigations
24  for individuals who are seeking to recoup their losses against
25  a manufacturer or an insurance company?

BSA

Case 3:02-cv-01916-JBA    Document 24-6    Filed 02/02/2004    Page 21 of 25
SAFECO -V- MAYTAG - FRANK S. WATKINSON, PH.    12/18/03    XMAX(7/7)

## Page 25

1  In-house?
2  A.  Yes.
3  Q.  Let me qualify it, then. As an outside or private
4  consulting engineer starting in 1984, you have never done any
5  kind of design work?
6  A.  No.
7  Q.  How many refrigerator fires have you investigated or
8  fires — let me put it this way, fires allegedly attributable
9  to a refrigerator?
10  A.  Good question. I can think of probably half a dozen
11  or so.
12  Q.  Okay.
13  A.  Refrigerators are commonly a component of a kitchen
14  fire, but in which the allegation is directly related to the
15  refrigerator is relatively small.
16  Q.  When you say "refrigerators are commonly a component
17  of a kitchen fire," what do you mean?
18  A.  I mean, any time a fire occurs in a kitchen, it's
19  one of the appliances that one would evaluate.
20  Q.  Okay. In other words, it's something that is
21  plugged into an outlet so you investigate and rule it out or
22  rule it in?
23  A.  Correct.
24  Q.  And the half dozen cases or so that you have
25  referenced are cases in which there was an allegation that the

## Page 26

1  fire actually started with the refrigerator?
2  A.  There was a concern that the fire had started with
3  the refrigerator.
4  Q.  Of those half a dozen cases or so, how many of those
5  were you able to actually go to the scene of the fire?
6  A.  I think every one except this.
7  Q.  And why weren't you able to go to the scene in this
8  case?
9  A.  I wasn't involved until long after the scene had
10  been cleaned up.
11  Q.  Do you prefer to go to the scene or do you prefer to
12  see the refrigerator after the scene has been discarded?
13  A.  I prefer to go to the scene.
14  Q.  And why is that?
15  A.  Because you can gain valuable information that helps
16  in your interpretation of the damage that you see in the
17  refrigerator.
18  Q.  All right. And the half dozen or so cases that you
19  have had — I'll just say involving refrigerators — do you
20  recall what your conclusions were?
21  A.  They varied. In several of them, I came to the
22  conclusion that the refrigerator was not involved directly in
23  the fire ignition. In a couple of cases, I believe that it
24  was.
25  Q.  Have you ever had a case where, say, a fire marshal

## Page 27

1  or a fire chief who was involved in extinguishing the fire and
2  writing a report implicated the refrigerator, but when you
3  looked at it, found that it wasn't the refrigerator?
4  A.  Yes.
5  Q.  And have you had cases where fire marshals or fire
6  investigators for local fire departments have implicated
7  appliances that weren't involved at all?
8  A.  Yes.
9  Q.  That's something that happens fairly commonly, isn't
10  it?
11  A.  Yes.
12  Q.  Now, in the — let me ask it this way. Are you able
13  to estimate the number of cases in which you've concluded that
14  a refrigerator was involved in ignition of a fire?
15  A.  I can only think of perhaps two.
16  Q.  And where in the refrigerator did these fires start?
17  A.  One started in the compressor compartment and the
18  other started on the power cord.
19  Q.  When you say the compressor compartment, you mean
20  the — I think some people call it the machinery cabinet in
21  the refrigerator?
22  A.  The component opening in the back of the
23  refrigerator at the base that contains the compressor and the
24  fan and the leads to the condenser and the power cord.
25  Q.  When your — strike that. And the other was the

## Page 28

1  power cord?
2  A.  Yes.
3  Q.  Okay. What had happened to the power cord in that
4  case?
5  A.  It had become crushed.
6  Q.  Under the refrigerator wheel?
7  A.  Actually, against the wall at the back of the
8  refrigerator, I believe. That was quite a long time ago and
9  it may have been crushed under the wheel of the refrigerator,
10  but it was damage to the power cord.
11  Q.  How many times have you investigated kitchen fires
12  where you actually took a look at the refrigerator? An
13  approximate number is fine.
14  A.  Twenty, thirty.
15  Q.  How do you go about examining a refrigerator in a
16  kitchen fire?
17  A.  Initially, it would be just an evaluation of the
18  physical damage to the exterior and the interior to develop a
19  sense of the burn patterns. It would be an appraisal of the
20  immediate surroundings of the refrigerator. It would be an
21  understanding of the circuit into which the refrigerator is
22  plugged, and it would be an evaluation of the electrical
23  components within the refrigerator.
24  Q.  Why don't we get more specific. As opposed to
25  looking at burn patterns, what component do you concentrate on

