# WATERBURY FIRE MARSHAL'S
# FIRE INVESTIGATION REPORT

| | |
|---|---|
| INCIDENT NUMBER # : | 00-3625 |
| DATE: | November 13, 2000 |
| ADDRESS: | 35 Edgewood Avenue |
| ENGINES: | Engines 2, 10 & 5; Battalion 2; Rescue 9; Trucks 1 & 3 responded at 17:39 – 20:01 hours<br>Car 5 responded at 17:40 – 18:59 hours<br>Car 42 responded at 17:49 – 20:01 hours<br>Car 45 responded at 18:17 – 20:01 hours |
| INCIDENT COMMANDER AND CO. ON SCENE: | D.C. Gary Gray |
| INCIDENT DESCRIPTION: | Structure Fire |
| INJURIES: | Owner: slight burns to hands |
| SCOPE OF INVESTIGATION: | To determine the cause and origin of the fire |
| DATE AND TIME OF INVESTIGATION: | November 13, 2000 at 1749 hours to 2001 hours |
| WEATHER: | 40°F approx. |
| OWNER: | Norberto Claro |
| BUILDING DESCRIPTION: | One family cape with in-law apartment in basement |
| EXTERIOR EXAM: | Fire damage to the "C, D" corner of the structure. This is where the back entrance and porch are located. There was fire damage to the second floor directly above the rear entrance. No other fire damage. There was smoke and heat damage to the walls on the first floor "D: side (kitchen area) around the window frames. |
| INTERIOR EXAM: | Smoke damage throughout the structure. The least amount upstairs and progressed as you reached the first floor and into the kitchen. The kitchen had extensive fire damage with most in the area around the back door. |

Report # 00-3625

**ELECTRICAL EXAM:**    I examined the outlets in the area of origin and ruled them out as a cause of the fire. Kitchen beakers tripped and range. There was no sign of arcing in the outlets.

**AREA OF ORIGIN:**    Kitchen

**POINT OF ORIGIN:**    Refrigerator/freezer

**FLAME SPREAD:**    From appliance to walls and ceiling.

**FUEL LOAD:**    Ordinary combustibles within kitchen

**PHOTOS:**    Yes

**DAMAGE ESTIMATE.:**    $25,000.00

**SCENE RELEASED TO:**    Owner

**COMMENTS:**    Norberto smelled something funny while he was in the living room. So he went to the kitchen and found that it was coming from the refrigerator/freezer. He opened the freezer and seen fire in the lower left side. He tried to get the appliance out the back door and didn't succeed. He burned his hands in the process. The fire eventually spread from the appliance to the walls and ceiling.

**CONCLUSION:**    Based on the physical evidence at the scene and witness interviews I believe this fire was caused by a malfunction of the refrigerator/freezer.

**STATUS:**    Closed

**INVESTIGATOR:**    Deputy Marshal Patrick Ariola

DFM *Patrick Ariola*
Signature

PA/sf

DEPARTMENT OF PUBLIC SAFETY
DIVISION OF STATE POLICE
SP-227-C (Rev. 11/85)

**LOCAL FIRE REPORT TO THE STATE FIRE MARSHAL**
**BASIC INCIDENT REPORT**
**FIRE DEPARTMENT: City of Waterbury**

☐ REVISED REPORT

| PDIO | INCIDENT NO. | DIR.NO. | MO | DAY | YEAR | DAY OF WEEK | ALARM TIME | ARRIVAL TIME | TIME IN SERVICE |
|------|--------------|---------|----|----|------|-------------|-----------|--------------|-----------------|
| 06240 | 2003625 | 1 | 11 | 300 | MONDAY | 21739 | 1141 | 2001 |

TYPE OF SITUATION FOUND: STRUCTURE FIRE 111
TYPE OF ACTION TAKEN: EXTINGUISH 1
MUTUAL AID: ☐ REC'D ☑ GIVEN

FIXED PROPERTY USE: ONE FAMILY HOUSE 411
IGNITION FACTOR: UNDER INVESTIGATION 010

CORRECT ADDRESS: 35 EDGEWOOD AVE WTBY
ZIP CODE: 06106
CENSUS TRACT: 3151500

OCCUPANT NAME (LAST, FIRST, MID): CLARO NORBERTO
TELEPHONE: 7568672
ROOM OR APT.: NA
DATE OF BIRTH: 121956

OWNER NAME (LAST, FIRST, MID): CLARO NORBERTO
ADDRESS: 35 EDGEWOOD AVE
TELEPHONE: 7568412
DATE OF BIRTH: 121956

METHOD OF ALARM FROM PUBLIC: TEL 911
DISTRICT: 4
SHIFT: B
NO. ALARMS: 1

NUMBER FIRE SERVICE PERSONNEL RESPONDED: 34
NUMBER ENGINES RESPONDED: 3
NUMBER AERIAL APPARATUS RESPONDED: 2
NUMBER OTHER VEHICLES RESPONDED: 5

NUMBER OF INJURIES FIRE SERVICE: 0 | OTHER: 0
NUMBER OF FATALITIES FIRE SERVICE: 0 | OTHER: 0

COMPLEX: DWELLING 411
MOBILE PROPERTY USE: NA 018

AREA OF ORIGIN: KITCHEN 24
EQUIPMENT INVOLVED IN IGNITION: UNDER INVESTIGATION 100

FORM OF HEAT OF IGNITION: UNDER INVESTIG 010
TYPE OF MATERIAL IGNITED: UNDER INVEST 010
FORM OF MATERIAL IGNITED: UNDER INVEST 010

METHOD OF EXTINGUISHMENT: PRECONNECT HOSE 6
LEVEL OF FIRE ORIGIN: GRADE TO 9' 1
ESTIMATED LOSS (DOLLARS ONLY): 4.0000

VALUE OF BUILDING: UNK
VALUE OF CONTENTS: UNK
INSURANCE ON BUILDING: UNK
INSURANCE ON CONTENTS: UNK

NUMBER OF STORIES: 3 3
CONSTRUCTION TYPE: WOOD FRAME 8

EXTENT OF FLAME DAMAGE: STRUCTURE OF ORIGIN 6
EXTENT OF SMOKE DAMAGE: STRUCTURE OF ORIGIN 6

DETECTOR PERFORMANCE: NONE 8
SPRINKLER PERFORMANCE: NONE 8

IF SMOKE SPREAD BEYOND ROOM OF ORIGIN: WOOD
TYPE OF MATERIAL GENERATING MOST SMOKE: 63
AVENUE OF SMOKE TRAVEL: OPENINGS 15

FORM OF MATERIAL GENERATING MOST SMOKE: WOOD 11

| IF MOBILE PROPERTY | YEAR | MAKE | MODEL | SERIAL N° | ST | LICENSE N° |
|--------------------|------|------|-------|-----------|----|-----------| 
| IF EQUIPMENT INVOLVED IN IGNITION | YEAR | MAKE | MODEL | SERIAL N° | | |

COMMENTS:
UNDER INVESTIGATION BY ARIOLA (42) AND FISHER (45)

INVESTIGATED BY
LOCAL FIRE MARSHAL _____ U
LOCAL POLICE DEPT. _____
STATE FIRE MARSHAL _____

OFFICER FILLING OUT REPORT—SIGN AND PRINT NAME: DC
DATE: 11-13-00

FIRE MARSHAL SUBMITTING REPORT: _____ ID: _____ DATE: _____

# INCIDENT REPORT

## Waterbury Fire Department

NFIRS 1

FILL IN THIS REPORT
IN YOUR OWN WORDS

☐ DELETE
☐ CHANGE

| FDID 06240 | INCIDENT # 003625 | EXP # 00 | MO DY YR 11/13/00 | WEEK DAY Mon | 2 | ALARM TIME 17:39 | ARRIVAL TIME 17:41 | TIME IN SERVICE 20:01 |
|---|---|---|---|---|---|---|---|---|

| TYPE OF SITUATION FOUND Structure fire | 11 | TYPE OF ACTION TAKEN Extinguishment | 1 | MUTUAL AID ☐ REC'D ☐ GIVEN |
|---|---|---|---|---|

| FIXED PROPERTY USE 1-fam dwell year rnd | 411 | IGNITION FACTOR Undeterm/not reported | 0 |
|---|---|---|---|

| CORRECT ADDRESS 35 Edgewood Avenue, Waterbury, CT | ZIP CODE 06706 | CENSUS 351500 |
|---|---|---|

| OCCUPANT NAME (LAST, FIRST, MI) Claro, Norberto | TELEPHONE 2037568672 | ROOM OR APT. |
|---|---|---|

| OWNER NAME (LAST, FIRST, MI) Claro, Norberto | ADDRESS 35 Edgewood Avenue, Waterbury, CT | TELEPHONE 2037568672 |
|---|---|---|

| METHOD OF ALARM FROM PUBLIC Phone tie-in to FD | 7 | DISTRICT 004 | SHIFT B | # ALARMS 1 |
|---|---|---|---|---|

| FIRE SERVICE PERSONNEL RESPONDED 034 | NUMBER ENGINES RESPONDED 003 | AERIAL APPARATUS RESPONDED 002 | OTHER VEHICLES RESPONDED 005 |
|---|---|---|---|

| NUMBER OF INJURIES FIRE SERVICE 000 | OTHER 001 | NUMBER OF FATALITIES FIRE SERVICE 000 | OTHER 000 |
|---|---|---|---|

| COMPLEX Dwelling complex 1-2 family | 41 | MOBILE PROPERTY TYPE Mobile property type n/a | 8 |
|---|---|---|---|

| AREA OF FIRE ORIGIN Kitchen, cooking area | 24 | EQUIPMENT INVOLVED IN IGNITION Undetermined equipment | 0 |
|---|---|---|---|

| FORM HEAT IGNITION Form undetermined | 00 | TYPE OF MATERIAL IGNITED Undet/not reptd. | 0 | FORM MATERIAL IGNITED Form undeterm. | 0 |
|---|---|---|---|---|---|

| METHOD OF EXTINGUISH Hose:precon. to hydr | 6 | LEVEL OF FIRE ORIGIN Grade to 9' above gr | 1 | ESTIMATED LOSS 000,040,000 |
|---|---|---|---|---|

| NUMBER OF STORIES 3 to 4 stories. | 3 | CONSTRUCTION TYPE Unprotected wood frame | 8 |
|---|---|---|---|

| EXTENT OF FLAME DAMAGE Structure of origin | 6 | EXTENT OF SMOKE DAMAGE Structure of origin | 6 |
|---|---|---|---|

| DETECTOR PERFORMANCE No detectors present | 8 | SPRINKLER PERFORMANCE No equipment present | 8 |
|---|---|---|---|

| IF SMOKE SPREAD BEYOND ROOM OF ORIGIN | TYPE OF MATERIAL GENERATING MOST SMOKE Sawn wood | 63 | AVENUE OF SMOKE TRAVEL Opening in construction | 5 |
|---|---|---|---|---|
| | FORM OF MATERIAL GENERATING MOST SMOKE Structural membr | 17 | | |

| IF MOBILE PROPERTY | YR | MAKE | MODEL | SERIAL NO. | LICENSE NO. |
|---|---|---|---|---|---|
| IF EQUIPMENT INVOLVED IN IGNITION | YR | MAKE | MODEL | SERIAL NO. | |

