**1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

SAFECO INSURANCE COMPANY OF        :
AMERICA as subrogee of NOBERTO     :
AND MARIA CLARO,                   :   CIVIL ACTION NO.:
    Plaintiffs,                :   3:02CV-1916JBA
    vs.                        :
                               :   JANUARY 7, 2004
MAYTAG CORPORATION,                :
    Defendant.                 :

------------------------------------------
        DEPOSITION OF PETER VALLAS
------------------------------------------

APPEARANCES:

  LAW OFFICES OF STUART G. BLACKBURN
    Attorneys for the Plaintiffs
    2 Concorde Way, P.O. Box 608
    Windsor Locks, Connecticut 06096-0608
    (860) 292-1116
  BY:  ERIK LOFTUS, ESQ.


  CAMPBELL CAMPBELL EDWARDS & CONROY
    Attorneys for the Defendants
    One Constitution Plaza
    Boston, Massachusetts  02129
    (617) 241-3000
  BY:  TIMOTHY M. ROCHE, ESQ.


  NIZIANKIEWICZ & MILLER REPORTING SERVICES
       972 Tolland Street
  East Hartford, Connecticut 06108-1533
      (860) 291-9191

    DONNA M. DECIANTIS, LSR

---

**2**

Deposition of PETER VALLAS, taken on behalf of the
defendants in the hereinbefore entitled action pursuant
to the Federal Rule of Civil Procedure 30 and 45 before
Donna M. DeCiantis, duly qualified notary public in and
for the State of Connecticut, held at the offices of
Campbell Campbell Edwards & Conroy, 100 Pearl Street,
Hartford, Connecticut, commencing at 10:00 a.m.,
Wednesday, January 7, 2004.

---

**3**

I N D E X

WITNESS

PETER VALLAS

  Direct examination by Attorney Roche..........4

------------------------------------------
       INDEX OF EXHIBITS
     (Marked for Identification)

DEFENDANT'S EXHIBITS

1   Mr. Vallas's CV................................6
2   Head sheet...................................24
3   Group of photos..............................29
4   Group of unused photos.......................30
4-A  Photograph..................................77
4-B  Photograph..................................78
5   Mr. Vallas's report..........................30
6   Property evidence transfer document..........34
7   Handwritten notes............................35
8   Packet of documents..........................88
9   Handwritten notes, photocopied business card...90
10  List of testimony...........................104

---

**4**

(The deposition commenced at 10:00 a.m.)

  ATTORNEY ROCHE:  We will reserve all
objections except as to form of the question
and motions to strike until the time of
trial?

  ATTORNEY LOFTUS:  Right.

  ATTORNEY ROCHE:  Does the witness want
to read and sign the transcript?

  ATTORNEY LOFTUS:  Mr. Vallas?

  THE DEPONENT:  Yeah, I think I would.

  ATTORNEY ROCHE:  Thirty days from
receipt, and we'll waive the notary
provision?

  ATTORNEY LOFTUS:  Right.

  ATTORNEY ROCHE:  Swear the witness.

P E T E R   V A L L A S,

  first duly sworn by Donna M. DeCiantis,

  shorthand reporter and Notary Public within

  and for the State of Connecticut, was

  examined and testified as follows:

    DIRECT EXAMINATION

BY ATTORNEY ROCHE

  Q   Good morning, Mr. Vallas.  My name is
Timothy Roche.  We met a few minutes earlier.  I
represent Maytag Corporation in this lawsuit.  I'm

5

1  going to be asking you some questions today about the
2  investigation that you performed and some of your
3  opinions in the case. You've been deposed before, I'm
4  sure.
5      A    Many many times.
6      Q    Okay. Do you have a listing of trial
7  testimony that you have given in the last four years?
8      A    I do. And that was part of your request
9  today, and I failed to bring it but I can have that --
10 when I went over that list this morning, reading the
11 document, I saw that was one of your requests. I do
12 have a list of deposition and trial testimony. It's
13 not my entire career. I do have that, and I can
14 provide that to you.
15     Q    Is it possible that we can get someone from
16 your office to fax it to us here at this office?
17     A    Absolutely.
18     Q    Maybe we'll take a break in a few minutes
19 and do that. Can you give me your full name, please?
20     A    Peter, middle initial S, Stephen Vallas,
21 V-a-l-l-a-s.
22     Q    And your date of birth, sir?
23     A    February 3, 1964.
24     Q    And where do you currently reside?
25     A    12 Oakwood Drive, Woodcliff -- one word --

6

1  Lake, New Jersey.
2      Q    Can you give me a sense of your educational
3  background?
4      A    I completed high school in 1982. From that
5  point on over the course of years I have taken many
6  seminars, courses, certification classes, etc., all
7  associated with fire and explosion investigation. I
8  did not attend college. And a copy of all of that
9  documentation is in a curriculum vitae that I brought
10 with me today.
11             ATTORNEY ROCHE: Why don't we mark the
12         curriculum vitae as Exhibit No. 1 before we
13         get too far along.
14             (Defendant's Exhibit No. 1, Mr. Vallas's
15             curriculum vitae, was marked for
16             identification.)
17     Q    And the document that we've marked as
18 Exhibit No. 1 is your current curriculum vitae; is that
19 correct?
20     A    I believe so, yes.
21     Q    You said that you graduated from high school
22 in 1982. Where was that high school?
23     A    Jersey City, New Jersey.
24     Q    Can you give me a sense of your employment
25 history since the time you graduated from high school?

7

1      A    Well, in 1979 I actually -- Peter Vallas
2  Associated was incorporated, and I was working under
3  the direction of my father more or less as an
4  apprentice fire investigator since 1979 and then full
5  time immediately in 1982 with Peter Vallas Associates.
6      Q    Are you a junior?
7      A    I'm a few things by name, but yeah,
8  technically you can call me Peter Vallas, Jr. There is
9  a Peter R. Vallas, who is my father and senior and
10 partner, or I should say I'm his partner -- in the
11 firm.
12     Q    So your dad founded the firm back in 1979,
13 okay. And you said that you've been working with him
14 since that time?
15     A    Sure, yeah.
16     Q    Have you ever worked as a firefighter?
17     A    For I think approximately one year. I was a
18 volunteer firefighter for Iselin, I-s-l-i-n, New Jersey
19 Fire Department.
20     Q    Now, the CV we marked as Exhibit No. 1, are
21 these all -- does this CV reflect all of your
22 credentials, or is this a firm-type CV for Peter Vallas
23 Associates?
24     A    This would represent all of my personal
25 education and credentials and professional training.

8

1  The only thing that I'll point you to that may
2  represent the firm is that Peter Vallas Associates is a
3  licensed engineering firm in the state of New Jersey.
4  I am not a licensed engineer, but I hold the license
5  with professional engineers on staff. That would
6  represent our firm.
7      Q    So that's a firm-type license?
8      A    Correct.
9      Q    Based on the credentials of other members of
10 Peter Vallas Associates?
11     A    That's correct.
12     Q    So you don't have any degree in mechanical
13 or electrical engineering; is that correct?
14     A    Correct.
15     Q    And you're not a refrigeration expert, are
16 you?
17     A    No.
18     Q    Are you an appliance expert?
19     A    I've testified on cases regarding either
20 appliances or components that were in appliances.
21     Q    As to the design of the appliance, or as to
22 whether or not that appliance was the cause and origin
23 of the fire?
24     A    Strictly from a fire investigator's opinion
25 as to the origin and cause of the fire either

9

1  originating in it or not originating within it.

2      Q    So you're not an appliance design type

3  expert?

4      A    No, I am not.

5      Q    Now, you said you were sort of an apprentice

6  back in '79 while you were still in high school with

7  your dad's firm?

8      A    Correct.  It was weekends, nights, days off,

9  vacations, etc., I would work in the company handling

10  evidence and conducting fire investigation with my

11  father, and perhaps even a training seminar or two back

12  then I would have attended.

13      Q    And upon graduation from high school, you

14  began working full time for Peter Vallas Associates?

15      A    Yes.

16      Q    During the course of your career,

17  approximately how many fires have you investigated?

18      A    Maybe 5,000.

19      Q    How many of those fires did you determine

20  were caused by refrigerators?

21      A    I can't recall.  I don't keep a record of

22  this, so I'm surely making an approximation, maybe ten

23  or fifteen.

24      Q    Was that the allegation, that the

25  refrigerator caused the fire, or is that what you

10

1  determined to be the actual cause of the fire that you

2  investigated that you're referring to?

3      A    I don't recall.  In some cases there may

4  have been an allegation and others it may have been

5  part of the normal fire scene investigation and then

6  ultimately determining an area of origin and perhaps a

7  point of origin associated with the refrigerator being

8  suspect or cause.

9      Q    It's fair to say, though, that it's rare to

10  have a fire caused by a refrigerator in your

11  experience?

12      A    I think it's -- I don't know that it's rare.

13  I can't speak statistically.  From my own personal

14  knowledge, I believe years ago there were more fires

15  associated with refrigerators than there are today, but

16  I don't know how rare a fire would be or not associated

17  with a refrigerator.

18      Q    How many cases do you -- are you currently

19  in charge of as we sit here today?

20      A    Well, I oversee every file in the firm, so I

21  would have to say that every file that's handled by any

22  one of the 31 employees in the firm I actually read

23  that document, meaning a report, if one is generated.

24  And last year there was 4,300 files.

25      Q    Active files last year?

11

1      A    Yeah.  They were incoming files to the firm

2  last year that are either still active and/or closed or

3  settled or completed.

4      Q    So about 4300 files came to your office last

5  year?

6      A    That's correct.

7      Q    You guys are pretty busy.

8      A    There's many divisions.  It's not all fire.

9  There's many multidisciplined areas, so...

10      Q    We'll get into that in a little bit.  Now,

11  have you ever testified in a court in a refrigerator

12  fire case?

13      A    Only in arbitration that I can recall at

14  this time.

15      Q    Do you remember when that was?

16      A    At least ten years ago.

17      Q    Do you have more cases that you've handled

18  in which it's alleged that the stove in this kitchen

19  area of the home caused the fire than you do

20  refrigerators?

21      A    I don't know.  I've investigated fires that

22  were associated with a stove or an oven.  More or less

23  than that, I can't tell you, I'm not sure.

24      Q    You're not sure if it's more common for the

25  stove in a kitchen area to be more a cause of the fire

12

1  in that part of the residence as opposed to a

2  refrigerator?

3      A    I don't know.

4      Q    So you said you testified at some type of an

5  arbitration in a refrigeration fire case?

6      A    Yes.

7      Q    That was more than ten years ago, correct?

8      A    Yes.

9      Q    Do you remember what the specific allegation

10  was in that case as far as what was wrong with the

11  particular refrigerator?

12      A    Yeah.  The allegation was that the power

13  cord was damaged by the refrigerator being moved in and

14  out from its location within cabinets.

15      Q    And were you testifying on behalf of the

16  manufacturer in that case or on behalf of an insurance

17  company or an individual person?

18      A    I believe I represented an insurance company

19  that insured a tenant that owned the refrigerator.

20      Q    Okay.  What type of business is Peter Vallas

21  Associates?  Is it a corporation?

22      A    Yes.

23      Q    And you said there were 31 employees; is

24  that right?

