105

1  and it's up until December 4, '02. And I have not
2  updated last year's history.
3      Q      Okay. Did you give trial testimony during
4  the course of 2003?
5      A      I think there was one trial.
6      Q      Do you remember where that trial was?
7      A      I don't at this time.
8      Q      Do you remember what the claim in that case
9  was?
10     A      I don't recall.
11     Q      Was it more than one trial that you gave
12 testimony at in 2003 or just one trial?
13     A      I think just one.
14     Q      Do you remember who the lawyer was that you
15 were working with in that case?
16     A      I don't really, but surely I can get you
17 that information.
18     Q      You understand that the federal rules of
19 civil procedure require that expert witnesses provide
20 testimony listings; do you understand that?
21     A      Yes.
22     Q      Is that why you keep this listing?
23     A      I think the first request was in 1993.
24 Whether the federal law was in existence then or not
25 I'm not sure, but that's when we started to keep a list

106

1  of the deposition and the trial history.
2      Q      Okay. Let me go through some of these. I
3  see you participated in some sort of arbitration with
4  the American Arbitration Association of New York. And
5  there's the name of an attorney, Joseph Rizzo. Could
6  that be the attorney who retained you in that case?
7  I'm talking about the arbitration now.
8      A      Well, ultimately, no. But that was the firm
9  that ended up representing the insurance company in
10 that particular case. And that firm was Cozen and
11 O'Connor. And Joe Rizzo, there's Joe Rizzos. One's an
12 attorney, the other's an investigator, and I don't know
13 which one is which. But that is the firm. The other
14 firm was representing the manufacturer of the product
15 in that case.
16     Q      Do you remember what the product was in that
17 arbitration?
18     A      That was an exhaust fan, bathroom exhaust
19 fan.
20     Q      Was that a Braun exhaust fan?
21     A      I think it was a Braun.
22     Q      And you were representing the insured in
23 that case?
24     A      That's correct.
25     Q      And I think you testified earlier that you

107

1  previously represented Braun; is that right?
2      A      Yes.
3      Q      So obviously you don't represent Braun
4  anymore; is that right?
5      A      I haven't done one recently, but I know that
6  on several occasions that we've done work for them.
7      Q      What was your opinion in that case? That
8  the exhaust fan was the cause of the fire?
9      A      Yes.
10     Q      It looks like you gave trial testimony in
11 Monmouth County Superior Court in '95. It says
12 Ortho-Kinetics. Does that refresh your recollection as
13 to what that case was about?
14     A      That was a manufacturer of a medical
15 reclining chair.
16     Q      Was it a fire investigation or some other
17 type of investigation?
18     A      I believe it was simply a product -- I think
19 the scene had been cleaned up. I did some review for
20 the manufacturer, and I examined the product.
21     Q      So you were for the manufacturer in that
22 case?
23     A      Yes.
24     Q      Does it matter what side of the equation you
25 testify about? I mean, it sounds like you've

108

1  represented cases involving Braun where you've defended
2  Braun products and also where you've essentially
3  attacked Braun products; is that true?
4      A      I wouldn't call it attack. I would call it
5  an investigation, and I render an opinion.
6      Q      Sure.
7      A      I don't have a specific contract with
8  someone. I get a call. I investigate it ethically,
9  fairly and honestly and render an opinion based on the
10 facts and the evidence that exist.
11     Q      Next one I want to ask you about quickly is
12 in '95. It says "trial testimony." It says "Town
13 Wigs." Any recollection of that case?
14     A      May I just see it, because it may be an
15 attorney that would trigger my memory? I don't recall.
16 I would need the file. I don't know.
17     Q      Sure. It's awhile back.
18     A      Yeah.
19     Q      '95, Herr-Piloso, looks like the name of
20 someone. Vincent McGuinness, Cozen and O'Connor?
21     A      I'd like to see it again. I recall it.
22     Q      What was that case about?
23     A      I represented an insurance company that
24 insured a large building in Mt. Vernon, New York. The
25 investigation that I performed was quite -- a whole

109

1  building burned down, so it was quite a long, extensive
2  investigation. I determined that it was a pot on a
3  stove.
4      Q   A pot on a stove?
5      A   Pot on a stove, an unattended pot on a stove
6  by the cook of, I believe it was, a bakery shop.
7      Q   '96, Middlesex County Court, Benenati,
8  Attorney Ball?
9      A   I'm thinking to myself out loud. I
10 apologize. It was -- I think it was a fire
11 investigation. There was a product involved. I
12 believe Allstate Insurance Company was involved. I may
13 have been retained by them, but I do not remember the
14 product.
15     Q   So you don't remember much about that case..
16 '97 trial, Rockland County Superior Court, Magurno,
17 David Smith's the lawyer?
18     A   Yep. That was a fire case. Is there
19 another reference to it?
20     Q   I think I gave it to you, other than there's
21 the docket number.
22     A   I believe it was a jewelry store. I forget
23 the details.
24     Q   Okay. Gregory Park Apartments case, looks
25 like trial testimony in '97 in Hudson County, Jersey

110

1  City?
2      A   Yes. That was a case where I performed
3  noise level monitoring in a boiler room.
4      Q   Not a fire investigation?
5      A   No.
6      Q   Caroline Cleaners case?
7      A   This was a fire investigation involving a
8  pinched power cord in a cleaners.
9      Q   Who did you represent in that case? An
10 insurance company?
11     A   I think I represented an insurance company
12 for the cleaners.
13     Q   And it was a pinched power cord, I'm sorry,
14 on what type of appliance?
15     A   It was a fan.
16     Q   Greer case in '98, what was that case about?
17     A   Is that Long Island?
18     Q   Garden City, New York.
19     A   This was the electrocution and fire case
20 that I referenced earlier. I represented the
21 homeowner's insurance company.
22     Q   What was the product?
23     A   It wasn't a product.
24     Q   Faulty wiring or something?
25     A   I actually got called to testify -- there

