UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO,<br><br>Plaintiff,<br><br>vs.<br><br>MAYTAG CORPORATION,<br><br>Defendant. | CIVIL ACTION NO. 3:02CV-1916 JBA<br><br>January 30, 2004 |

### MAYTAG CORPORATION'S MOTION TO BAR THE TESTIMONY OF THE PLAINTIFF'S PROPOSED EXPERT, FRANK WATKINSON, PH.D.

Maytag Corporation ("Maytag") moves pursuant to Fed. R. Evid. 104(a) and 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny for an order barring the plaintiff's proposed expert witness, Frank Watkinson, Ph.D., from testifying at the trial of this matter.

Dr. Watkinson is not qualified by knowledge, skill, experience, training or education to testify about the cause and origin of the fire in this case, and admits that he is not an expert in the area of cause and origin. Moreover, his deposition testimony demonstrates that even if he was qualified to testify about the cause and origin of the fire in this case, his opinions would not assist the trier of fact.

For the reasons set forth in its attached Memorandum, Maytag respectfully requests the Court enter an order barring Frank Watkinson, Ph.D. from testifying at trial.

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

Respectfully submitted,

**MAYTAG CORPORATION**
By Its Attorneys

**CAMPBELL CAMPBELL
EDWARDS & CONROY
PROFESSIONAL CORPORATION**

_____
Holly M. Polglase (ct 09276)
Timothy M. Roche (ct 24373)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was mailed, postage prepaid, via first class mail, on January 30, 2004 to:

Erik Loftus, Esquire
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, Connecticut 06096

_____
Timothy M. Roche

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO,<br><br>Plaintiff,<br><br>vs.<br><br>MAYTAG CORPORATION,<br><br>Defendant. | CIVIL ACTION NO. 3:02CV-1916 JBA<br><br>January 30, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF MAYTAG CORPORATION'S MOTION TO BAR THE TESTIMONY OF THE PLAINTIFF'S PROPOSED EXPERT WITNESSES FRANK WATKINSON, Ph.D.**

Maytag Corporation ("Maytag") brings this motion pursuant to Fed. R. Evid. 104(a) and 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny to bar the plaintiff's proposed expert Frank Watkinson, Ph.D. ("Watkinson") from testifying at trial. As grounds for its motion, Maytag states that Dr. Watkinson is not qualified by knowledge, skill, experience, training or education to testify about the cause and origin of the fire in this case. Moreover, his deposition testimony demonstrates that even if he was qualified to testify about the cause and origin of the fire, his opinions would not assist the trier of fact, because while he believes the refrigerator *possibly* caused the fire at the Claro residence, he is not willing to state that it was more probable than not the cause of the fire.

**I.   BACKGROUND**

This is a subrogation action arising out of a fire which occurred at the home of Norberto and Maria Claro, 35 Edgewood Avenue, Waterbury, CT on November 13, 2000. At the time of

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

the fire, Mrs. Claro was cooking on the stove. She claims that when she opened the refrigerator to get some milk that afternoon, she saw black smoke inside. She called her husband into the kitchen and when he opened the freezer side of the refrigerator, there were flames. Thereafter, she called 911 and reported the fire. While she was doing that, Mr. Claro tried to push the refrigerator out the back door of the house but could not do so. Thereafter, the Claro family evacuated the house and the Waterbury Fire Department arrived and extinguished the fire. Several years later, on June 3, 2003, Dr. Watkinson visually inspected and photographed the subject refrigerator at the offices of the plaintiff's proposed cause and origin expert, Peter Vallas.

At his deposition, Dr. Watkinson admitted that the fire could have started somewhere other than inside the refrigerator. Perhaps most telling, however, was the following exchange:

> Q: Do you have an opinion one way or the other as to whether the fire started on the interior of the refrigerator cabinet?
> A: I think it's a distinct possibility.
> Q: Sitting here today, you can say that it's possible that the fire started on the interior of the refrigerator cabinet, but you can't say it's more likely than not?
> A: Based upon the information that I've seen to this point, I can't reach that level of confidence.
>
> ******
>
> Q: Okay. I am just trying to get at where we are today. Sitting here today, you think it's possible this fire started with the refrigerator but you can't say it's probable?
> A: I believe that it's possible, and the fire damage to The refrigerator strongly suggests that it did. It's consistent with the reports that I have seen and deposition testimony that I have seen. But by virtue of the fact that I can't identify the ignition source within the refrigerator, that's why I have some – still some difficulty with raising my level of probability. (See, Watkinson deposition, pp. 34-35)

