UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

FILED

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO<br>Safeco Plaza<br>Seattle, WA 98185<br><br>Plaintiff,<br><br>v.<br><br>Maytag Corporation<br>403 West 4th Street North<br>Newton, IA 50208<br><br>Defendant | Civil Action No.<br><br>**302CV1916**<br><br>JURY TRIAL DEMANDED<br><br><br><br>OCTOBER 28, 2002 |

## COMPLAINT

NOW COMES Plaintiff, SAFECO INSURANCE COMPANY OF AMERICA, by and through its undersigned counsel, and hereby demands judgment against defendant, MAYTAG CORPORATION, and in support thereof avers as follows:

### PARTIES

1. Plaintiff, Safeco Insurance Company of America ("Safeco") is a corporation organized and existing under the laws of the State of Washington with a principal place of business located at Safeco Plaza, Seattle, Washington which at all times material hereto was duly authorized to issue insurance policies in the State of Connecticut.

2. Defendant, Maytag Corporation ("Maytag") is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located at 403 West 4th Street North, Newton, Iowa which at all times material hereto was in the business of inter alia, manufacturing kitchen appliances including refrigerators.

## JURISDICTION AND VENUE (FEDERAL)

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332(a). The matter in controversy exceeds, exclusive of interest and costs, the sum of One Hundred Fifty Thousand Dollars ($150,000.00) and there is diversity of citizenship between plaintiff and defendant.

4. Venue in this action is in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391 as the claim arose in this district.

## GENERAL ALLEGATIONS

5. At all times material hereto, Plaintiff provided property insurance coverage to Noberto and Maria Claro ("Claro") under policy number OK5302985.

6. At all times material hereto, the Claro residence was equipped with a refrigerator designed, manufactured and distributed by the defendant.

7. On or about November 13, 2000, a fire originated in the kitchen area of the Claro home located at 35 Edgewood Avenue, Waterbury, Connecticut ("the premises").

8. A defective Maytag "Magic Chef" refrigerator caused the fire and resulting damages.

9. Pursuant to the terms and conditions of the policy, Safeco made payments to Claro.

10. Pursuant to the principles of legal and equitable subrogation, as well as the terms and conditions of the aforementioned policy of insurance, Safeco is subrogated to the rights of its insured to the extent of its payments.

## COUNT I

## CONNECTICUT PRODUCT LIABILITY ACT

11. Plaintiff incorporates by reference each and every allegation set forth above and below as though the same were fully set forth herein at length.

12. Defendant is a product manufacturer and product seller as defined by the Connecticut Product Liability Act, C.G.S. §52-572m, et. seq.

13. Defendant is liable and legally responsible for the losses suffered by plaintiff pursuant to the Connecticut Product Liability Act, C.G.S. §52-572m et. seq. in one or more of the following ways:

(a) designing, manufacturing, selling and/or otherwise placing into the stream of commerce a refrigerator that was in a defective condition, unreasonably dangerous to consumers, including plaintiff's insured herein;

(b) failing to adequately warn plaintiff's insured of the defects in the refrigerator when the defendant knew or should have known of the defects and that they constituted a danger;

(c) carelessly, recklessly and negligently designing, manufacturing, distributing and selling the refrigerator in a defective and unreasonably dangerous condition;

(d) carelessly, recklessly and negligently failing to adequately, properly and safely inspect and/or test the refrigerator and to make the necessary corrections and adjustments thereto, which inspections and tests would have revealed the existence of the aforesaid dangerous condition, and which adjustments and/or corrections would have remedied same;

(e) carelessly, recklessly and negligently failing to discover defects in the refrigerator;

(f) carelessly, recklessly and negligently failing to exercise the requisite degree of care and caution in the design, manufacture, distribution and sale of the refrigerator;

(g) carelessly, recklessly and negligently failing to properly and adequately design and manufacture the refrigerator in order to provide a safe product;

(h) carelessly, recklessly and negligently failing to adequately, properly and/or completely supervise its personnel in the design, manufacture, distribution and sale of the refrigerator;

(i) carelessly, recklessly and negligently failing to remove the refrigerator from the market when the defendant knew or should have known of the defects in the refrigerator and that they constituted a danger;

(j) defendant impliedly warranted that the refrigerator was safe and fit for the purpose for which it was intended and was of merchantable quality, and defendant Maytag breached the aforesaid implied warranties in that the refrigerator was not of merchantable quality, fit and safe for the purpose for which it was intended;

(k) defendant, by virtue of advertisements, promotional literature, and/or sales brochures, made certain express warranties to the general public, and to plaintiff's insured in particular, that the refrigerator was safe and free from defects and the defendant breached its express warranties.

