UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA as subrogee of NOBERTO AND MARIA CLARO, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 3:02CV-1916 JBA |
| MAYTAG CORPORATION, | ) ) | January 30, 2004 |
| Defendant. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MAYTAG CORPORATION'S MOTION TO BAR THE TESTIMONY OF THE PLAINTIFF'S PROPOSED EXPERT WITNESS, PETER S. VALLAS

Maytag Corporation ("Maytag") brings this motion pursuant to Fed. R. Evid. 104(a) and 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny to bar the plaintiff's proposed cause and origin expert, Peter S. Vallas, from testifying at trial. As grounds for its motion, Maytag states that while Mr. Vallas is arguably qualified to render an opinion on the cause and origin of a fire, he should not be permitted to offer his opinions on the cause and origin of the fire in this case, because he failed to conduct any type of fire investigation to lend credence to his opinions and the physical evidence that he did examine does not support his opinions. Although he recommended further x-ray analysis of the refrigerator's remains, none was ever performed. In short, Mr. Vallas should not be permitted to testify in this case because his opinions are the product of an unreliable methodology and are based on nothing more than speculation and conjecture.

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

## I.    BACKGROUND

This product liability is brought by the plaintiff pursuant to Connecticut Product Liability Act, ("CPLA"), C.G.S. §§52-579m, et seq., alleging strict liability in tort, (*See, * Complaint, attached as Exhibit A) and arises out of fire which occurred at the home of Norberto and Maria Claro, 35 Edgewood Avenue, Waterbury, CT on November 13, 2000. (Id. at ¶7) At the time of the fire, Mrs. Claro was cooking on the stove. She claims that when she opened the refrigerator to get some milk that afternoon, she saw black smoke inside. Both she and her husband claim that when he came into the kitchen and opened the freezer, he observed more smoke and then flames. Thereafter, Mrs. Claro called 911 and reported the fire. While she was doing that, Mr. Claro moved the refrigerator and attempted to push it out the back door of the house but could not do so. Thereafter, the Claro family evacuated the house and the Waterbury Fire Department arrived and extinguished the fire.

## II.    PETER VALLAS' OPINIONS

In support of its claims in this case, the plaintiff has identified several purported expert witnesses, including Peter S. Vallas, the Chief Executive Officer of Peter Vallas and Associates, to testify on its behalf regarding the cause and origin of the Claro fire. (*See, * Plaintiff's "Rule 26 Disclosure", attached as Exhibit B).

If permitted to testify, Mr. Vallas would tell the jury that the fire in this case was caused by an electrical malfunction within the refrigerator. According to his January 10, 2001 report in this case, attached hereto as Exhibit C, "[a]ll fire patterns, the eye witness account, and laboratory analysis confirms fire development from the refrigerator." In that report, Mr. Vallas further concluded that "[a]n electrical malfunction and/or product defect existed within the equipment located at the rear base of the refrigerator."

2

## III. THE METHODOLOGY USED BY MR. VALLAS IN FORMING HIS OPINIONS

### a. What Peter Vallas Did

On November 15, 2000, two days after the fire, Rich Fradette, a claims adjuster employed by SafeCo Insurance Company, contacted Peter Vallas and Associates ("PVA") and requested they examine a refrigerator that caused a fire in this case for "possible subro". Thereafter, on November 16, 2000, Sergei Fell, an evidence handler (not a fire investigator) employed by PVA went to the Claro residence to pick up the refrigerator and bring it back to PVA's laboratory in Hackensack, N.J. (*See,* Deposition of Peter Vallas, p.26, 4-7, attached as Exhibit D) Mr. Vallas did not visit the fire scene. (Id., pp. 25-26, 24-25, 1-3) When he arrived at the Claro residence, Mr. Fell had a brief conversation with Mr. Claro, during which he made some notes. (Id., p. 35, 3-6) Mr. Fell also took some pictures of the fire scene.[1] (Id., p.26, 14-16) He then removed the refrigerator, several of the electrical receptacles in the kitchen, a cell phone charger and a multi-outlet power strip and took them back to Hackensack, N.J.

