109

1  building burned down, so it was quite a long, extensive
2  investigation.  I determined that it was a pot on a
3  stove.
4      Q    A pot on a stove?
5      A    Pot on a stove, an unattended pot on a stove
6  by the cook of, I believe it was, a bakery shop.
7      Q    '96, Middlesex County Court, Benenati,
8  Attorney Ball?
9      A    I'm thinking to myself out loud.  I
10  apologize.  It was -- I think it was a fire
11  investigation.  There was a product involved.  I
12  believe Allstate Insurance Company was involved.  I may
13  have been retained by them, but I do not remember the
14  product.
15      Q    So you don't remember much about that case.
16  '97 trial, Rockland County Superior Court, Magurno,
17  David Smith's the lawyer?
18      A    Yep.  That was a fire case.  Is there
19  another reference to it?
20      Q    I think I gave it to you, other than there's
21  the docket number.
22      A    I believe it was a jewelry store.  I forget
23  the details.
24      Q    Okay.  Gregory Park Apartments case, looks
25  like trial testimony in '97 in Hudson County, Jersey

---

110

1  City?
2      A    Yes.  That was a case where I performed
3  noise level monitoring in a boiler room.
4      Q    Not a fire investigation?
5      A    No.
6      Q    Caroline Cleaners case?
7      A    This was a fire investigation involving a
8  pinched power cord in a cleaners.
9      Q    Who did you represent in that case?  An
10  insurance company?
11      A    I think I represented an insurance company
12  for the cleaners.
13      Q    And it was a pinched power cord, I'm sorry,
14  on what type of appliance?
15      A    It was a fan.
16      Q    Greer case in '98, what was that case about?
17      A    Is that Long Island?
18      Q    Garden City, New York.
19      A    This was the electrocution and fire case
20  that I referenced earlier.  I represented the
21  homeowner's insurance company.
22      Q    What was the product?
23      A    It wasn't a product.
24      Q    Faulty wiring or something?
25      A    I actually got called to testify -- there

---

111

1  was a wire that failed as a result of a power surge or
2  a power problem with the utility company.  And I
3  actually got called, although the insurance company had
4  some type of interest in the case, the plaintiff's
5  attorney for the homeowner, who was injured, had
6  actually called me to testify.
7      Q    Is that Mr. Amrod?
8      A    Yes.
9      Q    '98 case is Harris.  It says District Court
10  of Maryland.  Do you remember that case?
11      A    Yeah.  That was an automobile fire.  I
12  testified -- I forget what it was now.  The fire was in
13  the vehicle.
14      Q    Sure.  And it says District Court of
15  Maryland.  Is that state court?  State district court
16  in Maryland?
17      A    All I know is it took forever to get there.
18  It was all the way down at the bottom, the last county
19  in Maryland.  I don't know.
20      Q    So you're not sure if that was a state or
21  federal case then?
22      A    I'm not sure.
23      Q    I see one that says Spadaro, Nassau County
24  Federal Court.  That's obviously in the federal court?
25      A    Yes.

---

112

1      Q    What was the Spadaro case about, if you can
2  recall?
3      A    There's no other reference to anything
4  there?
5      Q    Cozen and O'Connor, Brian -- I won't say his
6  last name because I won't get it right.
7      A    That was a case where I investigated a fire
8  scene in a large home and rendered an opinion as to the
9  area, the point and the cause of the fire, but didn't
10  do any further analysis.  Another expert got involved
11  in the product case, and I believe it was a Black &
12  Decker toaster oven.
13      Q    That's the toaster oven case you were
14  talking about?
15      A    I think so.
16      Q    Well, Cozen and O'Connor is a large
17  subrogation firm, aren't they?
18      A    Yes.
19      Q    They wouldn't be representing the product
20  manufacturer in a case like that, would they?
21      A    In that particular case they represented the
22  carrier who insured the home.
23      Q    Okay.  But when we talked about the Black &
24  Decker case earlier I asked if you had testified on
25  behalf of the manufacturer, and you identified Black &

113

1  Decker as one of those companies, correct?

2       A    I don't know if I said I testified on behalf

3  of Black & Decker.  And if I did, I don't believe

4  that's the case, and I apologize.  I simply may have

5  represented Black & Decker, but I've never testified

6  for them.  In other words, they've retained us, I

7  believe, on a case, but I don't think it ever got to a

8  point of testifying.