Page 33

1  Q.   And just generally, tell me what your conclusions
2  were after looking at the refrigerator, and then I'll get into
3  it in some more detail.
4  A.   Okay. I was surprised at the degree of damage that
5  I saw to it.
6  Q.   Can you tell me what you mean by that?
7  A.   I've seen many refrigerators that have been involved
8  in kitchen fires, not as the source of the fire but have been
9  involved in kitchen fires. And in many of them, the interior
10  of the refrigerator, the cabinet itself, remains somewhat
11  protected. In this particular case, the interior was totally
12  consumed, and that's unusual. Not rare, but unusual.
13  Secondly, the electrical compartment of the back of the
14  refrigerator was after looking at, it. Not totally clean,
15  but in good condition. I mean, it had lint and dust and those
16  kinds of things. The wiring was in good condition except
17  where there had been fire exposure on the exterior.
18  Q.   And based upon those observations, you concluded
19  what?
20  A.   I recognized that I was not going to be able to
21  determine precisely what the ignition cause – ignition source
22  of this fire was.
23  Q.   And why is that?
24  A.   Because I was looking at a refrigerator in
25  isolation, and all of the electrical components that were in

Page 34

1  the areas of major fire damage were missing or consumed. The
2  electrical components that were still present were intact and
3  did not show damage which would be consistent with them being
4  an ignition source.
5  Q.   Do you have an opinion one way or the other as to
6  whether the fire started on the interior of the refrigerator
7  cabinet?
8  A.   I think it's a distinct possibility.
9  Q.   Sitting here today, you can say that it's possible
10  that the fire started on the interior of the refrigerator
11  cabinet, but you can't say it's more likely than not?
12  A.   Based upon the information that I've seen to this
13  point, I can't reach that level of confidence.
14  Q.   And given that the remainder of the refrigerator was
15  in fairly good condition and you – I think in your report –
16  ruled out the other components of the refrigerator as the
17  source of the fire, is it fair to say that sitting here today
18  you can't state that the fire started with this refrigerator
19  more likely than not?
20  A.   I think that the evidence that I've seen suggests
21  that more likely than not it started within the refrigerator,
22  based upon the burn patterns of the refrigerator. And based
23  upon the photographs at the scene that I have examined – but
24  those are limited in extent, the photographic documentation
25  that I have seen to date – and I would want to see more of

Page 35

1  that before my confidence level would be such that I would say
2  it probably started inside the refrigerator.
3  Q.   Okay. I am just trying to get at where are we
4  today. Sitting here today, you think it's possible this fire
5  started with the refrigerator but you can't say it's probable?
6  A.   I believe that it's possible, and the fire damage to
7  the refrigerator strongly suggests that it did. It's
8  consistent with the reports that I have seen and deposition
9  testimony that I have seen. But by virtue of the fact that I
10  can't identify the ignition source within the refrigerator,
11  that's why I have some – still some difficulty with raising
12  my level of probability.
13  Q.   So, the answer is possible but not yet probable?
14  A.   Not certain.
15  MS. POLGLASE:   Why don't we go through what you
16  did and take a short break.
17
18  (A recess was taken)
19
20  MS. POLGLASE:   Back on the record.
21  Q.   (By Ms. Polglase) I think I sent a subpoena. Did
22  you bring your billing records?
23  A.   Yes.
24  Q.   Great. Sometimes that's the easiest way to go
25  through what you did. You know, what I'll do is I'll just

Page 36

1  mark your whole file and then we will just go through and,
2  sort of, identify it rather than try to mark individual
3  things.
4  A.   Okay.
5
6  (Defendant's Exhibit F, File with Contents,
7  marked for identification)
8
9  THE WITNESS:   You want to mark my copy or your
10  copy?
11  Q.   (By Ms. Polglase) No. I just marked the copy. Why
12  don't we have you just identify this. I'll show you what's
13  been marked as Exhibit F. I would just ask you if you can
14  identify that as a copy of your file.
15  A.   It appears to be.
16  Q.   All right. And could you point me to your billing
17  records?
18  A.   There is a folder with a tab on it that says, "03190
19  Attorney Ralphs, fire/refrigerator."
20  Q.   Sometimes it's easier to look at that to determine
21  when things happened. You were first contacted in the case,
22  you think, 4/28 there?
23  A.   Yes.
24  Q.   And what year would that be?
25  A.   '03.