☒ CHECK IF COMMENTS ON REVERSE SIDE

| OFFICER IN CHARGE (NAME, POSITION, ASSIGNMENT) Gray, Gary, Deputy Chief | DATE 11/13/00 |
|---|---|
| MEMBER MAKING REPORT (IF DIFFERENT FROM ABOVE) Caisse, Edward | DATE 12/12/00 |

Under investigation by Ariola (42) and Fisher (45).



FIRE AND EXPLOSION ANALYSIS • ANALYTICAL LABORATORY
INVESTIGATIVE ENGINEERING SERVICES

# PETER VALLAS ASSOCIATES Inc.

### A Professional Corporation

Internet: http://www.petervallas.com
E-mail: experts@petervallas.com

★ **Corporate Headquarters**
105 Main Street
Hackensack, NJ 07601
(201) 487-8901
Fax: 201-487-1253

★ **Northern Regional Office**
106 Washington Avenue
Endicott, NY 13760
(607) 785-8250
Fax: 607-785-6541

★ **Eastern Regional Office**
100 Mill Plain Road
Danbury, CT 06811
(203) 791-0100
Fax: 203-791-0200

★ **Northwestern Regional Office**
169 North Main Street
Warsaw, NY 14569
(716) 786-9980

★ **Laboratory Facilities**
85 Zabriskie Street
Hackensack, NJ 07601
(201) 487-0266

★ **Pennsylvania Regional Office**
Pennsylvania Avenue
Philadelphia, PA 19130
(215) 564-2488

★ **Northeastern Regional Office**
1740 Massachusetts Avenue
Boxborough, MA 01719
(978) 264-9221
Fax: (978) 264-9224

Date of Report:     January 10, 2001

Total Pages:       25

Mr. Rich Fradette
SAFECO INSURANCE COMPANY
P. O. Box 9202
Forestville, CT 06010

Fax Number:     <u>860-589-9448</u>

☑ VIA MAIL AND FACSIMILE ( 4 PAGES)

File:   003184
Re :   CLARO, NORBERTO
    <u>Loss:</u>   35 Edgewood Avenue, 1st Fl.
        Waterbury, CT 06706
C/F:   56A003184168
Pol.:   56A003184168
D/L :   November 13, 2000

Prepared by:   Peter S. Vallas, CFEI, CFII
        Chief Executive Officer

**PETER VALLAS ASSOCIATES Inc.** reserves the right to amend and/or supplement this report in the event additional information, documentation or evidence becomes available.

**THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE. RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY THE RESPONSIBILITY OF ADDRESSEE.**

• National Fire Protection Association • National Association of Fire Investigators • International Association of Arson Investigators •
• New Jersey Chapter IAAI • New York Chapter IAAI • International Association of Bomb Technicians and Investigators • American Concrete Institute •
• Building Officials and Code Administrators International • International Society of Fire Services Instructors • Private Detectives Association •

**PETER VALLAS ASSOCIATES Inc.**

# PRODUCT ANALYSIS

## PURPOSE OF THE ASSIGNMENT

In accordance with your request, on-site examinations and securing of a refrigerator and other components were performed for the purpose of identifying the cause of a fire occurrence. It was reported that the fire originated in the refrigerator as witnessed by the homeowner. After careful on-site examinations, follow-up investigation, and laboratory analysis, the following are the results of our findings.

## DESCRIPTION OF THE STRUCTURE

The subject structure was identified as a wood frame building and indicated to be a private residence. Our inspections were confined to, but not limited to, the kitchen in which the refrigerator and fire damage existed.

## FIRE ORIGIN AND CAUSE ANALYSIS

On-site examination and securing of physical evidence were conducted on November 16, 2000. The site examination clearly suggested that the fire did originate within the refrigerator. Fire damage to the refrigerator was extensive. An examination was made of all electrical wiring in the wall, including the wall receptacle. It was noted that no evidence of an electrical failure was found, therefore eliminating the electrical wiring in the building as a cause of the fire occurrence.

In the kitchen there was a dishwasher and coffeemaker. On the opposite side of the wall examinations indicated that they were affected by some slight heat and smoke, but were not involved in the cause of the fire.

Examinations made of other room areas revealed that smoke and heat were an issue throughout the house, but once again, I ruled out any evidence of fire developing from any other location.

Overall examinations made of the refrigerator revealed evidence of severe fire damage, particularly to the interior compartment. The fire patterns throughout the structure indicated that some patterns did not exist where the fire was originally located. It was ultimately learned that upon discovering the fire burning in the rear base of the refrigerator, the homeowner attempted to drag it out the door, but was unsuccessful. The fire damage in this particular hallway leading to the rear door clearly suggested development from the fire burning within the refrigerator itself.

The refrigerator, along with three outlets, a power strip, and a cell phone charger, were all secured from the scene and transferred to our laboratory facilities for further examinations and analysis.

---

FIRE AND EXPLOSION ANALYSIS ★ ANALYTICAL LABORATORY ★ INVESTIGATIVE ENGINEERING SERVICES

# PETER VALLAS ASSOCIATES Inc.

## OTHER RELEVANT INFORMATION

Follow-up conversations with the homeowner indicated that it was approximately four to five years old. It was purchased new at Brooklyn Appliance in Waterbury, Connecticut. Mrs. Claro was cooking when she detected the odor of smoke. She opened the refrigerator and saw smoke and flames at the bottom of the refrigerator against the back wall on the interior of the unit. The insureds attempted to remove the refrigerator from the premises, but were unsuccessful. They did not have any paperwork, manuals, or sales slips for the refrigerator. They also knew of no repair work or servicing to the refrigerator prior to the fire. No other product or item was plugged into the outlet servicing the refrigerator power cord.

## LABORATORY ANALYSIS AND/OR TESTING

Laboratory inspections and analyses are conducted in accordance with investigative procedures. Specialized engineers associated with our firm can perform continued investigative engineering or testing. Additional invasive or destructive analyses may also be required pending authorization from all interested parties associated with the investigation on a case.

PETER VALLAS ASSOCIATES Inc. recommends that any interested parties reviewing this document be aware we may be retaining property/evidence relating to this loss. It is mandatory that we be notified of any potential interests. Lack of notification may result in the ultimate destruction of the property/evidence.

Overall examinations of the refrigerator revealed no nameplate or identification label whatsoever. Examinations revealed severe fire damages to the interior compartment to the point that most of the plastic material was either consumed or melted down. The fire patterns on the side and rear of the unit were consistent with evidence of fire development from within the unit.

Clearing and sifting at the base of the unit revealed evidence of a severe meltdown and the uncovering of electrical wiring and other components could not be performed.

An examination made of the power cord revealed no evidence of any short-circuiting, beading, or failure. The rear of the unit where the compressor, fan motor, and condensing coil were located, along with other wires revealed no evidence of any failure or fire development from this compartment. It is obvious that the fire originated within the base of the unit, and in all probability, a defrost timer or related wiring is the potential ignition source. Until the material is removed and X-raying of the melted plastic is performed, no further conclusive opinion on the exact item can be made. It is know, however, that this refrigerator, only four to five years old, ultimately had a defective and/or malfunctioning electrical component or wiring that ultimately caused the fire occurrence. The lack of any physical damage and prior servicing would clearly indicate that the

**PETER VALLAS ASSOCIATES Inc.**

manufacturer's product was defective in some way, which ultimately resulted in a failure and the fire damages that exist.

Detailed examinations made of the three outlets removed from the kitchen revealed no evidence of electrical short-circuiting, arcing, or any failure to suggest their involvement in the cause of the fire occurrence.

Examining the power strip and the remains of the cell phone charger revealed that they were affected by external heat and flame conditions. Slight melting of these materials did exist, but once again, they are not consistent with the eyewitness account of the fire developing in the refrigerator, and there is no physical evidence to suggest failure or their involvement in the cause of the fire occurrence. These items have been ruled out, and are considered victims of the fire occurrence.

Our laboratory examination has confirmed that the fire originated within the subject refrigerator, and the refrigerator is the direct cause of the fire.

## CONCLUSIONS

Subsequent follow-up conversations were held with the homeowner in an attempt to locate any manuals or paperwork, and/or receipts for the refrigerator. The insureds reconfirmed that the papers had burned up in the fire, and they did not have copies. They also confirmed that the name that was on the refrigerator was Magic Chef.