25      A    Yes.

13

1    Q    How many of those 31 people are fire
2  investigators?
3    A    I believe there's nine.
4    Q    Now, in this particular fire, did any one of
5  those other nine fire investigators participate in the
6  investigation of the Claro fire, as I'll refer to it?
7    A    No.
8    Q    You are the only fire investigator in the
9  office to work on this file; is that right?
10    A    There was an investigator that picked up the
11  refrigerator and brought it to our laboratory.  He took
12  some photographs of the scene.  But no, other fire
13  investigator or engineer examined or participated in
14  this investigation other than me.
15    Q    Okay.  How many electrical engineers are
16  employed by Peter Vallas Associates?
17    A    Currently we have one.
18    Q    How about mechanical engineers?
19    A    There's two.
20    Q    Did either of the mechanical engineers --
21  actually, strike that.  At the time that you were doing
22  your fire investigation in this case was early 2001; is
23  that right?
24    A    That's correct.
25    Q    The fire in this case was sometime in

14

1  November of 2000, right?
2    A    Yeah.
3    Q    And then you prepared a report shortly
4  thereafter based on what your investigation revealed to
5  you, correct?
6    A    Yes.
7    Q    Okay.  At that time can you tell me how many
8  mechanical engineers were employed by Peter Vallas
9  Associates?
10    A    Probably the same amount.
11    Q    Okay.  Is that the same also for the
12  electrical engineers as well?
13    A    No, not at that time.  I did not have an
14  electrical engineer on staff at that time.
15    Q    So none at the time of the investigation?
16    A    Right.
17    Q    So you have nine fire investigators, three
18  other engineers.  That's 12 people.  Who are the other
19  19 folks?
20    A    It would be made up of a clerical staff,
21  structural engineers and regular technicians:  Boiler
22  inspector, an evidence controller, a laboratory
23  technician, that sort of thing.
24    Q    Did you engage the services of an electrical
25  engineer at any time during your investigation of this

15

1  file?
2    A    I did not, no.
3    Q    Did either of the mechanical engineers at
4  Peter Vallas Associates participate in any way in this
5  investigation?
6    A    No.
7    Q    I see in your CV at least from 1988 to 2000
8  you have been the chief executive officer of the
9  company; is that right?
10    A    That's correct.
11    Q    And you said you're in charge of all of the
12  files in the office essentially?
13    A    I oversee the entire operations, so I would
14  consider that every file that comes in I know about on
15  a daily basis.  And during its workup or investigative
16  process, I meet with the various people on those files.
17  And if a file is on its stage of being completed or a
18  report is being prepared or a recommendation is being
19  made, I'm also aware of that, and I actually read every
20  report on every file in the firm.
21    Q    You don't write every report that's
22  generated by the firm, right, because there's too many
23  files?
24    A    Obviously.
25    Q    Your CV also indicates on page 8 that you

16

1  oversee all the offices operated by Peter Vallas
2  Associates, correct?
3    A    Yes.
4    Q    What are your duties exactly in overseeing
5  the operation?  Are you in charge of, say, personnel
6  decisions?
7    A    I am in charge of everything from
8  administrative to personnel to hiring to firing to
9  instituting and purchasing of equipment that's needed.
10    Q    So you do it all?
11    A    Well, I have a very good administrative
12  staff that assists me.  But I actually make the
13  decisions on all those levels, yes.
14    Q    Are you also in charge of generating new
15  business for the company?  I mean, marketing efforts
16  and things along those lines?
17    A    Along with an assistant, yes.
18    Q    Now, you have a web site, right?
19    A    Yes.
20    Q    I've had a chance to look on your web site a
21  little bit, and it lists some companies that you've
22  represented, correct?
23    A    Correct.
24    Q    Have you ever represented an appliance
25  manufacturer in any litigation?

18

1    A    I believe we have, yes.

2    Q    Are you able to identify that manufacturer
3    for me as you sit here today?

4    A    Black & Decker.

5    Q    Do you remember what particular product you
6    defended for Black & Decker?

7    A    I believe it was a toaster oven.

8    Q    Any others that you can think of?

9    A    Braun.

10    Q    Coffee maker?

11    A    No.  They manufacture exhaust fans for
12    bathroom ventilation.

13    Q    Okay.

14    A    Off the top of my head, I can't think of any
15    others without researching it.

16    Q    You haven't represented a refrigerator
17    manufacturer before, correct?

18    A    Not to my knowledge.  I don't believe so.

19    Q    And you also do work for insurance
20    companies, right?

21    A    Yes.

22    Q    I noticed on the web site that you didn't
23    list Safeco Insurance Company as one of your clients,
24    and that may just be for some reason I'm not aware of.
25    Can you tell me, have you represented Safeco in other

18

1    litigation other than this case?

2    A    I believe so.

3    Q    Are you able to estimate for me the number
4    of times in which you have done so?

5    A    In litigation in particular, I don't know
6    how many, maybe several.  But then on occasion I will
7    accept an assignment from them based on whatever
8    capacity it may be.  It could simply be to pick up a
9    well pump and test it to perhaps a fire investigation
10    or a product analysis.  So there's probably more
11    occasion where we get some work from Safeco as opposed
12    to it all being like a litigated type of a file.

13    Q    But you have a regular business relationship
14    with Safeco Insurance Company; is that fair to say?

15    A    We probably take several cases a year, sure.

16    Q    Now, your firm is engaged in a wide variety
17    of activities, right, I guess boiler explosion cases,
18    electrocution cases, things along those lines; is that
19    true?

20    A    Yes.

21    Q    Do you participate -- you said you
22    participate in all the investigations, but can you tell
23    me, say, of the 4300 files you had last year how many
24    of those were actually fire investigations as opposed
25    to one of the other types of investigations that you

19

1    do?

2    A    I could.  Those numbers are being put
3    together now for annual reports.  I would think on an
4    average we probably handle 30 to 40 fire investigations
5    a month, you know, give or take a little bit.  I don't
6    know the exact numbers, if we're utilizing last year as
7    the basis.

8    Q    Sure.  Now, is the company open seven days a
9    week?

10    A    No.

11    Q    You're open Monday through Friday?

12    A    Well, technically we're open Monday through
13    Friday.  Saturday, on occasion some of the guys work
14    the laboratory, maybe in operation.

15    Q    Okay.  Are you like on call with the
16    insurance companies that you represent?  They may call
17    you any time to go out and investigate a fire, or is it
18    more like something that comes in from nine to five
19    during the workday from the claims department?

20    A    More in the sense of a phone call into the
21    office between eight and five.  If a call comes in it's
22    left on a voice mail, and there's a response the
23    following day to whoever the potential client may be.

24    Q    And when the firm gets a new fire
25    investigation, do you make a determination as to which

20

1    individual fire inspector should conduct the
2    examination of that fire?

3    A    Sometimes.  And other times I have an
4    operations director in the office who coordinates the
5    scheduling and the appointments.  And he also has the
6    capability of making that decision.

7    Q    But it sounds like you have a lot of
8    responsibilities there at the company; that's fair to
9    say, right?  You're the chief executive officer, right?

10    A    I would say so, yes.

11    Q    How much time to you actually get to get out
12    into the field and do fire investigations at this
13    point?

14    A    At least three days a week.

15    Q    So 60 percent of your time then; is that
16    fair to say?

17    A    Three days a week over the course of a year
18    calculates to -- that's generally the rule of thumb,
19    for me to be in at least two days and out in the field
20    at least three days.  And that all depends on caseload
21    and volume and where the file may or may not be and how
22    many cases come in that week or that day, etc.  So
23    there's some variables there.  But I try to stay active
24    in the field at least three days a week.

25    Q    But when you're active in the field,

21

1   sometimes that's, what, traveling like you did today to
2   come to a deposition?  Do you consider that working in
3   the field?
4        A     Yes.
5        Q     So it may be that the 60 percent that you're
6   in the field is not actually investigating fires; you
7   could be sitting here like you are today giving
8   depositions.  Is that fair to say?
9        A     That's true.  To do the work you have to
10  travel, so I consider that all part of a workday, three
11  days a week.
12       Q     I understand.  But, for instance, you're not
13  investigating a fire as we sit here today, you're
14  talking to me about something you did in the past,
15  right?
16       A     That's correct.
17       Q     So today you're in the field, but you're not
18  actually conducting a fire investigation?
19       A     That's correct.
20       Q     I'm just trying to get a sense of how often
21  does that happen.  In other words, how often do you
22  give deposition testimony like you're giving today on a
23  monthly basis?
24       A     It depends.  It's not that often anymore.  I
25  don't know.  Maybe I gave four or five last year.

22

1        Q     Okay.  And are you able to estimate for me
2   the number of times that you've actually testified in a
3   trial, not a deposition, but at the courthouse in front
4   of a judge or a jury?
5        A     At least 15 times.  That's probably what I
6   have tracked to date.
7        Q     We'll take a break and get that list faxed
8   over.
9        A     Yeah.
10       Q     Have you ever testified in federal court?
11       A     Once, I believe.  Maybe twice.
12       Q     Do you remember when that was?
13       A     I know it was in Suffolk County, Long
14  Island.  It was some time ago.  I don't remember the
15  actual date or the year.
16       Q     Okay.  What was the nature of your testimony
17  in that case?
18       A     It was a -- I believe it was a fire and an
19  electrocution as a result of failed wiring I believe in
20  a ceiling.
21       Q     Who were you testifying for in that case?
22       A     I represented an insurance company that
23  insured the homeowner.
24       Q     And it was your opinion in that case that
25  faulty wiring caused the fire at issue?

23

1        A     Yes.
2        Q     Is that the only federal court testimony
3   that you can remember?
4        A     Perhaps if I look at that list...
5        Q     Okay.  But the testimony you just referred
6   to in Suffolk County, Long Island, do you remember how
7   long ago that was?
8        A     I don't.
9        Q     Was it more than ten years ago, do you
10  think?
11       A     I really don't recall.  I'd have to look at
12  the list.
13       Q     You think that one's going to be on the
14  list?
15       A     I'll know as soon as I see it.
16       Q     Okay.  Now, how did Peter Vallas Associates
17  first learn about the fire in this case?
18       A     May I refer to my file?
19       Q     Sure.
20       A     On November 15, 2000 we received a telephone
21  call from a Richard Pradette, P-r-a-d-e-t-t-e, of
22  Safeco Insurance Company, which he informed us that
23  there was a fire and it was believed to be a
24  refrigerator and to conduct a product analysis, pick up
25  the refrigerator and look it at in the laboratory and

24

1   do an investigation.
2            ATTORNEY ROCHE:  Can we mark that as
3            the next exhibit?
4            (Defendant's Exhibit No. 2, document
5            regarding first contact information,
6            head sheet, was marked for
7            identification.)
8        Q     I just marked as Exhibit No. 2 I guess it's
9   the sheet that you got from Mr. Pradette; is that
10  right.
11       A     Well, it's a Peter Vallas Associates'
12  document.  We call it a "head sheet."  It's a case
13  information take-in sheet, for lack of a better term.
14  And that's generated by my office through a
15  receptionist or an operations person that takes in the
16  information.
17       Q     So this is -- the information contained on
18  this sheet is the result of a telephone call from
19  Mr. Pradette to your office; is that right?
20       A     Yes.
21       Q     And you did not participate in that phone
22  call, correct?
23       A     You know, I don't remember if I personally
24  spoke with him or I was next to the person that took in
25  the case.  But I have a recollection of when it came

25

1  in, because there was question as to was it a fire or
2  was it just a burn in a refrigerator. And it ended up
3  being a product analysis, as opposed to being set up as
4  a fire investigation, and a pickup of a refrigerator.
5  So I know I participated in a conversation at the time.
6  I just don't recall if it was me direct or a
7  conversation next to one of my employees.
8      Q    Okay. And that assignment came in on the
9  15th of November; is that right?
10     A    Yes.
11     Q    And it appears the person who called from
12 Safeco indicated that the fire originated in the
13 refrigerator; is that right?
14     A    Yes.
15     Q    And he wanted to know if there was a
16 possible subrogation action; is that correct?
17     A    That's what verbally he told the case intake
18 person, yes.
19     Q    So when the file was received by your
20 office, obviously you were retained by an insurance
21 company to investigate potential litigation against --
22 with the refrigerator; is that fair to say?
23     A    Of course.
24     Q    At some point did you go to the scene of the
25 fire yourself?