111

1  was a wire that failed as a result of a power surge or
2  a power problem with the utility company. And I
3  actually got called, although the insurance company had
4  some type of interest in the case, the plaintiff's
5  attorney for the homeowner, who was injured, had
6  actually called me to testify.
7      Q   Is that Mr. Amrod?
8      A   Yes.
9      Q   '98 case is Harris. It says District Court
10 of Maryland. Do you remember that case?
11     A   Yeah. That was an automobile fire. I
12 testified -- I forget what it was now. The fire was in
13 the vehicle.
14     Q   Sure. And it says District Court of
15 Maryland. Is that state court? State district court
16 in Maryland?
17     A   All I know is it took forever to get there.
18 It was all the way down at the bottom, the last county
19 in Maryland. I don't know.
20     Q   So you're not sure if that was a state or
21 federal case then?
22     A   I'm not sure.
23     Q   I see one that says Spadaro, Nassau County
24 Federal Court. That's obviously in the federal court?
25     A   Yes.

112

1      Q   What was the Spadaro case about, if you can
2  recall?
3      A   There's no other reference to anything
4  there?
5      Q   Cozen and O'Connor, Brian -- I won't say his
6  last name because I won't get it right.
7      A   That was a case where I investigated a fire
8  scene in a large home and rendered an opinion as to the
9  area, the point and the cause of the fire, but didn't
10 do any further analysis. Another expert got involved
11 in the product case, and I believe it was a Black &
12 Decker toaster oven.
13     Q   That's the toaster oven case you were
14 talking about?
15     A   I think so.
16     Q   Well, Cozen and O'Connor is a large
17 subrogation firm, aren't they?
18     A   Yes.
19     Q   They wouldn't be representing the product
20 manufacturer in a case like that, would they?
21     A   In that particular case they represented the
22 carrier who insured the home.
23     Q   Okay. But when we talked about the Black &
24 Decker case earlier I asked if you had testified on
25 behalf of the manufacturer, and you identified Black &

113

```
 1  Decker as one of those companies, correct?
 2      A    I don't know if I said I testified on behalf
 3  of Black & Decker. And if I did, I don't believe
 4  that's the case, and I apologize. I simply may have
 5  represented Black & Decker, but I've never testified
 6  for them. In other words, they've retained us, I
 7  believe, on a case, but I don't think it ever got to a
 8  point of testifying.
 9      Q    Sure. This was a trial, the Spadaro case?
10      A    That's right.
11      Q    And you gave testimony that, what, Black &
12  Decker --
13      A    The toaster oven --
14      Q    -- started the fire?
15      A    I pinpointed where the fire started, and the
16  only thing in that area was a Black & Decker. And they
17  hired another engineer to deal with the --
18      Q    So what you did was sort of pinpoint the
19  area of origin?
20      A    Yes.
21      Q    Sort of the general area of origin?
22      A    Yes.
23      Q    '98, Eldorado Motel case, Attorney
24  Pasquarelli. It says that you qualified as a
25  specialist in lightning effects on electrical
```

114

```
 1  equipment. Does that help you remember what that case
 2  was about?
 3      A    Can I see it again? If my memory is
 4  correct, it was some type of a phone system or a
 5  computer system that had been damaged by lightning or
 6  not damaged by lightning, I can't recall. Oh, I do
 7  recall. It was a telephone system that had damage. It
 8  had fire damage to it and had been burned. And the
 9  testimony was whether it was external heat or flame
10  placed on the equipment or was it damaged from
11  lightning.
12      Q    Okay. '98 case, Mafara, Attorney Sweet?
13      A    Location?
14      Q    Sure. It's Freehold, New Jersey.
15      A    I'm not sure, but I think it involved a zero
16  clearance fireplace unit that was located in a
17  building, in a home or condominium, that was involved
18  in the cause of the fire.
19      Q    2000, Ditullio v. Kenvil Laundromat. It
20  sounds like a laundromat fire to me.
21      A    I just need to look at it. Doesn't ring a
22  bell.
23      Q    You can't remember?
24      A    I do not remember.
25      Q    You testified in court. You just don't
```

115

```
 1  remember?
 2      A    I do not remember.
 3      Q    Trial in 2000, Zindt vs. Luzzi, Attorney
 4  Kleiner?
 5      A    This -- what was this? I represented a
 6  defense attorney who was defending, I believe, a tenant
 7  in a condominium. And I don't recall what the issue
 8  was.
 9      Q    And that says 2000?
10      A    Yeah.
11      Q    Did you give any trial testimony in 2001 or
12  2002?
13      A    I don't know.
14      Q    If it's not here --
15      A    -- then I probably did not.
16      Q    Okay. Do you keep copies of any of your
17  trial testimony anywhere?
18      A    I never see the trial testimony.
19      Q    You never see any of the transcripts?
20      A    No.
21      Q    As far as you're concerned, you've completed
22  all your work on this case, right? Safeco hasn't asked
23  you to do anything other than make this refrigerator
24  available for my office and some other folks to
25  inspect, correct?
```

116

```
 1      A    Yes.
 2      Q    I think that is it. I have no further
 3  questions for you this morning.
 4           ATTORNEY LOFTUS:  I don't have any.
 5
 6           (Whereupon the deposition concluded
 7            at 12:48 p.m.)
```

## CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither counsel nor attorney to either of the parties to said suit nor related to or employed by either counsel in said suit nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _12_ day of _January_ 20 _04_.