2

Thus, even if Dr. Watkinson were permitted to testify in this case, he would not tell the jury that the fire in this case more probably than not originated within the refrigerator.[1]

## II.   THE PLAINTIFF'S EXPERTS

Following the fire, the plaintiff commenced this product liability action against Maytag under the Connecticut Product Liability Act, ("CPLA"), C.G.S. §§52-579m, et seq., alleging strict liability in tort. (*See* Complaint, attached as Exhibit A). In support of its claim, the plaintiff identified several purported experts who will testify on its behalf at trial, one of whom is Frank Watkinson, Ph.D. (*See*, Plaintiff's "Rule 26 Disclosure", attached as Exhibit B).

### a.   Dr. Watkinson's Opinions

Even if he was permitted to testify in this case, Dr. Watkinson would have little to tell the jury. While he would tell the jury that the refrigerator was in the area of the fire's origin, he cannot identify any defect in the refrigerator or any component that malfunctioned or caused the fire. (*See*, Deposition of Frank Watkinson, ("Watkinson Deposition"), p.82, 12-17, attached as Exhibit C). He cannot identify the ignition source for the fire. (Watkinson Deposition, p.82, 9-11) He would, however, tell the jury that his inspection of the refrigerator did not reveal any evidence of an electrical malfunction. (Watkinson Deposition, p.33-34, 13-25, 1-4. He would also testify that based on the burn patterns on the refrigerator itself, "it certainly could be concluded that the fire didn't start within it." (Watkinson Deposition, p.18, 11-14).

In addition, Dr. Watkinson would tell the jury that the interior compartment of a refrigerator is not a common place for a fire to originate, due to the types of wiring and

---

[1] Dr. Watkinson later backed away from this admission, testifying that "I think that the evidence that I've seen suggests that more likely than not it started with the refrigerator, based upon the burn patterns of the refrigerator. And based upon the photographs at the scene that I have examined – but those are limited in extent, the photographic documentation that I've seen to date – and I would want to see more of that before my confidence lever would be such that I would say it probably started inside the refrigerator." Watkinson Deposition, pp.34-35, 14-25, 1-2.

3

components contained inside a refrigerator, the limited supply of oxygen available to fuel such a fire, and the fact that refrigerator typically contain large volumes of cold product that are not particularly conducive to fire ignition. (Watkinson Deposition, p.26, 7-10). Despite all of the helpful testimony to Maytag that Dr. Watkinson would provide, he is not qualified to render opinions on the cause and origin of the fire in this case.

### III.  DR. WATKINSON'S QUALIFICATIONS

#### (a)  Dr. Watkinson's Qualifications as a General Matter

It is important to know at the outset that Dr. Watkinson devotes substantially all of his professional time to litigation. He has been a principal of Spectrum Engineering Group since 1986. (Watkinson Deposition, p.15, 1-2). Prior to becoming involved in litigation consulting, had no prior experience with appliances or fire investigations. (Watkinson Deposition, pp.15-16, 23-25, 1-14). In nearly every appliance fire he has ever investigated he has been retained by an insurance company looking to recoup its losses from a product manufacturer. (Watkinson Deposition, p.19, 2-8). This by itself does not mean Dr. Watkinson is unqualified to offer expert testimony, but gives reason to be cautious in scrutinizing both his credentials and the reliability of the work underlying the testimony he proposes to give. *See, e.g.*, Travelers Prop. & Cas. Corp. v. GE, 150 F. Supp. 2d 360, 364 (2001); In re Air Crash Disaster at New Orleans, Louisiana, 795 F.2d 1230, 1234 (5th Cir. 1986); *Compare* Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co., 958 F.2d 1169, 1174-1175 (1st Cir. 1992) (reciting a proposed expert's employment as a professional litigation consultant, and the wide breadth of his testifying, among other grounds for affirming the district court's finding that he was unqualified).

#### (b)  Dr. Watkinson's Educational Background

Dr. Watkinson's educational background is in metallurgy. He obtained both his B.S. and

4

his Ph.D. in metallurgy from the University of Leeds England. He does not have an engineering license in the State of Connecticut. (<u>Watkinson Deposition</u>, p.24, 14-16). A copy of Dr. Watkinson's curriculum vitae, Exhibit 1 to his deposition, is attached as Exhibit D. Although he has taken some fire investigation courses since becoming a litigation consultant, he is not certified by the International Arson Investigators as a Certified Fire Investigator. *In fact, he does not even consider himself an expert on cause and origin.* Instead, he testified that he is "familiar with cause and origin", although he considers himself an expert in fire investigation. (<u>Watkinson Deposition</u>, p.17, 9-12).