14. As a direct and proximate result of defendant's designing, manufacturing and selling a product that was in a defective, unreasonably dangerous condition, the fire and damages referred to above occurred.

WHEREFORE, Plaintiff Safeco demands judgment against Defendant Maytag in excess of One Hundred and Fifty Thousand Dollars ($150,000.00), together with interest, the cost of this action, fees, punitive damages and such other and further relief as this Court deems just and proper.

THE PLAINTIFF,

By /s/ _____
Margaret Ralphs, Esq., CT14251
LAW OFFICES OF STUART G. BLACKBURN
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
(860) 292-1116
(860) 292-1221 Facsimile
sgblackburn@worldnet.att.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO,<br><br>    Plaintiff,<br><br>vs.<br><br>MAYTAG CORPORATION,<br><br>    Defendant. | CIVIL ACTION NO. 3:02CV-1916 JBA<br><br>JULY 1, 2003 |

## PLAINTIFF SAFECO INSURANCE COMPANY A/S/O NOBERTO AND MARIA CLARO RULE 26 DISCLOSURE

1.  **NAME AND ADDRESS OF WITNESS**

    Peter S. Vallas
    Peter Vallas Associates, Inc.
    105 Main Street
    Hackensack, NJ 07601

    Frank S. Watkinson, Ph.D.
    Spectrum Engineering
    1111 South Main Street
    Cheshire, CT 06410

    Deputy Fire Marshal Patrick Ariola
    Waterbury Fire Marshal
    235 Grand Street
    Waterbury, CT

SAFECO INSURANCE COMPANY OF AMERICA,
By Its Attorney,

By_____
    Margaret Ralphs, Esq.
    Law Offices of Stuart G. Blackburn
    Two Concorde Way
    P. O. Box 608
    Windsor Locks, CT 06096
    Tel. 860-292-1116
    Fax: 860-292-1221
    Fed. Bar No.: CT14251

COURT:

Office of the Clerk
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510

## SAFECO -V- MAYTAG - FRANK S. WATKINSON, PH.D. - 12/18/03

**Page 1 to Page 84**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

## Page 1

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
SAFECO INSURANCE COMPANY OF    :    CIVIL ACTION NO.
AMERICA as subrogee of NOBERTO :    3:02CV-1916 (JBA)
and MARIA CLARO,
         Plaintiff             :