At some point thereafter, Mr. Vallas inspected the refrigerator. Mr. Vallas estimates that his inspection lasted approximately one hour (Id., p. 56, 21-22) and less than one complete roll of film was taken. The date on which this inspection took place is not known (Id., p.56, 17-20) and there are no written notes regarding this inspection. (Id., p.50, 2-9) Mr. Vallas' inspection revealed that the components in the machinery compartment in the rear base of the machine, including the compressor, fan motor and condensing coil and all of their related wiring were free of fire damage and showed no signs of electrical malfunction. (*See,* Exhibit B at p.2)

On January 5, 2001, Mr. Vallas spoke to Mr. Claro on the telephone. It was the only time he ever spoke to Mr. Claro, and their conversation was brief. The only notes of this conversation

---

[1] Of the 20 photographs of the fire scene attached to Mr. Vallas' report in this case, only four show portions of the kitchen area, and none depict the area where the refrigerator was located before it was moved by Mr. Claro.

and the reference to it in Mr. Vallas' report suggest it consisted solely of Mr. Vallas asking Mr. Claro if he had any paperwork for the refrigerator and Mr. Claro's response that the paperwork had been destroyed in the fire. (*See,* Exhibit B at p. 3; Vallas Deposition, p.37, 9-12, attached as Exhibit D, Exhibit 7 to the Deposition of Peter Vallas, attached as Exhibit E) Thereafter, on January 10, 2001, Mr. Vallas prepared his report.

**b.     What Peter Vallas Didn't Do**

As noted above, the extent of Mr. Vallas' cause and origin investigation in this case consisted of an undocumented inspection, his review of Mr. Fell's photographs, a brief conversation with Mr. Claro and conversations with Mr. Fell. It thus appears that Mr. Vallas spent less than two hours investigating the fire in this case, other than the time he spent preparing his report.  If he had truly been desirous of determining the cause and origin of the fire in this case, there were numerous other things he could have done, but chose not to do.  For example:

- he never went to the fire scene, even after he learned it was still available; (Vallas Deposition, pp. 25-26, 24-25, 1-2, Exhibit D)

- neither he nor Mr. Fell prepared a diagram of the fire scene; (Id., p.100, 5-9)

- he never reviewed the Waterbury Fire Dept.'s report of the fire; (Id., p. 45, 17-18)

- he never reviewed the Waterbury Fire Marshal's report; (Id., p.45, 14-16)

- he never spoke to Deputy Fire Marshal Patrick Ariola; (Id., p.46, 20-22)

- he never saw the Waterbury Fire Dept.'s fire scene photos; (Id., p.64, 17-20)

- he never spoke to Mrs. Claro about the fire; (Id., p.36, 21-22)

- he never reviewed any of the deposition testimony in this case; (Id., p.48, 6-8)

- he did nothing to determine what was being cooked on the stove at the time of the fire; (Id., p.42, 15-17)

- he did no testing on any of the refrigerator's components; (Id., p.68, 9-13)

4

- he did nothing to determine if there were other similar reported incidents involving Magic Chef brand refrigerators; (Id., p.101, 10-17)

- neither he nor Mr. Fell examined the electrical panel at the Claro residence; (Id., p.93, 10-13)

- he did not obtain any photographs of the location in the kitchen where the refrigerator was at the time the fire began; (Id., pp. 31-32, 25, 1-3)

- he did not x-ray the melted plastic material in the base of the refrigerator; (See, Exhibit B at p.2)

The fact that Mr. Vallas spent less than two hours investigating the fire in this case is not surprising.   As the chief executive officer of PVA[2], he is responsible for all aspects of the business.  He does the marketing and client development work, makes personnel decisions and handles the day to day operations of the business. (Id., p.15, 7-20, p.16, 4-17) In addition to his responsibilities as CEO, he oversees every file in the office. Last year alone, PVA received 4,300 new files (Id., pp.10-11, 18-25, 1-6).

c.    **NFPA 921**

Although Mr. Vallas testified that PVA conducts all of its fire investigations in accordance with the National Fire Protection Agency's "Guide for Fire and Explosion Investigations" ("NFPA 921"), which he considers to be authoritative in the area of fire investigation, (Vallas Deposition, pp.50-51, 18-25, 1-5) his investigation of the fire in this case fell far short of complying with the methodology described therein. For example, NFPA 921, Chapter 2.4.3, which discusses the basic methodology for investigating any fire, states that the "investigator should conduct an examination of the scene, if it is available, and collect data necessary to the analysis." (See, NFPA 921, §2.4.3, attached as Exhibit F). That same section goes on to state: "A typical fire or explosion investigation may include all or some of the following: a scene inspection; scene documentation through photography and diagramming;

---

[2] Peter R. Vallas, Mr. Vallas' father, founded the company in 1979.