9       Q    Sure.  This was a trial, the Spadaro case?

10      A    That's right.

11      Q    And you gave testimony that, what, Black &

12 Decker --

13      A    The toaster oven --

14      Q    -- started the fire?

15      A    I pinpointed where the fire started, and the

16 only thing in that area was a Black & Decker.  And they

17 hired another engineer to deal with the --

18      Q    So what you did was sort of pinpoint the

19 area of origin?

20      A    Yes.

21      Q    Sort of the general area of origin?

22      A    Yes.

23      Q    '98, Eldorado Motel case, Attorney

24 Pasquarelli.  It says that you qualified as a

25 specialist in lightning effects on electrical

114

1  equipment.  Does that help you remember what that case

2  was about?

3       A    Can I see it again?  If my memory is

4  correct, it was some type of a phone system or a

5  computer system that had been damaged by lightning or

6  not damaged by lightning, I can't recall.  Oh, I do

7  recall.  It was a telephone system that had damage.  It

8  had fire damage to it and had been burned.  And the

9  testimony was whether it was external heat or flame

10 placed on the equipment or was it damaged from

11 lightning.

12      Q    Okay.  '98 case, Mafara, Attorney Sweet?

13      A    Location?

14      Q    Sure.  It's Freehold, New Jersey.

15      A    I'm not sure, but I think it involved a zero

16 clearance fireplace unit that was located in a

17 building, in a home or condominium, that was involved

18 in the cause of the fire.

19      Q    2000, Ditullio v. Kenvil Laundromat.  It

20 sounds like a laundromat fire to me.

21      A    I just need to look at it.  Doesn't ring a

22 bell.

23      Q    You can't remember?

24      A    I do not remember.

25      Q    You testified in court.  You just don't

115

1  remember?

2       A    I do not remember.

3       Q    Trial in 2000, Zindt vs. Luzzi, Attorney

4  Kleiner?

5       A    This -- what was this?  I represented a

6  defense attorney who was defending, I believe, a tenant

7  in a condominium.  And I don't recall what the issue

8  was.

9       Q    And that says 2000?

10      A    Yeah.

11      Q    Did you give any trial testimony in 2001 or

12 2002?

13      A    I don't know.

14      Q    If it's not here --

15      A    -- then I probably did not.

16      Q    Okay.  Do you keep copies of any of your

17 trial testimony anywhere?

18      A    I never see the trial testimony.

19      Q    You never see any of the transcripts?

20      A    No.

21      Q    As far as you're concerned, you've completed

22 all your work on this case, right?  Safeco hasn't asked

23 you to do anything other than make this refrigerator

24 available for my office and some other folks to

25 inspect, correct?

116

1       A    Yes.

2       Q    I think that is it.  I have no further

3  questions for you this morning.

4            ATTORNEY LOFTUS:  I don't have any.

5

6            (Whereupon the deposition concluded

7            at 12:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither counsel nor attorney to either of the parties to said suit nor related to or employed by either counsel in said suit nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _January_ 20 _04_.


_____
Notary Public

Connecticut License No. 00181
My commission expires:
November 30, 2004

11/16/00     SERGEi F. (NOTES (ON SITE))

1) REFRigERATOR 4-5 yEARS old.

2) PURCHASED NEW AT BROOKLYN APPLiANCE iN WATERBURY, CT

3) iNSD'S wife WAS cooking WHEN he smelled SMOKE, iNSD opened REFRigERATOR + SAW SMOKE + FLAMES AT THE BOTTOM OF REAR REFRigERATOR
Magic Chief AGAiNST BACK WALL ON THE iNSiDE.