## Page 41

1  Q.  I think I have a recollection of that. All right.
2  And on it looks like June 5th you did something.
3  A.  Yes. I got some additional file materials and
4  photographs, which included the fire marshal's report and
5  photographs from Attorney Ralphs' office.
6  Q.  And you wrote your report on June 5th. Is that
7  right?
8  A.  Yes.
9  Q.  The report itself is dated June 11th. Did you make
10  some changes between June 5th and June 11th?
11  A.  No. It's probably the timing that I made the
12  annotations in here and the time that it took to get it
13  dictated and signed out from the secretary.
14  Q.  All right. And then June 11th, something was
15  mailed. Can we presume that's your report?
16  A.  Probably photographs and report, perhaps. I don't
17  remember.
18  Q.  And then there is some activity in October regarding
19  deposition dates?
20  A.  Yes. I was contacted by Attorney Loftus who I
21  learned was taking over the file from Attorney Ralphs.
22  Q.  And from October to the present, have you done
23  anything except conference with Attorney Loftus regarding
24  deposition dates and review deposition transcription and your
25  file?

## Page 42

1  A.  I received and reviewed the deposition transcripts.
2  I received and reviewed the interrogatories of Maytag's
3  experts. I did disclosures, I should say, not
4  interrogatories. And I also saw hard copies, I think, of Mr.
5  Vallas' photographs.
6  Q.  Anything else?
7  A.  No.
8  MS. POLGLASE:  Why don't we mark this as F1.
9
10  (Defendant's Exhibit F1, Handwritten Notes,
11  marked for identification)
12
13  Q.  (By Ms. Polglase) All right. I'll show you two
14  pages of notes. I have marked them F1.
15  A.  Yes.
16  Q.  Are those your handwritten notes?
17  A.  Yes.
18  Q.  And when were these generated?
19  A.  During the inspection in New Jersey.
20  Q.  Okay. Your handwriting is better than most, but if
21  I could ask you, there are some things I can't read here.
22  There isn't that much here. Can you read these two pages of
23  notes into the record for me?
24  A.  Sure. The first line is actually a website
25  identification called Repairclinic.com. Someone had, at the

## Page 43

1  inspection, provided that to me as a potential source for the
2  schematic for this refrigerator.
3  Q.  Someone from Maytag or from Peter Vallas?
4  A.  I don't recall. Then there are several lines of
5  observations that I made as I was looking at the refrigerator.
6  "Still dust underneath. Plastic components still good. Tray,
7  too, et cetera. Cardboard separated, good except front
8  outside edge. Trademark on front of plug." And there is a
9  little sketch. "Cord sixty inches from attachment to back of
10  refrigerator to plug." In other words, the length of the
11  appliance cord. "No arcing on the power cord." Then there is
12  information that I read from the compressor. "ASH736154,
13  Model DA77L13RAU6, 150 volts, 16 hertz. Locked rotor, 14.0
14  amps. Thermally protected. Single phase R12 Matsushita
15  Electric, U.S.A. No arcing on wires or to back of
16  refrigerator." The second page is, "Aluminum evaporator and
17  tray lies in bottom left-hand side of rear on top of plastic.
18  Power strip with transformer for cell phone charger installed,
19  six outlets, Model S-50, made in China, 8467 listed E93302,
20  Curtis Manufacturing Company. Cell phone charger, desktop
21  holder, Model DC-50, WDC, 5.2 volt, input 1 amp, 5.2 watts, DC
22  5.2 volt, output one amp. Serial number DAZ 9002148, made in
23  Korea."
24  Q.  Thank you. On these sheets, I take it, are notes
25  that you made on the day of your inspection?

## Page 44

1  A.  Yes.
2  Q.  And on page two of the notes, where you were talking
3  about the power strip, what are you talking about there?
4  A.  There was a notation, I believe it was, in Peter
5  Vallas' report that there was some electrical components which
6  were found on the countertop in the kitchen. He had collected
7  those so that they could be excluded as potential ignition
8  sources.
9  Q.  Same thing with the cell phone charger?
10  A.  Yes.
11  Q.  Now, there is a page in your file that says, "New
12  project information." Is that just an intake sheet?
13  A.  Yes.
14  Q.  All right. And at the bottom it says "Information"?
15  A.  Yes.
16  Q.  "Peter Vallas did C2V." What does that mean?
17  A.  Cause and origin.
18  Q.  Oh, cause and origin?
19  A.  Yeah. "Fire originated internally - defroster?"
20  Q.  Where did you get that information from?
21  A.  From Attorney Ralphs. "Maytag looking to inspect
22  serial number. Model number destroyed. Magic Chef -
23  manufactured by Maytag four to five years old. Husband
24  noticed burning smell, opened refrigerator and smoke came out.
25  Attorney Ralphs will send documents overnight."