It is the opinion of this organization that the subject fire occurrence developed as a direct result of an electrical malfunction within the refrigerator unit. All fire patterns, the eyewitness account, and laboratory analysis confirms fire development from the refrigerator. An electrical malfunction and/or product defect existed within the equipment located at the rear base of the refrigerator. When sufficient levels of fuel, heat, and oxygen were simultaneously attained, the subject fire propagated to a free-burning state, subsequently causing the damages that exist.

At this time, it is recommended that legal counsel be consulted in order to evaluate the potential responsibility and involvement of the manufacturer of the refrigerator.

It is also recommended that the manufacturer be placed on notice regarding their potential involvement. The physical evidence will be secured at our laboratory facility pending their notification and the potential property inspection with the manufacturer and our office.

FIRE AND EXPLOSION ANALYSIS ★ ANALYTICAL LABORATORY ★ INVESTIGATIVE ENGINEERING SERVICES

# PETER VALLAS ASSOCIATES Inc.

003184
Page 4

We want to thank you for the opportunity to have been of service to you. If any additional information is required or follow-up is to be conducted, please contact us.

Respectfully submitted,

PETER VALLAS ASSOCIATES Inc.

Peter S. Vallas, CFEI, CFII
Chief Executive Officer

PSV:mem
Encl.

## PHOTOGRAPHIC DOCUMENTATION

1

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF CONNECTICUT
 3
 4  SAFECO INSURANCE COMPANY OF        :
    AMERICA as subrogee of ROBERTO     :
 5  AND MARIA CLARO,                   :
             Plaintiffs,               :  CIVIL ACTION NO.:
 6                                     :  3:02CV-1916JBA
    vs.                                :
 7                                     :  JANUARY 7, 2004
    MAYTAG CORPORATION,                :
 8          Defendant.                 :
 9
10
11  --------------------------------------------------
          DEPOSITION OF PETER VALLAS
12  --------------------------------------------------
13
    APPEARANCES:
14
15      LAW OFFICES OF STUART G. BLACKBURN
            Attorneys for the Plaintiffs
16          2 Concorde Way, P.O. Box 608
            Windsor Locks, Connecticut 06096-0608
17          (860) 292-1116
        BY: ERIK LOFTUS, ESQ.
18
19      CAMPBELL CAMPBELL EDWARDS & CONROY
            Attorneys for the Defendants
20          One Constitution Plaza
            Boston, Massachusetts  02129
21          (617) 241-3000
        BY:  TIMOTHY M. ROCHE, ESQ.
22
23  NIZIANKIEWICZ & MILLER REPORTING SERVICES
            972 Tolland Street
24      East Hartford, Connecticut 06108-1533
            (860) 291-9191
25
            DONNA M. DeCIANTIS, LSR
```

2

```
 1        Deposition of PETER VALLAS, taken on behalf of the
 2  defendants in the hereinbefore entitled action pursuant
 3  to the Federal Rule of Civil Procedure 30 and 45 before
 4  Donna M. DeCiantis, duly qualified notary public in and
 5  for the State of Connecticut, held at the offices of
 6  Campbell Campbell Edwards & Conroy, 100 Pearl Street,
 7  Hartford, Connecticut, commencing at 10:00 a.m.,
 8  Wednesday, January 7, 2004.
```

3

```
 1                    I N D E X
 2  WITNESS
 3  PETER VALLAS
 4
 5      Direct examination by Attorney Roche..........4
 6
 7  --------------------------------------------------
            INDEX OF EXHIBITS
 8         (Marked for Identification)
 9  DEFENDANT'S EXHIBITS
10  1    Mr. Vallas's CV...............................6
11  2    Head sheet...................................24
12  3    Group of photos..............................29
13  4    Group of unused photos.......................30
14  4-A  Photograph...................................77
15  4-B  Photograph...................................78
16  5    Mr. Vallas's report..........................30
17  6    Property evidence transfer document..........34
18  7    Handwritten notes............................35
19  8    Packet of documents..........................88
20  9    Handwritten notes, photocopied business card...90
21  10   List of testimony...........................104
```

4