26

1      A    I did not, no.
2      Q    You did not go to the scene?
3      A    Nope.
4      Q    Who went to the scene from Peter Vallas
5  Associates?
6      A    One of our investigators. His name is
7  Sergei, S-e-r-g-e-i, last name is Fell, F-e-l-l.
8      Q    Is Mr. Fell still in your employ?
9      A    Yes.
10     Q    And so it was Mr. Fell who went to the
11 scene. And what did he do at the scene, do you know?
12     A    He went to the scene to simply pick up a
13 refrigerator, and when he arrived there the
14 refrigerator was in the kitchen. And he secured the
15 refrigerator and he took some photographs and I believe
16 he secured some other components: The outlets and I
17 think a power strip, a telephone charger. And he
18 placed it in the transportation vehicle and brought it
19 to the laboratory in Hackensack, New Jersey.
20     Q    Was he there -- in taking the pictures, was
21 he performing some of the fire investigation at that
22 point?
23     A    He works with the fire investigators all the
24 time, so he's very familiar, you know, with the
25 standards. However, this file was not set up as a fire

27

1  origin and cause investigation. It was simply a
2  product analysis, to pick up the refrigerator. So
3  being thorough as Mr. Fell is, he decided to take just
4  a few pictures of the kitchen and took it upon himself
5  to take some of the outlets that were in the kitchen
6  wall for viewing purposes. It helps when evaluating a
7  product if you know what the scene looks like, so he
8  took some photographs.
9      Q    Sure. It's important to obviously
10 adequately document the scene of a fire when you're
11 trying to do a cause and origin investigation, right?
12     A    Sure.
13     Q    You said, though, that the file wasn't set
14 up as a fire investigation?
15     A    That's correct.
16     Q    When you say it was set up as a product
17 analysis, did that mean that the cause of the fire had
18 already been determined at the time that you assigned
19 it?
20     A    No. It's categorized by what it is they
21 want us to do. When I say "they," it can be an
22 attorney, it can be a manufacturer, it can be an
23 insurance company. In this particular case, it sounded
24 as though the fire was confined to the refrigerator and
25 they wanted the refrigerator to be picked up and looked

28

1  at to verify was it a problem or was it not a problem
2  as far as cause. That's how the file was set up.
3  That's the direction that was given to us, and that's
4  what we followed through with. It's hard for you to
5  understand not knowing the makeup of the business, but
6  this could also be pick up a water filter that cracked
7  and caused water damage, or do a product analysis of a
8  piece of pipe that split. And that's how we
9  categorized this: Based on the information.
10     Q    If you were going to go to somebody's house
11 to pick up a pipe that split, you would know
12 automatically that the pipe had failed, right? In
13 other words, you wouldn't have to do an investigation
14 of what happened. You'd just have to go collect the
15 evidence and bring it back and maybe determine why it
16 happened, right?
17     A    Yeah. But in many cases what is called in
18 or what is alleged or what is believed isn't always the
19 case.
20     Q    Sure.
21     A    So that may or may not be a good example,
22 depending on what the circumstances are.
23     Q    If they sent someone from your office out to
24 verify, 1 guess, that this refrigerator either was or
25 was not the cause of the fire, you're really doing a

29

1  fire investigation at that point, isn't that true?  I
2  mean, you're calling it a product analysis, but
3  essentially it's a fire investigation; is that right?
4      A    Technically it is a fire investigation.  We
5  had the opportunity to see the kitchen; to photograph
6  the kitchen; I did review those photographs; I did
7  review the refrigerator; I understood the
8  circumstances; and I rendered an opinion.  So, yeah,
9  it's similar to a fire investigation.
10      Q    Well, is Mr. Fell a fire investigator
11  himself?
12      A    No.
13      Q    He's not?
14      A    No.
15      Q    Let me look at the photos real quick.  So
16  you have some extra photographs in here?
17      A    The ones you're holding are labeled in a bag
18  "unused" or "extra photographs."
19      Q    Let me see if there's an easier way to do
20  it.  I'm sure there is.  Why don't we mark the photos
21  from your file of the property inspection as the next
22  exhibit, just that whole group of photographs?
23      A    Okay.
24           (Defendant's Exhibit No. 3, group of
25            photographs, was marked for

30

1           identification.)
2           ATTORNEY ROCHE:  Then we'll just mark
3  the unused or extra photos that you called
4  them on the outside of this as the next
5  exhibit.
6           (Defendant's Exhibit No. 4, set of
7            unused or extra photographs, was marked
8            for identification.)
9           ATTORNEY ROCHE:  Let's also mark the
10  report as well.
11           (Defendant's Exhibit No. 5, Mr. Vallas's
12            report, was marked for identification.)
13      Q    Now, was it you that assigned Mr. Fell the
14  responsibility to go and pick up the refrigerator?
15      A    I don't recall.  It was either myself and/or
16  -- I'm trying to think of who would have been at the
17  desk at that particular time.  I believe it was our
18  controller at the time, George Stathis, S-t-a-t-h-i-s,
19  I believe.
20      Q    Okay.  So at the time, though, that Mr. Fell
21  was sent to the scene, was he instructed to take
22  photographs?
23      A    He was instructed to go pick up the
24  refrigerator.
25      Q    And that was it?

31

1      A    Yeah.
2      Q    Okay.  And he just happened to take some
3  photos because you say he was a conscientious employee;
4  is that right?
5      A    Yeah.  He saw he had a scene and talked to
6  the people, he made some notes about circumstances,
7  removed a few extra things and diligently documented
8  that room and secured the physical property or
9  evidence.
10      Q    Okay.  So if he hadn't been a conscientious
11  employee, you wouldn't have had any photographs that
12  you folks at Peter Vallas Associates would have taken;
13  is that fair to say?
14      A    Either that or if we didn't have access,
15  sure.
16      Q    Do you know if the refrigerator had been
17  moved in between the time of the fire on the 13th and
18  the day that Mr. Fell got to the scene?
19      A    I believe it had.
20      Q    Do you know if -- there are no photographs
21  that I have that show where the refrigerator was
22  immediately after the fire.  Do you have any such
23  photographs?
24      A    No.
25      Q    Do you have any photographs that show where

32

1  the refrigerator was in the kitchen area of this house
2  at the time that the fire began?
3      A    No.
4      Q    We marked your report as Exhibit No. 5, and
5  attached to Exhibit No. 5 there were like 50
6  photographs; is that right?
7      A    Yes.
8      Q    And those photographs were obviously taken
9  prior to the date of your report on January 10, 2001,
10  right?
11      A    Yes.
12      Q    Did you have any other -- did you take any
13  other photographs of either the scene of the fire or
14  any of the components of the refrigerator or any of the
15  other evidence that was removed from the fire scene
16  other than these 30 photographs prior to January 10 of
17  2001?  That's a long question.  Do you understand it?
18      A    Yes.  The answer would be yes, if I'm
19  understanding the question.  And those photographs are
20  what I have marked in an envelope called "unused" or
21  "extra photographs."
22      Q    Okay.  So there are additional photographs
23  perhaps that aren't part of the report; is that what
24  you're telling me?
25      A    Yes.

33

```
1    Q    Is there any particular reason why they
2  wouldn't be part of the report?
3    A    Common reasons:  The photo didn't come out,
4  it's a duplicate of, it may be repetitive of another
5  photograph that was taken.
6    Q    Let me ask you the question in a different
7  way.  You attached the most important photographs to
8  your report; is that true?
9    A    Yeah.  I believe the ones that best depict
10 the observations and the opinions and documentation of
11 the scene.
12   Q    Sure.  So this stuff that -- the photographs
13 that support your opinions are certainly going to be
14 the ones that you're going to attach to your report,
15 right?
16   A    Not excluding other photos, but surely they
17 are what I felt was the best that depict and document
18 the scene.
19   Q    When Mr. Fell went to the residence, was he
20 accompanied by anyone from Peter Vallas Associates?
21   A    I don't believe so.
22   Q    Do you know who, if anyone, was present when
23 he arrived at the residence?
24   A    I think it was either Mr. or Mrs. Claro.
25   Q    Now, you said that there were some notes
```

34

```
1  that he took; is that right?
2    A    Yes.
3            ATTORNEY ROCHE:  Can you mark this as
4          the next exhibit?
5            (Defendant's Exhibit No. 6; property
6            evidence transfer document, was marked
7            for identification.)
8    Q    I'm going to show you what we've just marked
9  as Defendant's Exhibit 6.  It's a document of Peter
10 Vallas Associates.  It's two pages long.  It says
11 "property evidence transfer document."  Can you tell
12 me, is that a document that Mr. Fell would have
13 prepared?
14   A    Yes.
15   Q    Is that to document the items of evidence or
16 the items, I guess, that he was removing from the
17 residence?
18   A    Yes.
19   Q    So he prepared that as he was leaving, I
20 guess, on the 16th, to your knowledge?
21   A    More than likely towards the end of him
22 securing or just before he secured it.
23   Q    Okay.
24            ATTORNEY ROCHE:  Can you mark that as
25          the next exhibit?
```

35

```
1            (Defendant's, Exhibit No. 7, handwritten
2            notes, was marked for identification.)
3    Q    Defendant's Exhibit 7, can you tell me what
4  that is, please?
5    A    These are handwritten notes by Mr. Sergei
6  Fell in a conversation that he had with Mr. Claro.  And
7  on the bottom there is a different style of
8  handwriting, and that's my handwriting with notes that
9  I had with Mr. Claro.
10   Q    I'm sorry.  When Mr. Fell got to the
11 residence -- I think you answered this question, but
12 I'm not sure I heard the answer or was paying attention
13 -- who was present at the house?  Just Mr. Claro?
14   A    I don't know for sure, but obviously
15 Mr. Claro was there -- I think it was Mr. Claro.  I'm
16 not sure if anyone else was there.
17   Q    Because there's a reference in this to the
18 insured's wife.  But you're assuming it was Mr. Claro
19 that was there?
20   A    I thought it was Mr. Claro.
21   Q    Okay.  Do you know how long Mr. Fell was
22 present at the scene?
23   A    I don't.
24   Q    It could have been fifteen minutes or an
25 hour; you're not sure?
```

36

```
1    A    I would think at least an hour, but I don't
2  know for sure.
3    Q    Now, the notes that we marked as Exhibit No.
4  7, there's a notation on the left-hand side, about a
5  third of the way down the page, it says "Magic Chef."
6  Do you see that?
7    A    Yes.
8    Q    Is that in your handwriting, or is that
9  Mr. Fell's handwriting?
10   A    That's mine.
11   Q    And is that -- do you know when that
12 notation was put in these notes?
13   A    It would have to be on or after January 5,
14 '01.
15   Q    Is that the first time that you spoke to
16 Mr. Claro in this case, on January 5?
17   A    Yep.
18   Q    How many conversations did you have with
19 Mr. Claro in this case?
20   A    Just the one.
21   Q    Did you speak to Mrs. Claro at all?
22   A    I don't believe so, nope.
23   Q    Do you remember how long your conversation
24 lasted with Mr. Claro?
25   A    I don't recall how many minutes.
```

37

1    Q    Was it an hour-long conversation?

2    A    I wouldn't think so, no.

3    Q    Half an hour?

4    A    I don't recall it being even that long.

5    Q    So to your best recollection, it was a

6  conversation that lasted less than thirty minutes; is

7  that right?

8    A    Yes.

9    Q    Did you make any other notations other than

10 what appear on Defendant's Exhibit No. 7 regarding your

11 discussion with Mr. Claro on January the 5th?

12   A    No.

13   Q    In other words, you don't have any other

14 contemporaneous notes that were prepared as you were

15 having your conversation with him, right?

16   A    No.

17   Q    But it appears he told you it was a Magic

18 Chef brand refrigerator?

19   A    That's what he stated to me.

20   Q    Did you make any effort to contact Magic

21 Chef to get a listing of the products they may have had

22 available at the time this refrigerator was purchased

23 by the Claros?

24   A    No, not at that particular time.  That was

25 something that was proposed and/or could have been done

38

1  at a later date either by our staff or someone else's.

2    Q    Do you know if it was ever done?

3    A    I think recently there was an inspection at

4  our laboratory with an engineering firm, several

5  individuals, perhaps yourself, examining the

6  refrigerator on a more detailed aspect than the

7  preliminary examination that I made.

8    Q    You were never able to determine what model

9  refrigerator this was, right, what Magic Chef model

10 number the refrigerator was?

11   A    No.

12   Q    What can you tell me about the refrigerator

13 that you do recall?  In other words, did it have an ice

14 maker in it?

15   A    I don't know if it had an ice maker.

16   Q    Was it a top and bottom model?  Side by

17 side?  Is there anything about it that you can recall

18 as you sit here today?

19   A    Well, it was a heavily damaged refrigerator,

20 particularly on the inside of the unit.  I remember

21 that.  There was a huge meltdown of plastic at the

22 bottom which made it very difficult to identify

23 components, find components or even evaluate those type

24 of components and the overall condition of the

25 components.

39

1    Q    Let me ask you this question:  Do you know

2  what the seal on the refrigerator doors is made out of?

3    A    The seal?

4    Q    The seal.

5    A    I don't know the exact material.

6    Q    But it's a plastic type component, correct?

7    A    Yeah.  A plastic, rubber type, sure.

8    Q    You've been in a lot of fire scenes during

9  the course of your career, right?  Approximately 5000

10 fires you said you investigated?

11   A    Yep.

12   Q    And you've been in the kitchens of many

13 residences that have burned in fires, correct?

14   A    Yes.

15   Q    Has it been your experience that the seal on

16 the refrigerator failed during the course of the fire?

17   A    Yes.

18   Q    And when the seal on the refrigerator door

19 fails, the doors tend to fall away and open up?  After

20 the seal fails, the door will open up, correct?

21   A    In some cases the door can open up, yes.

22   Q    Is that fairly common in your experience,

23 sir?

24   A    They either open up or they lose the seal

25 which allows some exposure of heat and/or fire to the

40

1  inside of the refrigerator.

2    Q    Sure.  So it's not unusual then when you're

3  investigating a fire that has consumed a kitchen to

4  find that the interior compartment of the refrigerator

5  is burned, correct?