_____
Notary Public
Connecticut License No. 00181
My commission expires:
November 30, 2004

Case 3:02-cv-01916-JBA    Document 26-5    Filed 02/02/2004    Page 5 of 16

**SAFECO -V- MAYTAG - FRANK S. WATKINSON, PH.D. - 12/18/03**

**Page 1 to Page 84**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

Case 3:02-cv-01916-JBA   Document 26-5   Filed 02/02/2004   Page 6 of 16

## Page 1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2  SAFECO INSURANCE COMPANY OF    :   CIVIL ACTION NO.
    AMERICA as subrogee of NOBERTO :   3:02CV-1916 (JBA)
 3  and MARIA CLARO,
 4           Plaintiff             :
 5                                 :
 6  vs.                            :
 7  MAYTAG CORPORATION,            :
 8           Defendant             :   DECEMBER 18, 2003
 9  DEPOSITION OF:  FRANK S. WATKINSON, Ph.D.
10  APPEARANCES:
11       LAW OFFICES OF STUART G. BLACKBURN
12            Attorneys for the Plaintiff
13            Two Concorde Way - P.O. Box 608
14            Windsor Locks, CT 06096
15            (860) 292-1116
16       BY:  ERIK LOFTUS, ESQ.
17       CAMPBELL, CAMPBELL, EDWARDS & CONROY
18            Attorneys for the Defendant
19            One Constitution Plaza
20            Boston, MA 02129
21            (617) 241-5115
22       BY:  HOLLY M. POLGLASE, ESQ.
23                   Christine E. Borrelli
24                   Connecticut License No. 117
25                   Registered Professional Reporter
```

## Page 2

1 ...... Deposition of FRANK S. WATKINSON, Ph.D., a
2 witness, taken on behalf of the Defendant, in the herein
3 before entitled action, pursuant to the Connecticut Practice
4 Book, before Christine E. Borrelli, duly qualified Notary
5 Public in and for the State of Connecticut, held at the Law
6 Offices of Campbell, Campbell, Edwards & Conroy, 100 Pearl
7 Street, Hartford, Connecticut, commencing at 11:00 a.m. on
8 Thursday, December 18, 2003.

10 STIPULATIONS

12 It is hereby stipulated and agreed by and among counsel
13 for the respective parties that all formalities in
14 connection with the taking of this deposition, including
15 time, place, sufficiency of notice, and the authority of
16 the officer before whom it is being taken may be and are
17 hereby waived.
18 It is further stipulated and agreed that objections
19 other than as to form are reserved to the time of trial.
20 It is further stipulated and agreed that the reading and
21 signing of the deposition transcript by the deponent is
22 hereby not waived.
23 It is further stipulated and agreed that the proof of
24 the qualifications of the Notary Public before whom the
25 deposition is being taken is hereby waived.

## Page 3

1 INDEX

3 WITNESS    DIRECT   CROSS   REDIRECT   RECROSS

5 Frank S. Watkinson, Ph.D.   4

EXHIBIT PAGE:

11 Defendant's Exhibits A1-24, Photographs ............ 4
12 Defendant's Exhibits B1-17, Photographs ............ 4
13 Defendant's Exhibits C1-13, Photographs ............ 4
14 Defendant's Exhibits D1-24, Photographs ............ 4
15 Defendant's Exhibit E, Curriculum Vitae ............ 4
16 Defendant's Exhibit F, File with Contents .......... 36
17 Defendant's Exhibit F1, Handwritten Notes .......... 42
18 Defendant's Exhibit F2, Three-Page Document ........ 48
19 Defendant's Exhibit F3, Testimony List ............. 49
20 Defendant's Exhibit F4, Report ..................... 50
21 Defendant's Exhibit F5, Photograph ................. 54

23 * * * * * * * * * * * *

## Page 4

1  MS. POLGLASE:  Would you mark these?

3  (Defendant's Exhibits A-E, Documents, marked for
4  identification)

6  FRANK S. WATKINSON, Ph.D., called as a witness by
7  the Defendant, having been first duly sworn by the Notary, was
8  examined and testified on his oath as follows:

10 DIRECT EXAMINATION BY MS. POLGLASE:

12 Q.   Would you state your full name?
13 A.   My name is Dr. Frank S. Watkinson.
14 Q.   Is Frank a nickname for Francis or is it Frank?
15 A.   It's Frank.
16 Q.   Dr. Watkinson, I am going to show you what has been
17 marked as Exhibit E and just ask you if you can identify that
18 as a copy of your CV?
19 A.   Yes, it is.
20 Q.   Is that up to date?
21 A.   Yeah, I believe so.
22 Q.   Thanks. You are, as I understand it, a principal of
23 Spectrum Engineering Group?
24 A.   Yes.
25 Q.   Describe for me what Spectrum Engineering Group is?

### Page 9

1  industry or whether to go into – go back to the university
2  and do the Ph.D.. One of the employers that had offered me a
3  job was Shell. So when I decided not to go into industry but
4  to go back to do research, they approached me and said they
5  would be willing to give me a sponsorship.
6   Q.   Do you have any post-Leeds University education?
7  And by that I mean formal education.
8   A.   I went to the Harvard Business School for – it's
9  about a five-month, six-month course in management
10 development.
11  Q.   Why did you take that course?
12  A.   Because my work history at that time had involved a
13 lot of technical management, but I also wanted to gain some
14 capabilities in other management fields ready to do general
15 management.
16  Q.   And that was while you were working for the
17 Kennecott Rubber Corporation?
18  A.   Kennecott Copper Corporation.
19  Q.   I'm sorry. Copper. I read that before and I read
20 it as rubber and then I see it was copper. Did you have any
21 jobs while you were going to school?
22  A.   Only during the summer months.
23  Q.   What kinds of jobs did you have?
24  A.   I worked for a large chemical company in my hometown
25 for a couple of years, and I worked in Sweden for a large

### Page 10

1  steel company one year.
2   Q.   What did you do for the chemical company?
3   A.   I ran experiments and the research lab.
4   Q.   Generally, what kind of experiments?
5   A.   They were on – they were looking for some
6  development of battery technology.
7   Q.   What did you do for the steel company in Sweden?
8   A.   I worked in the steel works on the shop floor for
9  most of the time, and then I worked in the engineering
10 department doing drafting work.
11  Q.   When you say "drafting work," can you tell me what
12 you mean?
13  A.   Producing engineering drawings.
14  Q.   For what types of products?
15  A.   They wanted a complete layout of their casting shop
16 to be documented, and I had this drawing that went about
17 thirty feet long.
18  Q.   All right. So, aside from the Harvard Business