### (c) Dr. Watkinson's Employment History

As noted above, Dr. Watkinson has been a professional litigation consultant since approximately 1984. Prior to becoming a paid expert witness, Dr. Watkinson worked for a variety of companies from 1970 and 1984 in positions that utilized his metallurgy background. From 1970 to 1978 he worked for the Chase Brass and Copper Company, a company that manufactured copper and brass products. While at Chase Brass and Copper, he did some studies on welding technology and in trying to improve techniques for drawing copper tubing. He also served as a project manager in the development of a new casting technology. (<u>Watkinson Deposition</u>, p.11, 11-14). From 1978 to 1980 he was employed by Century Brass Products, Inc., another manufacturer of copper alloy products, where his primary responsibility was the purchase and installation of a large casting machine. From 1980 to 1984 he was employed by the Chase Nuclear & Extrusion Division of Standard Oil, a company that sold zirconium and titanium alloy products to companies in the aerospace and nuclear industries. Since that time he has been a professional litigation consultant. He has never worked for an appliance manufacturer and has never designed any appliances. (<u>Watkinson Deposition</u>, p.18, 11-14). In

short, Dr. Watkinson has no relevant work history with refrigerators or other appliances outside of his litigation consulting business.

### (d)  Dr. Watkinson's Publications

Dr. Watkinson has not written any publications about refrigerators, appliances or appliance fires.[2] (*See,* Curriculum Vitae, attached as Exhibit D). *Compare* Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co., 958 F.2d 1169, 1174 (1st Cir. 1992) (noting lack of relevant publications as evidence supporting a district court's refusal to permit a proposed expert to testify).

### IV.  THE METHODOLOGY USED BY WATKINSON IN FORMING HIS OPINIONS

As noted above, Dr. Watkinson has one primary opinion in this case. He believes the fire in this case originated in the area of the refrigerator. Beyond that, he has little else to say. He cannot identify the cause of the fire.

#### a.  How Dr. Watkinson Arrived at His Opinion

Dr. Watkinson's investigation in this case consisted of reviewing the deposition testimony of Mr. and Mrs. Claro, reviewing the reports and photos produced by the fire marshal and Peter Vallas, and visually inspecting the refrigerator on June 2, 2003, more than two and a half years after the fire. (Watkinson Deposition, p.38, 10-14, attached as Exhibit C). He did not visit the fire scene (Id., p.26, 7-10). Based on his deposition testimony and his report, it appears he relied almost exclusively on the testimony of the Claros and the "investigation"[3] performed by Peter Vallas, another of the plaintiff's purported cause and origin experts, in forming his opinion.

While the Rule 26(a)(2) report he produced in this case indicates that he believes a malfunction or manufacturing defect in one of the components in the freezer or refrigerator

---

[2] Maytag is not aware of any publications he has authored within the last ten years and none were identified in his Fed. R. Civ. P. 26(a)(2) expert disclosure in this case.
[3] See Maytag's accompanying Motion to Bar the Testimony of Peter Vallas for a detailed review of Mr. Vallas

6

compartments caused the fire, based on the testimony of the Claros and the investigation performed by Peter Vallas, he arrived at that conclusion even though his examination of the refrigerator did not reveal any evidence of an electrical malfunction in any of the electrical components he examined. (Watkinson Deposition, p.33-34, 13-25, 1-4, attached as Exhibit C).

Dr. Watkinson admitted that he had not been able to locate the refrigerator's defroster and could not say that the fire originated in the defroster. (Id., p.45, 1-7) He did not know the location of the refrigerator's thermostat, although he admitted that his examination of the thermostat indicated it was not the cause of the fire. (Id., p.69, 11-16). He never examined any electrical schematics for the refrigerator. (Id., p.39, 19-23). In short, the opinion contained in Dr. Watkinson's report that a malfunction of an unidentified component in the refrigerator caused the fire is rank speculation.