vs.
MAYTAG CORPORATION,            :
         Defendant             :    DECEMBER 18, 2003
DEPOSITION OF: FRANK S. WATKINSON, Ph.D.
APPEARANCES:
   LAW OFFICES OF STUART G. BLACKBURN
         Attorneys for the Plaintiff
         Two Concorde Way - P.O. Box 608
         Windsor Locks, CT 06096
         (860) 292-1116
   BY: ERIK LOFTUS, ESQ.
   CAMPBELL, CAMPBELL, EDWARDS & CONROY
         Attorneys for the Defendant
         One Constitution Plaza
         Boston, MA 02129
         (617) 241-5115
   BY: HOLLY M. POLGLASE, ESQ.
                    Christine E. Borrelli
                    Connecticut License No. 117
                    Registered Professional Reporter
```

## Page 2

...... Deposition of FRANK S. WATKINSON, Ph.D., a witness, taken on behalf of the Defendant, in the herein before entitled action, pursuant to the Connecticut Practice Book, before Christine E. Borrelli, duly qualified Notary Public in and for the State of Connecticut, held at the Law Offices of Campbell, Campbell, Edwards & Conroy, 100 Pearl Street, Hartford, Connecticut, commencing at 11:00 a.m. on Thursday, December 18, 2003.

STIPULATIONS

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken may be and are hereby waived.

It is further stipulated and agreed that objections other than as to form are reserved to the time of trial.

It is further stipulated and agreed that the reading and signing of the deposition transcript by the deponent is hereby not waived.

It is further stipulated and agreed that the proof of the qualifications of the Notary Public before whom the deposition is being taken is hereby waived.

## Page 3

INDEX

WITNESS   DIRECT   CROSS   REDIRECT   RECROSS

Frank S. Watkinson, Ph.D.   4

EXHIBIT PAGE:

Defendant's Exhibits A1-24, Photographs ............ 4
Defendant's Exhibits B1-17, Photographs ............ 4
Defendant's Exhibits C1-13, Photographs ............ 4
Defendant's Exhibits D1-24, Photographs ............ 4
Defendant's Exhibit E, Curriculum Vitae ............ 4
Defendant's Exhibit F, File with Contents .......... 36
Defendant's Exhibit F1, Handwritten Notes .......... 42
Defendant's Exhibit F2, Three-Page Document ........ 48
Defendant's Exhibit F3, Testimony List ............. 49
Defendant's Exhibit F4, Report ..................... 50
Defendant's Exhibit F5, Photograph ................. 54

* * * * * * * * * * * *

## Page 4

**MS. POLGLASE:** Would you mark these?

(Defendant's Exhibits A-E, Documents, marked for identification)

FRANK S. WATKINSON, Ph.D., called as a witness by the Defendant, having been first duly sworn by the Notary, was examined and testified on his oath as follows:

DIRECT EXAMINATION BY MS. POLGLASE:

Q. Would you state your full name?
A. **My name is Dr. Frank S. Watkinson.**
Q. Is Frank a nickname for Francis or is it Frank?
A. **It's Frank.**
Q. Dr. Watkinson, I am going to show you what has been marked as Exhibit E and just ask you if you can identify that as a copy of your CV?
A. **Yes, it is.**
Q. Is that up to date?
A. **Yeah, I believe so.**
Q. Thanks. You are, as I understand it, a principal of Spectrum Engineering Group?
A. **Yes.**
Q. Describe for me what Spectrum Engineering Group is?

### Page 9

1 industry or whether to go into – go back to the university
2 and do the Ph.D.. One of the employers that had offered me a
3 job was Shell. So when I decided not to go into industry but
4 to go back to do research, they approached me and said they
5 would be willing to give me a sponsorship.
6  Q. Do you have any post-Leeds University education?
7 And by that I mean formal education.
8  A. I went to the Harvard Business School for – it's
9 about a five-month, six-month course in management
10 development.
11  Q. Why did you take that course?
12  A. Because my work history at that time had involved a
13 lot of technical management, but I also wanted to gain some
14 capabilities in other management fields ready to do general
15 management.
16  Q. And that was while you were working for the
17 Kennecott Rubber Corporation?
18  A. Kennecott Copper Corporation.
19  Q. I'm sorry. Copper. I read that before and I read
20 it as rubber and then I see it was copper. Did you have any
21 jobs while you were going to school?
22  A. Only during the summer months.
23  Q. What kinds of jobs did you have?
24  A. I worked for a large chemical company in my hometown
25 for a couple of years, and I worked in Sweden for a large

### Page 10

1 steel company one year.
2  Q. What did you do for the chemical company?
3  A. I ran experiments and the research lab.
4  Q. Generally, what kind of experiments?
5  A. They were on – they were looking for some
6 development of battery technology.
7  Q. What did you do for the steel company in Sweden?
8  A. I worked in the steel works on the shop floor for
9 most of the time, and then I worked in the engineering
10 department doing drafting work.
11  Q. When you say "drafting work," can you tell me what
12 you mean?
13  A. Producing engineering drawings.
14  Q. For what types of products?
15  A. They wanted a complete layout of their casting shop
16 to be documented, and I had this drawing that went about
17 thirty feet long.
18  Q. All right. So, aside from the Harvard Business