5

evidence recognition, documentation, and preservation; witness interviews; review and analysis of investigations of others; and identification and collection of data or information from other appropriate sources." Id. Mr. Vallas' investigation in this case was largely devoid of any of this type of activity. He never went to the scene, he never conducted witness interviews, save for a brief conversation with Mr. Claro, and he never reviewed the reports or photographs prepared by the fire department or fire marshal's office.

Chapter 21 of NFPA 921 deals with fire investigations involving appliances. Section 21.2.1 describes the proper method of photographing the area of origin and states that "the appliance should be photographed *in place* from as many angles as possible." This same section notes that "[i]f an appliance has been moved since the start of the fire, then the same photographs should be taken where it was found. If it can be established where the appliance was located at the time of the fire . . . the appliance should be moved to its pre-fire location and the same photographs taken." (*See*, NFPA 921, §21.2.1, attached as Exhibit F). Although Mr. Claro testified that he moved the refrigerator after the fire was discovered, none of these types of photographs were taken. Section 21.2.2 of NFPA 921 indicates that the scene should be photographed and diagrammed. Further, "[t]he location of the appliance within the area of origin is particularly important. The investigator should take measurements that will establish the location of the appliance." (*See*, NFPA 921, §21.2.2, attached as Exhibit F) Not only were no measurements of diagrams prepared by Mr. Vallas, he does not even have a photograph that depicts the pre-fire location of the refrigerator.

Finally, Section 21.4.1 of NFPA 921 indicates that "[b]efore it can be concluded that a particular appliance has caused the fire, it should first be established how the appliance generated sufficient heat energy to cause ignition. *** The next step is to determine the first material

6

ignited and how ignition took place. *** If no likely ignition scenario exists, either accidental or intentional, then the cause should be classified as undetermined." (*See*, NFPA 921, §21.2.2, attached as Exhibit F). In this case, Mr. Vallas was not able to identify the first material ignited or how ignition took place. Thus, according to the document which he himself testified describes the appropriate method for investigating fires, the fire in this case should have been classified as "undetermined".

## IV.    LEGAL STANDARDS FOR ADMITTING EXPERT TESTIMONY

In Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) the Supreme Court defined the appropriate analysis for scrutinizing expert testimony under Federal Rule of Evidence 702. The Daubert Court provided a framework for the trial judge to act as gatekeeper to screen purportedly scientific evidence for the purpose of ensuring that scientific testimony or evidence is not only relevant, but also reliable under Federal Rule of Evidence 702. Id. at 590. The Court's opinion explained that the term "scientific" in Federal Rule of Evidence 702 implies "grounding in the methods and procedures of science" and the term "knowledge" implies "more than subjective belief or unsupported speculation." Id.

The Court charged the trial judge with the task of determining as a preliminary matter under Rule 104(a) "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[3] Id. Thus, the trial court must conduct a preliminary assessment as to whether the methodology underlying the opinions is scientifically valid and can be applied to the facts of the case. Id. at 592. The Court went on to

---

[3] Rule 104 provides in part:
> (a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, ... or the admissibility of evidence shall be determined by the court, .... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

7

promulgate factors, which the District Court Judge, as gatekeeper, could use to assess whether the proffered testimony meets the standard of scientific validity or, evidentiary reliability:

1) Whether the scientific theory or technique can be (and has been) tested;

2) Whether the theory or technique has been the subject of peer review or publication;

3) Whether there is a known or potential rate of error for the scientific technique and whether it has been considered;

4) Whether there are standards controlling the operation of the scientific technique;

5) Whether the theory or technique has been "generally accepted" in the relevant scientific community.

Id. at 593-594.

Courts both before and after Daubert have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact, see, e.g., Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702, such as whether the theory or method offered by the expert has been put to any non-judicial use, "or whether [the experts] have developed their opinions expressly for the purpose of testifying." Travelers Prop. & Cas. Corp. v. GE, 150 F. Supp. 2d 360 (2001) (quoting Cabrera v. Cordis Corp., 134 F.3d 1418, 1420-21 (9th Cir. 1998); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994).