4) NO PAPER WORK ON REFRigERATOR iS AVAiLABLE AT THiS TiME.

5) NO REPAiR WORK OR SERViCE WAS doNE TO REFRigERATOR PRiOR TO FiRE.

6) AS PER iNSD. NOTHiNG WAS PLUGGED iN WiTH REFRigERATOR.

1-5-01

called InS.
Said Magic chief
Paper work Burned up.





NFPA, 1 Batterymarch Park, PO Box 9101, Quincy, MA 02269-9101, USA
An International Codes and Standards Organization

Copyright © 2001 NFPA, All Rights Reserved

**NFPA 921**

**Guide for**

# Fire and Explosion Investigations

**2001 Edition**

This edition of NFPA 921, *Guide for Fire and Explosion Investigations,* was prepared by the Technical Committee on Fire Investigations and acted on by the National Fire Protection Association, Inc., at its November Meeting held November 12–15, 2000, in Orlando, FL. It was issued by the Standards Council on January 13, 2001, with an effective date of February 9, 2001, and supersedes all previous editions.

This edition of NFPA 921 was approved as an American National Standard on February 9, 2001.

## Origin and Development of NFPA 921

NFPA 921, *Guide for Fire and Explosion Investigations,* was developed by the Technical Committee on Fire Investigations to assist in improving the fire investigation process and the quality of information on fires resulting from the investigative process. The guide is intended for use by both public sector employees who have statutory responsibility for fire investigation and private sector persons conducting investigations for insurance companies or litigation purposes. The goal of the committee is to provide guidance to investigators that is based on accepted scientific principles or scientific research.

The first edition of the document, issued by NFPA in 1992, focused largely on the determination of origin and cause of fires and explosions involving structures. The second edition of the document included revised chapters on the collection and handling of physical evidence, safety, and explosions. NFPA 907M, *Manual for the Determination of Electrical Fire Causes,* was withdrawn as an individual document and was integrated with revisions into this document as a separate chapter. Elements of NFPA 907M that relate to other chapters of this document were relocated appropriately. New chapters dealing with the investigation of motor vehicle fires, management of major investigations, incendiary fires, and appliances were added.

The third edition of the document included a new chapter on fuel gas systems in buildings and the impact of fuel gases on fire and explosion investigations. The chapter on electricity and fire was rewritten to improve organization, clarify terminology, and add references. In the chapter on fire patterns, several sections were revised. Other revisions were made in the chapter on physical evidence on the subject of preservation of the fire scene and of physical evidence. The edition also included new text regarding ignitable liquid detection canine/handler teams.

The fourth edition of this document includes new chapters on building systems, fire-related human behavior, failure analysis and analytical tools, fire and explosion deaths and injuries, and wildfire investigations. An updated chapter on motor vehicle fires has been written. The document has been organized to group chapters into subjects that will make the document more usable.

**FIGURE 2.3   Use of the scientific method.**



2.3.1 **Recognize the Need.** First, one should determine that a problem exists. In this case, a fire or explosion has occurred and the cause should be determined and listed so that future, similar incidents can be prevented.

2.3.2 **Define the Problem.** Having determined that a problem exists, the investigator or analyst should define in what manner the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.

2.3.3 **Collect Data.** Facts about the fire incident are now collected. This is done by observation, experiment, or other direct data-gathering means. This is called empirical data because it is based on observation or experience and is capable of being verified.

2.3.4 **Analyze the Data (Inductive Reasoning).** All of the collected and observed information is analyzed by inductive reasoning: the process in which the total body of empirical data collected is carefully examined in the light of the investigator's knowledge, training, and experience. Subjective or speculative information cannot be included in the analysis, only facts that can be proven clearly by observation or experiment.

2.3.5 **Develop a Hypothesis.** Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire or explosion incident. This hypothesis should be based solely on the empirical data that the investigator has collected.