## Page 49

handwriting?

1   handwriting?
2   A.  The top section is my handwriting.
3   Q.  What does that page pertain to?
4   A.  That would be the information that I gave her from
5 my notes, previous notes, on the information on the
6 compressor. And the rest would be her discussion with
7 Matsushita, I would imagine, and then there is a notation to
8 call Tim Roche.
9   Q.  Why is there a notation to call Tim Roche?
10   A.  I suspect that she came back to me and told me what
11 she had found, and I suggested that she immediately call Tim
12 and ask him for the information that we were looking for.
13   MS. POLGLASE:  Mark this F3.
14
15   (Defendant's Exhibit F3, Testimony List, marked
16 for identification)
17
18   Q.  (By Ms. Polglase) F3 is your testimony list?
19   A.  Yes.
20   Q.  Are any of those refrigerator-related incidents?
21   A.  I don't know what the arbitration in 1995 was. It
22 says, "Electrical fire at home," and I don't know what the
23 circumstances of that were. None of the others are related to
24 refrigerators.
25   Q.  From your file, it appears that you have reviewed

## Page 50

1 the depositions of Maria Claro, Noberto Claro and Noberto
2 Claro, Jr.. Is that correct?
3   A.  Yes.
4   Q.  And have you reviewed the deposition of Patricia
5 Ariola?
6   A.  No.
7   MS. POLGLASE:  Mark this.
8
9   (Defendant's Exhibit F4, Report, marked for
10 identification)
11
12   Q.  (By Ms. Polglase) I'll show you what's been marked
13 as F4, and that's a copy of your report. Is that right?
14   A.  Yes.
15   Q.  And you have reviewed the reports of Maytag's
16 experts in this case?
17   A.  The disclosures?
18   Q.  Yes.
19   A.  Yes.
20   Q.  Did you disagree with these disclosures in any way?
21   A.  Of course.
22   Q.  In what ways did you disagree?
23   A.  I had no comment on the disclosure of Mr. Dolinsek
24 other than that he can't spell my name. The disclosure of Mr.
25 Splain concerned me on a couple of issues. I'm not sure how I

## Page 51

1 – his statement that the impossibility of reaching a
2 conclusion in large part is due to the Plaintiff's
3 representatives' and expert's failure to examine and record
4 the incident scene properly. I'm not sure that that's an
5 accurate statement.
6   Q.  Why aren't you sure that that's an accurate
7 statement?
8   A.  I don't know what he has seen of the photographs,
9 and I don't know whether the photographs that I have seen
10 represent the entirety of those that are available. And the
11 reports of the facts and the opinions and conclusions appear
12 to be not entirely consistent with the deposition testimony of
13 the Claros.
14   Q.  What is inconsistent?
15   A.  Well, first of all, he says that she was using the
16 oven to bake and also frying oil on the stove top for the
17 evening dinner. I think with respect to the timing of the
18 fire, while she may have used a little olive oil to saute the
19 onions in her description, that would hardly constitute frying
20 oil on the stove top. And down below when he says that, "It's
21 probable that without her knowing it, Mrs. Claro, accidentily
22 started the fire while she was cooking. The fire may have
23 appeared to her that it started within the refrigerator, but
24 the black smoke was coming from another area such as frying
25 oil overheating." I don't think that that is consistent with

## Page 52

1 the testimony. In his opinions and conclusions, the
2 electrical stove was not fully examined and documented. I
3 don't know that for a fact.
4   Q.  You don't know either way?
5   A.  I don't know either way. Cooking oil was used to
6 fry foods. The implication appears to be that there was a pan
7 of oil that could have easily become overheated, and that's
8 not consistent with her testimony. Relative items such as
9 pots and pans which were in use were not documented or
10 preserved. They do not appear to have been preserved. I
11 don't know whether or not they were fully documented. The
12 burn pattern visible in the photographs indicates the classic
13 V pattern over the stove and the sink. I would take issue if
14 he is looking at the same photographs that I'm looking at.
15 His conclusion, with respect to the refrigerator representing
16 an external attack, the burn patterns on the outside of the
17 refrigerator support from a fire that came from in front of
18 the floor, in front of the refrigerator, and burned up in a
19 classic V pattern. I would agree that that conclusion is
20 accurate, but that doesn't exclude a fire which started
21 internal to the refrigerator as being the source for that V
22 pattern.
23   Q.  And why is that?
24   A.  Because the doors were clearly opened on this
25 refrigerator during the fire and a lot of the plastic debris