```
 1        (The deposition commenced at 10:00 a.m.)
 2        ATTORNEY ROCHE:  We will reserve all
 3  objections except as to form of the question
 4  and motions to strike until the time of
 5  trial?
 6        ATTORNEY LOFTUS:  Right.
 7        ATTORNEY ROCHE:  Does the witness want
 8  to read and sign the transcript?
 9        ATTORNEY LOFTUS:  Mr. Vallas?
10        THE DEPONENT:  Yeah, I think I would.
11        ATTORNEY ROCHE:  Thirty days from
12  receipt, and we'll waive the notary
13  provision?
14        ATTORNEY LOFTUS:  Right.
15        ATTORNEY ROCHE:  Swear the witness.
16  P E T E R   V A L L A S,
17      first duly sworn by Donna M. DeCiantis,
18      shorthand reporter and Notary Public within
19      and for the State of Connecticut, was
20      examined and testified as follows:
21              DIRECT EXAMINATION
22  BY ATTORNEY ROCHE
23      Q    Good morning, Mr. Vallas.  My name is
24  Timothy Roche.  We met a few minutes earlier.  I
25  represent Maytag Corporation in this lawsuit.  I'm
```

5

1  going to be asking you some questions today about the
2  investigation that you performed and some of your
3  opinions in the case.  You've been deposed before, I'm
4  sure.
5      A   Many many times.
6      Q   Okay.  Do you have a listing of trial
7  testimony that you have given in the last four years?
8      A   I do.  And that was part of your request
9  today, and I failed to bring it but I can have that --
10 when I went over that list this morning, reading the
11 document, I saw that was one of your requests.  I do
12 have a list of deposition and trial testimony.  It's
13 not my entire career.  I do have that, and I can
14 provide that to you.
15     Q   Is it possible that we can get someone from
16 your office to fax it to us here at this office?
17     A   Absolutely.
18     Q   Maybe we'll take a break in a few minutes
19 and do that.  Can you give me your full name, please?
20     A   Peter, middle initial S, Stephen Vallas,
21 V-a-l-l-a-s.
22     Q   And your date of birth, sir?
23     A   February 3, 1964.
24     Q   And where do you currently reside?
25     A   12 Oakwood Drive, Woodcliff -- one word --

6

1  Lake, New Jersey.
2      Q   Can you give me a sense of your educational
3  background?
4      A   I completed high school in 1982.  From that
5  point on over the course of years I have taken many
6  seminars, courses, certification classes, etc., all
7  associated with fire and explosion investigation.  I
8  did not attend college.  And a copy of all of that
9  documentation is in a curriculum vitae that I brought
10 with me today.
11            ATTORNEY ROCHE:  Why don't we mark the
12        curriculum vitae as Exhibit No. 1 before we
13        get too far along.
14        (Defendant's Exhibit No. 1, Mr. Vallas's
15          curriculum vitae, was marked for
16          identification.)
17     Q   And the document that we've marked as
18 Exhibit No. 1 is your current curriculum vitae; is that
19 correct?
20     A   I believe so, yes.
21     Q   You said that you graduated from high school
22 in 1982.  Where was that high school?
23     A   Jersey City, New Jersey.
24     Q   Can you give me a sense of your employment
25 history since the time you graduated from high school?

7

1      A   Well, in 1979 I actually -- Peter Vallas
2  Associated was incorporated, and I was working under
3  the direction of my father more or less as an
4  apprentice fire investigator since 1979 and then full
5  time immediately in 1982 with Peter Vallas Associates.
6      Q   Are you a junior?
7      A   I'm a few things by name, but yeah,
8  technically you can call me Peter Vallas, Jr.  There is
9  a Peter R. Vallas, who is my father and senior and
10 partner, or I should say I'm his partner -- in the
11 firm.
12     Q   So your dad founded the firm back in 1979,
13 okay.  And you said that you've been working with him
14 since that time?
15     A   Sure, yeah.
16     Q   Have you ever worked as a firefighter?
17     A   For I think approximately one year.  I was a
18 volunteer firefighter for Islin, I-s-l-i-n, New Jersey
19 Fire Department.
20     Q   Now, the CV we marked as Exhibit No. 1, are
21 these all -- does this CV reflect all of your
22 credentials, or is this a firm-type CV for Peter Vallas
23 Associates?
24     A   This would represent all of my personal
25 education and credentials and professional training.

8

1  The only thing that I'll point you to that may
2  represent the firm is that Peter Vallas Associates is a
3  licensed engineering firm in the state of New Jersey.
4  I am not a licensed engineer, but I hold the license
5  with professional engineers on staff.  That would
6  represent our firm.
7      Q   So that's a firm-type license?
8      A   Correct.
9      Q   Based on the credentials of other members of
10 Peter Vallas Associates?
11     A   That's correct.
12     Q   So you don't have any degree in mechanical
13 or electrical engineering; is that correct?
14     A   Correct.
15     Q   And you're not a refrigeration expert, are
16 you?
17     A   No.
18     Q   Are you an appliance expert?
19     A   I've testified on cases regarding either
20 appliances or components that were in appliances.
21     Q   As to the design of the appliance, or as to
22 whether or not that appliance was the cause and origin
23 of the fire?
24     A   Strictly from a fire investigator's opinion
25 as to the origin and cause of the fire either

9

1  originating in it or not originating within it.
2      Q    So you're not an appliance design type
3  expert?
4      A    No, I am not.
5      Q    Now, you said you were sort of an apprentice
6  back in '79 while you were still in high school with
7  your dad's firm?
8      A    Correct.  It was weekends, nights, days off,
9  vacations, etc., I would work in the company handling
10  evidence and conducting fire investigation with my
11  father, and perhaps even a training seminar or two back
12  then I would have attended.
13      Q    And upon graduation from high school, you
14  began working full time for Peter Vallas Associates?
15      A    Yes.
16      Q    During the course of your career,
17  approximately how many fires have you investigated?
18      A    Maybe 5,000.
19      Q    How many of those fires did you determine
20  were caused by refrigerators?
21      A    I can't recall.  I don't keep a record of
22  this, so I'm surely making an approximation, maybe ten
23  or fifteen.
24      Q    Was that the allegation, that the
25  refrigerator caused the fire, or is that what you

10

1  determined to be the actual cause of the fire that you
2  investigated that you're referring to?
3      A    I don't recall.  In some cases there may
4  have been an allegation and others it may have been
5  part of the normal fire scene investigation and then
6  ultimately determining an area of origin and perhaps a
7  point of origin associated with the refrigerator being
8  suspect or cause.
9      Q    It's fair to say, though, that it's rare to
10  have a fire caused by a refrigerator in your
11  experience?
12      A    I think it's -- I don't know that it's rare.
13  I can't speak statistically.  From my own personal
14  knowledge, I believe years ago there were more fires
15  associated with refrigerators than there are today, but
16  I don't know how rare a fire would be or not associated
17  with a refrigerator.
18      Q    How many cases do you -- are you currently
19  in charge of as we sit here today?
20      A    Well, I oversee every file in the firm, so I
21  would have to say that every file that's handled by any
22  one of the 31 employees in the firm I actually read
23  that document, meaning a report, if one is generated.
24  And last year there was 4,300 files.
25      Q    Active files last year?

11

1      A    Yeah.  They were incoming files to the firm
2  last year that are either still active and/or closed or
3  settled or completed.
4      Q    So about 4300 files came to your office last
5  year?
6      A    That's correct.
7      Q    You guys are pretty busy.
8      A    There's many divisions.  It's not all fire.
9  There's many multidisciplined areas, so...
10      Q    We'll get into that in a little bit.  Now,
11  have you ever testified in a court in a refrigerator
12  fire case?
13      A    Only in arbitration that I can recall at
14  this time.
15      Q    Do you remember when that was?
16      A    At least ten years ago.
17      Q    Do you have more cases that you've handled
18  in which it's alleged that the stove in this kitchen
19  area of the home caused the fire than you do
20  refrigerators?
21      A    I don't know.  I've investigated fires that
22  were associated with a stove or an oven.  More or less
23  than that, I can't tell you, I'm not sure.
24      Q    You're not sure if it's more common for the
25  stove in a kitchen area to be more a cause of the fire

12

1  in that part of the residence as opposed to a
2  refrigerator?
3      A    I don't know.
4      Q    So you said you testified at some type of an
5  arbitration in a refrigeration fire case?
6      A    Yes.
7      Q    That was more than ten years ago, correct?
8      A    Yes.
9      Q    Do you remember what the specific allegation
10  was in that case as far as what was wrong with the
11  particular refrigerator?
12      A    Yeah.  The allegation was that the power
13  cord was damaged by the refrigerator being moved in and
14  out from its location within cabinets.
15      Q    And were you testifying on behalf of the
16  manufacturer in that case or on behalf of an insurance
17  company or an individual person?
18      A    I believe I represented an insurance company
19  that insured a tenant that owned the refrigerator.
20      Q    Okay.  What type of business is Peter Vallas
21  Associates?  Is it a corporation?
22      A    Yes.
23      Q    And you said there were 31 employees; is
24  that right?
25      A    Yes.

13

1    Q    How many of those 31 people are fire

2 investigators?

3    A    I believe there's nine.

4    Q    Now, in this particular fire, did any one of

5 those other nine fire investigators participate in the

6 investigation of the Claro fire, as I'll refer to it?

7    A    No.

8    Q    You are the only fire investigator in the

9 office to work on this file; is that right?

10    A    There was an investigator that picked up the

11 refrigerator and brought it to our laboratory.  He took

12 some photographs of the scene.  But no other fire

13 investigator or engineer examined or participated in

14 this investigation other than me.

15    Q    Okay.  How many electrical engineers are

16 employed by Peter Vallas Associates?

17    A    Currently we have one.

18    Q    How about mechanical engineers?

19    A    There's two.

20    Q    Did either of the mechanical engineers --

21 actually, strike that.  At the time that you were doing

22 your fire investigation in this case was early 2001; is

23 that right?

24    A    That's correct.

25    Q    The fire in this case was sometime in

14

1 November of 2000, right?

2    A    Yeah.

3    Q    And then you prepared a report shortly

4 thereafter based on what your investigation revealed to

5 you, correct?

6    A    Yes.

7    Q    Okay.  At that time can you tell me how many

8 mechanical engineers were employed by Peter Vallas

9 Associates?

10    A    Probably the same amount.

11    Q    Okay.  Is that the same also for the

12 electrical engineers as well?

13    A    No, not at that time.  I did not have an

14 electrical engineer on staff at that time.

15    Q    So none at the time of the investigation?

16    A    Right.

17    Q    So you have nine fire investigators, three

18 other engineers.  That's 12 people.  Who are the other

19 19 folks?

20    A    It would be made up of a clerical staff,

21 structural engineers and regular technicians:  Boiler

22 inspector, an evidence controller, a laboratory

23 technician, that sort of thing.

24    Q    Did you engage the services of an electrical

25 engineer at any time during your investigation of this

15

1 file?

2    A    I did not, no.