6    A    In some cases it's not uncommon.

7    Q    Well, I guess in all cases, is it a common

8  thing to see or not?

9    A    Well, depends on how much fire, the location

10 of the refrigerator, the distance from the heat or the

11 fire.

12   Q    Let me ask you this question:  I'm sure

13 you're probably familiar with this, but approximately

14 what temperature would the plastic seal on a

15 refrigerator door begin to melt?  This isn't a science

16 quiz.  I'm just trying to get your estimation.

17   A    Over 100 degrees, perhaps maybe 150 degrees,

18 180 degrees.  I don't know for sure.

19   Q    But it's fair to say that plastic type

20 material melts at a lower temperature than the metal,

21 say, cabinet of the refrigerator, right?

22   A    Obviously, yes.

23   Q    Did you ever -- can you give me your

24 estimate of what the approximate temperature would have

25 been in the kitchen at the stage that this fire was

41

1  really out of control, what the temperature would have
2  been in the room?
3      A    I don't know.
4      Q    Would it have been in excess of 180 degrees?
5      A    Yes.
6      Q    In excess of 2 or 300 degrees?
7      A    I would think so, yes.
8      Q    Obviously hot enough to melt the seal on a
9  refrigerator door, correct?
10     A    Yes.
11     Q    And isn't it true that if the door in the
12 refrigerator came open, the contents of the
13 refrigerator are going to be exposed to the heat and
14 fire in the room, right?
15     A    Well, if the scenario was that the fire was
16 outside of the refrigerator and the refrigerator was
17 attacked by fire, yeah, the seal could melt and the
18 door may or may not open, sure.
19     Q    But if it did open, it would expose the
20 contents to the external fire and heat, correct?
21     A    If it opened wide, everything would be
22 subjected to some form of heat or fire condition, yes.
23     Q    Did you ever go to the scene of this fire?
24     A    No.
25     Q    Was that just because it was your

42

1  understanding that this was still just a product
2  analysis type case?
3      A    More or less.  It was picked up, we had some
4  photographs, we knew the circumstances, there was quite
5  a bit of damage to the refrigerator, so we never did
6  return.
7      Q    Can you tell me what the circumstances were
8  as you understood them?
9      A    Well, what was provided to Mr. Fell was that
10 they were in the kitchen cooking and they smelled
11 smoke.  And the insured opened up the refrigerator, saw
12 smoke and flames in the bottom of the refrigerator and
13 identified the fire burning in the refrigerator and
14 nowhere else in the room.
15     Q    Did you learn at any time what was being
16 cooked on the stove? .
17     A    No.
18     Q    Did you ever speak to -- I think you said
19 you never spoke to Mrs. Claro at all, right?
20     A    I don't believe so.  I believe it was
21 Mr. Claro.
22     Q    Mr. Claro.  And you don't recall any
23 conversation you had with him about what was being
24 prepared --
25     A    No.

43

1      Q    -- on the stove?  Did you ever ask any
2  questions about what was on top of the refrigerator?
3  In other words, was there papers or other items on top
4  of the refrigerator?
5      A    I don't believe so.
6      Q    Now, is there a photo log, by the way, for
7  your photographs in the case?  I got the 30 here, but I
8  don't see a log that accompanies them.  There's sort of
9  some notations on some but not on others.
10     A    The log would be a description of the
11 photograph or photographs by number.
12     Q    That's what's contained then in your report
13 as we look as these 30 photographs?  So you're saying
14 the photo log is just the stuff that appears on the
15 bottom here next to the numbers on the photographs?
16     A    I'm assuming by definition, "photo log,"
17 it's a photograph and then a description of that
18 photograph relative to a number.
19     Q    Okay.  Other than the one-page fax that you
20 got from Safeco Insurance Company that we marked as
21 Exhibit No. 2, actually this page was generated after
22 the phone call, correct?
23     A    Yes.
24     Q    Did the person who went to the fire scene
25 take this piece of paper with him when he went there,

44

1  do you know?
2      A    Yes.
3      Q    That would be something that he would
4  normally do?
5      A    It would be part of the file in its early
6  stages.
7      Q    Because it's got the contact information and
8  who you need to speak to to get access, etc., correct?
9      A    Yes.
10     Q    Did you have any other written documentation
11 regarding the fire at the time of the scene inspection
12 other than this one piece of paper?
13     A    No.
14     Q    Now, we made a copy of your entire file,
15 correct?
16     A    Yes.
17     Q    And there are no other portions of that file
18 that are in your office relating to your investigation
19 in this case; is that correct?
20     A    The only thing that may not be part of this
21 is there would be a file that would have a copy of an
22 invoice for the storage of the equipment.  But it's not
23 pertaining to investigative or notes or anything
24 handwritten.
25     Q    Sure.

45

1    A    It's just a file that says we're doing
2  storage on a piece of property.
3    Q    How much do you folks charge to do a fire
4  investigation or a product analysis, I guess?
5    A    It depends.  Our hourly rate is $135.00 an
6  hour for the investigator.  That incorporates his time
7  to do what it may be:  Examining the equipment,
8  laboratory, dictation of the report, phone
9  conversation, whatever it maybe.
10   Q    Okay.  I notice, though, that you don't have
11  a copy of the Waterbury Fire Department's report of
12  this fire, is that correct, or is that just missing?
13   A    That is correct.
14   Q    You didn't look at the fire marshal's report
15  of the fire? .
16   A    No.
17   Q    Or the fire department's report of the fire?
18   A    No.
19   Q    You didn't need to do that to conduct your
20  investigation?
21   A    No.  We prepared the report based on the
22  observations and the investigation to date, made
23  references in that report that further work should be
24  done and perhaps they should get a legal opinion as to
25  certain things and then we could carry on.  There was

46

1  talk about maybe another engineer examining the
2  refrigerator.  So we basically prepared the report,
3  and...
4    Q    And that was it?
5    A    That was it.
6    Q    Exhibit No. 5, is that your only report in
7  this case?  Do you want to take a look at it?
8    A    Yeah.  Yes, that is the only report.
9    Q    So there are no supplements or addenda to
10  this report, correct?
11   A    I believe the only thing that was ever
12  generated is a letter that I just sent out that a
13  property inspection took place.
14   Q    I see that in the file.  But there's no
15  other actual supplements to this report?
16   A    No.
17   Q    And the report is dated January 10 of 2001,
18  correct?
19   A    Yes.
20   Q    Did you ever speak to the fire marshal about
21  the case?
22   A    No.
23   Q    Did you ever speak to anybody from the
24  Waterbury PD about the case?
25   A    No.

47

1    Q    Any particular reason you didn't do that?
2    A    As I explained, we provided a verbal to the
3  client, we explained the circumstances, made some
4  references in the report.  And there was no follow-up
5  from the client to pursue or not pursue or continue any
6  other investigation.  We just -- it was my
7  understanding they were going to put or retain an
8  engineer of some type to come in and examine the
9  refrigerator.
10   Q    Did you ever speak to the other engineer in
11  the case that was retained by the plaintiffs?
12   A    No.
13   Q    Do you know what his name is?
14   A    I don't know.
15   Q    You have some business cards that are there,
16  correct?
17   A    Yes.
18   Q    All right.  I guess they're stapled to the
19  front part of your file, right?
20   A    Sure.
21   Q    There's a Maytag card there.  But of the
22  other two folks, you're not sure which of those people
23  is the investigator or the engineering person?
24   A    I was not present at the inspection, so I
25  don't know.  I was told to allow for an inspection and

48

1  there would be individuals coming to examine it, and I
2  had a representative there to more or less oversee --
3    Q    Sure.
4    A    -- and re-secure the evidence, but I don't
5  know.
6    Q    Have you ever seen any of the deposition
7  testimony in this case?
8    A    No.
9    Q    Did you ever have a discussion with Safeco
10  attorneys about what transpired during those
11  depositions?
12   A    No.  Since the date of that report up until
13  early last year the file was not active.
14   Q    Okay.  So between January 10 of 2001 and the
15  date of the product inspection that occurred in this
16  case on January 2 of 2003, there was no further work
17  done on the file by Peter Vallas Associates Inc.; is
18  that correct?
19   A    The only work, if you want to consider it
20  work, was several phone conversations with counsel with
21  Safeco.
22   Q    To arrange for the inspection?
23   A    To arrange for it and/or make a
24  recommendation as to someone to examine the
25  refrigerator.

49

1    Q    Did you folks make a recommendation to
2  Safeco as to who should examine the refrigerator?
3    A    I believe we gave them two different firms
4  or engineers.
5    Q    Did they utilize either of those firms?
6    A    I don't believe so.
7    Q    Have you ever done any work with Frank
8  Watkinson of Spectrum Engineering in Cheshire,
9  Connecticut before?
10    A    I don't believe I've worked with him, but I
11  believe I've seen perhaps a report with the Spectrum
12  Engineering Group name on it.
13    Q    I want to understand what you did in the
14  case.  Mr. Fell went to the scene and took the
15  photographs and then brought the evidence back to your
16  laboratory; is that right?
17    A    Correct.
18    Q    When did you first see this refrigerator?
19    A    I don't know the exact date.  It was
20  sometime obviously after his on-site inspection of
21  November 16, 2000.  But the first time I did see it was
22  at the laboratory with Mr. Fell present and the
23  photographs of the scene present.  At which time I
24  examined the refrigerator, reviewed the photographs,
25  which ultimately led to me dictating this report of

50

1  January 10, 2001.
2    Q    Did you make any notes during the course of
3  your initial inspection of this appliance back at the
4  laboratory?
5    A    I may have made some notes on a recording or
6  on a tape, and those notes ultimately become part of my
7  report.  So I don't have any handwritten notes.
8    Q    So there are no handwritten notes?
9    A    No.
10    Q    Now, your web site says that you conduct all
11  of your investigations in accordance with NFPA 921; is
12  that correct?
13    A    Correct.
14    Q    Can you tell me what NFPA 921 is, please?
15    A    It's a guideline issued by a very reputable
16  organization, the NFPA, for conducting fire and
17  explosion investigations.
18    Q    Do you consider it to be authoritative?
19    A    For the most part, yes.
20    Q    Are there portions of NFPA 921 to which you
21  do not adhere?
22    A    I just think that some things may or may not
23  be applicable in the course of an investigation based
24  on the circumstances of the fire, the condition of the
25  building, what may or may not be conducted.

51

1    Q    But as a general rule you want to follow the
2  guidelines in the NFPA 921 during the course of any
3  fire investigation that you're going to put your name
4  on; is that fair to say?
5    A    Sure, yes, correct.
6    Q    Wouldn't you want to have a fire
7  investigator actually examine the fire scene before you
8  render an opinion as to the cause of a fire?  Is that
9  something that NFPA would recommend?
10    A    They would recommend that.  But, again, this
11  was called in to us as a product analysis.  In other
12  words, to pick up the product and evaluate it and take
13  a look at it and make any comments or recommendations,
14  as we did.  So although helpful, and that was done
15  through scene documentation by Mr. Fell, you know, to
16  an extent, there was some documentation of the scene.
17    Q    Sure.  Let's just -- Mr. Fell took some
18  photographs at the scene.  It appears he took twenty
19  photographs, or at least I have twenty photographs
20  attached to your report that appear to be from the
21  scene.  Let's just look at those photographs, if we
22  could.
23    A    I have a set here.
24    Q    You have a better set than I do.
25    A    I think -- oh, I think there is actually 30

52

1  photographs.
2    Q    That's right.  But it looks like, at least
3  from what I can tell, the last ten were taken back in
4  your laboratory in Hackensack.
5    Q    So there are twenty scene photographs
6  really, right?
7    A    Yes.
8    Q    If we look at those photographs, I note that
9  Numbers 1 through 4 are exterior views of the
10  structure; is that right?
11    A    Yes.
12    Q    Any particular idea why Mr. Fell would have
13  taken those photographs?
14    A    He was just documenting the overall exterior
15  and also a door that led into the kitchen from the back
16  of the house where there was some fire patterns as
17  well.
18    Q    Okay.  Photograph No. 5 shows a view within
19  the kitchen, correct?
20    A    Yes.
21    Q    Are you able to tell me where in that
22  photograph this refrigerator was located prior to being
23  moved by the homeowner?
24    A    No.