19 School program, no formal education after Leeds University?
20  A.   Oh, I did – I have done courses and seminars in a
21 whole raft of things, but nothing that was more than a week or
22 two weeks in duration.
23  Q.   So, after you got out of Leeds University, you went
24 to work for the Kennecott Copper Corporation?
25  A.   One of their subsidiaries, yes.

### Page 11

1   Q.   What was the subsidiary?
2   A.   Chase Brass & Copper Company.
3   Q.   And did you work for the Chase Brass & Copper
4  Company from 1970 to 1978?
5   A.   Yes.
6   Q.   What did you do for that company?
7   A.   I started out in research in process development and
8  material development. I did some studies for them on welding
9  technology. I worked in one of their manufacturing facilities
10 trying to improve techniques for drawing copper tubing. Then
11 I moved to one of their other facilities and was in charge of
12 quality improvement and then was in charge of their entire
13 technical department.
14  Q.   I'm sorry. Were you finished?
15  A.   I worked for them as a project manager developing a
16 new casting technology.
17  Q.   The work that you did for this copper and brass
18 company, I take it was working with copper and brass
19 materials?
20  A.   Copper and brass alloys. Not just brasses, but
21 bronzes, other alloys of copper.
22  Q.   Utilizing your background in metallurgy?
23  A.   Yes.
24  Q.   Did you come to the United States to work for this
25 company –

### Page 12

1   A.   Yes.
2   Q.   – Chase Brass & Copper?
3   A.   Yes.
4   Q.   And in 1978, you moved on to the Century Brass
5  Products Company?
6   A.   Yes.
7   Q.   Why did you make that move?
8   A.   The company I was working for was closing down their
9  facilities and relocating them in South Carolina. I didn't
10 want to make that move. My wife was happy in Connecticut.
11  Q.   Where was the Chase Brass & Copper Company?
12  A.   Initially in Cleveland, and then I worked in one of
13 their plants in Connecticut.
14  Q.   Whereabouts in Connecticut?
15  A.   In Waterbury.
16  Q.   And where was Century Brass?
17  A.   That was in Waterbury.
18  Q.   What did you do for Century Brass?
19  A.   I was initially put in charge of the installation of
20 a large casting machine which we purchased in Germany. I was
21 responsible for the purchase and the implementation of the
22 technology in the facility. After that, I was in charge of
23 all technical and quality control issues and some of the
24 engineering issues.
25  Q.   And that was dealing with brass products?

### Page 17

1 significant ones on that. I haven't updated it for a while.
2   Q.   All right. Have you obtained or received any kind
3 of certification as a fire investigator?
4   A.   No. At many of the conferences, such as the IAI
5 conferences, you receive partial certifications that
6 cumulatively you can use to get qualification of that nature.
7 I've received those partials, but I have never put in for the
8 qualification.
9   Q.   Do you consider yourself a cause and origin expert?
10   A.   I consider myself familiar with cause and origin. I
11 think I would qualify as an expert based on my experience, but
12 it's not the expertise that I sell as an engineer.
13   Q.   So, you don't put yourself out there as a cause and
14 origin expert?
15   A.   Correct.
16   Q.   You put yourself out there as an expert in --
17   A.   Fire investigations, particularly involving
18 appliances and electrical systems and in other types of
19 failure analyses.
20   Q.   And how did you obtain -- coming from having a
21 metallurgical background, how did you obtain this expertise in
22 fire investigations involving appliances?
23   A.   Well, the engineering part of it I had done as part
24 of my schooling, the electrical engineering and mechanical
25 engineering. When I was in industry, we supplied product to

### Page 18

1 many of the large electrical companies, both the manufacturers
2 of appliances and also the manufacturers of electrical
3 products. So, I interfaced with them frequently on the types
4 of materials that they wanted to use, why they wanted to use
5 them, and how they wanted to use them. In the early part of
6 my consulting period from 1984 onwards, I was asked to
7 evaluate products which had become damaged in fires, and so I
8 followed that up with the usual learning process of how
9 appliances are built. I disassembled them. I examined them.
10 I went to seminars. I read as much as I could on the subject.
11   Q.   Have you ever worked for an appliance manufacturer?
12   A.   Not directly, no.
13   Q.   Have you ever designed an appliance?
14   A.   No.
15   Q.   In your consulting business, has any appliance
16 manufacturer asked you to consult on fire-related matters?
17   A.   Yes.
18   Q.   Under what circumstances?
19   A.   Under the circumstances where a product that they
20 have either been using or promoting has been involved in fires
21 and they want an analysis and some recommendations with
22 respect to changes in the product.
23   Q.   How many times has that happened?
24   A.   Probably two or three.
25   Q.   How many appliance fires have you investigated?

### Page 19

1   A.   Hundreds.
2   Q.   And those have been for persons or insurance
3 companies or entities who want to bring a -- potentially want
4 to bring a lawsuit against the manufacturer?
5   A.   They have been for insurance companies primarily.
6   Q.   And those would be insurance companies looking to
7 recover -- recoup their losses from a manufacturer?
8   A.   In most instances, I would say so.
9   Q.   Who is the insurance company you're working for in
10 this matter, is it Safeco?
11   A.   I believe it's Safeco.
12   Q.   You have had other cases for Safeco?
13   A.   Yes.
14   Q.   How many other cases have you had for Safeco?
15   A.   I have absolutely no idea.
16   Q.   It would be well in excess of ten or twenty, would
17 it not?
18   A.   Probably.
19   Q.   Would it be in the hundreds?
20   A.   I don't know.
21   Q.   What other insurance companies do you have cases
22 for?
23   A.   I've worked for -- you name the company, I have
24 worked for them.
25   Q.   How do you do your billing with these insurance

### Page 20

1 companies? Are you on a flat rate, for instance, say, with
2 Safeco?
3   A.   No. I bill the same way for all of the fires that I