## IV.   LEGAL STANDARDS FOR ADMITTING EXPERT TESTIMONY

In Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) the Supreme Court defined the appropriate analysis for scrutinizing expert testimony under Federal Rule of Evidence 702. The Daubert Court provided a framework for the trial judge to act as gatekeeper to screen purportedly scientific evidence for the purpose of ensuring that scientific testimony or evidence is not only relevant, but also reliable under Federal Rule of Evidence 702. Id. at 590. The Court's opinion explained that the term "scientific" in Federal Rule of Evidence 702 implies "grounding in the methods and procedures of science" and the term "knowledge" implies "more than subjective belief or unsupported speculation." Id.

The Court charged the trial judge with the task of determining as a preliminary matter under Rule 104(a) "whether the expert is proposing to testify to (1) scientific knowledge that (2)

will assist the trier of fact to understand or determine a fact in issue."[4] Id. Thus, the trial court must conduct a preliminary assessment as to whether the reasoning or methodology underlying the opinions is scientifically valid and can be applied to the facts of the case. Id. at 592. The Court went on to promulgate factors, which the District Court Judge, as gatekeeper, could use to assess whether the proffered testimony meets the standard of scientific validity or, evidentiary reliability:

1) Whether the scientific theory or technique can be (and has been) tested;

2) Whether the theory or technique has been the subject of peer review or publication;

3) Whether there is a known or potential rate of error for the scientific technique and whether it has been considered;

4) Whether there are standards controlling the operation of the scientific technique;

5) Whether the theory or technique has been "generally accepted" in the relevant scientific community.

Id. at 593-594.

Courts both before and after Daubert have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact, see, e.g., Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702, such as whether the theory or method offered by the expert has been put to any non-judicial use, "or whether [the experts] have developed their opinions expressly for the purpose of testifying." Travelers Prop. & Cas. Corp. v. GE, 150 F. Supp. 2d 360 (2001) (quoting Cabrera v. Cordis Corp., 134 F.3d 1418, 1420-21 (9th Cir. 1998); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994).

---

[4] Rule 104 provides in part:
(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, ... or the admissibility of evidence shall be determined by the court, .... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

The purpose of a <u>Daubert</u> inquiry is to determine whether the proffered "expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" <u>Zuchowicz v. United States</u>, 140 F.3d 381, 386 (2d Cir. 1998) (quoting <u>Daubert</u>, 509 U.S. at 597). The admissibility of evidence must be established by a preponderance of the evidence, and the burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. *See,* <u>Daubert</u>, 509 U.S. at 597. In assessing the reliability of a proffered expert's testimony, a district court's inquiry under <u>Daubert</u> must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See,* <u>Daubert</u>, 509 U.S. at 590, 595; <u>Amorgianos v. National Railroad Passenger Corp.</u>, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001).

In <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997) the Court noted that although the appropriate inquiry by the trial judge should be the principals and methodology used by the expert and not the conclusions generated through the methodology, conclusions and methodology are not entirely distinct from one another.

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1998), the Supreme Court confirmed that the standards promulgated in <u>Daubert</u> and <u>Joiner</u> were applicable, not only to so-called "scientific" testimony, but also to opinion testimony based on "technical or other specialized knowledge." The Court noted that Rule 702 made no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. <u>Id.</u> at 147. Thus, the trial judge's gatekeeping function applied not only to the opinions of medical doctors and

9

epidemiologists, but also to engineers and other experts whose education, training and experience was considered technical rather than "scientific."

In <u>Kumho</u>, the Court upheld the trial judge's exclusion of purported tire expert, Dennis Carlson's testimony. The trial judge found that none of the <u>Daubert</u> factors indicated that the opinions were reliable and nothing else offered in support of the opinions outweighed the <u>Daubert</u> factors. Mr. Carlson concluded that despite significant wear and some indicia of abuse, the subject tire failed due to a defect. Finding important Mr. Carlson's "repeated reliance on the 'subjectiveness' of his mode of analysis," the Court again emphasized that expert conclusions must be based upon more reliable methodology than the *ipse dixit* of the witness. <u>Id.</u> at 154-158.

In response to <u>Daubert</u> and its progeny, Rule 702 was amended to clarify the trial judge's role as gatekeeper with respect to the introduction of expert testimony and to provide some general standards of admissibility. See Fed. R. Evid. 702 advisory committee's note. As of December 1, 2000, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

Under the amended Rule 702, the proffering party still has the burden of showing that opinion testimony will assist the trier of fact to understand the evidence or decide a factual issue. Rudd v. General Motors Corp., 127 F.Supp.2d 1330, 1334 (M.D. Ala. 2001). In addition, as was the case before <u>Daubert</u>, the expert must be qualified by knowledge, skill, experience, training, or education. Polaino v. Bayer Corp., 122 F.Supp.2d 63, 66 (D. Mass. 2000). "Although an expert need not have specialization in every area in which he will be called to testify, Rule 702 nonetheless requires that the expert be qualified in the relevant field." <u>Sittig v. Louisville Ladder</u>

10

Group LLC, 136 F.Supp.2d 610 (W.D. La. 2001) (mechanical engineer not qualified in field of ladder design).