19 School program, no formal education after Leeds University?
20  A. Oh, I did – I have done courses and seminars in a
21 whole raft of things, but nothing that was more than a week or
22 two weeks in duration.
23  Q. So, after you got out of Leeds University, you went
24 to work for the Kennecott Copper Corporation?
25  A. One of their subsidiaries, yes.

### Page 11

1  Q. What was the subsidiary?
2  A. Chase Brass & Copper Company.
3  Q. And did you work for the Chase Brass & Copper
4 Company from 1970 to 1978?
5  A. Yes.
6  Q. What did you do for that company?
7  A. I started out in research in process development and
8 material development. I did some studies for them on welding
9 technology. I worked in one of their manufacturing facilities
10 trying to improve techniques for drawing copper tubing. Then
11 I moved to one of their other facilities and was in charge of
12 quality improvement and then was in charge of their entire
13 technical department.
14  Q. I'm sorry. Were you finished?
15  A. I worked for them as a project manager developing a
16 new casting technology.
17  Q. The work that you did for this copper and brass
18 company, I take it was working with copper and brass
19 materials?
20  A. Copper and brass alloys. Not just brasses, but
21 bronzes, other alloys of copper.
22  Q. Utilizing your background in metallurgy?
23  A. Yes.
24  Q. Did you come to the United States to work for this
25 company –

### Page 12

1  A. Yes.
2  Q. – Chase Brass & Copper?
3  A. Yes.
4  Q. And in 1978, you moved on to the Century Brass
5 Products Company?
6  A. Yes.
7  Q. Why did you make that move?
8  A. The company I was working for was closing down their
9 facilities and relocating them in South Carolina. I didn't
10 want to make that move. My wife was happy in Connecticut.
11  Q. Where was the Chase Brass & Copper Company?
12  A. Initially in Cleveland, and then I worked in one of
13 their plants in Connecticut.
14  Q. Whereabouts in Connecticut?
15  A. In Waterbury.
16  Q. And where was Century Brass?
17  A. That was in Waterbury.
18  Q. What did you do for Century Brass?
19  A. I was initially put in charge of the installation of
20 a large casting machine which we purchased in Germany. I was
21 responsible for the purchase and the implementation of the
22 technology in the facility. After that, I was in charge of
23 all technical and quality control issues and some of the
24 engineering issues.
25  Q. And that was dealing with brass products?

### Page 17

1 significant ones on that. I haven't updated it for a while.
2  Q. All right. Have you obtained or received any kind
3 of certification as a fire investigator?
4  A. No. At many of the conferences, such as the IAI
5 conferences, you receive partial certifications that
6 cumulatively you can use to get qualification of that nature.
7 I've received those partials, but I have never put in for the
8 qualification.
9  Q. Do you consider yourself a cause and origin expert?
10  A. I consider myself familiar with cause and origin. I
11 think I would qualify as an expert based on my experience, but
12 it's not the expertise that I sell as an engineer.
13  Q. So, you don't put yourself out there as a cause and
14 origin expert?
15  A. Correct.
16  Q. You put yourself out there as an expert in --
17  A. Fire investigations, particularly involving
18 appliances and electrical systems and in other types of
19 failure analyses.
20  Q. And how did you obtain -- coming from having a
21 metallurgical background, how did you obtain this expertise in
22 fire investigations involving appliances?
23  A. Well, the engineering part of it I had done as part
24 of my schooling, the electrical engineering and mechanical
25 engineering. When I was in industry, we supplied product to

### Page 18

1 many of the large electrical companies, both the manufacturers
2 of appliances and also the manufacturers of electrical
3 products. So, I interfaced with them frequently on the types
4 of materials that they wanted to use, why they wanted to use
5 them, and how they wanted to use them. In the early part of
6 my consulting period from 1984 onwards, I was asked to
7 evaluate products which had become damaged in fires, and so I
8 followed that up with the usual learning process of how
9 appliances are built. I disassembled them. I examined them.
10 I went to seminars. I read as much as I could on the subject.
11  Q. Have you ever worked for an appliance manufacturer?
12  A. Not directly, no.
13  Q. Have you ever designed an appliance?
14  A. No.
15  Q. In your consulting business, has any appliance
16 manufacturer asked you to consult on fire-related matters?
17  A. Yes.
18  Q. Under what circumstances?
19  A. Under the circumstances where a product that they
20 have either been using or promoting has been involved in fires
21 and they want an analysis and some recommendations with
22 respect to changes in the product.
23  Q. How many times has that happened?
24  A. Probably two or three.
25  Q. How many appliance fires have you investigated?

### Page 19

1  A. Hundreds.
2  Q. And those have been for persons or insurance
3 companies or entities who want to bring a -- potentially want
4 to bring a lawsuit against the manufacturer?