The purpose of a Daubert inquiry is to determine whether the proffered "expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" Zuchowicz v. United States, 140 F.3d 381, 386 (2d Cir. 1998) (quoting Daubert, 509 U.S. at 597). The admissibility of evidence must be established by a preponderance of the evidence, and the burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. See, Daubert, 509 U.S. at 597. In assessing the reliability of a proffered expert's

8

testimony, a district court's inquiry under <u>Daubert</u> must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See,* <u>Daubert</u>, 509 U.S. at 590, 595; <u>Amorgianos v. National Railroad Passenger Corp.</u>, 137 F. Supp. 2d 147, 162 (E.D.N.Y. 2001).

In <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997) the Court noted that although the appropriate inquiry by the trial judge should be the principals and methodology used by the expert and not the conclusions generated through the methodology, conclusions and methodology are not entirely distinct from one another.

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1998), the Supreme Court confirmed that the standards promulgated in <u>Daubert</u> and <u>Joiner</u> were applicable, not only to so-called "scientific" testimony, but also to opinion testimony based on "technical or other specialized knowledge." The Court noted that Rule 702 made no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. <u>Id.</u> at 147. Thus, the trial judge's gatekeeping function applies not only to the opinions of medical doctors and epidemiologists, but also to engineers and other experts whose education, training and experience was considered technical rather than "scientific."

In <u>Kumho</u>, the Court upheld the trial judge's exclusion of purported tire expert, Dennis Carlson's testimony. The trial judge found that none of the <u>Daubert</u> factors indicated that the opinions were reliable and nothing else offered in support of the opinions outweighed the <u>Daubert</u> factors. Mr. Carlson concluded that despite significant wear and some indicia of abuse,

the subject tire failed due to a defect.  Finding important Mr. Carlson's "repeated reliance on the 'subjectiveness' of his mode of analysis," the Court again emphasized that expert conclusions must be based upon more reliable methodology than the *ipse dixit* of the witness.  Id. at 154-158.

In response to Daubert and its progeny, Rule 702 was amended to clarify the trial judge's role as gatekeeper with respect to the introduction of expert testimony and to provide some general standards of admissibility.  *See*, Fed. R. Evid. 702 advisory committee's note.  As of December 1, 2000, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

The amendment to Rule 702 added the italicized language.  Under the amended Rule 702, the proffering party still has the burden of showing that opinion testimony will assist the trier of fact to understand the evidence or decide a factual issue.  Rudd v. General Motors Corp., 127 F.Supp.2d 1330, 1334 (M.D. Ala. 2001).

Mr. Vallas's opinions in this case do not pass muster under either Daubert and its progeny or Rule 702 because they are based on insufficient facts and data and he has not reliably applied the principles and methods of fire investigation in forming those opinions.  His opinions in this case are based on nothing more than speculation, and as Daubert and its progeny and Rule 702 make clear, that is not enough.

V.    **ARGUMENT**

    a.    **The Investigation Performed By Mr. Vallas Was Woefully Inadequate And Does Not Provide A Reliable Foundation for His Opinions**

Although Mr. Vallas would like to tell the jury about the cause of the fire in this case, he has failed to do almost anything to lend credence to his opinions. First, he has no connection at all to the fire scene – he was not present when the fire occurred, he never went to the Claro residence and the photographs of the fire scene he was provided with are so inadequate that they do not even show the location of the refrigerator at the time the fire allegedly began. He never examined the electrical panel in the Claro residence. He did nothing to eliminate the stove in the Claro kitchen as the cause of the fire and his report makes no mention of the fact that Mrs. Claro was cooking at the time of the fire. He has never seen the Waterbury Fire Department's report of the fire or its photographs of the fire scene. All he knows about the fire scene is what he learned from speaking to the evidence technician who went to the Claro residence on November 16, 2000 and reviewing the two or three photographs of the fire scene that were taken that day.

Second, he has not spoken to any of the percipient fact witnesses, other than one brief conversation he had with Mr. Claro. He never spoke to the firefighters who responded to the fire or the fire marshal who investigated the fire. He never spoke to Mrs. Claro, the person who allegedly discovered the fire, or any of the other members of the Claro family who were in the house at the time of the fire.