2.3.6 **Test the Hypothesis (Deductive Reasoning).** The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data. This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

2.3.7 **Presumption of Cause.** Until data have been collected, no specific hypothesis can be reasonably formed or treated. All fires, however, should be approached by the investigator without presumption.

2.4 **Basic Method of a Fire Investigation.** Using the scientific method in most fire or explosion incidents should involve the following five major steps from inception through final analysis.

2.4.1 **Receiving the Assignment.** The investigator should be notified of the incident, what his or her role in it is, and what he or she is to accomplish. For example, the investigator should know if he or she is expected to determine the origin, cause, and responsibility; produce a written or oral report; prepare for criminal or civil litigation; make suggestions for code enforcement, code promulgation, or changes; make suggestions to manufacturers, industry associations, or government agency action; or determine some other results.

2.4.2 **Preparing for the Investigation.** The investigator should marshal his or her forces and resources and plan the conduct of the investigation. Preplanning at this stage can greatly increase the efficiency and therefore the chances for success of the overall investigation. Estimating what tools, equipment, and personnel (both laborers and experts) will be needed can make the initial scene investigation, as well as subsequent investigative examinations and analyses, go more smoothly and be more productive.

2.4.3 **Conducting the Investigation.** The investigator should conduct an examination of the scene, if it is available, and collect data necessary to the analysis. The actual investigation may take and include different steps and procedures, and these will be determined by the purpose of the investigation assignment. These steps and procedures are described in detail elsewhere in the document. A typical fire or explosion investigation may include all or some of the following: a scene inspection; scene documentation through photography and diagramming; evidence recognition, documentation, and preservation; witness interviews; review and analysis of the investigations of others; and identification and collection of data or information from other appropriate sources.

It is during this phase of the investigation that the data necessary for the analysis of the incident will be collected.

2.4.4 **Collecting and Preserving Evidence.** Valuable physical evidence should be recognized, properly collected, and preserved for further testing and evaluation or courtroom presentation.

2.4.5 **Analyzing the Incident.** All collected and available data should be analyzed using the principles of the scientific method. An incident scenario or failure analysis should be described, explaining the origin, cause, fire spread, and responsibility for the incident. Conclusions should be drawn according to the principles expressed in this guide.

2.5 **Reporting Procedure.** The reporting procedure may take many written or oral forms, depending on the specific responsibility of the investigator. Pertinent information should be reported in a proper form and forum to help prevent recurrence.

2001 Edition

### 21.3.2 Fire Patterns.
Fire patterns should be used carefully in establishing an appliance at the point of origin. Definite and unambiguous fire patterns help to show that the appliance was at the point of origin. Other causes of these patterns should be eliminated. The degree of damage to the appliance may or may not be an adequate indication of origin. Where the overall relative damage to the scene is light to moderate and the damage to the appliance is severe, then this may be an indicator of the origin. However, if there is widespread severe damage, other causes such as drop down, fuel load (i.e., fuel gas leak), ventilation, and other effects should be considered and eliminated. If the degree of damage to the appliance is not appreciably greater than the rest of the fire origin, then the appliance should not be chosen solely by virtue of its presence.

### 21.3.3 Plastic Appliance Components.
Appliances that are constructed of plastic materials may be found at the fire scene with severe damage. The appliance may be severely distorted or deformed, or the combustible material may be burned away, leaving only wire and other metallic components. This condition of an appliance in and of itself is not an adequate indicator of the point of origin. This is especially true where there was sufficient energy from the fire in the room to cause this damage by radiant heating and ignition. Conditions approaching at, or following, flashover can have sufficient energy to produce these effects some distance from the point of origin.

### 21.3.4 Reconstruction of the Area of Origin.
Reconstruction of the area of origin may be necessary to locate and document those patterns and indicators that the investigator will be using to establish the area of origin. As much of the material from the appliance as possible should be returned to its original location and then recorded with photographs and a diagram. The help of a person familiar with the scene prior to the fire may be necessary.