### Page 57

1   there was nothing anywhere near this refrigerator that could
2   have started this fire, just looking at the physical evidence,
3   isn't it certainly possible that there was a fire that started
4   external to this refrigerator at the bottom and the front?
5       A.   It's possible, but there is neither anecdotal
6   evidence nor physical evidence to support that.
7       Q.   When you say "physical evidence," what do you mean?
8       A.   I mean, no one collected debris from that area
9   immediately following the fire. I haven't seen photographic
10  documentation of that area of the floor immediately following
11  the fire. It may exist. I haven't seen it.
12      Q.   Are there any photographs that – well, strike that.
13  The refrigerator was moved at some point during the fire.
14  Isn't that right?
15      A.   It appears that it was probably moved twice.
16      Q.   Can you say what you mean?
17      A.   Mr. Claro's description of the incidents immediately
18  leading up to and following the fire suggest that he moved the
19  refrigerator from its location along the wall to try to get it
20  out through the door. And there is certainly what appears to
21  be a protected area where the refrigerator had been located.
22  And there is physical bending of the plug which would be
23  somewhat consistent with him trying to pull the plug out, but
24  his description appears to suggest that he got it right up to
25  the door. The photographs show it moved back into the – more

### Page 59

1   I'd like to see a clearer view of the stove and the items that
2   were on it and around it. I'd like to see the interior of the
3   stove. There is a description of what Mrs. Claro was doing,
4   and I haven't seen that documented. I would like to see the
5   condition of the floor where the refrigerator had been
6   located. It appears in some of the photographs that it's a
7   ceramic tile floor, and that's not confirmed or denied in any
8   of the descriptions that I have seen. I think that's of great
9   interest. I haven't seen good documentary photographs yet of
10  the ceiling above the various areas of the kitchen to see how
11  the fire propagated; all of those may well be available and I
12  would like to see them.
13      Q.   Okay. What about the ceramic tile floor would be of
14  interest to you?
15      A.   Well, it's a non-combustible floor. And if you look
16  at the possibility of a fire originating on the floor, perhaps
17  as Mr. Splain surmises from a cooking oil accident, one would
18  have to try to imagine how an incident on the stove would
19  result in a fire on the floor in front of the refrigerator.
20  The combustibility of the floor materials would be of great
21  interest.
22      Q.   Or the presence of debris or markings on the floor
23  that would show the fire started with a box used for trash, a
24  barrel used for trash?
25      A.   You still have to have an ignition source for it.

### Page 58

1   towards the center of the room, and that's entirely possible
2   if the fire department entered the room from the door. So, I
3   suspect that it was moved once and then back in again.
4       Q.   So, it's certainly quite possible that any physical
5   evidence at the base of the refrigerator could have been
6   disturbed during all of this moving?
7       A.   It's possible.
8       Q.   Now, you mentioned at the beginning of the
9   deposition that there was some additional evidence that you
10  wanted to look at in order to finalize your conclusion in this
11  case. Can you tell me what that evidence is?
12      A.   There are some items which are not sufficiently
13  clearly visible in the photographs that I have seen to date,
14  and I would like to know if there are other – additional
15  photographs available. For example, my report has however
16  many photographs in it, but I actually took seventy-eight
17  photographs. I suspect that Mr. Vallas may well have selected
18  photographs of the scene and didn't utilize all of them in his
19  report. I would very much like to see those. And the same
20  goes for the fire marshal or the claims adjuster; the issues
21  that they might have been focusing on are not necessarily the
22  ones that I would like to examine.
23      Q.   And what are those things that you describe as not
24  sufficiently visible?
25      A.   There is not a very good photograph of the stove.

### Page 60

1       Q.   Understandable. But you would certainly want to
2   know what was around there?
3       A.   Yes. One other item while I recall, I have not
4   received or seen the exhibits which were attached to the
5   Claros' depositions which indicated a layout of the kitchen
6   area, and I would like to see that.
7       Q.   Have you investigated fires – other fires where
8   statements of the homeowners or those people in the vicinity
9   of the fire did not match with the physical evidence?
10      A.   There is usually some level of contradiction between
11  statements of the homeowner in terms of time or observations
12  that don't exactly match up with the physical evidence.
13  Sometimes it's more extreme than that.
14      Q.   So, there have been instances where you simply
15  didn't believe the verbal description of what had happened?
16      A.   Yes.
17      Q.   Do you believe the Claros in this instance?
18      A.   I believe that their observations are consistent
19  with the physical evidence as it exists and the documentary
20  photographs of it.
21      Q.   That you have available to you?
22      A.   Correct.
23      Q.   All right. I just want to turn to your photographs
24  for a few minutes. Photographs A1 and A2 show the left,
25  actually, as your facing it, the right side of the

---