3    Q    Did either of the mechanical engineers at

4 Peter Vallas Associates participate in any way in this

5 investigation?

6    A    No.

7    Q    I see in your CV at least from 1988 to 2000

8 you have been the chief executive officer of the

9 company; is that right?

10    A    That's correct.

11    Q    And you said you're in charge of all of the

12 files in the office essentially?

13    A    I oversee the entire operations, so I would

14 consider that every file that comes in I know about on

15 a daily basis.  And during its workup or investigative

16 process, I meet with the various people on those files.

17 And if a file is on its stage of being completed or a

18 report is being prepared or a recommendation is being

19 made, I'm also aware of that, and I actually read every

20 report on every file in the firm.

21    Q    You don't write every report that's

22 generated by the firm, right, because there's too many

23 files?

24    A    Obviously.

25    Q    Your CV also indicates on page 8 that you

16

1 oversee all the offices operated by Peter Vallas

2 Associates, correct?

3    A    Yes.

4    Q    What are your duties exactly in overseeing

5 the offices?  Are you in charge of, say, personnel

6 decisions?

7    A    I am in charge of everything from

8 administrative to personnel to hiring to firing to

9 instituting and purchasing of equipment that's needed.

10    Q    So you do it all?

11    A    Well, I have a very good administrative

12 staff that assists me.  But I actually make the

13 decisions on all those levels, yes.

14    Q    Are you also in charge of generating new

15 business for the company?  I mean, marketing efforts

16 and things along those lines?

17    A    Along with an assistant, yes.

18    Q    Now, you have a web site, right?

19    A    Yes.

20    Q    I've had a chance to look on your web site a

21 little bit, and it lists some companies that you've

22 represented, correct?

23    A    Correct.

24    Q    Have you ever represented an appliance

25 manufacturer in any litigation?

18

1  A    I believe we have, yes.

2  Q    Are you able to identify that manufacturer

3  for me as you sit here today?

4  A    Black & Decker.

5  Q    Do you remember what particular product you

6  defended for Black & Decker?

7  A    I believe it was a toaster oven.

8  Q    Any others that you can think of?

9  A    Braun.

10  Q    Coffee maker?

11  A    No.  They manufacture exhaust fans for

12  bathroom ventilation.

13  Q    Okay.

14  A    Off the top of my head, I can't think of any

15  others without researching it.

16  Q    You haven't represented a refrigerator

17  manufacturer before, correct?

18  A    Not to my knowledge.  I don't believe so.

19  Q    And you also do work for insurance

20  companies, right?

21  A    Yes.

22  Q    I noticed on the web site that you didn't

23  list Safeco Insurance Company as one of your clients,

24  and that may just be for some reason I'm not aware of.

25  Can you tell me, have you represented Safeco in other

---

19

1  litigation other than this case?

2  A    I believe so.

3  Q    Are you able to estimate for me the number

4  of times in which you have done so?

5  A    In litigation in particular, I don't know

6  how many, maybe several.  But then on occasion I will

7  accept an assignment from them based on whatever

8  capacity it may be.  It could simply be to pick up a

9  well pump and test it to perhaps a fire investigation

10  or a product analysis.  So there's probably more

11  occasion where we get some work from Safeco as opposed

12  to it all being like a litigated type of a file.

13  Q    But you have a regular business relationship

14  with Safeco Insurance Company; is that fair to say?

15  A    We probably take several cases a year, sure.

16  Q    Now, your firm is engaged in a wide variety

17  of activities, right, I guess boiler explosion cases,

18  electrocution cases, things along those lines; is that

19  true?

20  A    Yes.

21  Q    Do you participate -- you said you

22  participate in all the investigations, but can you tell

23  me, say, of the 4300 files you had last year how many

24  of those were actually fire investigations as opposed

25  to one of the other types of investigations that you

---

19

1  do?

2  A    I could.  Those numbers are being put

3  together now for annual reports.  I would think on an

4  average we probably handle 30 to 40 fire investigations

5  a month, you know, give or take a little bit.  I don't

6  know the exact numbers, if we're utilizing last year as

7  the basis.

8  Q    Sure.  Now, is the company open seven days a

9  week?

10  A    No.

11  Q    You're open Monday through Friday?

12  A    Well, technically we're open Monday through

13  Friday.  Saturday, on occasion some of the guys work

14  the laboratory, maybe in operation.

15  Q    Okay.  Are you like on call with the

16  insurance companies that you represent?  They may call

17  you any time to go out and investigate a fire, or is it

18  more like something that comes in from nine to five

19  during the workday from the claims department?

20  A    More in the sense of a phone call into the

21  office between eight and five.  If a call comes in it's

22  left on a voice mail, and there's a response the

23  following day to whoever the potential client may be.

24  Q    And when the firm gets a new fire

25  investigation, do you make a determination as to which

---

20

1  individual fire inspector should conduct the

2  examination of that fire?

3  A    Sometimes.  And other times I have an

4  operations director in the office who coordinates the

5  scheduling and the appointments.  And he also has the

6  capability of making that decision.

7  Q    But it sounds like you have a lot of

8  responsibilities there at the company; that's fair to

9  say, right?  You're the chief executive officer, right?

10  A    I would say so, yes.

11  Q    How much time to you actually get to get out

12  into the field and do fire investigations at this

13  point?

14  A    At least three days a week.

15  Q    So 60 percent of your time then; is that

16  fair to say?

17  A    Three days a week over the course of a year

18  calculates to -- that's generally the rule of thumb,

19  for me to be in at least two days and out in the field

20  at least three days.  And that all depends on caseload

21  and volume and where the file may or may not be and how

22  many cases come in that week or that day, etc.  So

23  there's some variables there.  But I try to stay active

24  in the field at least three days a week.

25  Q    But when you're active in the field,

21

1  sometimes that's, what, traveling like you did today to
2  come to a deposition?  Do you consider that working in
3  the field?

4      A    Yes.

5      Q    So it may be that the 60 percent that you're
6  in the field is not actually investigating fires; you
7  could be sitting here like you are today giving
8  depositions.  Is that fair to say?

9      A    That's true.  To do the work you have to
10  travel, so I consider that all part of a workday, three
11  days a week.

12      Q    I understand.  But, for instance, you're not
13  investigating a fire as we sit here today, you're
14  talking to me about something you did in the past,
15  right?

16      A    That's correct.

17      Q    So today you're in the field, but you're not
18  actually conducting a fire investigation?

19      A    That's correct.

20      Q    I'm just trying to get a sense of how often
21  does that happen.  In other words, how often do you
22  give deposition testimony like you're giving today on a
23  monthly basis?

24      A    It depends.  It's not that often anymore.  I
25  don't know.  Maybe I gave four or five last year.

22

1      Q    Okay.  And are you able to estimate for me
2  the number of times that you've actually testified in a
3  trial, not a deposition, but at the courthouse in front
4  of a judge or a jury?

5      A    At least 15 times.  That's probably what I
6  have tracked to date.

7      Q    We'll take a break and get that list faxed
8  over.

9      A    Yeah.

10      Q    Have you ever testified in federal court?

11      A    Once, I believe.  Maybe twice.

12      Q    Do you remember when that was?

13      A    I know it was in Suffolk County, Long
14  Island.  It was some time ago.  I don't remember the
15  actual date or the year.

16      Q    Okay.  What was the nature of your testimony
17  in that case?

18      A    It was a -- I believe it was a fire and an
19  electrocution as a result of failed wiring I believe in
20  a ceiling.

21      Q    Who were you testifying for in that case?

22      A    I represented an insurance company that
23  insured the homeowner.

24      Q    And it was your opinion in that case that
25  faulty wiring caused the fire at issue?

23

1      A    Yes.

2      Q    Is that the only federal court testimony
3  that you can remember?

4      A    Perhaps if I look at that list...

5      Q    Okay.  But the testimony you just referred
6  to in Suffolk County, Long Island, do you remember how
7  long ago that was?

8      A    I don't.

9      Q    Was it more than ten years ago, do you
10  think?

11      A    I really don't recall.  I'd have to look at
12  the list.

13      Q    You think that one's going to be on the
14  list?

15      A    I'll know as soon as I see it.

16      Q    Okay.  Now, how did Peter Vallas Associates
17  first learn about the fire in this case?

18      A    May I refer to my file?

19      Q    Sure.

20      A    On November 15, 2000 we received a telephone
21  call from a Richard Fradette, F-r-a-d-e-t-t-e, of
22  Safeco Insurance Company, which he informed us that
23  there was a fire and it was believed to be a
24  refrigerator and to conduct a product analysis, pick up
25  the refrigerator and look it at in the laboratory and

24

1  do an investigation.

2          ATTORNEY ROCHE:  Can we mark that as
3          the next exhibit?

4          (Defendant's Exhibit No. 2, document
5          regarding first contact information,
6          - head sheet, was marked for
7          identification.)

8      Q    I just marked as Exhibit No. 2 I guess it's
9  the sheet that you got from Mr. Fradette; is that
10  right.

11      A    Well, it's a Peter Vallas Associates'
12  document.  We call it a "head sheet."  It's a case
13  information take-in sheet, for lack of a better term.
14  And that's generated by my office through a
15  receptionist or an operations person that takes in the
16  information.

17      Q    So this is -- the information contained on
18  this sheet is the result of a telephone call from
19  Mr. Fradette to your office; is that right?

20      A    Yes.

21      Q    And you did not participate in that phone
22  call, correct?

23      A    You know, I don't remember if I personally
24  spoke with him or I was next to the person that took in
25  the case.  But I have a recollection of when it came

25

1  in, because there was question as to was it a fire or
2  was it just a burn in a refrigerator.  And it ended up
3  being a product analysis, as opposed to being set up as
4  a fire investigation, and a pickup of a refrigerator.
5  So I know I participated in a conversation at the time.
6  I just don't recall if it was me direct or a
7  conversation next to one of my employees.
8      Q    Okay.  And that assignment came in on the
9  15th of November; is that right?
10     A    Yes.
11     Q    And it appears the person who called from
12 Safeco indicated that the fire originated in the
13 refrigerator; is that right?
14     A    Yes.
15     Q    And he wanted to know if there was a
16 possible subrogation action; is that correct?
17     A    That's what verbally he told the case intake
18 person, yes.
19     Q    So when the file was received by your
20 office, obviously you were retained by an insurance
21 company to investigate potential litigation against --
22 with the refrigerator; is that fair to say?
23     A    Of course.
24     Q    At some point did you go to the scene of the