53

1    Q    You agree with me that I don't have an
2  overall view of this kitchen that shows me where this
3  refrigerator was located in these photographs, do I?
4    A    You don't.
5    Q    Number 6 shows a view within the living room
6  of the house, right?
7    A    Yes.
8    Q    7 is the same.  It's another view of the
9  living room?
10    A    Yes.
11    Q    Photograph No. 8 is a view leading into the
12  kitchen, is the description, but you really can't see
13  the kitchen in the photograph other than from a
14  distance; is that true?
15    A    That is true.  Just looking at the photo, 7
16  is actually a view of the dining room.
17    Q    I'm sorry.
18    A    You said living room, and I agreed with you.
19    Q    Sorry.  It is dining room.  Number 9 is an
20  overall view, again, in the kitchen.  Do you know where
21  in this photograph the refrigerator was prior to the
22  fire?
23    A    No.
24    Q    You're not able to locate for me on this
25  photograph where the refrigerator was; is that true?

54

1    A    Where it was originally, I cannot do that,
2  no.
3    Q    Number 10, the description of that
4  photograph says "a view documenting the overall fire
5  patterns and spread."  Do you see that?
6    A    Yes.
7    Q    Can you tell me where that was taken?  In
8  what room of the house?
9    A    I believe it was documenting the joists from
10  the kitchen into the hallway, if I'm not mistaken.
11    Q    You're not sure, though, because of the way
12  it's labeled; is that fair to say?  I see some burnt
13  wood, but I'm not sure where it is.  In other words, is
14  it in the north corner, the eastern corner, etc.?
15    A    I don't know the direction.
16    Q    But you think it's out the rear hallway of
17  the house leading out the back door?
18    A    From the kitchen into the back door.
19    Q    Okay.  Number 11, "a view documenting the
20  refrigerator."  I note that there are no photographs
21  that show the doors of the refrigerator; is that true?
22    A    Within the scene or in this photograph?
23    Q    In the scene.  Well, actually in Number 11.
24  Let's talk specifically --
25    A    No, I don't see the doors.

55

1    Q    Okay.  12 through 16 says "views of the
2  electrical wiring showing no failure or fire
3  development from this location."
4    A    Yes.  I see that.
5    Q    Are you able to tell me -- it looks like
6  there's a couple of photographs of at least one and
7  possibly two receptacles; is that fair to say?
8    A    There appears to be three receptacles
9  overall in those descriptions.
10    Q    Okay.
11    A    And 15 and 16 would be a receptacle that was
12  within a junction box by itself.  And the earlier
13  photographs represent two receptacles in a box.
14    Q    Do you know which of these receptacles the
15  refrigerator was plugged into at the time of the fire?
16    A    I believe based on what was explained and
17  told to us was that it was plugged into the -- give me
18  a minute -- the receptacle.  Let me just pinpoint the
19  right one for you.  I think it's the receptacle 15 and
20  16.
21    Q    You think that's the one it was plugged
22  into?
23    A    Yeah.
24    Q    Are you certain about that or are you
25  guessing as we sit here today?

56

1    A    Well, again, since 2000.  It's been a long
2  time since I had the review with Sergei.  I believe
3  that was the one.
4    Q    You've investigated a lot of fires in that
5  time frame, right?
6    A    Yes.
7    Q    It's possible you could be mistaken as to
8  that?
9    A    I would like to clarify it with Mr. Pell, if
10  I could.
11    Q    Sure.  And the photo log -- if there was
12  another photo log for each individual photo, that would
13  help us, wouldn't it?
14    A    Well, specifically identifying that, you
15  know...  They weren't listed that way in the log, so
16  I'm not sure.
17    Q    Okay.  After the refrigerator was taken back
18  to the laboratory, you had a chance to examine it.
19  You're not sure of the date, though, right?
20    A    No.
21    Q    How long did your examination last?
22    A    Probably at least an hour.
23    Q    And were there further photographs taken
24  during that examination?
25    A    Yes.

57

1   Q   And are those the photographs that appear on

2  Exhibit No. 5 as photographs 21 through 30?

3   A   Yes.

4   Q   Were there any other photographs taken

5  during your, I guess, initial inspection, if you will,

6  of this refrigerator?

7   A   There may be several that are in that group

8  of photographs that were labeled as "unused" or

9  "extras."

10   Q   Okay.  And your inspection at that time

11  consisted essentially of visually -- you looked at the

12  refrigerator and the other evidence that had been

13  secured from the scene by Mr. Fell; is that right?

14   A   That's correct.

15   Q   There was no laboratory analysis done at

16  that point, right?

17   A   I considered a laboratory analysis which was

18  a preliminary visual of the equipment.  By

19  "laboratory," I don't mean that tests were done and

20  things like that were conducted.  But it was in the

21  laboratory.  It was an analysis in the laboratory of

22  the product as depicted in the photographs.

23   Q   It's a visual inspection, I guess, because

24  when you say "laboratory analysis," I'm thinking that

25  you're taking out equipment and running laboratory type

58

1  testing on the equipment.

2   A   I explained what my definition of laboratory

3  analysis is.  It could be that and/or it could be an

4  analysis of something that's burned, and in this case

5  the refrigerator.  But no tests were done, nothing

6  invasive.

7   Q   I'm just trying to figure out if you're

8  calling it laboratory analysis because it took place in

9  the laboratory, because you could have done a visual

10  inspection the same way at the scene of the fire; is

11  that true?

12   A   You could have.  But the environment of the

13  laboratory area is conducive for lighting and for

14  examining a lot better than it is at a scene.  So I

15  consider it a laboratory analysis, which in your words,

16  and I would agree with you, is visual.

17   Q   And I'm not trying to denigrate what you

18  did.  I'm just trying to understand what it was.

19   A   Right.

20   Q   You agree with me, though, that if you had

21  an opportunity to go to the fire scene and look at

22  that, you would have able to gather more information to

23  confirm your opinions in this case?

24   A   More information could have been gathered,

25  yes.

59

1   Q   Well, for instance, we don't have any

2  photographs that show the location where this

3  refrigerator was when it allegedly burst into flames,

4  isn't that true?

5   A   Well, no, I mean, it would have been

6  difficult even at the time we were there, because there

7  had been cleanup of the kitchen.  There had been debris

8  discarded to the exterior of the building.

9   Q   Sure.  The fire scene has been spoliated at

10  that point to some degree, hadn't it?

11   A   Yes.

12   Q   Some of the evidence had been moved around;

13  is that true?

14   A   I believe so, yeah.

15   Q   When you say there had been some cleanup

16  work, do you know what the cleanup work consisted of?

17  In other words, was there any demolition done by

18  anyone?

19   A   I don't think any demolition was done, but

20  some debris that was on the floor and portions of some

21  burned material were all discarded and thrown to the

22  exterior of the building on the side of the house.  So

23  fortunately the refrigerator was in the kitchen, but

24  not in a place that it was originally.

25   Q   So we have 20 photographs taken during

60

1  Mr. Fell's visit to pick up the refrigerator, two or

2  three of which show the kitchen area of the house; is

3  that right?

4   A   At least four.  And then others that

5  incorporate the receptacles, but they're just close-ups

6  of the receptacles more or less.

7   Q   I see a couple of the kitchen and there are

8  some of the ceiling.  Are you including those in the

9  four?

10   A   There is some view of the kitchen in one of

11  the shots that's taken from an adjacent room, so I just

12  wanted to incorporate any and all that may in any way

13  document the kitchen.

14   Q   Sure.  Are you satisfied that those four

15  photographs that depict some or all of the kitchen are

16  adequate documentation for purposes of a fire

17  investigation like this?

18   A   Based on what was there and the condition of

19  the room, I do, yes.

20   Q   You certainly would have liked to have a

21  photograph of the location where the refrigerator was

22  at the time it caught fire, right?

23   A   That's helpful, yes.

24   Q   You certainly want to have some photographs

25  that depict the origin point of the fire within the

61

1  room, right?

2       A    It's helpful.

3       Q    Now, we talked about your report just sort

4  of generally.  Mr. Fell went to the scene on the 16th,

5  you examined the refrigerator at some point after that,

6  and you had one telephone call with Mr. Claro; is that

7  right?

8       A    Correct.

9       Q    Did you do anything else in between the date

10  that your company was assigned this case and the date

11  you prepared this report to investigate the fire?

12       A    I had that verbal -- I spoke with the

13  client, Mr. Fradette, F-r-a-d-e-t-t-e, and that was

14  probably right at the time I either prepared the report

15  or just after or just before.  That's generally how I

16  -- I generally make the phone call before I prepared

17  the report.  I'm sure that's what transpired at that

18  point.  Then the report was prepared.  I did a final

19  read on it.  And then it would have been mailed to the

20  client.  And we set up a storage folder, that we had

21  stuff in the laboratory, and put it in a location so

22  that we had proper securing of it.  And nothing else

23  was performed other than displaying it for that joint

24  inspection.

25       Q    That occurred after the date you prepared

62

1  your report?

2       A    That's correct.

3       Q    And you had already reached the conclusions

4  that you have in this case at the time you prepared

5  this report, right?

6       A    Yes.

7            ATTORNEY ROCHE:  Let's go off the

8       record.

9            (Whereupon, a recess was taken at 11:18,

10            and the deposition resumed at 11:22.)

11       Q    And this report that we marked as Exhibit

12  No. 5 contains all of the opinions you intend to

13  express to the jury at the time of trial; is that

14  correct, sir?

15       A    At this time, unless I'm asked to do

16  something else or perform additional evaluation.

17       Q    Sure.  But you understand that there's

18  deadlines in litigation and we're past the deadlines

19  for certain activities to take place.  And as we sit

20  here today, those are your opinions in the case --

21       A    Yes.

22       Q    -- in Exhibit 5, right?

23       A    That's correct.

24       Q    Okay.  If we could just go through the

25  report.  So the "purpose of the assignment," the last

63

1  sentence says here says, "After careful on-site

2  examinations, follow-up investigation, and laboratory

3  analysis," and you list the results, correct?

4       A    Yes.

5       Q    And the on-site examination is the time that

6  Mr. Fell spent at the scene that day, correct?

7       A    Yes.

8       Q    No other time?

9       A    Correct.

10       Q    And the follow-up investigation, what did

11  that consist of?

12       A    The follow-up was probably just the phone

13  call and, you know, preparing any -- the verbal to the

14  client and preparing any reports and looking at the

15  photographs, etc., just following up on what was done

16  at the site.

17       Q    Would that also include your examination of

18  the refrigerator in the laboratory?

19       A    Yeah.  Then it goes on to say laboratory

20  analysis.

21       Q    And that's your laboratory analysis --

22       A    Yeah.

23       Q    -- is that visual inspection of the

24  refrigerator that you performed in the lab?

25       A    Yes.

64

1       Q    Is that the sum total of the testing that

2  was done -- strike that.  Is that the sum total of the

3  activity that you engaged or that Peter Vallas

4  Associates engaged in that form the basis for your

5  opinions in this case?

6       A    That's right.

7       Q    "Fire origin and cause analysis," the third

8  section of your report.  So when you wrote the report,

9  you were actually writing it as a cause and origin

10  analysis, though, at that time; is that true?

11       A    Well, we had access to the scene, there were

12  photographs, there were observations made; so we put it

13  as a fire origin and cause analysis, because we had

14  some of that documentation, for me to expand a little

15  bit on just having picked up a refrigerator and looking

16  at only a refrigerator under those conditions.

17       Q    You never saw any of the photographs of the

18  scene taken by the fire marshal's office; is that

19  correct?

20       A    That's correct.

21       Q    And you never saw -- at the time that this

22  report was prepared, there had been no follow-up

23  inspections, so you hadn't had a chance to review any

24  other photographs that had been taken after that

25  obviously?

65

1    A    No.

2    Q    "An examination was made of all electrical

3 wiring in the wall, including the wall receptacle."

4 And that examination was made by?

5    A    Mr. Pell.  And then ultimately myself

6 through a photograph.

7    Q    Through a photograph that he took that day?

8    A    Yes.

9    Q    He removed those items as well; is that

10 correct?

11    A    Correct.

12    Q    What is Mr. Pell's background?  You told me

13 he's not a fire investigator.  What does he do?

14    A    He's an investigator on staff, and he deals

15 with the handling of evidence and assisting the fire

16 investigators on the site:  Digging, reconstruction.

17 So he's more of an assistant to the fire investigators.

18 And he has some formal seminars and some training.  I

19 don't know all of it off the top of my head.

20    Q    You are basing some of your opinions in this

21 case at least though on what he told you and what he

22 relayed to you; is that fair to say?

23    A    Yeah.  I would have to say that.  He has

24 documentation and photographs and conversation that

25 helped assist in evaluating, you know, to get to this

66

1 preliminary product analysis.  I would relay upon that,

2 yes.

3    Q    So this is a preliminary product analysis,

4 this report?