4 work on, whether it's for a plaintiff or whether it's for an
5 insurance company.
6   Q.   Let me stop you there. When you say a plaintiff,
7 you mean an individual?
8   A.   An individual, yes.
9   Q.   I'll come back to that, too.
10   A.   Okay. If I'm asked to do a basic understanding of
11 how an accident happened, which the insurance companies often
12 do just to see what the cause of the fire was, I bill it at a
13 particular rate. If the fire is involved in litigation, then
14 I bill at a different rate.
15   Q.   Okay. What are the two rates?
16   A.   Currently it's $155 for doing basic investigation
17 and $200 an hour for litigation.
18   Q.   Okay.
19   A.   And $240 for depositions and testimony.
20   Q.   So, for this matter, you have been at the litigation
21 rate?
22   A.   Yes.
23   Q.   You mentioned plaintiffs, you also do investigations
24 for individuals who are seeking to recoup their losses against
25 a manufacturer or an insurance company?

Page 25

1  in-house?
2  A.  Yes.
3  Q.  Let me qualify it, then. As an outside or private
4  consulting engineer starting in 1984, you have never done any
5  kind of design work?
6  A.  No.
7  Q.  How many refrigerator fires have you investigated or
8  fires -- let me put it this way, fires allegedly attributable
9  to a refrigerator?
10  A.  Good question. I can think of probably half a dozen
11  or so.
12  Q.  Okay.
13  A.  Refrigerators are commonly a component of a kitchen
14  fire, but in which the allegation is directly related to the
15  refrigerator is relatively small.
16  Q.  When you say "refrigerators are commonly a component
17  of a kitchen fire," what do you mean?
18  A.  I mean, any time a fire occurs in a kitchen, it's
19  one of the appliances that one would evaluate.
20  Q.  Okay. In other words, it's something that is
21  plugged into an outlet so you investigate and rule it out or
22  rule it in?
23  A.  Correct.
24  Q.  And the half dozen cases or so that you have
25  referenced are cases in which there was an allegation that the

Page 26

1  fire actually started with the refrigerator?
2  A.  There was a concern that the fire had started with
3  the refrigerator.
4  Q.  Of those half a dozen cases or so, how many of those
5  were you able to actually go to the scene of the fire?
6  A.  I think every one except this.
7  Q.  And why weren't you able to go to the scene in this
8  case?
9  A.  I wasn't involved until long after the scene had
10  been cleaned up.
11  Q.  Do you prefer to go to the scene or do you prefer to
12  see the refrigerator after the scene has been discarded?
13  A.  I prefer to go to the scene.
14  Q.  And why is that?
15  A.  Because you can gain valuable information that helps
16  in your interpretation of the damage that you see in the
17  refrigerator.
18  Q.  All right. And the half dozen or so cases that you
19  have had -- I'll just say involving refrigerators -- do you
20  recall what your conclusions were?
21  A.  They varied. In several of them, I came to the
22  conclusion that the refrigerator was not involved directly in
23  the fire ignition. In a couple of cases, I believe that it
24  was.
25  Q.  Have you ever had a case where, say, a fire marshal

Page 27

1  or a fire chief who was involved in extinguishing the fire and
2  writing a report implicated the refrigerator, but when you
3  looked at it, found that it wasn't the refrigerator?
4  A.  Yes.
5  Q.  And have you had cases where fire marshals or fire
6  investigators for local fire departments have implicated
7  appliances that weren't involved at all?
8  A.  Yes.
9  Q.  That's something that happens fairly commonly, isn't
10  it?
11  A.  Yes.
12  Q.  Now, in the -- let me ask it this way. Are you able
13  to estimate the number of cases in which you've concluded that
14  a refrigerator was involved in ignition of a fire?
15  A.  I can only think of perhaps two.
16  Q.  And where in the refrigerator did these fires start?
17  A.  One started in the compressor compartment and the
18  other started on the power cord.
19  Q.  When you say the compressor compartment, you mean
20  the -- I think some people call it the machinery cabinet in
21  the refrigerator?
22  A.  The component opening in the back of the
23  refrigerator at the base that contains the compressor and the
24  fan and the leads to the condenser and the power cord.
25  Q.  When your -- strike that. And the other was the

Page 28

1  power cord?
2  A.  Yes.
3  Q.  Okay. What had happened to the power cord in that
4  case?
5  A.  It had become crushed.
6  Q.  Under the refrigerator wheel?
7  A.  Actually, against the wall at the back of the
8  refrigerator, I believe. That was quite a long time ago and
9  it may have been crushed under the wheel of the refrigerator,
10  but it was damage to the power cord.
11  Q.  How many times have you investigated kitchen fires
12  where you actually took a look at the refrigerator? An
13  approximate number is fine.
14  A.  Twenty, thirty.
15  Q.  How do you go about examining a refrigerator in a
16  kitchen fire?
17  A.  Initially, it would be just an evaluation of the
18  physical damage to the exterior and the interior to develop a
19  sense of the burn patterns. It would be an appraisal of the
20  immediate surroundings of the refrigerator. It would be an
21  understanding of the circuit into which the refrigerator is
22  plugged, and it would be an evaluation of the electrical
23  components within the refrigerator.
24  Q.  Why don't we get more specific. As opposed to
25  looking at burn patterns, what component do you concentrate on

**Page 33**

1  Q. And just generally, tell me what your conclusions
2  were after looking at the refrigerator, and then I'll get into
3  it in some more detail.
4  A. Okay. I was surprised at the degree of damage that
5  I saw to it.
6  Q. Can you tell me what you mean by that?
7  A. I've seen many refrigerators that have been involved
8  in kitchen fires, not as the source of the fire but have been
9  involved in kitchen fires. And in many of them, the interior
10 of the refrigerator, the cabinet itself, remains somewhat
11 protected. In this particular case, the interior was totally
12 consumed, and that's unusual. Not rare, but unusual.
13 Secondly, the electrical compartment of the back of the
14 refrigerator was in excellent condition. Not totally clean,