Dr. Watkinson's opinions in this case do not pass muster under either Daubert and its progeny or Rule 702 because he is not qualified by knowledge, skill, experience, training or education to render them. His opinions are merely based upon his say so, and as Daubert and its progeny and Rule 702 make clear, that is not enough.

**V.  ARGUMENT**

**1.  Frank Watkinson, Ph.D. is Not Qualified By Knowledge, Skill, Experience, Training or Education to Render Opinions in This Case**

Dr. Watkinson has no relevant knowledge, skill, experience, training or education that would qualify him as an expert in this case. He has never been employed as a fire investigator apart from his litigation consulting, has never worked for an appliance manufacturer and has never designed an appliance. He is a metallurgist by education, not a cause and origin investigator. Despite the fact that he is providing an opinion on the cause and origin of the fire in this case, *he is not a certified fire investigator and admitted during his deposition that he is not a cause and origin expert*. Those admissions alone should provide sufficient justification for the Court to exclude Dr. Watkinson in this case.

Although his report indicates that the fire was caused by an unknown electrical malfunction in the refrigerator, he is not an electrical engineer and admits that he found no evidence of an electrical malfunction in any of the components of the refrigerator or the refrigerator's power cord. Dr. Watkinson also opines (at least in his report) that an unidentified manufacturing defect in one of the refrigerator's electrical components may have caused the fire in this case, even though he did not review a wiring schematic or any product specifications for the refrigerator. He cannot say whether any of the refrigerator's components differed in any way

11

from their intended design or manufacture and therefore, cannot render a reliable opinion that the refrigerator in this case had a manufacturing defect.

Dr. Watkinson has never worked in the industry designing or manufacturing refrigerators or other appliances. His sole contact with the appliance industry is in rendering litigation opinions for insurance companies seeking to sue appliance manufacturers to recoup losses paid out to their insured. Based on this fact alone, his opinions are highly suspect due to the inherent bias they suffer from. Dr. Watkinson has never written any publications regarding appliance fires (none have been disclosed to Maytag as required by Fed. R. Civ. P. 26(A)(2)).

In short, Dr. Watkinson meets *none* of the criteria set forth in Daubert and its progeny to qualify as an expert in this case. While no *single factor* - lack of relevant education alone, lack of design experience with the product at issue alone, lack of relevant teaching experience or publications alone, employment as a professional testifier alone - is dispositive of a proposed expert's qualification to testify, conjunction of *all* of those factors impels a finding that Dr. Watkinson is not qualified.

**2.     Dr. Watkinson's Opinions Will Not Assist the Trier of Fact**

Even if the Court were to conclude that Dr. Watkinson is qualified to present his opinions to the jury in this case, those opinions will not assist the jury in determining any fact in issue. Expert testimony should not be admitted if it will not "assist the trier of fact." Fed. R. Evid. 702. District courts thus have the duty to ensure that an expert witness's testimony "rests on a reliable foundation." Daubert, 509 U.S. at 597. An expert's testimony should be excluded if it is "speculative or conjectural" or is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Boucher v. US Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1998) (per curiam).

### a) Dr. Watkinson's Opinion That The Fire Started in the Refrigerator

In this case, Dr. Watkinson's testimony will not aid the jury precisely because it does not rest on a reliable foundation, and because it is speculative and conjectural. A review of his report and his deposition testimony in this case shows that even is unsure of his opinions. Although his report indicates that the fire started within the refrigerator, he testified at his deposition that based on the burn patterns on the refrigerator itself, "it certainly could be concluded that the fire didn't start within it." Thus, even he admits that the fire could have started somewhere other than inside the refrigerator. He cannot say whether the fire was caused by an electrical malfunction any more than he can conclude that a lit match thrown onto the floor in front of the refrigerator caused the fire in this case.

Perhaps the most compelling reason to exclude Dr. Watkinson in this case, however, is the fact that he cannot state that the fire more probably than not originated within the refrigerator. While he believes this is a possibility, he is not willing to state that it is more probably than not the cause of the fire due to the lack of data available to him to support such an opinion. Unfortunately, Dr. Watkinson's own honesty in that regard provides the most compelling argument for his exclusion.