5  A. They have been for insurance companies primarily.
6  Q. And those would be insurance companies looking to
7 recover -- recoup their losses from a manufacturer?
8  A. In most instances, I would say so.
9  Q. Who is the insurance company you're working for in
10 this matter, is it Safeco?
11  A. I believe it's Safeco.
12  Q. You have had other cases for Safeco?
13  A. Yes.
14  Q. How many other cases have you had for Safeco?
15  A. I have absolutely no idea.
16  Q. It would be well in excess of ten or twenty, would
17 it not?
18  A. Probably.
19  Q. Would it be in the hundreds?
20  A. I don't know.
21  Q. What other insurance companies do you have cases
22 for?
23  A. I've worked for -- you name the company, I have
24 worked for them.
25  Q. How do you do your billing with these insurance

### Page 20

1 companies? Are you on a flat rate, for instance, say, with
2 Safeco?
3  A. No. I bill the same way for all of the fires that I
4 work on, whether it's for a plaintiff or whether it's for an
5 insurance company.
6  Q. Let me stop you there. When you say a plaintiff,
7 you mean an individual?
8  A. An individual, yes.
9  Q. I'll come back to that, too.
10  A. Okay. If I'm asked to do a basic understanding of
11 how an accident happened, which the insurance companies often
12 do just to see what the cause of the fire was, I bill it at a
13 particular rate. If the fire is involved in litigation, then
14 I bill at a different rate.
15  Q. Okay. What are the two rates?
16  A. Currently it's $155 for doing basic investigation
17 and $200 an hour for litigation.
18  Q. Okay.
19  A. And $240 for depositions and testimony.
20  Q. So, for this matter, you have been at the litigation
21 rate?
22  A. Yes.
23  Q. You mentioned plaintiffs, you also do investigations
24 for individuals who are seeking to recoup their losses against
25 a manufacturer or an insurance company?

## Page 25

1   in-house?
2   A.  Yes.
3   Q.  Let me qualify it, then. As an outside or private
4   consulting engineer starting in 1984, you have never done any
5   kind of design work?
6   A.  No.
7   Q.  How many refrigerator fires have you investigated or
8   fires – let me put it this way, fires allegedly attributable
9   to a refrigerator?
10  A.  Good question. I can think of probably half a dozen
11  or so.
12  Q.  Okay.
13  A.  Refrigerators are commonly a component of a kitchen
14  fire, but in which the allegation is directly related to the
15  refrigerator is relatively small.
16  Q.  When you say "refrigerators are commonly a component
17  of a kitchen fire," what do you mean?
18  A.  I mean, any time a fire occurs in a kitchen, it's
19  one of the appliances that one would evaluate.
20  Q.  Okay. In other words, it's something that is
21  plugged into an outlet so you investigate and rule it out or
22  rule it in?
23  A.  Correct.
24  Q.  And the half dozen cases or so that you have
25  referenced are cases in which there was an allegation that the

## Page 26

1   fire actually started with the refrigerator?
2   A.  There was a concern that the fire had started with
3   the refrigerator.
4   Q.  Of those half a dozen cases or so, how many of those
5   were you able to actually go to the scene of the fire?
6   A.  I think every one except this.
7   Q.  And why weren't you able to go to the scene in this
8   case?
9   A.  I wasn't involved until long after the scene had
10  been cleaned up.
11  Q.  Do you prefer to go to the scene or do you prefer to
12  see the refrigerator after the scene has been discarded?
13  A.  I prefer to go to the scene.
14  Q.  And why is that?
15  A.  Because you can gain valuable information that helps
16  in your interpretation of the damage that you see in the
17  refrigerator.
18  Q.  All right. And the half dozen or so cases that you
19  have had – I'll just say involving refrigerators – do you
20  recall what your conclusions were?
21  A.  They varied. In several of them, I came to the
22  conclusion that the refrigerator was not involved directly in
23  the fire ignition. In a couple of cases, I believe that it
24  was.
25  Q.  Have you ever had a case where, say, a fire marshal

## Page 27

1   or a fire chief who was involved in extinguishing the fire and
2   writing a report implicated the refrigerator, but when you
3   looked at it, found that it wasn't the refrigerator?
4   A.  Yes.
5   Q.  And have you had cases where fire marshals or fire
6   investigators for local fire departments have implicated
7   appliances that weren't involved at all?
8   A.  Yes.
9   Q.  That's something that happens fairly commonly, isn't
10  it?
11  A.  Yes.
12  Q.  Now, in the – let me ask it this way. Are you able
13  to estimate the number of cases in which you've concluded that
14  a refrigerator was involved in ignition of a fire?
15  A.  I can only think of perhaps two.
16  Q.  And where in the refrigerator did these fires start?
17  A.  One started in the compressor compartment and the
18  other started on the power cord.
19  Q.  When you say the compressor compartment, you mean
20  the – I think some people call it the machinery cabinet in
21  the refrigerator?
22  A.  The component opening in the back of the
23  refrigerator at the base that contains the compressor and the