Finally, Mr. Vallas' investigation revealed nothing that supports his opinions in this case. He found no evidence of an electrical failure in the refrigerator or any of its components that he examined during his visual inspection in Hackensack, N.J. He has no photographs of the alleged area of origin of the fire. He cannot identify any specific component or piece of wiring that malfunctioned. Although his report indicates there was an unspecified electrical malfunction in one of the components in the rear base of the refrigerator, examination of the refrigerator revealed that that area of the refrigerator was virtually undamaged by fire or heat. While he

11

recommended in his report that the melted plastic material be x-rayed to identify the specific component that malfunctioned, no x-rays were ever performed.

Thus, whatever relevant knowledge, skill, experience, training or education that Mr. Vallas may possess, he has done virtually nothing to apply that knowledge to the facts of this case. He has not spoken to the people who were in the best position to provide him with information about the fire, he never went to the fire scene to gather whatever evidence was available there to support his opinions, and he never obtained any of the product specifications or electrical schematics for the refrigerator to determine the location of the refrigerator's electrical components or to determine if any of the refrigerator's components differed in any way from their intended design or manufacture. Since he cannot even identify the defect, how could he possibly opine that it existed at the time the refrigerator left Maytag?

**b.    Mr. Vallas' Opinions Will Not Assist the Trier of Fact in This Case**

Even if the Court were to somehow conclude that Mr. Vallas used an appropriate fire investigation methodology to arrive at his opinions in this case, he still should not be permitted to testify because his opinions will not assist the jury. As noted above, Mr. Vallas would tell the jury simply that one of the refrigerator's components malfunctioned and caused the fire. He cannot identify the component or wiring allegedly involved in the fire.

One of the Court's gatekeeping functions is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1998). Surely, any scientist or engineer who wanted to rule out the presence of a manufacturing defect in a refrigerator would consult the specifications for the refrigerator to determine if it varied from those specifications. He might

12

also perform some other form of objective tests on the refrigerator's components to determine if they varied at all from the manufacturer's specifications. Mr. Vallas did none of this.

Mr. Vallas has never actually participated in manufacturing or designing a refrigerator, has never been retained by a refrigerator manufacturer for any purpose, and failed to perform even rudimentary testing on the refrigerator at issue in this case. So while he is happy to offer opinions from New Jersey about an alleged manufacturing defect or malfunction in a refrigerator that caused a fire in Connecticut, he has done *nothing* to lay a reliable technical or scientific foundation for those opinions. Like the proposed expert barred from testifying in Oddi v. Ford Motor Co., 2000 U.S. App. LEXIS 25496 (3rd Cir. 2000), Mr. Vallas "used little, if any, methodology beyond his own intuition," *id.*, *57. "Although Daubert does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry that" Mr. Vallas engaged in. *See,* 2000 U.S. App. LEXIS 25496 at *50 to *51. *See also, e.g.,* Clark v. Takata Corp., 192 F.3d 750, 758-759 (7th Cir. 1999); Watkins v. Telsmith, Inc., 121 F.3d 984, 992-993 (5th Cir. 1997); Peitzmeier v. Hennessey Industries, Inc., 97 F.3d 293, 297-298 (8th Cir. 1996).

Mr. Vallas has no empirical basis, either from testing he himself has done, or from his review of the investigations performed by others in this case, or from analysis of engineering documents, for asserting that the refrigerator in this case was defective at the time it left Maytag's possession. Given his failure to conduct even a rudimentary investigation of the fire in this case, Mr. Vallas simply has no more qualifications than any other layperson to formulate a reliable opinion. In short, Mr. Vallas' opinions are the result of the type of haphazard analysis that Daubert and its progeny say does not pass muster under Rule 702.

13

## VI.   CONCLUSION

For the foregoing reasons, Maytag respectfully requests the Court issue an order precluding plaintiff's purported expert, Peter S. Vallas, from testifying at trial.

MAYTAG CORPORATION
By Its Attorneys

CAMPBELL CAMPBELL
EDWARDS & CONROY
PROFESSIONAL CORPORATION

Holly M. Polglase (ct 09276)
Timothy M. Roche (ct 24373)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was mailed, postage prepaid, via first class mail, on January 30, 2004 to:

Erik Loftus, Esquire
Law Offices of Stuart G. Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, Connecticut 06096

Timothy M. Roche

14