### 21.4 Cause Analysis Involving Appliances.
The material presented in Chapter 16 should be used where appropriate to analyze an appliance that may have caused a fire. Material presented in this section is supplemental or has specific application to appliances.

### 21.4.1 How the Appliance Generated Heat.
Before it can be concluded that a particular appliance has caused the fire, it should first be established how the appliance generated sufficient heat energy to cause ignition. The type of appliance will dictate whether this heat is possible under normal operating conditions or as a result of abnormal conditions. The next step is to determine the first material ignited and how ignition took place. The most likely ignition scenario(s) will remain after less likely or impossible ignition scenarios have been eliminated. If no likely ignition scenario exists, either accidental or intentional, then the cause should be classified as undetermined.

Patterns on the appliance may indicate the source of the ignition energy. However, hot spots or other burn patterns may be the result of other factors not related to the cause and need to be carefully considered. Patterns on nearby surfaces may provide information on the ignition source.

### 21.4.2 The Use and Design of the Appliance.
The use and operation of an appliance should be well understood before it is identified as the fire cause. Some appliances are simple or very familiar to fire investigators and may not require in-depth study. However, appliance design can be changed by the manufacturer, or an appliance can be damaged or altered by the user, and, therefore, each appliance warrants investigation. More complicated appliances may require the help of specialized personnel to gain a full understanding of how they work and how they could generate sufficient energy for ignition.

### 21.4.3 Electrical Appliances as Ignition Sources.
Many appliances use electricity as the power source, and electricity should be considered as a possible source for ignition. The material presented in Chapter 16 should be carefully considered and applied in this situation. Only under a specific set of conditions can sufficient heat be generated by electricity as a result of an overload or fault within or by an appliance and subsequently cause ignition.

### 21.4.4 Photographing Appliance Disassembly.
When it is necessary to disassemble an appliance (or its remains) recovered from a fire scene, each step should be documented by photography. *(See 14.10.1.)* This is done to establish that the investigator did not haphazardly pull the artifact apart, causing pieces to be further damaged or lost. The documentation should show the artifact at the start and at each stage of disassembly, from multiple angles if possible, keeping careful track of loose pieces. Some investigators find it helpful to videotape this process. The investigator should have at least one specific reason for disassembling an artifact, and once an answer has been found, the disassembly process should stop. When an artifact cannot be easily disassembled or if the disassembly would be too destructive, the use of X-rays should be considered.

### 21.4.5 Obtaining Exemplar Appliances.
To understand an appliance more fully, to test its operation, or to explore failure mechanisms, the investigator may need to obtain an exact duplicate (i.e., an exemplar). For this, the model and serial numbers may be required, and the manufacturer may need to be contacted to determine the history of this appliance. It may be that the manufacturer does not make the particular appliance any more or has changed it in some way. The investigator will need to determine whether the exemplar located is similar enough to the artifact to be useful.

### 21.4.6 Testing Exemplar Appliances.
Exemplar appliances can be operated and tested to establish the validity of the proposed ignition scenario. If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on the exemplar. Where extensive or repeated testing is foreseen, the investigator will probably need more than one exemplar. The testing should show not just that the appliance is capable of generating heat, but that such heat is of sufficient magnitude and duration to ignite combustible material.

### 21.5 Appliance Components.
Appliances are diverse in what they do and how they are constructed. Therefore, this section will provide a description of each of the common parts or components that might be found in various appliances. Where information is given in later sections about particular appliances, there will be references to the components that are used in those appliances.

### 21.5.1 Appliance Housings.
Housings of appliances can be made of various materials. The nature of these materials can affect what happens to the appliances during fires and what the remains will look like after a fire. Most housings are made of metal or plastic, but other materials such as wood, glass, or ceramics might be found also.

Many appliances utilize painted steel finishes. This typically includes refrigerators, dryers, fluorescent fixtures, baseboard heaters, and the like.