25 fire yourself?

26

1      A    I did not, no.
2      Q    You did not go to the scene?
3      A    Nope.
4      Q    Who went to the scene from Peter Vallas
5  Associates?
6      A    One of our investigators.  His name is
7  Sergei, S-e-r-g-e-i, last name is Fell, F-e-l-l.
8      Q    Is Mr. Fell still in your employ?
9      A    Yes.
10     Q    And so it was Mr. Fell who went to the
11 scene.  And what did he do at the scene, do you know?
12     A    He went to the scene to simply pick up a
13 refrigerator, and when he arrived there the
14 refrigerator was in the kitchen.  And he secured the
15 refrigerator and he took some photographs and I believe
16 he secured some other components:  The outlets and I
17 think a power strip, a telephone charger.  And he
18 placed it in the transportation vehicle and brought it
19 to the laboratory in Hackensack, New Jersey.
20     Q    Was he there -- in taking the pictures, was
21 he performing some of the fire investigation at that
22 point?
23     A    He works with the fire investigators all the
24 time, so he's very familiar, you know, with the
25 standards.  However, this file was not set up as a fire

27

1  origin and cause investigation.  It was simply a
2  product analysis, to pick up the refrigerator.  So
3  being thorough as Mr. Fell is, he decided to take just
4  a few pictures of the kitchen and took it upon himself
5  to take some of the outlets that were in the kitchen
6  wall for viewing purposes.  It helps when evaluating a
7  product if you know what the scene looks like, so he
8  took some photographs.
9      Q    Sure.  It's important to obviously
10 adequately document the scene of a fire when you're
11 trying to do a cause and origin investigation, right?
12     A    Sure.
13     Q    You said, though, that the file wasn't set
14 up as a fire investigation?
15     A    That's correct.
16     Q    When you say it was set up as a product
17 analysis, did that mean that the cause of the fire had
18 already been determined at the time that you assigned
19 it?
20     A    No.  It's categorized by what it is they
21 want us to do.  When I say "they," it can be an
22 attorney, it can be a manufacturer, it can be an
23 insurance company.  In this particular case, it sounded
24 as though the fire was confined to the refrigerator and
25 they wanted the refrigerator to be picked up and looked

28

1  at to verify was it a problem or was it not a problem
2  as far as cause.  That's how the file was set up.
3  That's the direction that was given to us, and that's
4  what we followed through with.  It's hard for you to
5  understand not knowing the makeup of the business, but
6  this could also be pick up a water filter that cracked
7  and caused water damage, or do a product analysis of a
8  piece of pipe that split.  And that's how we
9  categorized this:  Based on the information.
10     Q    If you were going to go to somebody's house
11 to pick up a pipe that split, you would know
12 automatically that the pipe had failed, right?  In
13 other words, you wouldn't have to do an investigation
14 of what happened.  You'd just have to go collect the
15 evidence and bring it back and maybe determine why it
16 happened, right?
17     A    Yeah.  But in many cases what is called in
18 or what is alleged or what is believed isn't always the
19 case.
20     Q    Sure.
21     A    So that may or may not be a good example,
22 depending on what the circumstances are.
23     Q    If they sent someone from your office out to
24 verify, I guess, that this refrigerator either was or
25 was not the cause of the fire, you're really doing a

29

1  fire investigation at that point, isn't that true?  I
2  mean, you're calling it a product analysis, but
3  essentially it's a fire investigation; is that right?
4      A      Technically it is a fire investigation.  We
5  had the opportunity to see the kitchen; to photograph
6  the kitchen; I did review those photographs; I did
7  review the refrigerator; I understood the
8  circumstances; and I rendered an opinion.  So, yeah,
9  it's similar to a fire investigation.
10     Q      Well, is Mr. Fell a fire investigator
11 himself?
12     A      No.
13     Q      He's not?
14     A      No.
15     Q      Let me look at the photos real quick.  So
16 you have some extra photographs in here?
17     A      The ones you're holding are labeled in a bag
18 "unused" or "extra photographs."
19     Q      Let me see if there's an easier way to do
20 it.  I'm sure there is.  Why don't we mark the photos
21 from your file of the property inspection as the next
22 exhibit, just that whole group of photographs?
23     A      Okay.
24             (Defendant's Exhibit No. 3, group of
25                photographs, was marked for

30

1                identification.)
2             ATTORNEY ROCHE:  Then we'll just mark
3      the unused or extra photos that you called
4      them on the outside of this as the next
5      exhibit.
6             (Defendant's Exhibit No. 4, set of
7                unused or extra photographs, was marked
8                for identification.)
9             ATTORNEY ROCHE:  Let's also mark the
10     report as well.
11            (Defendant's Exhibit No. 5, Mr. Vallae's
12               report, was marked for identification.)
13     Q      Now, was it you that assigned Mr. Fell the
14 responsibility to go and pick up the refrigerator?
15     A      I don't recall.  It was either myself and/or
16 -- I'm trying to think of who would have been at the
17 desk at that particular time.  I believe it was our
18 controller at the time, George Stathis, S-t-a-t-h-i-s,
19 I believe.
20     Q      Okay.  So at the time, though, that Mr. Fell
21 was sent to the scene, he was instructed to take
22 photographs?
23     A      He was instructed to go pick up the
24 refrigerator.
25     Q      And that was it?

31

1      A      Yeah.
2      Q      Okay.  And he just happened to take some
3  photos because you say he was a conscientious employee;
4  is that right?
5      A      Yeah.  He saw he had a scene and talked to
6  the people, he made some notes about circumstances,
7  removed a few extra things and diligently documented
8  that room and secured the physical property or
9  evidence.
10     Q      Okay.  So if he hadn't been a conscientious
11 employee, you wouldn't have had any photographs that
12 you folks at Peter Vallas Associates would have taken;
13 is that fair to say?
14     A      Either that or if we didn't have access,
15 sure.
16     Q      Do you know if the refrigerator had been
17 moved in between the time of the fire on the 13th and
18 the day that Mr. Fell got to the scene?
19     A      I believe it had.
20     Q      Do you know if -- there are no photographs
21 that I have that show where the refrigerator was
22 immediately after the fire.  Do you have any such
23 photographs?
24     A      No.
25     Q      Do you have any photographs that show where

32

1  the refrigerator was in the kitchen area of this house
2  at the time that the fire began?
3      A      No.
4      Q      We marked your report as Exhibit No. 5, and
5  attached to Exhibit No. 5 there were like 50
6  photographs; is that right?
7      A      Yes.
8      Q      And those photographs were obviously taken
9  prior to the date of your report on January 10, 2001,
10 right?
11     A      Yes.
12     Q      Did you have any other -- did you take any
13 other photographs of either the scene of the fire or
14 any of the components of the refrigerator or any of the
15 other evidence that was removed from the fire scene
16 other than these 30 photographs prior to January 10 of
17 2001?  That's a long question.  Do you understand it?
18     A      Yes.  The answer would be yes, if I'm
19 understanding the question.  And those photographs are
20 what I have marked in an envelope called "unused" or
21 "extra photographs."
22     Q      Okay.  So there are additional photographs
23 perhaps that aren't part of the report; is that what
24 you're telling me?
25     A      Yes.

33

1    Q    Is there any particular reason why they
2 wouldn't be part of the report?
3    A    Common reasons:  The photo didn't come out,
4 it's a duplicate of, it may be repetitive of another
5 photograph that was taken.
6    Q    Let me ask you the question in a different
7 way.  You attached the most important photographs to
8 your report; is that true?
9    A    Yeah.  I believe the ones that best depict
10 the observations and the opinions and documentation of
11 the scene.
12    Q    Sure.  So this stuff that -- the photographs
13 that support your opinions are certainly going to be
14 the ones that you're going to attach to your report,
15 right?
16    A    Not excluding other photos, but surely they
17 are what I felt was the best that depict and document
18 the scene.
19    Q    When Mr. Fell went to the residence, was he
20 accompanied by anyone from Peter Vallas Associates?
21    A    I don't believe so.
22    Q    Do you know who, if anyone, was present when
23 he arrived at the residence?
24    A    I think it was either Mr. or Mrs. Claro.
25    Q    Now, you said that there were some notes

34

1 that he took; is that right?
2    A    Yes.
3         ATTORNEY ROCHE:  Can you mark this as
4    the next exhibit?
5         (Defendant's Exhibit No. 6, property
6    evidence transfer document, was marked
7    for identification.)
8    Q    I'm going to show you what we've just marked
9 as Defendant's Exhibit 6.  It's a document of Peter
10 Vallas Associates.  It's two pages long.  It says
11 "property evidence transfer document."  Can you tell
12 me, is that a document that Mr. Fell would have
13 prepared?
14    A    Yes.
15    Q    Is that to document the items of evidence or
16 the items, I guess, that he was removing from the
17 residence?
18    A    Yes.
19    Q    So he prepared that as he was leaving, I
20 guess, on the 16th, to your knowledge?
21    A    More than likely towards the end of him
22 securing or just before he secured it.
23    Q    Okay.
24         ATTORNEY ROCHE:  Can you mark that as
25    the next exhibit?

35

1         (Defendant's, Exhibit No. 7, handwritten
2    notes, was marked for identification.)
3    Q    Defendant's Exhibit 7, can you tell me what
4 that is, please?
5    A    These are handwritten notes by Mr. Sergei
6 Fell in a conversation that he had with Mr. Claro.  And
7 on the bottom there is a different style of
8 handwriting, and that's my handwriting with notes that
9 I had with Mr. Claro.
10    Q    I'm sorry.  When Mr. Fell got to the
11 residence -- I think you answered this question, but
12 I'm not sure I heard the answer or was paying attention
13 -- who was present at the house?  Just Mr. Claro?
14    A    I don't know for sure, but obviously
15 Mr. Claro was there -- I think it was Mr. Claro.  I'm
16 not sure if anyone else was there.
17    Q    Because there's a reference in this to the
18 insured's wife.  But you're assuming it was Mr. Claro
19 that was there?
20    A    I thought it was Mr. Claro.
21    Q    Okay.  Do you know how long Mr. Fell was
22 present at the scene?
23    A    I don't.
24    Q    It could have been fifteen minutes or an
25 hour; you're not sure?

36

1    A    I would think at least an hour, but I don't
2 know for sure.
3    Q    Now, the notes that we marked as Exhibit No.
4 7, there's a notation on the left-hand side, about a
5 third of the way down the page, it says "Magic Chef."
6 Do you see that?
7    A    Yes.
8    Q    Is that in your handwriting, or is that
9 Mr. Fell's handwriting?
10    A    That's mine.
11    Q    And is that -- do you know when that
12 notation was put in these notes?
13    A    It would have to be on or after January 5,
14 '01.
15    Q    Is that the first time that you spoke to
16 Mr. Claro in this case, on January 5?
17    A    Yep.
18    Q    How many conversations did you have with
19 Mr. Claro in this case?
20    A    Just the one.
21    Q    Did you speak to Mrs. Claro at all?
22    A    I don't believe so, nope.
23    Q    Do you remember how long your conversation
24 lasted with Mr. Claro?
25    A    I don't recall how many minutes.

37