5    A    Well, more or less.  We recommended that

6 with all the circumstances that existed with some of

7 the  cleanup at the scene and the type of damage that

8 existed to the refrigerator and the melted materials,

9 you know, verbally I had indicated that there should be

10 additional investigation; and secondly, you know, that

11 a legal expert of some type should evaluate all of this

12 in order to determine if there should be a joint

13 inspection or where to proceed from this particular

14 point based on the circumstances.

15    Q    So you talk -- sorry.

16    A    From a fire origin and cause or a product

17 analysis investigation, these opinions -- everything

18 appeared to have originated within the refrigerator,

19 but no other specific information could be provided at

20 that particular time.  That's basically how the report

21 reads.

22    Q    Okay.  Next sentence under fire origin and

23 cause says, "An examination was made of all electrical"

24 -- I'm sorry.  "It was noted that no evidence of an

25 electrical failure was found, therefore eliminating

67

1 wiring in the building as a cause of the fire

2 occurrence," correct?

3    A    Yes.

4    Q    Was there any evidence of electrical failure

5 found in the refrigerator compartment?

6    A    No.

7    Q    None?  You didn't find beaded wires to lead

8 you to believe that the fire began at some certain

9 location in the wiring; is that true?

10    A    That is true.

11    Q    Did you find any electrical faults in the

12 refrigerator?

13    A    No.

14    Q    Did you make a determination, though, that

15 this was an electrical fire?

16    A    It appeared that some sort of an electrical

17 malfunction may have been an ignition source.

18    Q    May have been an ignition source?

19    A    Correct.

20    Q    Were there other potential ignition sources

21 in the room?

22    A    No.  Specifically I thought in the

23 refrigerator you were referring to.

24    Q    I'm just talking generally.  I'm just trying

25 to understand, how did you determine that this was an

68

1 electrical fire?

2    A    Well, it appeared that, you know, the fire

3 originated in the refrigerator.  There was an

4 eyewitness account of it in the refrigerator, and the

5 only potential source in a refrigerator at that

6 particular place would be some type of an electrical

7 malfunction.  But specifically I don't know based on

8 the damage and the melted materials.

9    Q    Did you examine any of the individual

10 components of this refrigerator, other than looking at

11 them?  Was there any kind of testing done on any of the

12 compressor or condenser units, any of that stuff?

13    A    No.  Absolutely not.

14    Q    You would have wanted to involve the other

15 parties to litigation if there was?

16    A    That's why we referenced a legal opinion as

17 to the procedure and not to do anything further, and

18 other parties should be placed on notice based on the

19 circumstances that existed in the case.

20    Q    Towards the bottom of this page, the second

21 to last paragraph, it says "Overall examinations made

22 of the refrigerator revealed evidence of severe fire

23 damage, particularly to the interior compartment."

24 That's what it says, right?

25    A    Yes.

69

1    Q   Did you find that to be important in your
2 analysis in this case?
3    A   Sure.
4    Q   We talked earlier about the possibility of
5 the seal on the refrigerator door failing and the door
6 falling away from the unit, correct?
7    A   Right.
8    Q   Would that account for severe damage to the
9 contents of the refrigerator?
10    A   I don't believe in this particular case.
11    Q   Why not?
12    A   Well, there's -- the patterns are of such
13 that it appeared that the fire was in the refrigerator
14 compartment.  The eyewitness account did not provide
15 any information of fire anywhere else in the room.  So
16 one would think that you could eliminate that the fire
17 attacked the refrigerator based on what was provided to
18 us and that physical evidence somewhat supporting that.
19    Q   When you say "that physical evidence
20 somewhat supporting that," what physical evidence are
21 you talking about?  You talked about pattern evidence.
22    A   Yeah.  The meltdown and the destruction
23 inside the refrigerator.  The overall views of the room
24 don't show any other potential area other than the back
25 hallway where we could have had some other type of fire

70

1 development.  And taking into account the statement as
2 evidence that it was discovered burning inside of the
3 refrigerator would allow me to use that information to
4 develop that opinion, that it appeared to be in that
5 refrigerator.
6    Q   If you could look at your report there's a
7 couple of photographs that were taken in your
8 laboratory.  I think they're marked as Number 25 and
9 22.  22 says, a view documenting fire and heat
10 patterns, right?
11    A   Yeah.
12    Q   Is there something on this photograph that
13 you can point to to tell me that this is a burn pattern
14 that you feel shows that the fire originated from
15 within the refrigerator compartment?  I don't
16 understand burn pattern evidence, that's why I'm trying
17 to ask you to explain it to me.
18    A   The discoloration in 22 on the actual
19 cabinet or the frame of the refrigerator is indicative
20 of utilizing the patterns and the heat effect on the
21 inside to show that they were not as great on the
22 outside as they are on the inside of the refrigerator.
23 And you have to look at other photos and look at the
24 equipment to utilize that.  It would also indicate
25 that, you know, there was no fire in the back of the

71

1 refrigerator where a power cord or compressor or the
2 condensing evaporator coil may have been.
3    Q   Looking at this photograph then, do you
4 agree that the fire does not appear to have originated
5 in the rear part of this refrigerator?
6    A   That's correct.
7    Q   It didn't originate back in that machinery
8 compartment at the bottom rear of the refrigerator,
9 right?
10    A   I don't believe so, no.
11    Q   Okay.  Is that because of the way the burn
12 pattern is?  It appears that it's more towards the
13 front of the refrigerator?
14    A   Well, that and there's no fire damage.
15    Q   Sure.  In No. 22 if you look at the pattern
16 that runs up the side of the refrigerator, is that
17 indicative of a fire that originated in a front part of
18 the refrigerator?
19    A   Not necessarily.  When all that material
20 starts to burn and melt down and drop down and there's
21 involvement of the room in other areas, those patterns
22 --
23    Q   When you say "drop down," are you talking
24 about from the ceiling?
25    A   Within the refrigerator itself.

72

1    Q   Well, let's talk about the stuff that
2 dropped down in the refrigerator.  What is the interior
3 of this refrigerator made of, do you know?
4    A   I don't know the exact component.  It's a
5 plastic type of component that's now extremely hard and
6 melted together.
7    Q   But we talked about that earlier, and I
8 think you said that the melting point of plastic is
9 180, maybe a little bit more for different types
10 plastics.  But it's within that range --
11    A   Yes.
12    Q   -- a couple hundred degrees and it melts?
13    A   Yep.
14    Q   And obviously it melts inside the
15 refrigerator and it's going to drop down and go to the
16 bottom by force of gravity, right?
17    A   Yes, of course.
18    Q   And if the temperature within the room got
19 above the melting point, you would expect to see the
20 stuff inside the refrigerator melt and fall to the
21 base?
22    A   There's a lot happening there.  You have
23 potentially a fire in that refrigerator, and as the
24 room gets involved and the fire spreads, there's even
25 further damages that can exist or even further patterns

73

1  that may or may not exist.

2      Q      Do you have a potential for the fire

3  originating outside of the refrigerator causing this

4  type of a burn pattern?

5      A      Based on what was available, based on what

6  was left at the scene and the documentation that was

7  made, it did not appear that the fire originated

8  outside of the refrigerator.

9      Q      There are no photographs that depict the

10  area in front of where this refrigerator was at the

11  time of the fire that we're aware of, right?  Do you

12  have any of those?

13      A      There are not.  I don't have the exact

14  photograph or a photograph of where this was positioned

15  originally; however, there are photographs of overalls

16  of the room that show the lack of a lot of fire

17  developing from maybe counters or other locations.  And

18  we have, you know, an eyewitness account.

19      Q      How much weight do you give the eyewitness

20  account?  Pretty substantial weight, huh?

21      A      I would think so, yeah.

22      Q      Have you ever investigated a fire where

23  somebody gave you an incorrect accounting of what

24  happened based on perhaps maybe guilt that they caused

25  the fire or panic that set in once they realized there

74

1  was a fire?  Has that ever happened?

2      A      Sure.

3      Q      And that can affect your evaluation of the

4  evidence of the scene, can it?

5      A      It can.  Although what exists may or may not

6  be consistent with what someone's saying, but, you

7  know, looking at the room or the area where the fire

8  pattern is, one is able to still make a judgment on

9  where something may have developed or where the fire

10  may have developed regardless of what a statement may

11  have provided.

12      Q      Sure.  That's if you have an intact fire

13  scene that's adequately documented, right?

14      A      More or less, yes.

15      Q      Sure.  So this fire scene, the building had

16  been sealed, there had been some cleanup done, the

17  refrigerator had been moved, correct?

18      A      Yes.

19      Q      Obviously it wasn't optimal conditions for

20  you to make an investigatory analysis of what caused

21  this fire?

22      A      As I said earlier, that cleanup was why it

23  was called in as a pick up, to try to look at the

24  refrigerator.  I mean, they know there was some

25  movement and debris had been discarded.  And it was

75

1  said that it even had been cleaned.  That's why it was

2  considered pick up the refrigerator and see if there's

3  anything absolutely conclusive based on a product

4  analysis that we can tell may have been the cause of

5  the fire.

6      Q      And you didn't have anything that was

7  absolutely conclusive based on your analysis, right?

8      A      Yeah.

9      Q      There's a statement on page 1 of the report

10  in the second to the last paragraph, second to the last

11  sentence:  "The fire patterns throughout the structure

12  indicated that some patterns did not exist where the

13  fire was originally located."  I'm trying to understand

14  what you mean by that statement.

15      A      That's referring to the little hallway

16  towards the rear of the kitchen or the rear of the

17  house.  There appeared to be some evidence of almost

18  like a separate fire or an unrelated fire to where the

19  refrigerator may have been located.  And then

20  ultimately, you know, through conversations we were

21  told that that represented the individual in the home

22  trying to put the refrigerator in that location as it

23  was burning.

24      Q      Were you able to make any determination as

25  to what level in the door jamb the fire began?

76

1      A      No.

2      Q      In other words, did it start three feet

3  above the floor?  Six feet above the floor?

4      A      I was not able to do that, no.

5      Q      Why is that?  Is that because the scene

6  wasn't photographed enough?

7      A      It had been cleaned up.  That area that

8  we're referring to had been cleared or cleaned up.

9      Q      Sure.  But if the door jamb was still there

10  and portions of it were not burned in the fire, you'd

11  be able to estimate where along the back, I guess, of

12  the refrigerator the fire was burning at the time it

13  was in contact with the door jamb, right?

14      A      I would think so, yes.

15      Q      Fire burns up, right?

16      A      It'd be right there, yeah.

17      Q      Mr. Fell secured a cell phone charger and a

18  power strip; is that right?

19      A      Yes.

20      Q      Do you know where they were located in

21  conjunction to where the refrigerator was located in

22  this room?

23      A      I don't.  He found them on a counter.  I

24  think it was a red counter.  It was in the kitchen and

25  he noticed the damage, noticed they were affected by

77

1   heat or fire, indicating that they may or may not have
2   been close to the refrigerator and decided to secure
3   them.
4       Q       Did he think that they were potential
5   ignition sources?
6       A       He didn't know.  That's why he secured them.
7       Q       Was there any laboratory analysis done on
8   the cell phone charger or the power strip?
9       A       Again, just a visual was performed in the
10  laboratory.
11      Q       Were you able to determine the make of the
12  power strip?
13      A       I don't know.  I don't believe I wrote it
14  down.  It may be on the back.  I think there may be a
15  photograph that documents the power strip in one of my
16  segments of photographs.
17              ATTORNEY ROCHE:  I'm just looking at a
18              couple of these photographs.  This whole
19              group was marked before as Exhibit 4.  Can
20              we just call this one 4-A to keep it
21              separate?
22              (Defendant's Exhibit No. 4-A,
23              photograph, was marked for
24              identification.)
25      Q       The photograph marked as 4-A shows some,

78

1   looks like, fire damage debris outside of the
2   residence; is that correct?
3       A       Yes.
4       Q       Do you know where any of that debris came
5   from within the house?
6       A       I believe it came from the kitchen.  There
7   may be other things from other areas of the house, but
8   a lot of the burn material appeared to have come from
9   the kitchen.
10      Q       The kitchen or the rear hall of the house;
11  is that right?
12      A       Yes.
13              ATTORNEY ROCHE:  Can you make this 4-B?
14              (Defendant's Exhibit No. 4-B,
15              photograph, was marked for
16              identification.)
17      Q       I'm showing you what we marked as Exhibit
18  4-B.  It appears to be a receptacle with something
19  plugged into it.  Do you see what I'm referring to?
20      A       Yes.
21      Q       Is that the refrigerator power cord?
22      A       It is.
23      Q       Now, when you examined that, did you find
24  any evidence of beading or anything in the wires of the
25  power cord?