15 but in good condition. I mean, it had lint and dust and those
16 kinds of things. The wiring was in good condition except
17 where there had been fire exposure on the exterior.
18 Q. And based upon those observations, you concluded
19 what?
20 A. I recognized that I was not going to be able to
21 determine precisely what the ignition cause -- ignition source
22 of this fire was.
23 Q. And why is that?
24 A. Because I was looking at a refrigerator in
25 isolation, and all of the electrical components that were in

**Page 34**

1  the areas of major fire damage were missing or consumed. The
2  electrical components that were still present were intact and
3  did not show damage which would be consistent with them being
4  an ignition source.
5  Q. Do you have an opinion one way or the other as to
6  whether the fire started on the interior of the refrigerator
7  cabinet?
8  A. I think it's a distinct possibility.
9  Q. Sitting here today, you can say that it's possible
10 that the fire started on the interior of the refrigerator
11 cabinet, but you can't say it's more likely than not?
12 A. Based upon the information that I've seen to this
13 point, I can't reach that level of confidence.
14 Q. And given that the remainder of the refrigerator was
15 in fairly good condition and you -- I think in your report --
16 ruled out the other components of the refrigerator as the
17 source of the fire, is it fair to say that sitting here today
18 you can't state that the fire started with this refrigerator
19 more likely than not?
20 A. I think that the evidence that I've seen suggests
21 that more likely than not it started within the refrigerator,
22 based upon the burn patterns of the refrigerator. And based
23 upon the photographs at the scene that I have examined -- but
24 those are limited in extent, the photographic documentation
25 that I have seen to date -- and I would want to see more of

**Page 35**

1  that before my confidence level would be such that I would say
2  it probably started inside the refrigerator.
3  Q. Okay. I am just trying to get at where we are
4  today. Sitting here today, you think it's possible this fire
5  started with the refrigerator but you can't say it's probable?
6  A. I believe that it's possible, and the fire damage to
7  the refrigerator strongly suggests that it did. It's
8  consistent with the reports that I have seen and deposition
9  testimony that I have seen. But by virtue of the fact that I
10 can't identify the ignition source within the refrigerator,
11 that's why I have some -- still some difficulty with raising
12 my level of probability.
13 Q. So, the answer is possible but not yet probable?
14 A. Not certain.
15 MS. POLGLASE: Why don't we go through what you
16 did and take a short break.
17
18 (A recess was taken)
19
20 MS. POLGLASE: Back on the record.
21 Q. (By Ms. Polglase) I think I sent a subpoena. Did
22 you bring your billing records?
23 A. Yes.
24 Q. Great. Sometimes that's the easiest way to go
25 through what you did. You know, what I'll do is I'll just

**Page 36**

1  mark your whole file and then we will just go through and,
2  sort of, identify it rather than try to mark individual
3  things.
4  A. Okay.
5
6  (Defendant's Exhibit F, File with Contents,
7  marked for identification)
8
9  THE WITNESS: You want to mark my copy or your
10 copy?
11 Q. (By Ms. Polglase) No. I just marked the copy. Why
12 don't we have you just identify this. I'll show you what's
13 been marked as Exhibit F. I would just ask you if you can
14 identify that as a copy of your file.
15 A. It appears to be.
16 Q. All right. And could you point me to your billing
17 records?
18 A. There is a folder with a tab on it that says, "03190
19 Attorney Ralphs, fire/refrigerator."
20 Q. Sometimes it's easier to look at that to determine
21 when things happened. You were first contacted in the case,
22 you think, 4/28 there?
23 A. Yes.
24 Q. And what year would that be?
25 A. '03.

### Page 41

1    Q.    I think I have a recollection of that. All right.
2 And on it looks like June 5th you did something.
3    A.    Yes. I got some additional file materials and
4 photographs, which included the fire marshal's report and
5 photographs from Attorney Ralphs' office.
6    Q.    And you wrote your report on June 5th. Is that
7 right?
8    A.    Yes.
9    Q.    The report itself is dated June 11th. Did you make
10 some changes between June 5th and June 11th?
11    A.    No. It's probably the timing that I made the
12 annotations in here and the time that it took to get it
13 dictated and signed out from the secretary.
14    Q.    All right. And then June 11th, something was
15 mailed. Can we presume that's your report?
16    A.    Probably photographs and report, perhaps. I don't
17 remember.
18    Q.    And then there is some activity in October regarding
19 deposition dates?
20    A.    Yes. I was contacted by Attorney Loftus who I
21 learned was taking over the file from Attorney Ralphs.
22    Q.    And from October to the present, have you done
23 anything except conference with Attorney Loftus regarding
24 deposition dates and review deposition transcription and your
25 file?

### Page 42

1    A.    I received and reviewed the deposition transcripts.
2 I received and reviewed the interrogatories of Maytag's
3 experts. I did disclosures, I should say, not
4 interrogatories. And I also saw hard copies, I think, of Mr.
5 Vallas' photographs.
6    Q.    Anything else?
7    A.    No.
8    MS. POLGLASE:    Why don't we mark this as F1.
9
10 (Defendant's Exhibit F1, Handwritten Notes,
11 marked for identification)
12
13    Q.    (By Ms. Polglase) All right. I'll show you two
14 pages of notes. I have marked them F1.
15    A.    Yes.
16    Q.    Are those your handwritten notes?
17    A.    Yes.
18    Q.    And when were these generated?
19    A.    During the inspection in New Jersey.
20    Q.    Okay. Your handwriting is better than most, but if
21 I could ask you, there are some things I can't read here.
22 There isn't that much here. Can you read these two pages of
23 notes into the record for me?
24    A.    Sure. The first line is actually a website
25 identification called Repairclinic.com. Someone had, at the

### Page 43

1 inspection, provided that to me as a potential source for the
2 schematic for this refrigerator.
3    Q.    Someone from Maytag or from Peter Vallas?