### b. Dr. Watkinson's Malfunction or Manufacturing Defect Opinion

Because he was unable to determine the exact cause of the fire in this case, Dr. Watkinson concluded that an electrical component of the refrigerator either 1) contained a manufacturing defect or 2) malfunctioned. "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." Miller v. United Technologies Corp., 233 Conn. 732, 779 (1995) (*quoting* Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1321 (11th Cir. 1989) cert. denied, 494 U.S. 1030, 110 S. Ct. 1479 (1990)).

13

Dr. Watkinson did not review any material specifications, design specifications or electrical schematics for the refrigerator or any of its components. He cannot identify which of the refrigerator's components was defectively manufactured. He cannot say how the unidentified component differed, if at all, from the way it was intended to be manufactured by Maytag. Before Dr. Watkinson can possibly be allowed to render an opinion that the refrigerator in this case contained a manufacturing defect, he should at least be able to identify the component that contained such a defect and be prepared to testify about how it differed from its intended specifications. Otherwise, any testimony by Dr. Watkinson that the refrigerator contained a manufacturing defect is pure speculation.

Similarly, in order for Dr. Watkinson to provide reliable testimony that an electrical component in the refrigerator or freezer compartments malfunctioned and caused the fire, he should at least be able to identify the component that malfunctioned. Here, Dr. Watkinson cannot identify the component that he believes malfunctioned or the nature of the malfunction. Further, he admits that none of the refrigerator's electrical components that he examined showed any evidence of an electrical malfunction. Given these admissions, how can Dr. Watkinson's opinion that an electrical malfunction caused the fire in this case be reliable?

One of the Court's gatekeeping functions is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1998). Surely, any scientist or engineer who wanted to rule out the presence of a manufacturing defect in a refrigerator would consult the specifications for the refrigerator to determine if it varied from those specifications. He might

14

also perform some other form of objective tests on the refrigerator's components to determine if they varied at all from the manufacturer's specifications. Dr. Watkinson did none of this.

Dr. Watkinson has, as noted above, never actually participated in manufacturing or designing a refrigerator and failed to perform even rudimentary testing on the refrigerator at issue in this case. So while he is happy to offer opinions about an alleged manufacturing defect or malfunction in the refrigerator, he has done *nothing* to lay a reliable technical or scientific foundation for those opinions. Like the proposed expert barred from testifying in Oddi v. Ford Motor Co., 2000 U.S. App. LEXIS 25496 (3rd Cir. 2000), Dr. Watkinson "used little, if any, methodology beyond his own intuition," *id.*, *57. "Although Daubert does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry that" Dr. Watkinson engaged in. *See* 2000 U.S. App. LEXIS 25496 at *50 to *51. *See also, e.g.*, Clark v. Takata Corp., 192 F.3d 750, 758-759 (7th Cir. 1999); Watkins v. Telsmith, Inc., 121 F.3d 984, 992-993 (5th Cir. 1997); Peitzmeier v. Hennessey Industries, Inc., 97 F.3d 293, 297-298 (8th Cir. 1996).

He has no empirical basis, either from testing he himself has done, or from reviewing results of testing others have done, or from analysis of real world data, or from analysis of engineering documents, for asserting that the refrigerator in this case was defective at the time it left Maytag's possession. Having been unable to determine the exact cause of the fire, Dr. Watkinson simply has no more qualification than any other layperson to formulate a reliable opinion in this case. As such, his opinions will do nothing to assist the trier of fact, because they cannot be tested or verified and have no known rate of failure. In short, Dr. Watkinson's opinions in this case are precisely the type that Daubert and its progeny say does not pass muster under Rule 702.

15

## VI. CONCLUSION

For the foregoing reasons, AMS respectfully requests the Court issue an order precluding plaintiff's purported expert, Frank Watkinson, Ph.D., from testifying at trial.

MAYTAG CORPORATION
By Its Attorneys

**CAMPBELL CAMPBELL EDWARDS & CONROY PROFESSIONAL CORPORATION**

_____
Holly M. Polglase (ct 09276)
Timothy M. Roche (ct 24373)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was mailed, postage prepaid, via first class mail, on January 30, 2004 to:

Erik Loftus, Esquire
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, Connecticut 06096

_____
Timothy M. Roche

16