24  fan and the leads to the condenser and the power cord.
25  Q.  When your – strike that. And the other was the

## Page 28

1   power cord?
2   A.  Yes.
3   Q.  Okay. What had happened to the power cord in that
4   case?
5   A.  It had become crushed.
6   Q.  Under the refrigerator wheel?
7   A.  Actually, against the wall at the back of the
8   refrigerator, I believe. That was quite a long time ago and
9   it may have been crushed under the wheel of the refrigerator,
10  but it was damage to the power cord.
11  Q.  How many times have you investigated kitchen fires
12  where you actually took a look at the refrigerator? An
13  approximate number is fine.
14  A.  Twenty, thirty.
15  Q.  How do you go about examining a refrigerator in a
16  kitchen fire?
17  A.  Initially, it would be just an evaluation of the
18  physical damage to the exterior and the interior to develop a
19  sense of the burn patterns. It would be an appraisal of the
20  immediate surroundings of the refrigerator. It would be an
21  understanding of the circuit into which the refrigerator is
22  plugged, and it would be an evaluation of the electrical
23  components within the refrigerator.
24  Q.  Why don't we get more specific. As opposed to
25  looking at burn patterns, what component do you concentrate on

Page 33

1   Q.   And just generally, tell me what your conclusions
2   were after looking at the refrigerator, and then I'll get into
3   it in some more detail.
4   A.   Okay. I was surprised at the degree of damage that
5   I saw to it.
6   Q.   Can you tell me what you mean by that?
7   A.   I've seen many refrigerators that have been involved
8   in kitchen fires, not as the source of the fire but have been
9   involved in kitchen fires. And in many of them, the interior
10  of the refrigerator, the cabinet itself, remains somewhat
11  protected. In this particular case, the interior was totally
12  consumed, and that's unusual. Not rare, but unusual.
13  Secondly, the electrical compartment of the back of the
14  refrigerator was in excellent condition. Not totally clean,
15  but in good condition. I mean, it had lint and dust and those
16  kinds of things. The wiring was in good condition except
17  where there had been fire exposure on the exterior.
18  Q.   And based upon those observations, you concluded
19  what?
20  A.   I recognized that I was not going to be able to
21  determine precisely what the ignition cause – ignition source
22  of this fire was.
23  Q.   And why is that?
24  A.   Because I was looking at a refrigerator in
25  isolation, and all of the electrical components that were in

Page 34

1   the areas of major fire damage were missing or consumed. The
2   electrical components that were still present were intact and
3   did not show damage which would be consistent with them being
4   an ignition source.
5   Q.   Do you have an opinion one way or the other as to
6   whether the fire started on the interior of the refrigerator
7   cabinet?
8   A.   I think it's a distinct possibility.
9   Q.   Sitting here today, you can say that it's possible
10  that the fire started on the interior of the refrigerator
11  cabinet, but you can't say it's more likely than not?
12  A.   Based upon the information that I've seen to this
13  point, I can't reach that level of confidence.
14  Q.   And given that the remainder of the refrigerator was
15  in fairly good condition and you – I think in your report –
16  ruled out the other components of the refrigerator as the
17  source of the fire, is it fair to say that sitting here today
18  you can't state that the fire started with this refrigerator
19  more likely than not?
20  A.   I think that the evidence that I've seen suggests
21  that more likely than not it started within the refrigerator,
22  based upon the burn patterns of the refrigerator. And based
23  upon the photographs at the scene that I have examined – but
24  those are limited in extent, the photographic documentation
25  that I have seen to date – and I would want to see more of

Page 35

1   that before my confidence level would be such that I would say
2   it probably started inside the refrigerator.
3   Q.   Okay. I am just trying to get at where we are
4   today. Sitting here today, you think it's possible this fire
5   started with the refrigerator but you can't say it's probable?
6   A.   I believe that it's possible, and the fire damage to
7   the refrigerator strongly suggests that it did. It's
8   consistent with the reports that I have seen and deposition
9   testimony that I have seen. But by virtue of the fact that I
10  can't identify the ignition source within the refrigerator,
11  that's why I have some – still some difficulty with raising
12  my level of probability.
13  Q.   So, the answer is possible but not yet probable?
14  A.   Not certain.
15  MS. POLGLASE:   Why don't we go through what you
16  did and take a short break.
17
18       (A recess was taken)
19
20  MS. POLGLASE:   Back on the record.
21  Q.   (By Ms. Polglase) I think I sent a subpoena. Did
22  you bring your billing records?
23  A.   Yes.
24  Q.   Great. Sometimes that's the easiest way to go