```
 1    Q    Was it an hour-long conversation?
 2    A    I wouldn't think so, no.
 3    Q    Half an hour?
 4    A    I don't recall it being even that long.
 5    Q    So to your best recollection, it was a
 6  conversation that lasted less than thirty minutes; is
 7  that right?
 8    A    Yes.
 9    Q    Did you make any other notations other than
10  what appear on Defendant's Exhibit No. 7 regarding your
11  discussion with Mr. Claro on January the 5th?
12    A    No.
13    Q    In other words, you don't have any other
14  contemporaneous notes that were prepared as you were
15  having your conversation with him, right?
16    A    No.
17    Q    But it appears he told you it was a Magic
18  Chef brand refrigerator?
19    A    That's what he stated to me.
20    Q    Did you make any effort to contact Magic
21  Chef to get a listing of the products they may have had
22  available at the time this refrigerator was purchased
23  by the Claros?
24    A    No, not at that particular time.  That was
25  something that was proposed and/or could have been done
```

38

```
 1  at a later date either by our staff or someone else's.
 2    Q    Do you know if it was ever done?
 3    A    I think recently there was an inspection at
 4  our laboratory with an engineering firm, several
 5  individuals, perhaps yourself, examining the
 6  refrigerator on a more detailed aspect than the
 7  preliminary examination that I made.
 8    Q    You were never able to determine what model
 9  refrigerator this was, right, what Magic Chef model
10  number the refrigerator was?
11    A    No.
12    Q    What can you tell me about the refrigerator
13  that you do recall?  In other words, did it have an ice
14  maker in it?
15    A    I don't know if it had an ice maker.
16    Q    Was it a top and bottom model?  Side by
17  side?  Is there anything about it that you can recall
18  as you sit here today?
19    A    Well, it was a heavily damaged refrigerator,
20  particularly on the inside of the unit.  I remember
21  that.  There was a huge meltdown of plastic at the
22  bottom which made it very difficult to identify
23  components, find components or even evaluate those type
24  of components and the overall condition of the
25  components.
```

39

```
 1    Q    Let me ask you this question:  Do you know
 2  what the seal on the refrigerator doors is made out of?
 3    A    The seal?
 4    Q    The seal.
 5    A    I don't know the exact material.
 6    Q    But it's a plastic type component, correct?
 7    A    Yeah.  A plastic, rubber type, sure.
 8    Q    You've been in a lot of fire scenes during
 9  the course of your career, right?  Approximately 5000
10  fires you said you investigated?
11    A    Yep.
12    Q    And you've been in the kitchens of many
13  residences that have burned in fires, correct?
14    A    Yes.
15    Q    Has it been your experience that the seal on
16  the refrigerator failed during the course of the fire?
17    A    Yes.
18    Q    And when the seal on the refrigerator door
19  fails, the doors tend to fall away and open up?  After
20  the seal fails, the door will open up, correct?
21    A    In some cases the door can open up, yes.
22    Q    Is that fairly common in your experience,
23  sir?
24    A    They either open up or they lose the seal
25  which allows some exposure of heat and/or fire to the
```

40