79

1       A       No.
2       Q       There was no evidence of an electrical
3   failure in the power cord; is that correct?
4       A       I did not observe any, no.
5       Q       If the fire was an electrical fire that
6   originated within the refrigerator, wouldn't you expect
7   to see some beading or some deformity of the wiring
8   other than sort of being attacked externally by the
9   heat of the fire?
10      A       We're still referring to the power cord?
11      Q       Yes.
12      A       Not necessarily.  The power cord is outside
13  and behind the unit, and you may or may not get
14  shorting or beading.  I did not see any on that
15  particular cord.  It does not necessarily indicate that
16  you would have that if it started in the refrigerator.
17      Q       But isn't that also consistent with the
18  power or the electricity to the refrigerator sort of
19  shutting down prior to the damage being inflicted on
20  the power cord?  In other words, the electrical system
21  shuts down, but then other areas of the room including
22  perhaps the power cord are attacked externally by
23  flames and heat, correct?
24      A       That's correct.
25      Q       And the damage that you observed on the

80

1   power cord, is it consistent with that type of
2   scenario?  Just considering the power cord now, not all
3   the other --
4       A       Considering the power cord, if it had been
5   energized and insulation had melted and the conductors
6   came in contact with each other, there may be evidence
7   of electrical activity.
8       Q       Page 2 of your report says that refrigerator
9   was purchased four or five years prior at a place
10  called Brooklyn Appliance; is that right?
11      A       That's what it says, yes.
12      Q       That's what Mr. Claro told you?
13      A       Told Sergei, yes.
14      Q       He didn't tell you, he told Sergei that?
15      A       Yes.
16      Q       Now, according to your report, Mrs. Claro
17  opened the refrigerator and saw smoke and flames at the
18  bottom of the refrigerator against the back wall on the
19  interior of the unit; is that right?
20      A       Yes.
21      Q       Is that consistent with the fire pattern
22  evidence contained in your photographs?
23      A       Yeah.  I mean, the meltdown and the amount
24  of damage in the refrigerator is consistent with there
25  having been fire inside of that compartment.

81

1  Q    In the rear of the refrigerator as relayed
2  to you by the homeowner?
3     A    The damage and the meltdown obviously has
4  covered this particular area, so viewing it at this
5  time was very difficult.
6     Q    Again, this says -- the report says down
7  below "The fire patterns on the side and rear of the
8  unit were consistent with evidence of fire development
9  from within the unit." We touched on that a little bit
10 earlier. But I think as I understand your testimony
11 it's your opinion that the damage to the interior
12 compartment of the refrigerator was more extensive than
13 the damage to the exterior portion of the refrigerator?
14    A    That's correct.
15    Q    And could that have been caused by the fuel
16 load of food within the refrigerator burning after the
17 seal of the door on the refrigerator may have failed
18 during this fire?
19    A    I'm sure at one point that fire in the room
20 itself played a factor in the continuing damage to the
21 refrigerator.
22    Q    But it would have been right in contact with
23 the fuel, right? The interior of the refrigerator
24 would have been in contact with the food contents at
25 the time that they were ignited in this fire, right?

82

1     A    Sure.
2     Q    So the fire would be actually right up
3  against the interior surfaces of the refrigerator, if
4  you will?
5     A    Sure, yes.
6     Q    Whereas the fire on the outside of the
7  refrigerator wouldn't be directly in contact with the
8  interior surface of the refrigerator. Do you
9  understand what I'm saying?
10    A    No, I don't.
11    Q    There's food inside the refrigerator that's
12 on fire, right?
13    A    Right.
14    Q    As it's on fire, it's in direct contact with
15 the sides of the refrigerator, is that true, unless
16 it's in the middle of the compartment?
17    A    For the most part.
18    Q    You're going to assume at least that some of
19 it's in contact with the interior portions of the
20 walls, right?
21    A    Correct.
22    Q    How about on the outside? In other words,
23 if this refrigerator stands alone in the middle of the
24 room, there's not going to be any fuel load directly in
25 contact with the exterior walls of the refrigerator,

83

1  isn't that true?
2     A    Yes.
3     Q    Unless you have some drop down that falls
4  down and leans up against it, right?
5     A    Correct.
6     Q    Do you know whether or not this refrigerator
7  was up against anything else in the room at the time
8  this fire was alleged to have begun?
9     A    I don't know.
10    Q    Down below it says that you examined the
11 power cord and found no evidence of short-circuiting,
12 beading or failure, right?
13    A    Correct.
14    Q    "The rear of the unit where the compressor,
15 fan motor, and condensing coil were located, along with
16 other wires revealed no evidence of any failure or fire
17 development from this compartment," correct?
18    A    That's correct.
19    Q    Then your next sentence says "It is obvious
20 that the fire originated within the base of the unit,
21 and in all probability, a defrost timer or related
22 wiring is the potential ignition source"; is that
23 correct?
24    A    Correct.
25    Q    Do you know where the defrost timer would

84

1  have been located in this particular refrigerator?
2     A    I'm not sure of the specific location.
3     Q    Would you expect to find the defrost timer
4  in the base of the refrigerator, or would you expect to
5  find it up closer to the freezer compartment of the
6  refrigerator?
7     A    In some cases I've seen it mounted up high.
8  After the course of the fire and the promulgation of
9  the fire, that equipment or other wiring, whatever it
10 may be, would then be at the base of the unit.
11    Q    Okay. Looks like from the report you
12 thought that a defrost timer or some related wiring was
13 the most likely cause of this fire?
14    A    Well, it's speculating until further
15 analysis.
16    Q    Okay. So that's speculation at this point
17 until you do further analysis; is that true?
18    A    It's suggesting that wiring or the defrost
19 timer or some other component -- and that's how the
20 report is written -- is in all probability the ignition
21 source or the cause of the fire.
22    Q    Okay. I guess that's what I'm trying to get
23 at. When you say "or some other component," you never
24 actually made a determination of what component in this
25 refrigerator failed?

85

1    A    No.

2    Q    Did you ever examine the defrost timer for

3 this refrigerator, or is that contained in whatever was

4 in the base of the unit?

5    A    If it's intact it should be in the base of

6 the unit. But with the amount of fire damage, I don't

7 know if it will ever be recovered or not.

8    Q    The next sentence says "Until the material

9 is removed and x-raying of the melted plastic is

10 performed, no further conclusive opinion on the exact

11 item can be made," correct?

12    A    That's correct.

13    Q    There was no further x-raying done, right?

14 I think you said you had perhaps recommended it to

15 Safeco, but they never got back to you on that issue;

16 is that true?

17    A    I recommended that an engineer and/or

18 further x-raying may allow for more detailed

19 examination of wiring which may or may not show

20 something more conclusive to support an opinion that

21 the fire developed in the refrigerator.

22    Q    I mean, we're not able at this time to point

23 to any exact electrical cause for this fire, right?

24    A    That's correct.

25    Q    There's no piece of wire that you can show

86

1 me that's beaded or that you can say that is what

2 failed and that is what caused the fire to begin; is

3 that correct?

4    A    That's correct.

5    Q    Because obviously you've got to do more

6 testing based on the damage of the refrigerator?

7    A    Either more testing or further evaluation

8 and conversations with, you know, some type of a legal

9 analyst as to pursuing these options.

10    Q    What was the ignition source for this fire?

11    A    It would appear there may be some type of an

12 electrical failure or deficiency or defect or something

13 in the refrigerator and may have resulted in there

14 being ignition and ultimately the fire.

15    Q    You say "may have." But we don't know

16 conclusively one way or the other; it could have been

17 something else that caused the fire?

18    A    The refrigerator itself, you know, I would

19 think if -- it would be an ignition source of an

20 electrical type bearing the fact that there was no

21 damage to the motor assembly or the mechanical aspect.

22 But I can't identify what that may be based on the

23 damage and based on the melted material and the lack of

24 having pursued any further analysis.

25    Q    When you talked to Safeco after you gave

87

1 them this report, did you have further conversations

2 with Safeco?

3    A    No. The only correspondence -- it wasn't a

4 conversation. It was correspondence from Safeco

5 advising me that someone else was handling the fire --

6 handling the file, excuse me.

7    Q    Okay.

8    A    And at that time, no, there was nothing else

9 ever -- the answer is no, sorry.

10    Q    Okay. You haven't examined any design

11 specifications to this refrigerator, correct?

12    A    None.

13    Q    You are unable to say whether or not this

14 refrigerator differed in any way at the time it left

15 Maytag's possession or Magic Chef's possession as it

16 was intended to be designed, correct?

17    A    That's correct.

18    Q    I think we talked earlier that you're not an

19 appliance design expert, right?

20    A    No.

21    Q    You don't have an opinion in this case that

22 the design of this refrigerator was inadequate in any

23 way, do you?

24    A    No.

25    Q    Let me take a look at some of these items.

88

1    A    Take your time.

2    ATTORNEY ROCHE: Can you mark this as

3 the next exhibit?

4    (Defendant's Exhibit No. 8, packet of

5    documents, was marked for

6    identification.)

7    Q    I have some documents that look to be a

8 correspondence portion of your file. Do you have that

9 in front of you?

10    A    I have several correspondence.

11    Q    This one looks like letters to the insurance

12 company and perhaps from the lawyers from Safeco. So

13 if you flip down a few pages into that exhibit, there's

14 a letter dated March 25th to you from the law offices

15 of Stuart Blackburn. Do you see that letter?

16    A    Yes.

17    Q    Did you assist Safeco in preparing its

18 answers to the interrogatories in this case?

19    A    I don't believe so. I mean, if I did, it

20 wasn't directly. If they asked me a question and they

21 utilized it in those answers, perhaps, but...

22    Q    But you weren't sent a copy of the

23 interrogatory questions to review?

24    A    No.

25    Q    Towards the bottom of that letter, three

89

1  sentences up, it says "lastly we'll need an appliance
2  expert to inspect the refrigerator." Do you see that
3  portion of the letter?
4      A   Yes.
5      Q   And I think you said earlier you made some
6  references to them, to Safeco as to who they could
7  potentially employ as an appliance expert in this case;
8  is that right?
9      A   No.  Originally at the time the report was
10  prepared I told them of the circumstances and the
11  issues and that further analysis would need to be done
12  and perhaps another expert would need to come on staff
13  and look at it, because I didn't have one at the time.
14      Q   Sure.  Because this letter is dated March of
15  2003, and they're asking you if you have any appliance
16  experts in your employ.  That's what I don't
17  understand.
18      A   When I produced the report and gave the
19  verbal, this file was unactive until these letters --
20      Q   So then two years later you get a letter
21  saying "do you have any appliance experts in your
22  employ"?
23      A   Yes.
24      Q   Did you make any recommendations?
25      A   I did.  I recommended two firms -- or two

90

1  individuals of a firm.  I think I have them.
2          (Defendant's Exhibit No. 9, photocopied
3          business card on a piece of paper that
4          also contains handwritten notes, was
5          marked for identification.)
6      Q   Let me show you what we've marked as Exhibit
7  No. 9.
8      A   Yeah.
9      Q   That Exhibit No. 9, that one-page document
10  has a photocopy of a business card on it; is that
11  correct?
12      A   Yes.
13      Q   Is that one of the people that you referred
14  Safeco to as an appliance expert?
15      A   I referred two for them to make that
16  decision, yeah.  One is Affiliated Engineering
17  Laboratory Firm.
18      Q   Do you know who the other one is?
19      A   Jim Prior.
20      Q   That's the other name that appears on that
21  sheet?
22      A   That's correct.  And the name of his firm.
23  I had it in a Rolodex, and I wrote it for the file.
24      Q   Okay.  And that is -- what does that say?
25      A   It says "Sergei Fell pickup slash

91

1  interview."
2      Q   What was the purpose of that, do you know?
3      A   Chances are this was a piece of paper that
4  was in the file from day one, and when we were having a
5  conversation about pickup and that is just a
6  refrigerator type of thing, that was probably
7  handwritten there, and I just wrote on something that
8  was in the file, meaning a document that was in the
9  file at the time of my conversation with Margaret
10  Ralphs.
11      Q   Okay.  Then there's a letter dated April
12  11th asking you to provide a CV of "your" appliance
13  expert.  Do you see that?
14      A   Yeah.
15      Q   Did you provide any CVs to Safeco Insurance
16  at that request?
17      A   I don't believe so, no.
18      Q   You have a letter dated June 10th to Miss
19  Ralphs at the law office.  Do you have that one?
20      A   What was the date?
21      Q   June 10th.
22      A   Yeah.
23      Q   Okay.  This is a letter that basically says
24  we had the product inspection, correct?
25      A   Yes.