4    A.    I don't recall. Then there are several lines of
5 observations that I made as I was looking at the refrigerator.
6 "Still dust underneath. Plastic components still good. Tray,
7 too, et cetera. Cardboard separated, good except front
8 outside edge. Trademark on front of plug." And there is a
9 little sketch. "Cord sixty inches from attachment to back of
10 refrigerator to plug." In other words, the length of the
11 appliance cord. "No arcing on the power cord." Then there is
12 information that I read from the compressor. "ASH736154,
13 Model DA77L13RAU6, 150 volts, 16 hertz. Locked rotor, 14.0
14 amps. Thermally protected. Single phase R12 Matsushita
15 Electric, U.S.A. No arcing on wires or to back of
16 refrigerator." The second page is, "Aluminum evaporator and
17 tray lies in bottom left-hand side of rear on top of plastic.
18 Power strip with transformer for cell phone charger installed,
19 six outlets, Model S-50, made in China, 8467 listed E93302,
20 Curtis Manufacturing Company. Cell phone charger, desktop
21 holder, Model DC-50, WDC, 5.2 volt, input 1 amp, 5.2 watts, DC
22 5.2 volt, output one amp. Serial number DAZ 9002148, made in
23 Korea."
24    Q.    Thank you. On these sheets, I take it, are notes
25 that you made on the day of your inspection?

### Page 44

1    A.    Yes.
2    Q.    And on page two of the notes, where you were talking
3 about the power strip, what are you talking about there?
4    A.    There was a notation, I believe it was, in Peter
5 Vallas' report that there was some electrical components which
6 were found on the countertop in the kitchen. He had collected
7 those so that they could be excluded as potential ignition
8 sources.
9    Q.    Same thing with the cell phone charger?
10    A.    Yes.
11    Q.    Now, there is a page in your file that says, "New
12 project information." Is that just an intake sheet?
13    A.    Yes.
14    Q.    All right. And at the bottom it says "Information"?
15    A.    Yes.
16    Q.    "Peter Vallas did C2V." What does that mean?
17    A.    Cause and origin.
18    Q.    Oh, cause and origin?
19    A.    Yeah. "Fire originated internally - defroster?"
20    Q.    Where did you get that information from?
21    A.    From Attorney Ralphs. "Maytag looking to inspect
22 serial number. Model number destroyed. Magic Chef -
23 manufactured by Maytag four to five years old. Husband
24 noticed burning smell, opened refrigerator and smoke came out.
25 Attorney Ralphs will send documents overnight."

### Page 49

1 *handwriting?*
2 A.  The top section is my handwriting.
3 Q.  What does that page pertain to?
4 A.  That would be the information that I gave her from
5 my notes, previous notes, on the information on the
6 compressor. And the rest would be her discussion with
7 Matsushita, I would imagine, and then there is a notation to
8 call Tim Roche.
9 Q.  Why is there a notation to call Tim Roche?
10 A.  I suspect that she came back to me and told me what
11 she had found, and I suggested that she immediately call Tim
12 and ask him for the information that we were looking for.
13 MS. POLGLASE:   Mark this F3.
14
15 (Defendant's Exhibit F3, Testimony List, marked
16 for identification)
17
18 Q.  (By Ms. Polglase) F3 is your testimony list?
19 A.  Yes.
20 Q.  Are any of those refrigerator-related incidents?
21 A.  I don't know what the arbitration in 1995 was. It
22 says, "Electrical fire at home," and I don't know what the
23 circumstances of that were. None of the others are related to
24 refrigerators.
25 Q.  From your file, it appears that you have reviewed

### Page 50

1 the depositions of Maria Claro, Noberto Claro and Noberto
2 Claro, Jr.. Is that correct?
3 A.  Yes.
4 Q.  And have you reviewed the deposition of Patricia
5 Ariola?
6 A.  No.
7 MS. POLGLASE:   Mark this.
8
9 (Defendant's Exhibit F4, Report, marked for
10 identification)
11
12 Q.  (By Ms. Polglase) I'll show you what's been marked
13 as F4, and that's a copy of your report. Is that right?
14 A.  Yes.
15 Q.  And you have reviewed the reports of Maytag's
16 experts in this case?
17 A.  The disclosures?
18 Q.  Yes.
19 A.  Yes.
20 Q.  Did you disagree with these disclosures in any way?
21 A.  Of course.
22 Q.  In what ways did you disagree?
23 A.  I had no comment on the disclosure of Mr. Dolinsek
24 other than that he can't spell my name. The disclosure of Mr.
25 Splain concerned me on a couple of issues. I'm not sure how I

### Page 51

1 -- his statement that the impossibility of reaching a
2 conclusion in large part is due to the Plaintiff's
3 representatives' and expert's failure to examine and record
4 the incident scene properly. I'm not sure that that's an
5 accurate statement.
6 Q.  Why aren't you sure that that's an accurate
7 statement?
8 A.  I don't know what he has seen of the photographs,
9 and I don't know whether the photographs that I have seen
10 represent the entirety of those that are available. And the
11 reports of the facts and the opinions and conclusions appear
12 to be not entirely consistent with the deposition testimony of
13 the Claros.
14 Q.  What is inconsistent?
15 A.  Well, first of all, he says that she was using the
16 oven to bake and also frying oil on the stove top for the
17 evening dinner. I think with respect to the timing of the
18 fire, while she may have used a little olive oil to saute the
19 onions in her description, that would hardly constitute frying
20 oil on the stove top. And down below when he says that, "It's
21 probable that without her knowing it, Mrs. Claro, accidently
22 started the fire while she was cooking. The fire may have
23 appeared to her that it started within the refrigerator, but
24 the black smoke was coming from another area such as frying
25 oil overheating." I don't think that that is consistent with

### Page 52

1 the testimony. In his opinions and conclusions, the
2 electrical stove was not fully examined and documented. I
3 don't know that for a fact.
4 Q.  You don't know either way?
5 A.  I don't know either way. Cooking oil was used to
6 fry foods. The implication appears to be that there was a pan
7 of oil that could have easily become overheated, and that's
8 not consistent with her testimony. Relative items such as
9 pots and pans which were in use were not documented or
10 preserved. They do not appear to have been preserved. I
11 don't know whether or not they were fully documented. The