25  through what you did. You know, what I'll do is I'll just

Page 36

1   mark your whole file and then we will just go through and,
2   sort of, identify it rather than try to mark individual
3   things.
4   A.   Okay.
5
6       (Defendant's Exhibit F, File with Contents,
7   marked for identification)
8
9   THE WITNESS:   You want to mark my copy or your
10  copy?
11  Q.   (By Ms. Polglase) No. I just marked the copy. Why
12  don't we have you just identify this. I'll show you what's
13  been marked as Exhibit F. I would just ask you if you can
14  identify that as a copy of your file.
15  A.   It appears to be.
16  Q.   All right. And could you point me to your billing
17  records?
18  A.   There is a folder with a tab on it that says, "03190
19  Attorney Ralphs, fire/refrigerator."
20  Q.   Sometimes it's easier to look at that to determine
21  when things happened. You were first contacted in the case,
22  you think, 4/28 there?
23  A.   Yes.
24  Q.   And what year would that be?
25  A.   '03.

Page 41

1  Q. I think I have a recollection of that. All right.
2  And on it looks like June 5th you did something.
3  A. Yes. I got some additional file materials and
4  photographs, which included the fire marshal's report and
5  photographs from Attorney Ralphs' office.
6  Q. And you wrote your report on June 5th. Is that
7  right?
8  A. Yes.
9  Q. The report itself is dated June 11th. Did you make
10 some changes between June 5th and June 11th?
11 A. No. It's probably the timing that I made the
12 annotations in here and the time that it took to get it
13 dictated and signed out from the secretary.
14 Q. All right. And then June 11th, something was
15 mailed. Can we presume that's your report?
16 A. Probably photographs and report, perhaps. I don't
17 remember.
18 Q. And then there is some activity in October regarding
19 deposition dates?
20 A. Yes. I was contacted by Attorney Loftus who I
21 learned was taking over the file from Attorney Ralphs.
22 Q. And from October to the present, have you done
23 anything except conference with Attorney Loftus regarding
24 deposition dates and review deposition transcription and your
25 file?

Page 42

1  A. I received and reviewed the deposition transcripts.
2  I received and reviewed the Interrogatories of Maytag's
3  experts. I did disclosures, I should say, not
4  interrogatories. And I also saw hard copies, I think, of Mr.
5  Vallas' photographs.
6  Q. Anything else?
7  A. No.
8  MS. POLGLASE:  Why don't we mark this as F1.
9
10 (Defendant's Exhibit F1, Handwritten Notes,
11 marked for Identification)
12
13 Q. (By Ms. Polglase) All right. I'll show you two
14 pages of notes. I have marked them F1.
15 A. Yes.
16 Q. Are those your handwritten notes?
17 A. Yes.
18 Q. And when were these generated?
19 A. During the inspection in New Jersey.
20 Q. Okay. Your handwriting is better than most, but if
21 I could ask you, there are some things I can't read here.
22 There isn't that much here. Can you read these two pages of
23 notes into the record for me?
24 A. Sure. The first line is actually a website
25 identification called Repairclinic.com. Someone had, at the

Page 43

1  inspection, provided that to me as a potential source for the
2  schematic for this refrigerator.
3  Q. Someone from Maytag or from Peter Vallas?
4  A. I don't recall. Then there are several lines of
5  observations that I made as I was looking at the refrigerator.
6  "Still dust underneath. Plastic components still good. Tray,
7  too, et cetera. Cardboard separated, good except front
8  outside edge. Trademark on front of plug." And there is a
9  little sketch. "Cord sixty inches from attachment to back of
10 refrigerator to plug." In other words, the length of the
11 appliance cord. "No arcing on the power cord." Then there is
12 information that I read from the compressor. "ASH736154,
13 Model DA77L13RAU6, 150 volts, 16 hertz. Locked rotor, 14.0
14 amps. Thermally protected. Single phase R12 Matsushita
15 Electric, U.S.A. No arcing on wires or to back of
16 refrigerator." The second page is, "Aluminum evaporator and
17 tray lies in bottom left-hand side of rear on top of plastic.
18 Power strip with transformer for cell phone charger installed,
19 six outlets, Model S-50, made in China, 8467 listed E93302,
20 Curtis Manufacturing Company. Cell phone charger, desktop
21 holder, Model DC-50, WDC, 5.2 volt, input 1 amp, 5.2 watts, DC
22 5.2 volt, output one amp. Serial number DAZ 9002148, made in
23 Korea."
24 Q. Thank you. On these sheets, I take it, are notes
25 that you made on the day of your inspection?

Page 44

1  A. Yes.
2  Q. And on page two of the notes, where you were talking
3  about the power strip, what are you talking about there?
4  A. There was a notation, I believe it was, in Peter
5  Vallas' report that there was some electrical components which
6  were found on the countertop in the kitchen. He had collected
7  those so that they could be excluded as potential ignition
8  sources.
9  Q. Same thing with the cell phone charger?
10 A. Yes.
11 Q. Now, there is a page in your file that says, "New
12 project information." Is that just an intake sheet?
13 A. Yes.
14 Q. All right. And at the bottom it says "Information"?
15 A. Yes.