```
 1  inside of the refrigerator.
 2    Q    Sure.  So it's not unusual then when you're
 3  investigating a fire that has consumed a kitchen to
 4  find that the interior compartment of the refrigerator
 5  is burned, correct?
 6    A    In some cases it's not uncommon.
 7    Q    Well, I guess in all cases, is it a common
 8  thing to see or not?
 9    A    Well, depends on how much fire, the location
10  of the refrigerator, the distance from the heat or the
11  fire.
12    Q    Let me ask you this question:  I'm sure
13  you're probably familiar with this, but approximately
14  what temperature would the plastic seal on a
15  refrigerator door begin to melt?  This isn't a science
16  quiz.  I'm just trying to get your estimation.
17    A    Over 100 degrees, perhaps maybe 150 degrees,
18  180 degrees.  I don't know for sure.
19    Q    But it's fair to say that plastic type
20  material melts at a lower temperature than the metal,
21  say, cabinet of the refrigerator, right?
22    A    Obviously, yes.
23    Q    Did you ever -- can you give me your
24  estimate of what the approximate temperature would have
25  been in the kitchen at the stage that this fire was
```

41

1  really out of control, what the temperature would have
2  been in the room?
3      A    I don't know.
4      Q    Would it have been in excess of 180 degrees?
5      A    Yes.
6      Q    In excess of 2 or 300 degrees?
7      A    I would think so, yes.
8      Q    Obviously hot enough to melt the seal on a
9  refrigerator door, correct?
10     A    Yes.
11     Q    And isn't it true that if the door in the
12 refrigerator came open, the contents of the
13 refrigerator are going to be exposed to the heat and
14 fire in the room, right?
15     A    Well, if the scenario was that the fire was
16 outside of the refrigerator and the refrigerator was
17 attacked by fire, yeah, the seal could melt and the
18 door may or may not open, sure.
19     Q    But if it did open, it would expose the
20 contents to the external fire and heat, correct?
21     A    If it opened wide, everything would be
22 subjected to some form of heat or fire condition, yes.
23     Q    Did you ever go to the scene of this fire?
24     A    No.
25     Q    Was that just because it was your

42

1  understanding that this was still just a product
2  analysis type case?
3      A    More or less.  It was picked up, we had some
4  photographs, we knew the circumstances, there was quite
5  a bit of damage to the refrigerator, so we never did
6  return.
7      Q    Can you tell me what the circumstances were
8  as you understood them?
9      A    Well, what was provided to Mr. Fell was that
10 they were in the kitchen cooking and they smelled
11 smoke.  And the insured opened up the refrigerator, saw
12 smoke and flames in the bottom of the refrigerator and
13 identified the fire burning in the refrigerator and
14 nowhere else in the room.
15     Q    Did you learn at any time what was being
16 cooked on the stove?
17     A    No.
18     Q    Did you ever speak to -- I think you said
19 you never spoke to Mrs. Claro at all, right?
20     A    I don't believe so.  I believe it was
21 Mr. Claro.
22     Q    Mr. Claro.  And you don't recall any
23 conversation you had with him about what was being
24 prepared --
25     A    No.

43

1      Q    -- on the stove?  Did you ever ask any
2  questions about what was on top of the refrigerator?
3  In other words, was there papers or other items on top
4  of the refrigerator?
5      A    I don't believe so.
6      Q    Now, is there a photo log, by the way, for
7  your photographs in the case?  I got the 30 here, but I
8  don't see a log that accompanies them.  There's sort of
9  some notations on some but not on others.
10     A    The log has a description of the
11 photograph or photographs by number.
12     Q    That's what's contained then in your report
13 as we look as these 30 photographs?  So you're saying
14 the photo log is just the stuff that appears on the
15 bottom here next to the numbers on the photographs?
16     A    I'm assuming by definition, "photo log,"
17 it's a photograph and then a description of that
18 photograph relative to a number.
19     Q    Okay.  Other than the one-page fax that you
20 got from Safeco Insurance Company that we marked as
21 Exhibit No. 2, actually this page was generated after
22 the phone call, correct?
23     A    Yes.
24     Q    Did the person who went to the fire scene
25 take this piece of paper with him when he went there,

44

1  do you know?
2      A    Yes.
3      Q    That would be something that he would
4  normally do?
5      A    It would be part of the file in its early
6  stages.
7      Q    Because it's got the contact information and
8  who you need to speak to to get access, etc., correct?
9      A    Yes.
10     Q    Did you have any other written documentation
11 regarding the fire at the time of the scene inspection
12 other than this one piece of paper?
13     A    No.
14     Q    Now, we made a copy of your entire file,
15 correct?
16     A    Yes.
17     Q    And there are no other portions of that file
18 that are in your office relating to your investigation
19 in this case; is that correct?
20     A    The only thing that may not be part of this
21 is there would be a file that would have a copy of an
22 invoice for the storage of the equipment.  But it's not
23 pertaining to investigative or notes or anything
24 handwritten.
25     Q    Sure.

45

1    A    It's just a file that says we're doing
2    storage on a piece of property.
3    Q    How much do you folks charge to do a fire
4    investigation or a product analysis, I guess?
5    A    It depends.  Our hourly rate is $135.00 an
6    hour for the investigator.  That incorporates his time
7    to do what it may be; Examining the equipment,
8    laboratory, dictation of the report, phone
9    conversation, whatever it maybe.
10   Q    Okay.  I notice, though, that you don't have
11   a copy of the Waterbury Fire Department's report of
12   this fire, is that correct, or is that just missing?
13   A    That is correct.
14   Q    You didn't look at the fire marshal's report
15   of the fire?
16   A    No.
17   Q    Or the fire department's report of the fire?
18   A    No.
19   Q    You didn't need to do that to conduct your
20   investigation?
21   A    No.  We prepared the report based on the
22   observations and the investigation to date, made
23   references in that report that further work should be
24   done and perhaps they should get a legal opinion as to
25   certain things and then we could carry on.  There was

46

1    talk about maybe another engineer examining the
2    refrigerator.  So we basically prepared the report,
3    and...
4    Q    And that was it?
5    A    That was it.
6    Q    Exhibit No. 5, is that your only report in
7    this case?  Do you want to take a look at it?
8    A    Yeah.  Yes, that is the only report.
9    Q    So there are no supplements or addenda to
10   this report, correct?
11   A    I believe the only thing that was ever
12   generated is a letter that I just sent out that a
13   property inspection took place.
14   Q    I see that in the file.  But there's no
15   other actual supplements to this report?
16   A    No.
17   Q    And the report is dated January 10 of 2001,
18   correct?
19   A    Yes.
20   Q    Did you ever speak to the fire marshal about
21   the case?
22   A    No.
23   Q    Did you ever speak to anybody from the
24   Waterbury PD about the case?
25   A    No.

47

1    Q    Any particular reason you didn't do that?
2    A    As I explained, we provided a verbal to the
3    client, we explained the circumstances, made some
4    references in the report.  And there was no follow-up
5    from the client to pursue or not pursue or continue any
6    other investigation.  We just -- it was my
7    understanding they were going to put or retain an
8    engineer of some type to come in and examine the
9    refrigerator.
10   Q    Did you ever speak to the other engineer in
11   the case that was retained by the plaintiffs?
12   A    No.
13   Q    Do you know what his name is?
14   A    I don't know.
15   Q    You have some business cards that are there,
16   correct?
17   A    Yes.
18   Q    All right.  I guess they're stapled to the
19   front part of your file, right?
20   A    Sure.
21   Q    There's a Maytag card there.  But of the
22   other two folks, you're not sure which of those people
23   is the investigator or the engineering person?
24   A    I was not present at the inspection, so I
25   don't know.  I was told to allow for an inspection and

48

1    there would be individuals coming to examine it, and I
2    had a representative there to more or less oversee --
3    Q    Sure.
4    A    -- and re-secure the evidence, but I don't
5    know.
6    Q    Have you ever seen any of the deposition
7    testimony in this case?
8    A    No.
9    Q    Did you ever have a discussion with Safeco
10   attorneys about what transpired during those
11   depositions?
12   A    No.  Since the date of that report up until
13   early last year the file was not active.
14   Q    Okay.  So between January 10 of 2001 and the
15   date of the product inspection that occurred in this
16   case on January 2 of 2003, there was no further work
17   done on the file by Peter Vallas Associates Inc.; is
18   that correct?
19   A    The only work, if you want to consider it
20   work, was several phone conversations with counsel with
21   Safeco.
22   Q    To arrange for the inspection?
23   A    To arrange for it and/or make a
24   recommendation as to someone to examine the
25   refrigerator.

49

1      Q      Did you folks make a recommendation to
2  Safeco as to who should examine the refrigerator?
3      A      I believe we gave them two different firms
4  or engineers?
5      Q      Did they utilize either of those firms?
6      A      I don't believe so.
7      Q      Have you ever done any work with Frank
8  Watkinson of Spectrum Engineering in Cheshire,
9  Connecticut before?
10     A      I don't believe I've worked with him, but I
11 believe I've seen perhaps a report with the Spectrum
12 Engineering Group name on it.
13     Q      I want to understand what you did in the
14 case.  Mr. Fell went to the scene and took the
15 photographs and then brought the evidence back to your
16 laboratory; is that right?
17     A      Correct.
18     Q      When did you first see this refrigerator?
19     A      I don't know the exact date.  It was
20 sometime obviously after his on-site inspection of
21 November 16, 2000.  But the first time I did see it was
22 at the laboratory with Mr. Fell present and the
23 photographs of the scene present.  At which time I
24 examined the refrigerator, reviewed the photographs,
25 which ultimately led to me dictating this report of

50

1  January 10, 2001.
2      Q      Did you make any notes during the course of
3  your initial inspection of this appliance back at the
4  laboratory?
5      A      I may have made some notes on a recording or
6  on a tape, and those notes ultimately become part of my
7  report.  So I don't have any handwritten notes.
8      Q      So there are no handwritten notes?
9      A      No.
10     Q      Now, your web site says that you conduct all
11 of your investigations in accordance with NFPA 921; is
12 that correct?
13     A      Correct.
14     Q      Can you tell me what NFPA 921 is, please?
15     A      It's a guideline issued by a very reputable
16 organization, the NFPA, for conducting fire and
17 explosion investigations.
18     Q      Do you consider it to be authoritative?
19     A      For the most part, yes.
20     Q      Are there portions of NFPA 921 to which you
21 do not adhere?
22     A      I just think that some things may or may not
23 be applicable in the course of an investigation based
24 on the circumstances of the fire, the condition of the
25 building, what may or may not be conducted.

51

1      Q      But as a general rule you want to follow the
2  guidelines in the NFPA 921 during the course of any
3  fire investigation that you're going to put your name
4  on; is that fair to say?
5      A      Sure, yes.
6      Q      Wouldn't you want to have a fire
7  investigator actually examine the fire scene before you
8  render an opinion as to the cause of a fire?  Is that
9  something that NFPA would recommend?
10     A      They would recommend that.  But, again, this
11 was called in to us as a product analysis.  In other
12 words, to pick up the product and evaluate it and take
13 a look at it and make any comments or recommendations,
14 as we did.  So although helpful, and that was done
15 through scene documentation by Mr. Fell, you know, to
16 an extent, there was some documentation of the scene.
17     Q      Sure.  Let's just -- Mr. Fell took some
18 photographs at the scene.  It appears he took twenty
19 photographs, or at least I have twenty photographs
20 attached to your report that appear to be from the
21 scene.  Let's just look at those photographs, if we
22 could.
23     A      I have a set here.
24     Q      You have a better set than I do.
25     A      I think -- oh, I think there is actually 30

52

1  photographs.
2      Q      That's right.  But it looks like, at least
3  from what I can tell, the last ten were taken back in
4  your laboratory in Hackensack.
5      A      That's correct.
6      Q      So there are twenty scene photographs
7  really, right?
8      A      Yes.
9      Q      If we look at those photographs, I note that
10 Numbers 1 through 4 are exterior views of the
11 structure; is that right?
12     A      Yes.
13     Q      Any particular idea why Mr. Fell would have
14 taken those photographs?
15     A      He was just documenting the overall exterior
16 and also a door that led into the kitchen from the back
17 of the house where there was some fire patterns as
18 well.
19     Q      Okay.  Photograph No. 5 shows a view within
20 the kitchen, correct?
21     A      Yes.
22     Q      Are you able to tell me where in that
23 photograph this refrigerator was located prior to being
24 moved by the homeowner?
25     A      No.

53

1  Q    You agree with me that I don't have an
2  overall view of this kitchen that shows me where this
3  refrigerator was located in these photographs, do I?
4  A    You don't.
5  Q    Number 6 shows a view within the living room
6  of the house, right?
7  A    Yes.
8  Q    7 is the same.  It's another view of the
9  living room?
10  A    Yes.
11  Q    Photograph No. 8 is a view leading into the
12  kitchen, is the description, but you really can't see
13  the kitchen in the photograph other than from a
14  distance; is that true?
15  A    That is true.  Just looking at the photo, 7
16  is actually a view of the dining room.
17  Q    I'm sorry.  Did I say kitchen?
18  A    You said living room, and I agreed with you.
19  Q    Sorry.  It is dining room.  Number 9 is an
20  overall view, again, in the kitchen.  Do you know where
21  in this photograph the refrigerator was prior to the
22  fire?
23  A    No.
24  Q    You're not able to locate for me on this
25  photograph where the refrigerator was; is that true?

54

1  A    Where it was originally, I cannot do that,
2  no.
3  Q    Number 10, the description of that
4  photograph says "a view documenting the overall fire
5  patterns and spread."  Do you see that?
6  A    Yes.
7  Q    Can you tell me where that was taken?  In
8  what room of the house?
9  A    I believe it was documenting the joists from
10  the kitchen into the hallway, if I'm not mistaken.
11  Q    You're not sure, though, because of the way
12  it's labeled; is that fair to say?  I see some burnt
13  wood, but I'm not sure where it is.  In other words, is
14  it in the north corner, the eastern corner, etc.?
15  A    I don't know the direction.
16  Q    But you think it's out the rear hallway of
17  the house leading out the back door?
18  A    From the kitchen into the back door.
19  Q    Okay.  Number 11, "a view documenting the
20  refrigerator."  I note that there are no photographs
21  that show the doors of the refrigerator; is that true?
22  A    Within the scene or in this photograph?
23  Q    In the scene.  Well, actually in Number 11.
24  Let's talk specifically --
25  A    No, I don't see the doors.

55

1  Q    Okay.  12 through 16 says "views of the
2  electrical wiring showing no failure or fire
3  development from this location."
4  A    Yes.  I see that.
5  Q    Are you able to tell me -- it looks like
6  there's a couple of photographs of at least one and
7  possibly two receptacles; is that fair to say?
8  A    There appears to be three receptacles
9  overall in those descriptions.
10  Q    Okay.
11  A    And 15 and 16 would be a receptacle that was
12  within a junction box by itself.  And the earlier
13  photographs represent two receptacles in a box.
14  Q    Do you know which of these receptacles the
15  refrigerator was plugged into at the time of the fire?
16  A    I believe based on what was explained and
17  told to us was that it was plugged into the -- give me
18  a minute -- the receptacle.  Let me just pinpoint the
19  right one for you.  I think it's the receptacle 15 and
20  16.
21  Q    You think that's the one it was plugged
22  into?
23  A    Yeah.
24  Q    Are you certain about that or are you
25  guessing as we sit here today?

56

1  A    Well, again, since 2000.  It's been a long
2  time since I had the review with Sergei.  I believe
3  that was the one.
4  Q    You've investigated a lot of fires in that
5  time frame, right?
6  A    Yes.
7  Q    It's possible you could be mistaken as to
8  that?
9  A    I would like to clarify it with Mr. Fell, if
10  I could.
11  Q    Sure.  And the photo log -- if there was
12  another photo log for each individual photo, that would
13  help us, wouldn't it?
14  A    Well, specifically identifying that, you
15  know...  They weren't listed that way in the log, so
16  I'm not sure.
17  Q    Okay.  After the refrigerator was taken back
18  to the laboratory, you had a chance to examine it.
19  You're not sure of the date, though, right?
20  A    No.
21  Q    How long did your examination last?
22  A    Probably at least an hour.
23  Q    And were there further photographs taken
24  during that examination?
25  A    Yes.

57

Q    And are those the photographs that appear on Exhibit No. 5 as photographs 21 through 30?

A    Yes.

Q    Were there any other photographs taken during your, I guess, initial inspection, if you will, of this refrigerator?

A    There may be several that are in that group of photographs that were labeled as "unused" or "extras."

Q    Okay.  And your inspection at that time consisted essentially of visually -- you looked at the refrigerator and the other evidence that had been secured from the scene by Mr. Fell; is that right?

A    That's correct.

Q    There was no laboratory analysis done at that point, right?

A    I considered a laboratory analysis which was a preliminary visual of the equipment.  By "laboratory," I don't mean that tests were done and things like that were conducted.  But it was in the laboratory.  It was an analysis in the laboratory of the product as depicted in the photographs.

Q    It's a visual inspection, I guess, because when you say "laboratory analysis," I'm thinking that you're taking out equipment and running laboratory type

58

testing on the equipment.

A    I explained what my definition of laboratory analysis is.  It could be that and/or it could be an analysis of something that's burned, and in this case the refrigerator.  But no tests were done, nothing invasive.

Q    I'm just trying to figure out if you're calling it laboratory analysis because it took place in the laboratory, because you could have done a visual inspection the same way as at the scene of the fire; is that true?

A    You could have.  But the environment of the laboratory area is conducive for lighting and for examining a lot better than it is at a scene.  So I consider it a laboratory analysis, which in your words, and I would agree with you, is visual.

Q    And I'm not trying to denigrate what you did.  I'm just trying to understand what it was.

A    Right.

Q    You agree with me, though, that if you had an opportunity to go to the fire scene and look at that, you would have able to gather more information to confirm your opinions in this case?

A    More information could have been gathered, yes.

59

Q    Well, for instance, we don't have any photographs that show the location where this refrigerator was when it allegedly burst into flames, isn't that true?

A    Well, no, I mean, it would have been difficult even at the time we were there, because there had been cleanup of the kitchen.  There had been debris discarded to the exterior of the building.

Q    Sure.  The fire scene has been spoliated at that point to some degree, hadn't it?

A    Yes.

Q    Some of the evidence had been moved around; is that true?

A    I believe so, yeah.

Q    When you say there had been some cleanup work, do you know what the cleanup work consisted of?  In other words, was there any demolition done by anyone?

A    I don't think any demolition was done, but some debris that was on the floor and portions of some burned material were all discarded and thrown to the exterior of the building on the side of the house.  So fortunately the refrigerator was in the kitchen, but not in a place that it was originally.

Q    So we have 20 photographs taken during

60

Mr. Fell's visit to pick up the refrigerator, two or three of which show the kitchen area of the house; is that right?

A    At least four.  And then others that incorporate the receptacles, but they're just close-ups of the receptacles more or less.

Q    I see a couple of the kitchen and there are some of the ceiling.  Are you including those in the four?

A    There is some view of the kitchen in one of the shots that's taken from an adjacent room, so I just wanted to incorporate any and all that may in any way document the kitchen.

Q    Sure.  Are you satisfied that those four photographs that depict some or all of the kitchen are adequate documentation for purposes of a fire investigation like this?

A    Based on what was there and the condition of the room, I do, yes.

Q    You certainly would have liked to have a photograph of the location where the refrigerator was at the time it caught fire, right?

A    That's helpful, yes.

Q    You certainly want to have some photographs that depict the origin point of the fire within the