92

1      Q   And your letter confirms that there was no
2  real attempt to examine the contents that were melted
3  in the base of the unit; is that true?
4      A   Not in those words, but it was minimal
5  invasive is what took place at the time.
6      Q   Did you ever review any of the photographs
7  taken during that inspection?
8      A   No.
9      Q   You have some in your file.  Did you look at
10  those?
11      A   Oh, I thought you meant other photographs
12  other than my own firm's.  I did.  Photographs taken, I
13  believe, by Joe Liebersfeld, L-i-e-b-e-r-s-f-e-l-d, and
14  I briefly looked at them.
15      Q   Do you have any information as to what UL
16  standards are applicable to a household refrigerator?
17      A   Without researching it or looking it up, I
18  do not.
19      Q   You don't intend to provide evidence that
20  this refrigerator violated any standards, do you?
21      A   Not at this time, no.
22      Q   Did you ever examine any of the videotape
23  that was taken during the inspection at your
24  laboratory?
25      A   No.

93

1     Q    Were you aware that there was videotape?

2     A    No.

3     Q    Have you ever discussed this case with Frank

4 Watkinson, the electrical engineer hired by Safeco

5 Insurance in the case as an expert?

6     A    No.

7     Q    Never had any conversations with him?

8     A    No.

9     Q    I need just a couple minutes to review some

10 notes. We're getting towards the end. No one from

11 your office looked at the electrical panel in the Claro

12 house; is that true?

13    A    I don't believe so.

14    Q    Any particular reason why that didn't take

15 place? Again, are we back to it was a product analysis

16 versus a cause and origin investigation?

17    A    More or less, yes.

18    Q    I guess I'm having a little trouble with

19 that. If you had characterized this loss type as a

20 cause and fire investigation, would one of your back to

21 the fire scene or one of your fire investigators would

22 have gone to the fire scene?

23    A    Yes. I mean, it was called in that there

24 was a cleanup, that it was a burned refrigerator, can

25 you get the refrigerator and look at the refrigerator.

---

94

1 And that's not uncommon.

2    Q    So that was the purpose of your assignment,

3 was just to look at the refrigerator?

4    A    The way it was called in and our

5 understanding was apparently there was a fire in the

6 refrigerator; the adjuster wants to know if there's

7 potential subro, meaning could there have been anything

8 wrong with the refrigerator; the site had been cleaned

9 up; and to pick up the refrigerator. That's what we

10 did, except we went a little bit beyond, seeing that we

11 had access, we documented the scene and took it that

12 extra step on our decision.

13    Q    Sure. But, again, if it had been called in

14 differently or you had characterized it differently,

15 you would have had a fire inspector out there

16 photographing the scene, looking at the electrical

17 panel; is that true?

18    A    Perhaps, yeah.

19    Q    Would you agree that a stove in a kitchen is

20 a potential ignition source?

21    A    Anything is a potential ignition source,

22 yes.

23    Q    But a stove is a fairly common ignition

24 source for a kitchen fire, isn't it?

25    A    Yes.

---

95

1    Q    Do you know whether or not the stove in this

2 case was a gas or an electric stove?

3    A    I don't know.

4    Q    You have an understanding at least that it

5 was in use at the time this fire began; is that

6 correct?

7    A    That's what we were told, yes.

8    Q    Because there's no reference in your report

9 to the stove at all. Is that just because, again, it

10 was pick up the refrigerator, bring it back to the lab

11 type of assignment?

12    A    I would think so, yes.

13    Q    And, again, because if you were going in

14 there as a cause and origin investigator, you would

15 want to look at other potential ignition sources within

16 the room, particularly a stove in a kitchen, right?

17    A    Normally as part of the process of

18 elimination that would take place.

19    Q    Sure. Even if you didn't think it started

20 there, you would want to document it photographically

21 so that you could later testify that you had an opinion

22 that it wasn't the stove, correct?

23    A    Yes.

24    Q    And you would do that with any other

25 appliance in the room that was at least in proximity to

---

96

1 where the suspected point of origin of the fire was,

2 correct?

3    A    Yes.

4    Q    And the only reason that that didn't happen

5 in this case is because of the way that it was called

6 into your office?

7    A    Yes.

8    Q    Is that the best way that you can explain

9 it?

10    A    Yeah. I mean, our understanding was the

11 scene had been cleaned up and the refrigerator was

12 there, to pick it up and bring it back.

13    Q    So that when Mr. Fell shows up and there's a

14 fire scene there, he decides to take a few photographs?

15    A    He documented the kitchen and documented the

16 electrical and did the best that he could after the

17 cleanup of the scene under those conditions and secured

18 what he thought was the proper thing to do, like wall

19 outlets and other items that may have been melted.

20    Q    He didn't call anyone from your office to

21 say, Hey, we've got a fire scene out here; maybe we

22 should have someone come down and look at it?

23    A    No. He did come back and after looking at

24 the refrigerator, in my verbal conversations with the

25 representative of Safeco, I stressed some of the points

97

1   that existed, like the scene had been cleaned up, the
2   refrigerator is extremely damaged, there's a melted
3   piece of material in the bottom that I don't know if
4   you'll ever get in there to make a determination in the
5   first place.  So there's a lot of these issues, and how
6   should we proceed?
7        Q      Sure.  So then you wait for their further
8   instruction on what they want you to do?
9        A      I wrote the report.  They asked for a report
10  to date.  I made the recommendations.  I also made a
11  recommendation that legal counsel review it because
12  they know sometimes better in assisting this type of a
13  situation.  And we secured the refrigerator, and
14  nothing else was performed until I was asked to provide
15  information surrounding an engineer.
16       Q      In the conclusions section, page 3 of your
17  report, second paragraph, third sentence it says "An
18  electrical malfunction and/or product defect existed
19  within the equipment located at the rear of the rear
20  base of the refrigerator."  Now, I thought we looked at
21  some photographs that showed the rear base of the
22  refrigerator to be in undamaged condition; is that
23  true?
24       A      Yeah.  I'm basically referring to the rear
25  base on the internal area.

98

1        Q      Is that an area somewhere above the
2   machinery compartment in the back of the unit?
3        A      Again, I don't know.  I'm simply saying we
4   had an eyewitness account of a fire in that area.  That
5   doesn't mean it couldn't have started high and dropped
6   down.  I mean, there could be circumstances there that
7   we're unaware of.  But we make reference to that not
8   being on the outside in the machine compartment, but
9   being on the internal area.
10       Q      So inside the sealed part of the
11  refrigerator when you shut the door, inside that area
12  is where this fire began; that's your opinion?
13       A      To date, based on everything that I looked
14  at that we were able to do, that's my opinion.
15       Q      I understand that's what you've done.  Is it
16  your opinion that there's sufficient oxygen inside the
17  refrigerator compartment to get this conflagration that
18  came about on the date of the fire?
19       A      Perhaps.
20       Q      Perhaps not?
21       A      I would think it is possible.
22       Q      More probable than not?
23       A      Sure.  I mean, I've seen examples of it
24  happening before.
25       Q      Where the fire originated within the sealed

99

1   compartment of the refrigerator?
2        A      Either within the sealed component of the
3   refrigerator or the freezer.
4        Q      Now many times in the course of your career?
5   You told me about refrigerator fire cases.
6        A      Then I referenced --
7        Q      Are you talking a handful?  Two or three at
8   the most?
9        A      Yeah.  And if I didn't handle it personally,
10  someone else may have.  But somewhere around ten that I
11  know of that I can think of.
12       Q      I thought we talked earlier of it being
13  around ten refrigerator fires that were caused -- fires
14  that were caused by refrigerators; is that true?
15       A      Correct.
16       Q      But of those ten fires, how many of those
17  ten fires did the fire actually originate within the
18  closed cabinet of the refrigerator as opposed to any
19  external machinery cabinet or the power cord?
20       A      Several that I can think of right now.
21       Q      Any specific ones that you can think of?
22       A      The ice maker equipment, I know, were a
23  problem.  And I believe there was one that had to do
24  with the defrost mechanism to prevent freezing.  Again,
25  I'm thinking --

100

1        Q      Sure.
2        A      -- these were either things at our lab or
3   were at our lab and someone was either inspecting,
4   working or investigating, so that's what I recall.
5        Q      There were no sketches done of the fire
6   scene, correct?
7        A      No.
8        Q      At least not by your office?
9        A      No.
10       Q      Again, does NFPA 921 recommend that a sketch
11  be prepared of every fire scene?
12       A      It does of various types.  It does make
13  reference to that.
14       Q      Do you agree with that requirement?
15       A      I think in many cases it's possible to do,
16  yes.
17       Q      Was it not possible to do that in this case?
18  Again, I guess I'm struggling because you've told me
19  that it's the nature of your assignment that sort of
20  drove what happened at the scene.
21       A      Correct.
22       Q      Because you're calling it a product
23  analysis.  But your product analysis hasn't determined
24  what, if any, electrical failure existed within the
25  refrigerator, correct?

101

1    A    That's correct.

2    Q    But you're going to give an opinion on cause

3    and origin of the fire in this case, correct?

4    A    I would provide an opinion based on what

5    this report states and what information was available

6    to me without having pursued this investigation; That

7    the fire appears to originate within the refrigerator.

8    Specifically what component, what wire or what

9    mechanism, I don't know.

10   Q    Did you ever do any research to determine

11   whether or not Magic Chef refrigerators had been

12   involved in other fires?

13   A    No.

14   Q    Or that any other Magic Chef refrigerator

15   had ever been the subject of a recall within the

16   relevant time period?

17   A    No.

18   Q    That's the kind of thing that would be

19   helpful in a product analysis, isn't it?

20   A    If it was pursued.  There are things

21   normally conducted in the course of evaluating a

22   product.

23   Q    I think your web site talks a little bit

24   about that, doesn't it?

25   A    I'm sure it does.

102

1    Q    It says a library -- this is from your web

2    site now under the section called product analysis,

3    product liability, "A library of documented losses

4    involving products and years of experience in testing

5    provide a keen awareness of pre-existing problems."

6    Did you consult that library in this case?

7    A    No.  Again, the recommendation for follow-up

8    analysis was made, and we didn't do that, no.

9    Q    Sure.  That's just because you were not

10   instructed to do anything further in the case by the

11   insurance company in the case?

12   A    That's correct.

13   Q    Next sentence on your web site says "often a

14   duplicate unit will be purchased and used during

15   laboratory analysis for better understanding of the

16   product."  And obviously you didn't do that in this

17   case, correct?

18   A    Did not.

19   Q    You were unable to identify exactly what

20   model this thing was anyway, so it would have been

21   difficult for you to get an exemplar, right?

22   A    Correct.

23   Q    How many people work in the corporate office

24   of your company?

25   A    Maybe 25.

103

1    Q    I see that you have an office in Danbury,

2    Connecticut?

3    A    That's correct.

4    Q    Is that a staffed office or is it sort of a

5    satellite?

6    A    It's a satellite that we'll utilize when we

7    need to: A deposition, a meeting, a property

8    inspection.

9    Q    You say there are 25 people in the

10   Hackensack office?

11   A    Yes.

12   Q    Where are the other six people located?

13   A    They're all up in -- actually it'd be seven,

14   I think, are based out of the Endicott operation.

15   Q    Okay.  So the only offices that are really

16   staffed full time by Peter Vallas Associates are the

17   corporate office and the northern regional office?

18   A    And the -- I don't know if it was in

19   existence at the time.  At this time, that's correct.

20   Q    I'm talking as we sit here today.  Are there

21   other offices that you have staffed on a regular basis?

22   A    We have; again, we have an engineer that's

23   staffed out of an office in Tamiment, Pennsylvania.

24   Q    That doesn't show up on your web site,

25   though, does it?  It's just talking about your

104

1    particular offices; is that right?

2    A    Yeah.  It needs a little updating as far as

3    addresses and locations.

4    Q    I see you have a Connecticut office, but

5    that's just a satellite office in Danbury?

6    A    It's in an office building.  There's a

7    physical office there that we use when we need it.

8    Q    Sure.  But you don't have anybody there

9    who's full time as a Connecticut fire investigator per

10   se?

11   A    No.

12   Q    Why don't we see if we have your testimony

13   list yet?

14       (Whereupon, a recess was taken at 12:20,

15        and the deposition resumed at 12:24.)

16       (Defendant's Exhibit No. 10, list of

17        testimony, was marked for

18        identification.)

19   Q    You had a chance to review what's been

20   marked Defendant's Exhibit 10, correct?

21   A    Yes.

22   Q    Is that -- is this a complete list of your

23   trial and deposition testimony in the last four years

24   or longer?

25   A    I believe we started documenting it in 1993,