12 burn pattern visible in the photographs indicates the classic
13 V pattern over the stove and the sink. I would take issue if
14 he is looking at the same photographs that I'm looking at.
15 His conclusion, with respect to the refrigerator representing
16 an external attack, the burn patterns on the outside of the
17 refrigerator support from a fire that came from in front of
18 the floor, in front of the refrigerator, and burned up in a
19 classic V pattern. I would agree that that conclusion is
20 accurate, but that doesn't exclude a fire which started
21 internal to the refrigerator as being the source for that V
22 pattern.
23 Q.  And why is that?
24 A.  Because the doors were clearly opened on this
25 refrigerator during the fire and a lot of the plastic debris

Case 3:02-cv-01916-JBA    Document 26-5    Filed 02/02/2004    Page 14 of 16

### Page 57

1  there was nothing anywhere near this refrigerator that could
2  have started this fire, just looking at the physical evidence,
3  isn't it certainly possible that there was a fire that started
4  external to this refrigerator at the bottom and the front?
5  A. It's possible, but there is neither anecdotal
6  evidence nor physical evidence to support that.
7  Q. When you say "physical evidence," what do you mean?
8  A. I mean, no one collected debris from that area
9  immediately following the fire. I haven't seen photographic
10 documentation of that area of the floor immediately following
11 the fire. It may exist. I haven't seen it.
12 Q. Are there any photographs that -- well, strike that.
13 The refrigerator was moved at some point during the fire.
14 Isn't that right?
15 A. It appears that it was probably moved twice.
16 Q. Can you say what you mean?
17 A. Mr. Claro's description of the incidents immediately
18 leading up to and following the fire suggest that he moved the
19 refrigerator from its location along the wall to try to get it
20 out through the door. And there is certainly what appears to
21 be a protected area where the refrigerator had been located.
22 And there is physical bending of the plug which would be
23 somewhat consistent with him trying to pull the plug out, but
24 his description appears to suggest that he got it right up to
25 the door. The photographs show it moved back into the -- more

### Page 58

1  towards the center of the room, and that's entirely possible
2  if the fire department entered the room from the door. So, I
3  suspect that it was moved once and then back in again.
4  Q. So, it's certainly quite possible that any physical
5  evidence at the base of the refrigerator could have been
6  disturbed during all of this moving?
7  A. It's possible.
8  Q. Now, you mentioned at the beginning of the
9  deposition that there was some additional evidence that you
10 wanted to look at in order to finalize your conclusion in this
11 case. Can you tell me what that evidence is?
12 A. There are some items which are not sufficiently
13 clearly visible in the photographs that I have seen to date,
14 and I would like to know if there are other -- additional
15 photographs available. For example, my report has however
16 many photographs in it, but I actually took seventy-eight
17 photographs. I suspect that Mr. Vallas may well have selected
18 photographs of the scene and didn't utilize all of them in his
19 report. I would very much like to see those. And the same
20 goes for the fire marshal or the claims adjuster; the issues
21 that they might have been focusing on are not necessarily the
22 ones that I would like to examine.
23 Q. And what are those things that you describe as not
24 sufficiently visible?
25 A. There is not a very good photograph of the stove.

### Page 59

1  I'd like to see a clearer view of the stove and the items that
2  were on it and around it. I'd like to see the interior of the
3  stove. There is a description of what Mrs. Claro was doing,
4  and I haven't seen that documented. I would like to see the
5  condition of the floor where the refrigerator had been
6  located. It appears in some of the photographs that it's a
7  ceramic tile floor, and that's not confirmed or denied in any
8  of the descriptions that I have seen. I think that's of great
9  interest. I haven't seen good documentary photographs yet of
10 the ceiling above the various areas of the kitchen to see how
11 the fire propagated; all of those may well be available and I
12 would like to see them.
13 Q. Okay. What about the ceramic tile floor would be of
14 interest to you?
15 A. Well, it's a non-combustible floor. And if you look
16 at the possibility of a fire originating on the floor, perhaps
17 as Mr. Splain surmises from a cooking oil accident, one would
18 have to try to imagine how an incident on the stove would
19 result in a fire on the floor in front of the refrigerator.
20 The combustibility of the floor materials would be of great
21 interest.
22 Q. Or the presence of debris or markings on the floor
23 that would show the fire started with a box used for trash, a
24 barrel used for trash?
25 A. You still have to have an ignition source for it.

### Page 60

1  Q. Understandable. But you would certainly want to
2  know what was around there?
3  A. Yes. One other item while I recall, I have not
4  received or seen the exhibits which were attached to the
5  Claros' depositions which indicated a layout of the kitchen
6  area, and I would like to see that.
7  Q. Have you investigated fires -- other fires where
8  statements of the homeowners or those people in the vicinity
9  of the fire did not match with the physical evidence?
10 A. There is usually some level of contradiction between
11 statements of the homeowner in terms of time or observations
12 that don't exactly match up with the physical evidence.
13 Sometimes it's more extreme than that.
14 Q. So, there have been instances where you simply
15 didn't believe the verbal description of what had happened?
16 A. Yes.
17 Q. Do you believe the Claros in this instance?
18 A. I believe that their observations are consistent
19 with the physical evidence as it exists and the documentary
20 photographs of it.
21 Q. That you have available to you?
22 A. Correct.
23 Q. All right. I just want to turn to your photographs
24 for a few minutes. Photographs A1 and A2 show the left,
25 actually, as your facing it, the right side of the