16 Q. "Peter Vallas did C2V." What does that mean?
17 A. Cause and origin.
18 Q. Oh, cause and origin?
19 A. Yeah. "Fire originated internally - defroster?"
20 Q. Where did you get that information from?
21 A. From Attorney Ralphs. "Maytag looking to inspect
22 serial number. Model number destroyed. Magic Chef -
23 manufactured by Maytag four to five years old. Husband
24 noticed burning smell, opened refrigerator and smoke came out.
25 Attorney Ralphs will send documents overnight."

### Page 49

1 handwriting?
2   A.   The top section is my handwriting.
3   Q.   What does that page pertain to?
4   A.   That would be the information that I gave her from
5 my notes, previous notes, on the information on the
6 compressor. And the rest would be her discussion with
7 Matsushita, I would imagine, and then there is a notation to
8 call Tim Roche.
9   Q.   Why is there a notation to call Tim Roche?
10  A.   I suspect that she came back to me and told me what
11 she had found, and I suggested that she immediately call Tim
12 and ask him for the information that we were looking for.
13  MS. POLGLASE:   Mark this F3.
14
15  (Defendant's Exhibit F3, Testimony List, marked
16  for Identification)
17
18  Q.   (By Ms. Polglase) F3 is your testimony list?
19  A.   Yes.
20  Q.   Are any of those refrigerator-related incidents?
21  A.   I don't know what the arbitration in 1995 was. It
22 says, "Electrical fire at home," and I don't know what the
23 circumstances of that were. None of the others are related to
24 refrigerators.
25  Q.   From your file, it appears that you have reviewed

### Page 50

1 the depositions of Maria Claro, Noberto Claro and Noberto
2 Claro, Jr.. Is that correct?
3   A.   Yes.
4   Q.   And have you reviewed the deposition of Patricia
5 Ariola?
6   A.   No.
7   MS. POLGLASE:   Mark this.
8
9   (Defendant's Exhibit F4, Report, marked for
10  Identification)
11
12  Q.   (By Ms. Polglase) I'll show you what's been marked
13 as F4, and that's a copy of your report. Is that right?
14  A.   Yes.
15  Q.   And you have reviewed the reports of Maytag's
16 experts in this case?
17  A.   The disclosures?
18  Q.   Yes.
19  A.   Yes.
20  Q.   Did you disagree with these disclosures in any way?
21  A.   Of course.
22  Q.   In what ways did you disagree?
23  A.   I had no comment on the disclosure of Mr. Dolinsek
24 other than that he can't spell my name. The disclosure of Mr.
25 Splain concerned me on a couple of issues. I'm not sure how I

### Page 51

1 -- his statement that the impossibility of reaching a
2 conclusion in large part is due to the Plaintiff's
3 representatives' and expert's failure to examine and record
4 the incident scene properly. I'm not sure that that's an
5 accurate statement.
6   Q.   Why aren't you sure that that's an accurate
7 statement?
8   A.   I don't know what he has seen of the photographs,
9 and I don't know whether the photographs that I have seen
10 represent the entirety of those that are available. And the
11 reports of the facts and the opinions and conclusions appear
12 to be not entirely consistent with the deposition testimony of
13 the Claros.
14  Q.   What is inconsistent?
15  A.   Well, first of all, he says that she was using the
16 oven to bake and also frying oil on the stove top for the
17 evening dinner. I think with respect to the timing of the
18 fire, while she may have used a little olive oil to saute the
19 onions in her description, that would hardly constitute frying
20 oil on the stove top. And down below when he says that, "It's
21 probable that without her knowing it, Mrs. Claro, accidentally
22 started the fire while she was cooking. The fire may have
23 appeared to her that it started within the refrigerator, but
24 the black smoke was coming from another area such as frying
25 oil overheating." I don't think that that is consistent with

### Page 52

1 the testimony. In his opinions and conclusions, the
2 electrical stove was not fully examined and documented. I
3 don't know that for a fact.
4   Q.   You don't know either way?
5   A.   I don't know either way. Cooking oil was used to
6 fry foods. The implication appears to be that there was a pan
7 of oil that could have easily become overheated, and that's
8 not consistent with her testimony. Relative items such as
9 pots and pans which were in use were not documented or
10 preserved. They do not appear to have been preserved. I
11 don't know whether or not they were fully documented. The
12 burn pattern visible in the photographs indicates the classic
13 V pattern over the stove and the sink. I would take issue if
14 he is looking at the same photographs that I'm looking at.
15 His conclusion, with respect to the refrigerator representing
16 an external attack, the burn patterns on the outside of the
17 refrigerator support from a fire that came from in front of
18 the floor, in front of the refrigerator, and burned up in a
19 classic V pattern. I would agree that that conclusion is
20 accurate, but that doesn't exclude a fire which started
21 internal to the refrigerator as being the source for that V
22 pattern.
23  Q.   And why is that?
24  A.   Because the doors were clearly opened on this
25 refrigerator during the fire and a lot of the plastic debris